IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>JONATHAN GIANNONE )<br>Defendant. )<br>)<br>_____ ) | CRIMINAL NO. 3:06-1011<br><br>**TRIAL BRIEF OF THE<br>UNITED STATES** |

THE HONORABLE CAMERON McGOWAN CURRIE
United States District Judge, District of South Carolina

Appearances:
For the United States:   Dean A. Eichelberger
                         Assistant United States Attorney

For the Defendant:       Thomas F. Liotti
                         Counsel for Jonathan Giannone

## I.   Introduction

The United States of America submits this trial brief to assist the court with issues which may arise in the above-referenced case.

### A.   Nature of case

The defendant is charged in a five count indictment with three counts of wire fraud (Counts 1, 3, and 4) and two counts of aggravated identify theft (Counts 2 and 4), in violation of Title 18, United States Code, Sections 1343 and 1028A, respectively.

The elements for wire fraud are:

1

ONE:	The defendant knowingly devised or knowingly participated in a scheme or artifice to defraud or to obtain money or property by means of false or fraudulent pretenses, representations, or promises as detailed in the indictment;

TWO:	The false pretenses, representations, or promises related to a material fact;

THREE:	The defendant acted willfully and with an intent to defraud; and

FOUR:	The defendant transmitted or caused to be transmitted by wire in interstate commerce some communication for the purpose of executing the scheme to defraud.

The elements for aggravated identity theft are:

ONE:	During and in relation to a specified fraud;

TWO:	The defendant transferred, possessed, or used a means of identification of another person;

THREE:	The defendant acted knowingly and without lawful authority.

For purposes of these elements, wire fraud is classified as a "specified fraud."

**B.	Factual summary**

This prosecution stems from an online undercover investigation conducted by the United States Secret Service at its Columbia, South Carolina, office. This operation was designed to identify persons who use the internet as a means of conducting illegal acts relating to identity theft, credit card theft, and related illegal activities. As part of its investigation, the Secret Service used the services of Brett Johnson, who had prior to his involvement with the government established a name and identity for himself on internet sites where persons interested in criminal activity congregated. His cooperation was prompted, in part, by his arrest in Charleston County, South Carolina, on charges of defrauding sellers of items over the eBay internet auction site. Unbeknownst to the Secret

Service, while not under their supervision, Johnson continued his illegal activities. He has pleaded guilty to multiple federal crimes stemming from both the eBay scheme and the subsequent scheme.

All of Johnson's actions relating to this investigation were conducted over the internet under the direct supervision of agents of the United States Secret Service. The internet sessions were recorded as they occurred both in the form of chat logs and in the form of "real time" digital video captures. As pertinent to this case, chat logs reflect that Johnson, using his undercover online identity, chatted with a person who identified himself as Pit Boss 2600 and CIA INTEL. It is clear from the chat transcripts that these are the same person. Indeed, at one point, CIA INTEL actually identifies himself as Pit Boss 2600. This person will be referred to as "Pit Boss" for ease of reference.

Pit Boss represented that he had access to credit card and debit card numbers that could be used to make purchases or to obtain money from accounts. On May 26, 2005, Pit Boss sent five Bank of America (BoA) Platinum credit card numbers and the names of the account holders as samples of his "merchandise." This transaction is the subject of Counts one and two of the Indictment.

These five credit card numbers proved to be inactive. When Pit Boss was advised of this fact, he sent another three card numbers on May 31, 2005. This transaction is the subject of Count 3 of the Indictment. These cards were active, and one alone had an available credit balance of over $20,000.

On June 4, 2005, Pit Boss offered to sell 21 debit card numbers for $600. He provided

3

account information for a BoA business account and asked that the money be deposited into the account. After transferring the funds into the BoA account, agents notified Pit Boss of the deposit. Within approximately one and one-half hour of being notified that the money had been deposited into the account, the defendant, Jonathan Giannone, appeared at an ATM maching and withdrew $500 from the account.

Through grand jury subpoenas and interviews of bank personnel, Secret Service agents determined that the account into which the $600 was deposited was opened in the name of A&W Auto Clinic by the defendant, Jonathan Giannone. Bank records further document that immediately prior to the $600 deposit, there was only a nominal balance in the account. Thus, the funds that Giannone withdrew are directly traceable to the $600 payment from the government.

On June 6, 2005, Pit Boss sent 21 BoA debit card numbers as well as the names for 11 of the account owners. This transaction is the subject of Counts 4 and 5 of the Indictment. BoA officials have confirmed that 19 of the cards were valid and had an aggregate available balance of over $130,000.

The case against Giannone is thus remarkably straightforward. During the course of an online undercover investigation, Pit Boss sent credit card and identification information to the government on three separate occasions. At Pit Boss' request, the government paid $600 into a Bank of America account that was owned and controlled by Giannone. Shortly after Pit Boss was notified that the money had been deposited, Giannone appeared at an ATM and withdrew $500. The withdrawal could not have been made without the

government's $600 deposit because there were insufficient funds in the account prior to the deposit.

## ANTICIPATED LEGAL ISSUES

a.      Admissibility of Undercover Chat transcripts -- During this undercover investigation, Giannone chatted with the undercover operation under both the PitBoss2600 name and the CIA INTEL names. He did not give his true name during the chats. The government's case will tie these chats to the defendant in a two step process. First, the government will show from common links within the chats that PitBoss2600 and CIA INTEL are the same person. The government will then establish that the defendant is the person behind these online identities. This second step will be accomplished by confirming specific details referenced in the chat sessions. For instance, in a chat that occurred on May 26, 2005, Giannone stated that he was in Jacksonville, Florida, on a the previous day. Business records document that on May 25, 2005, Giannone made an ATM withdrawal in Jacksonville, Florida. There will be several such links to tie Giannone to the anonymous on-line names.

The complete linkage will not be accomplished through any single exhibit that the government introduces into evidence during the trial. The government will therefore be submitting into evidence many documents pursuant to Fed. R. Evid. 104(b). The condition to establish the relevancy will be whether the government presents sufficient evidence to support the fact that PitBoss2600/CIA INTEL is the same person as Jonathan Giannone. Upon satisfying this condition, the chat transcripts will properly be considered as admissions pursuant to Fed. R. Evid. 801(d)(2).

b.        Credibility of Brett Johnson -- Throughout the pretrial phase of this case, counsel for the defendant has repeatedly characterized this investigation as premised solely on the word of unreliable hearsay informants.  In reality, the only informant whose credibility might be in issue is Hunter Moore, the former associate of the defendant.  As to Brett Johnson, the primary target of the defendant's vitriol, none of his actions taken during the undercover investigation require his credibility to be placed into issue.  This is because he was under the direct supervision of Secret Service Agents whenever he was working on the investigation.  Further, chat sessions between Johnson and the defendant were recorded, both in the form of chat transcripts and on digital video captures, as they occurred.

Neither Johnson's prior eBay fraud scheme nor his crime spree that began while he was working for the Secret Service are relevant to this case.  Stated plainly, neither the credibility nor the total lack of credibility of Johnson have any impact on the words that were communicated during the online communications between Johnson and Giannone.  These words were recorded as they were communicated, and Johnson had no ability to add to, detract from, or alter in any way, those words.

If the government calls Johnson to testify during the trial of this case, the government concedes that the defendant will be permitted to inquire into the fact of his illegal acts since they impact on his credibility.  The defendant should be prohibited, however, from dwelling on the details of the illegal acts.  Under Fed. R. Evid. 403, the Court has the authority to limit inquiry into matters that are repetitive, that create confusion, or that become a waste of the jury's time.  Repetitive inquiry into Johnson's illegal acts will serve only to divert attention

6

away from the transcripts of the chat sessions. It is the transcripts, not any testimony from Johnson or any other witness, that establishes the important facts of this case. The government submits that the probative value of dwelling on Johnson's illegality is substantially outweighed by the danger of confusion of the issues and unfair prejudice to the government. As such, the government submits that Fed. R. Evid. 403 should limit prolonged inquiry into these actions unless Johnson takes the stand.

If the government does not call Johnson to the stand, the defendant has indicated that he may call Johnson as part of his case-in-chief. The defendant can, of course, call any witness that has evidence relevant to this case. It reasonably appears, however, that if Johnson is called by the defense, the sole purpose would be to put before the jury his pattern of criminal activities. As pointed out above, this would serve no purpose other than to confuse the issues since Johnson's involvement was limited to actions that were recorded as they happened. Accordingly, the government submits that the Court should not permit the defense to pursue such distracting information.

c.      Defendant's "chat" session -- The defendant attached a transcript of a chat session to his motion for change of venue that purports to support his contention that Chris Cutler is the real criminal behind that acts that are charged in his Indictment and that he framed Giannone. From the defendant's allegations in his pleadings as well as from the chat transcript that the defendant made a part of his pleadings, it is apparent that Giannone is suggesting that he had no prior dealings with Cutler except for the negotiation and agreement to purchase a Ford F-150 pickup truck. This is clear from the very first part of the "chat" which follows:

7

| | |
|---|---|
| imakemovies4free: | yo |
| ElevenOnee: | Whos this |
| imakemovies4free: | john |
| ElevenOnee: | John Who? |
| imakemovies4free: | john . . . . brancas friend . . . the guy u met at the car lot |
| ElevenOnee:[1] | last year . . . around may ish |

This chat occurred on November 13, 2006. The clear implication is that the two persons engaging in this chat first met at "the car lot" "around mayish" of 2005. Thus, if the defendant's chat is true, Cutler and Giannone had never met prior to the purported sale of the Ford pickup.

Cutler tells a markedly different story from that of Giannone. Cutler states that he has known Giannone for approximately 4 years and that he has been with Giannone on approximately 30 occasions. He and Giannone have traveled up and down the eastern seaboard. During some of these trips, Cutler, at Giannone's urging and with his assistance, engaged in "carding" -- that is to say, he used fraudulent credit cards he obtained from Giannone and purchased goods at stores. In fact, the government has obtained records from Southwest airlines showing that in February of 2005 -- BEFORE the purported pickup transaction -- Giannone and Cutler traveled together to Florida and that Giannone paid for the airline tickets.

This fraudulent chat is admissible against the defendant as an admission pursuant to

---

[1] This last line does not seem to flow naturally from the context of the purported chat. This is exactly how it is set forth in the pleadings of the defendant. An examination of the computer used by the defendant in this "chat," however, shows that the identity of the person typing this line is not correct. It is, in fact, spoken by imakemovies4free.

8

Fed. R. Evid 801. The government's proof will establish that this purported chat is a false exculpatory statement. It will therefore be submitting a proposed jury charge requesting the Court to instruct the jury on the concept that when a defendant intentionally makes a false statement, the jury can consider that as evidence of guilty knowledge.

d.     Evidence of Other Acts -- Fed. R. Evid. 404(b)

Rule 404(b) permits the admission of evidence of acts other than those charged in the indictment so long as they are for purposes other than proving "character in order to show action in conformity therewith." The Fourth Circuit has characterized Rule 404(b) as a "rule of inclusion." United States v. Aramony, 88 F.3d 1369, 1377 (4th Cir. 1996). Evidence of prior acts is admissible under Fed. R. Evid. 404(b) and 403 if the evidence is: (1) relevant to an issue other than the general character of the defendant, (2) necessary, (3) reliable), and (4) if the probative value of the evidence is not substantially outweighed by its prejudicial effect. United States v. Queen, 132 F.3d 991, 997 (4th Cir. 1997).

The government will present evidence in the following areas that fall under Rule 404(b):

1.     Christopher Cutler

The prior relationship between Cutler and Giannone, discussed above in the section dealing with the purported chat transcript dealing with the Ford pickup will be addressed. Information about the background between Giannone and Cutler is relevant for several purposes. First, it establishes the nature of the relationship between the two -- a relationship that is at odds with the clear implications of the pleadings filed by Giannone. Second, it

9

provides a basis for Cutler's knowledge that Giannone uses the PitBoss2600 moniker in chats.

Cutler will not paint himself as an innocent bystander being falsely accused by Giannone. Instead, he will admit to his own involvement in similar criminal activity and explain that he and Giannone have engaged in such acts together. All of these uses are for purposes other than proving that Giannone is a person of bad character and that he acted consistent with such character in connection with this case.

Giannone has only himself to blame for making the history between himself and Cutler relevant. He appears to have chosen someone who he thought the government would have a difficult time locating. He was partially right. Cutler works on commercial fishing boats, and these activities often take him to sea for extended periods of time. The government therefore submits that testimony as generally outlined above should be permitted during the trial. The government has provided notice to the defendant of the general nature of this testimony as required by Fed. R. Evid. 404(b).

2.     Christopher Branca

Similar to issues surrounding the testimony of Christopher Cutler, the government has entered into a proffer agreement with Mr. Christopher Branca. Branca was initially identified by the defendant in his motion to transfer venue as a potential witness for Mr. Giannone. Further, he is the "branca" referenced in the fraudulent chat that Giannone has attempted to foist on the Court. Finally, Mr. Branca's name figures prominently in transcripts of chats between Giannone and the undercover investigation. Indeed, at one point during the chats,

Giannone gives the true name, address, phone number, name of probation officer, and probation officers phone number for Branca. It is apparent from these chat transcripts that Giannone and Branca have an extensive history of engaging in various schemes to defraud. While the government has not yet had the opportunity to debrief Mr. Branca in preparation for this trial, we anticipate that Branca will testify about this history to establish his familiarity with Giannone. He will further testify that he has seen Giannone use online identities that were used by Giannone during his chats with the undercover investigation. The government has provided notice of this anticipated testimony to the defendant as contemplated by Fed. R. Evid. 404(b).

    3.    Tim Horn

Finally, the government recently learned of additional criminal activity that Giannone committed since he was released on bond in this case. In December 2006, the defendant went to Boston, Massachusetts along with Mr. Tim Horn and engaged in "carding" -- that is, they used fraudulently obtained credit cards to purchase goods and services. The government has obtained and provided to the defendant photographic evidence showing that on December 30, 2006, the defendant visited an automated Metropolitan Boston Transit Authority (MBTA) kiosk where he used fraudulent credit cards to purchase rail passes. The government has further conducted a preliminary interview with Tim Horn, who was arrested in Boston on December 20, 2006, with approximately 26 fraudulent American Express card in his possession. Horn advises that he received these cards from Giannone, that he has witnessed Giannone produce fraudulent credit cards, and that he has chatted online with

11

Giannone via the AOL Instant Messenger chat protocol. During these chats, Giannone used the PitBoss2600 name that was also used during this investigation. Finally, the account information for some of the cards that were in Horn's possession when he was arrested was apparently encoded onto addition plastic blanks and used by Giannone to effect the fraudulent purchases at the MBTA kiosk -- a purchase that was made while Horn was still in jail.

Evidence that the defendant has continued to engage in criminal conduct even after having been released on bond is relevant to the element of intent in the wire fraud charges. The Fourth Circuit has observed that subsequent conduct may be highly probative of prior intent. The fact that one has thought in a particular illegal way over a period of time is evidence that one's thought patterns had already been so developed and were so operating on another previous occasion. United States v. Whaley, 786 F.2d 1229, 1232 (4th Cir. 1986); United States v. Hadaway, 681 F.2d 214, 217-18 (4th Cir. 1982); United States v. Anifowoshe, 307 F.3d 643, 646-47 (7th Cir. 2002). Thus, this evidence should be admitted in the trial of this matter. For the same reason, the pattern of illegal conduct engaged in with both Christopher Cutler and Christopher Branca is relevant to establishing the requisite intent that the government must show in this prosecution.

e.     Inadvertently omitted discovery -- On March 1, 2007, while reviewing logs of the chat sessions between the undercover operation and Pit Boss, the case agents realized that some chat transcripts were inadvertently omitted from discovery materials. The agents have identified and copied these materials, and they have provided them to the defendant.

12

Approximately 18 chats have been identified. Six of these are merely off-line messages left by Pit Boss when he unsuccessfully attempted to make contact. Nine are approximately ten to 20 lines of text in which nothing of significance is discussed. The remaining three are one to two pages in length. The agents advise that none of these materials appear to be exculpatory, and that at least one chat is powerfully inculpatory in the sense that it provides corroboration that Pit Boss is, in fact, the defendant Jonathan Giannone. This incriminating chat occurred on June 15, 2005, and Pit Boss stated that on that day, he and another person were expelled from the McLean, Virgina, Ritz Carlton hotel. Financial records which have previously been provided to the defendant confirm that Giannone paid for a room at that hotel on June 15, 2005.

**II.     Outstanding motions**

   None.

**III.    Witnesses**

   The following is a list of *potential* witnesses that may be called in this case.

   Special Agent Brad Smith            Special Agent Bobby Kirby
   Brett Johnson                       Christopher Branca
   Christopher Cutler                  Oussama Awkal
   Hunter Moore                        Deborah Aluzzo
   Todd Abbott                         Janice Davis
   Tim Horn

   The government reserves the right to expand or reduce its witness list.

**IV.    Time required**

13

3-4 days.

## V. Jury Charges

To be submitted separately.

Respectfully submitted,

REGINALD I. LLOYD
UNITED STATES ATTORNEY


By:    s/ Dean A. Eichelberger
       Dean A. Eichelberger (#5008)
       Assistant U.S. Attorney
       1441 Main Street, Suite 500
       Columbia, South Carolina 29201
       803-929-3040

March 2, 2007

CERTIFICATE OF SERVICE

I hereby certify that I am an employee in the Office of the United States Attorney for the District of South Carolina, and on March 2, 2007, I caused to be served one true and correct copy of the TRIAL BRIEF in the above-captioned case via the court's e-noticing system, but if that means failed, then by regular mail, on the following person(s)**:**

       Thomas F. Liotti, Esq.
       600 Old Country Road, Suite 530
       Garden City, New York 11530

       s/Dean A. Eichelberger
       Assistant United States Attorney