```
1           IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF SOUTH CAROLINA
2                   COLUMBIA DIVISION


3


4  UNITED STATES OF AMERICA,     )    Cr. No. 3:06-1011
                                 )
5                                )
   VERSUS                        )    Columbia, SC
6                                )    March 5, 2007
   JONATHAN GIANNONE,            )
7                                )
        Defendant.               )
8                                )
   --------------------------)

9


10


11                 JURY TRIAL - VOLUME I

12       BEFORE THE HONORABLE CAMERON MCGOWAN CURRIE
            UNITED STATES DISTRICT JUDGE, and a jury.
13


14


15  Appearances:

16  For the Government:    DEAN EICHELBERGER, ESQ.
                           ROBERT DALEY, ESQ.
17                         Assistant U.S. Attorneys
                           1441 Main Street, Suite 500
18                         Columbia, SC  29201

19  For the Defendant:     THOMAS F. LIOTTI, ESQ.
                           DRUMMOND C. SMITH, ESQ.
20                         600 Old Country Road, Suite 530
                           Garden City, NY, 11530

21


22

   Court Reporter:     Gary N. Smith, CM
23                     901 Richland Street
                       Columbia, SC  2920
24                     (803) 256-7743

25         Stenotype/Computer-Aided Transcription
```

1          THE COURT:  All right.  Mr. Eichelberger, you

2   may call the case.

3          MR. EICHELBERGER:  If it please the court, the

4   case is United States of America versus Jonathan

5   Giannone.  Mr. Giannone is present.  He's represented by

6   Mr. Thomas F. Liotti of the New York Bar.  Also

7   appearing with Mr.Liotti is Drummond Smith of the Liotti

8   law firm.  Dean Eichelberger for the United States, Bob

9   Daley assisting.  The case is called for purposes of

10  trial.

11         THE COURT:  All right.

12         Good morning, Mr. Liotti.

13         MR. LIOTTI:  Good morning, Your Honor.  Nice to

14  see you again.

15         THE COURT:  Good to see you.

16         Good morning, Mr. Smith.

17         MR. SMITH:  Good morning, Your Honor.

18         THE COURT:  You are filing your pro hac vice

19  papers?

20         MR. SMITH:  I believe they have been filed,

21  Your Honor.

22         THE COURT:  You think they have been?

23         MR. SMITH:  (Nods head in the affirmative.)

24         THE COURT:  I haven't seen them yet.

25         Have you -- we haven't got them?

```
 1          THE CLERK:  (Shakes head in the negative.)

 2          THE COURT:  Do you know how they were filed or

 3  to be filed?

 4          MR. SMITH:  Through our office.  I believe sent

 5  them by mail and by fax, if I'm not mistaken.  I can

 6  call and check.

 7          THE COURT:  Okay.  Well, at a break you can

 8  call and check.  We haven't -- we have received a number

 9  of faxes from your office, but at my office.  I don't

10  know whether the clerk's office has received any

11  different ones.

12          THE CLERK:  No.

13          MR. SMITH:  That's a possibility.

14          THE COURT:  But we -- we don't know of any, if

15  they have been -- if they have been received.

16          But anyway, conditionally, subject to your

17  meeting those requirements and paying the proper fee, I

18  will go ahead and admit you conditionally pro hac vice.

19          MR. SMITH:  Thank you, Your Honor.

20          THE COURT:  All right.  Okay.

21          I just received as I walked into the courtroom

22  the government's response to the letter motion of the

23  defendant.  I have not read it.  I have read the letter

24  motion of the defendant, and that is the document that I

25  believe was dated March 3 and -- let's see, it's a
```

1   little over four pages long.  So, I have those two

2   things.

3         I also have received proposed jury charges by

4   fax that I believe were filed, or to be filed, this

5   morning from the defense that contained three requested

6   jury charges.  And so we are -- we will make sure that

7   those are filed, and I do have those.

8         In fact -- and I think -- I think all three

9   topics are covered in my jury instructions already, but

10   I will compare to what you have submitted to what I have

11   and determine whether or not I should make any changes.

12         MR. LIOTTI:  Thank you, Judge.

13         THE COURT:  The government has filed in

14   addition to what I have already mentioned, I believe,

15   two motions in limine; is that correct?

16         MR. EICHELBERGER:  That's correct, Your Honor.

17         THE COURT:  Okay.  Both of those deal with

18   requests under the Federal Rules to use certain excerpts

19   from the declaration of Mr. Liotti that were filed in

20   the Fourth Circuit, at least this -- this one that came

21   in this morning does.

22         MR. EICHELBERGER:  The one line -- the second

23   one, Your Honor, deals solely with the declaration from

24   the Fourth Circuit.

25         The first one, which is more extensive, deals

1  with the declaration that was filed with this court back

2  in connection with the motion for change of venue.

3          THE COURT:  Right.  Okay.  I have both of

4  those.  All right.

5          Now, let's see what needs to be done before we

6  open to the jury.  I would like to get moving and would

7  prefer to only decide those matters that need to be

8  decided before we -- before we have opening statements.

9          MR. LIOTTI:  Judge, did you want to have legal

10  argument on that first point that you just raised

11  concerning the declaration?

12          THE COURT:  Only if Mr. -- only if

13  Mr. Eichelberger tells me that he plans to mention it in

14  his opening statement.

15          MR. LIOTTI:  Okay.

16          THE COURT:  Otherwise, I would wait to the

17  point in the trial when he actually intended to offer it

18  and take it up at that point.  Mr. --

19          MR. LIOTTI:  No problem, Judge.

20          THE COURT:  Mr. Eichelberger.

21          MR. EICHELBERGER:  We do intend to make

22  reference to the purported chat and, of course, the

23  purported chat is all that is referenced within this --

24  by "this one" I mean the more extensive of the two.

25          THE COURT:  Right.

1          MR. EICHELBERGER:  The declaration that was

2     filed in connection with the motion for change of

3     venue.

4          The second one, I don't think that we have an

5     issue with that one with respect to the opening

6     statements.  But as I say, I do intend to talk about the

7     purported chat between imakemovies4free and ElevenOnee,

8     that chat taking place on November 13th, 2006.  So we

9     may need to address the government's motion in limine in

10    respect to that issue.

11         THE COURT:  Okay.  All right.  And is that the

12    only issue that the government, from your point of view,

13    from your opening statement, needs to have me address

14    before opening statements?

15         MR. EICHELBERGER:  It's possible the court -- I

16    don't know that we're going to get far afield in terms

17    of 404(b) information on either Chris Cutler or Chris

18    Branca, and we're going to make reference to them in the

19    fact that they're going to testify.  I'm not going to

20    talk extensively about their histories with Mr. Giannone

21    but, of course, I think the court understands that those

22    histories are extensive.  But we're going to try not

23    to -- to go too far afield on that.

24         THE COURT:  Well, I need to know if there is

25    any portion of 404(b) evidence that you intend to

1 specifically refer to in your opening statements, and if

2 there is, I need to address it before you open.

3          MR. EICHELBERGER:  I don't think so.  I mean,

4 it's -- again, it's kind --

5          THE COURT:  You are the one who's going to be

6 up speaking, Mr. Eichelberger, so it makes me a little

7 nervous when you say you don't think so.  You're either

8 going to tell the jury this or you are not.  And if you

9 are or you plan to or you hope to, then I need to rule

10 on it.

11          MR. EICHELBERGER:  I will be making reference

12 to both -- I will be making reference to the fact that

13 they are both facing their own charges.  I will be

14 making reference to the fact that Mr. Cutler had

15 traveled to Orlando, Florida, with Mr. Giannone,

16 February of 2005.

17          I won't be talking about what they were doing

18 or what they have done on other trips.  So, the

19 relationship will be referenced, the fact that they have

20 traveled previously, and the fact that that travel is

21 inconsistent with the purported story that swirls around

22 the sale of the pickup truck, will be referenced during

23 my opening statement, but other than that, nothing.

24          THE COURT:  Okay.  And you take the position

25 that that portion of the Cutler evidence would not be

1    404(b)?

2            MR. EICHELBERGER:  No.  I think it sets the

3    stage.  It's a response to what the defendant has said,

4    the explaining away of how he was withdrawing $500 on

5    the very same day that he was notified that the money

6    was there.  It's all -- to use the Fourth Circuit's

7    terminology -- inextricably intertwined with the

8    violation itself.

9            THE COURT:  All right.  And the other witness

10   was Branca, you said?

11           MR. EICHELBERGER:  Christopher Branca.  That's

12   the witness, the court will recall, was initially

13   identified by the defendant in his motion to change

14   venue as a potential defense witness, in fact will be

15   called by the government.

16           THE COURT:  But you are not going to discuss --

17   other than the fact that he will be a witness, you are

18   not going to mention any 404(b) evidence that might be

19   elicited from him?

20           MR. EICHELBERGER:  The only other thing that we

21   may reference, and I'm looking at my outline, the

22   history with Giannone, there's some specifics about

23   Mr. Giannone having been angry with Mr. Branca.  We are

24   going to talk about that as -- call it an internal

25   consistency within the chat transcripts that links

1    Mr. Giannone to Mr. Branca.

2           THE COURT:  An internal consistency, not --

3           MR. EICHELBERGER:  Yes.

4           THE COURT:  Okay.

5           MR. EICHELBERGER:  An internal -- I will be

6    specific, Your Honor.  In chats, Mr. Giannone, during

7    chats with the undercover investigation, named

8    Mr. Branca by name and he gave a specific example of how

9    he thought that he had been wronged by Mr. Chris

10   Branca.  And we'll be -- I will be generally referring

11   to it, but not talk specifically.  Just the fact of the

12   anger is what I will be referring to in my opening

13   statement.

14           THE COURT:  All right.  Okay.  As long as you

15   limit it to that and don't mention the 404(b).  I can

16   deal with 404(b) as each witness is called --

17           MR. EICHELBERGER:  Yes, Your Honor.

18           THE COURT:  -- in a hearing outside the

19   presence of the jury.  You would tell me what you

20   propose to elicit from them and then I would rule on

21   whether it would come in.

22           MR. EICHELBERGER:  Yes, Your Honor.

23           THE COURT:  Okay.

24           MR. EICHELBERGER:  And the only other thing

25   with respect to laying the foundation for this purported

1  story, I mean, the purported story comes directly from

2  the defense pleadings.  So that section will be dealt

3  with with respect to this motion in limine.

4         And again --

5         THE COURT:  When you say "purported story,"

6  you're referring to the single-spaced, indented quoted

7  portion of your motion in limine that was filed on

8  March 2nd?

9         MR. EICHELBERGER:  That is correct, Your

10  Honor.  There is one other item that goes with that and

11  that is a chat transcript -- the purported chat

12  transcript, again, between imakemovies4free and

13  ElevenOnee.

14         What it is, is that it purports to offer an

15  innocent explanation for why Mr. Giannone would appear

16  at his bank and withdraw $500, $500 being proceeds of

17  money paid for 21 -- the term of art they use is full

18  info, but it's fraudulent information, fraudulently

19  obtained information.  And again, those are things that

20  the defense has filed, in the motion in limine, in the

21  course of this case.

22         THE COURT:  All right.  I want to be sure I

23  understand which evidence rule you are relying on.  I

24  have seen -- the motion that came in or that I first saw

25  this morning, which was the entry No. 67.  It is the one

1  dealing with the, "Mr. Giannone has never set foot in

2  South Carolina" and referred to 801(d)(2)(E).

3            MR. EICHELBERGER:  Yes, Your Honor.

4            THE COURT:  And I wasn't sure that that was a

5  typographical error or not.

6            MR. EICHELBERGER:  I'm sorry, Your Honor.  I

7  believe it's supposed to be (d)(2)(D).  It's an

8  authorized statement by an agent.

9            THE COURT:  Okay.  All right.

10            MR. EICHELBERGER:  And that's the same theory

11  for the other as well.

12            THE COURT:  All right.  Now, just let me get

13  you on the record to explain the government's position

14  concerning why you should be allowed to use the

15  referenced excerpts from the Liotti declaration.

16            MR. EICHELBERGER:  Your Honor, it requires a

17  brief factual predicate.  The proof in the case will

18  show that the agents paid $600 by depositing it into a

19  Bank of America account and then they notified the

20  person they were chatting with that the deposit had been

21  made.  Within a relatively short period of time

22  Mr. Giannone came to his bank and he withdrew $500 of

23  that $600.

24            In response to these charges and in connection

25  with the motion to change venue, the defense submitted

1  to this court a declaration from Mr. Liotti which laid

2  out a theory of defense, that theory of defense being

3  that Chris Cutler -- Chris Cutler was specifically

4  identified by name as the true criminal in this case.

5  That is the person who actually sold the 21 -- who

6  actually exacted the $600.

7        And then the explanation for how that money

8  goes into Mr. Giannone's account is that Chris Cutler

9  had agreed to purchase a Ford F-150 pickup truck through

10  A&W Auto Clinic and that instead of paying that money

11  himself, he diverted the proceeds from the 21

12  identification information into Mr. Giannone's account,

13  thereby satisfying his financial obligation to

14  Mr. Giannone, and in the words of the defense,

15  implicating or framing Mr. Giannone.

16        Now, we maintain that that pickup transaction

17  never occurred.  So, in order to set the stage, though,

18  for that -- that story about how Mr. Cutler is, in fact,

19  the true criminal, according to the defense, we need to

20  use the declaration under the theory of 801(d)(2)(D) as

21  a statement being made by an authorized person in

22  furtherance of that agency, and we also need to use the

23  chat transcript.  Again, this chat transcript is a

24  document which purports to validate this theory.

25        In the chat transcript, Mr. Giannone, appearing

1  as imakemovies4free, sets up what he claims is a chat

2  with Chris Cutler, appearing as ElevenOnee.  In the

3  course of that chat transcript, Cutler almost

4  immediately volunteers that he placed $600 into

5  Mr. Giannone's BoA or Bank of America account.

6          Again, we maintain that is a fraudulent chat

7  transcript, and as part of our case in chief we intend

8  to raise it as a false exculpatory statement, in

9  essence, is what we're looking at here.

10          THE COURT:  When you say fraudulent chat

11  transcript --

12          MR. EICHELBERGER:  Yes, Your Honor.

13          THE COURT:  -- what is your theory on how it

14  was prepared and by whom?

15          MR. EICHELBERGER:  We believe it was prepared

16  by the defendant by setting up a fraud.  I think he has

17  perpetrated a fraud on his attorneys and is attempting

18  to perpetuate a fraud upon this court.

19          The facts are, the person that he claims to

20  have been chatting with was on a fishing trip,

21  commercial fishing trip, between November the 9th and

22  November the 20th.

23          Mr. Cutler will testify that he never purchased

24  any vehicle from Mr. Giannone.  Mr. Chris Branca, who is

25  referenced as the person who referred Cutler to Giannone

1 for purposes of this purchase, will similarly testify

2 that that never happened.

3          Further, in the chat transcript and supporting

4 documentation, it's quite clear that the theory is

5 premised on the notion that Giannone and Cutler did not

6 know each other prior to this purported sales

7 transaction, which took place in May of 2005.

8          We have located and presented to the defense

9 travel records documenting that in February of 2005,

10 three months before this purported sales transaction,

11 Mr. Giannone paid for airline tickets for himself and

12 for Chris Cutler to travel to Florida.  So, the premise

13 of the fraudulent chat transcript is false on its face.

14          Now, I will say that in response, that in the

15 motion letter, having been advised of this new bit of

16 information, the defense now comes back and acknowledges

17 that February 2005 trip, but then they say explicitly

18 that's the last time that Mr. Giannone had any contact

19 with Mr. Cutler.

20          Well, I'm sorry, but you cannot have it both

21 ways.  You cannot have a transaction in May of 2005 and

22 a transaction in February of 2005 and say, with respect

23 to the May 2005, "This is the first time I met," which

24 is essentially what goes on, and then with respect to

25 the February, "That's the last time we spent any time

1  together."

2      And that's what we have in the written record

3  in this case, Your Honor.  It's two -- two affirmative

4  statements that are directly at odds with each other, so

5  we think we are entitled to go into those as

6  demonstrating a false exculpatory statement.

7      THE COURT:  And so you think that Mr. Giannone

8  produced a document which was supposed to be a photocopy

9  or a printable version of a chat transcript that did not

10  occur?

11      MR. EICHELBERGER:  I think the chat transcript

12  did occur -- the chat transaction itself did occur, but

13  it did not occur in the way that it is represented to

14  this court.  All that is required, Your Honor, is for

15  somebody to be sitting at a computer at some other

16  location, claiming to be a person, that's all it

17  requires, and -- and, really, if one takes the time to

18  read through that transcript, it's not credible on its

19  face just because of how quickly it gets to the proof of

20  the legitimacy of this supposed transaction.

21      By the way, with respect to the vehicle

22  transaction, we also have as a witness, the owner, the

23  actual owner of A&W Auto Clinic, and his testimony will

24  also be contrary to any thought that Mr. Giannone ever

25  sold a vehicle to Chris Cutler.  So, we have got it

1　covered from about three or four different angles.

2　　　　THE COURT: So, is it your theory that someone

3　posing as Chris Cutler was on the other end of that chat

4　transcript or -- or Mr. Giannone was on both ends of

5　that chat transcript? What's the government's take?

6　　　　MR. EICHELBERGER: I do not believe that

7　Mr. Giannone was on both ends of the chat transcript. I

8　believe that he had -- there's a reasonable inference

9　that he got some associate of his be on the far end of

10　that transcript and they had a cooked-up dialogue they

11　were going to create for purposes of presenting to this

12　court. That's exactly the government's theory.

13　　　　THE COURT: And then your theory is that that

14　was presented to the attorney, his defense attorneys, to

15　use that in furtherance of their defense?

16　　　　MR. EICHELBERGER: Exactly. As a matter of

17　fact, the declaration in the pleadings go so far as to

18　say that Mr. Giannone did that part of the chat

19　transcript in the presence of his attorney, Mr. Drummond

20　Smith. That is specifically stated in the -- in the

21　chat transcript.

22　　　　So, it's very clear that the chat transcript

23　itself was done for purposes of presentation in this

24　court. And it's our position -- we believe that we can

25　convince the jury that that transcript is fraudulent,

1    absolutely fraudulent.

2         THE COURT:  I'm just trying to make sure there

3    is no conflict here.  So, you have a situation where you

4    believe that Mr. Giannone essentially allowed Mr. Smith

5    to observe him have this chat conversation?

6         MR. EICHELBERGER:  That's correct.

7         THE COURT:  But you have no information that

8    Mr. Smith knew -- if it's true -- that the other end was

9    fake?

10        MR. EICHELBERGER:  I'm not suggesting that

11   either Mr. Smith or Mr. Liotti had knowledge of the

12   fraudulent nature of that chat transcript.

13        THE COURT:  And your position that that other

14   end was fraudulent is based on Chris Cutler telling you,

15   number one, he didn't engage in that conversation?

16        MR. EICHELBERGER:  Correct.

17        THE COURT:  And number two, that he was at sea

18   when it took place?

19        MR. EICHELBERGER:  Correct.  And that

20   Mr. Branca says it never took place and Mr. Awkal says

21   it never took place.

22        THE COURT:  How would they know?

23        MR. EICHELBERGER:  Mr. Awkal is the actual,

24   true owner --

25        THE COURT:  Well, I know they would know about

1    the car -- or the truck, but how would they know about

2    that chat transcript?

3           MR. EICHELBERGER:  Actually, it all ties into

4    it because the chat transcript purports to validate a

5    car sale transaction.  That car sale transaction -- as a

6    matter of fact, Government's Exhibit No. 21, can I see

7    it?  What I needed to do, Your Honor --

8           THE COURT:  You are just saying that these

9    other witnesses' testimony corroborates that there was

10   no such automobile transaction?

11          MR. EICHELBERGER:  That's correct, but it's --

12   it's more than that because the chat transcript itself

13   explicitly references Mr. Branca.  It says, "Who's

14   this?"  And the response is, "John."  "John who?"

15   "John, Branca's friend, the guy you met at the car lot

16   around May-ish last year."

17          This was in 2006.  So he's saying, "You met me

18   May of 2006 at the car lot -- 2005."  I'm sorry.  The

19   chat took place in 2006 referring back to May of last

20   year, that is May of 2005, a fake car sale transaction.

21   It didn't happen.  Mr. Branca will testify it didn't

22   happen, the car lot owner will testify it didn't happen,

23   Mr. Cutler will testify it didn't happen.

24          And the records will reflect that Mr. Giannone

25   and Mr. Cutler, the purported person that met him May of

1   2005 in fact knew him well before that.  They traveled

2   together on Mr. Giannone's dime in February of 2005.

3   That's why all this stuff is directly relevant and it

4   proves -- it goes to prove that there is a false

5   exculpatory statement.

6         THE COURT:  All right.  So this is all part of

7   proof of a false exculpatory statement in the

8   government's view?

9         MR. EICHELBERGER:  That is correct, Your Honor.

10         THE COURT.  Okay.  All right.

11         Mr. Liotti, could you address that particular

12   issue now?

13         MR. LIOTTI:  Yes, Your Honor, if the court

14   pleases.

15         I think we are in very dangerous territory

16   here, Your Honor, because it seems to me that the motion

17   in limine that has been filed by the government is

18   nothing more than a ruse to circumvent the Fifth

19   Amendment.

20         Now, what I would like to do is address the

21   case which Mr. Eichelberger has cited in his motion,

22   which I had the privilege of reading this morning,

23   United States versus Martin, he avers is supportive of

24   his position on his proffer of this declaration.  So,

25   that's cited, Judge.  You will see it in his papers,

1    it's 773 F.2d 579.  This is a Fourth Circuit case,

2    Judge.

3           Now, that case is very interesting because the

4    rule that Mr. Eichelberger is relying upon is a rule

5    that has to do with agency and the fact that a defendant

6    in a criminal case might authorize someone to act as his

7    agent.

8           Now, that is very telling when you look at the

9    Martin case because you compare the rule with Martin --

10   and what the Fourth Circuit did in Martin was, they

11   referred to statements made by an attorney to an IRS

12   auditor.  And particularly -- this is probably the most

13   important part of the case -- they allowed for the

14   statements to be used because there was a power of

15   attorney given by the defendant to his attorney in his

16   negotiations with the IRS audit.

17          So in that regard, apparently the attorney made

18   a statement to the auditor in trying to settle the IRS

19   liability that the amount of income was greater than

20   what was reflected on the tax returns, or things to that

21   effect, but it was with a specific power of attorney.

22          Contrasting that with what has happened here, I

23   have merely acted as an attorney for Mr. Giannone and we

24   have made a legal argument in the form of memoranda

25   submitted to this court.  That is a far cry from what is

1 contained in the Martin case, Your Honor.

2 I would also, Judge, most respectfully direct

3 the court's attention, if I may, to the rule, which is

4 801 -- I think you may have corrected it earlier, Judge,

5 but it was cited as 801(d)(2)(D), capital D.

6 But in any event -- but if you look at, Judge,

7 the advisory committee notes from the federal code and

8 rules, 2006 edition from Thompson West, which I'm sure

9 you have and Mr. Eichelberger has.

10 But at 330, page 330 there, in the first column

11 under No. 2, there is a reference to when admissions may

12 be utilized. And the committee points out that this is

13 something that should be very, very reluctantly

14 utilized. So, I would just offer that, Judge.

15 It's interesting, but I think the government is

16 ignoring the fact that a lot of these proffers that they

17 are making, Your Honor, with respect to witnesses and

18 statements and things of that nature, are belatedly

19 received and it seems to me that this also deals with

20 the issue that we have posited with the court concerning

21 late discovery, and a motion in limine with respect to

22 many of the witnesses that Mr. Eichelberger proposes to

23 offer.

24 And I have suggested to Your Honor that before

25 we have witnesses like Mr. Cutler and others coming

1  forward with this belated discovery that

2  Mr. Eichelberger offers as an attempt at bolstering and

3  nothing more, it seems to me that we need to look at --

4  and I would ask Your Honor to please look at Rule

5  801(d)(2) and a case from the Second Circuit, which is

6  Bourjaily -- if I may spell it, Your Honor, please,

7  B-o-u-r-j-a-i-l-y -- versus the United States,

8  483 U.S. 171, 1987.

9        And what is important about that, Judge, is you

10 can't just throw these statements up on the witness

11 stand and offer these witnesses without some awareness

12 and some ruling by the court as to their credibility and

13 whether they should be allowed to testify at all.

14        So, for example, in the advisory committee

15 notes in the same book I just alluded to moments ago,

16 the committee writes, "801(d)(2) has been amended in

17 order to respond to three issues raised by Bourjaily

18 versus the United States," and then the citation.

19        "First, the amendment codifies the holding in

20 Bourjaily by stating expressly that a court shall

21 consider the contents of a coconspirator's

22 statement -- " and I would argue that that's what these

23 witnesses are, at least the witnesses presented by

24 Mr. Eichelberger -- "in determining the existence of the

25 conspiracy" -- and even though my client isn't charged

1   with conspiracy, that's what these witnesses are

2   essentially alleging by virtue of the statements that

3   Mr. Eichelberger would like to offer here -- "and the

4   participation therein of the declarant and the party

5   against whom the statement is offered..

6         "According to Bourjaily, Rule 104(a) requires

7   these preliminary questions to be established by a

8   preponderance of the evidence."

9         And I would most respectfully submit that

10   Mr. Eichelberger hasn't done that with respect to any of

11   these proffers, not just the declaration but with

12   respect to any of these proffers.  And that's why, Your

13   Honor, we have filed a motion in limine dated March 3rd,

14   2007, with the court.

15         And we also reference the case of United States

16   versus John Gil.  That's cited at 297 F. 3d 93, Second

17   Circuit, 2002.  And that deals, Judge, with late

18   discovery.

19         So we are getting discovery from

20   Mr. Eichelberger as late as this morning and over the

21   weekend and last week, and the latter part of last

22   week.  And in United States versus Gil, the Second

23   Circuit said that when you are giving discovery to

24   counsel at this late stage in the proceedings, seven

25   days before trial in that case, that that simply is not

1 enough time for counsel to prepare and otherwise get

2 ready for the trial itself.

3       So, there was a reversal of John Gil's

4 conviction due to late discovery, and that followed the

5 seminal case in the Supreme Court of the United States,

6 Kyles versus Whitley, on the same point, which says that

7 the government has to, by due diligence, show their

8 efforts to secure discovery prior to trial.

9       Now, Mr. Eichelberger may have acted with due

10 diligence, but a lot of what he is trying to do at this

11 late stage is simply too late under United States versus

12 Gil and Kyles versus Whitley.

13       So, Judge, I would oppose his offer with

14 respect to the declaration because I think it's totally

15 inappropriate and, as I said before, just an attempt at

16 more bolstering by the government and a way -- a

17 convenient way for Mr. Eichelberger to try and

18 circumvent the Fifth Amendment.

19       And in addition, Judge, I'm a little concerned,

20 as you are, and I think you rightly pointed it out, I'm

21 concerned that Mr. Eichelberger is going to make certain

22 statements to this jury in his opening with regard to

23 Mr. Cutler and Mr. Branca and other people that Your

24 Honor may be in a position to take out of this case

25 after you have had an opportunity to fully consider the

1   proffer by Mr. Eichelberger.

2           And I would respectfully submit, Judge, that

3   while Your Honor may wish to go forward right away, I

4   think we need some clarification here on what exactly

5   Mr. Eichelberger is offering in the way of a case and

6   what statements, in addition to those that are referred

7   to in the indictment, he is going to blurt out before a

8   jury concerning 404(b) actions, or anything that relates

9   to a purported conspiracy between my client and any of

10  these witnesses that he's alluded to.

11          I think we are kind of dancing around the

12  really important issues here, and it's a 404(b) issue,

13  and it also has to do with late discovery and these

14  other matters that I'm offering to the court at this

15  stage.

16          So, Judge, I would most respectfully ask that

17  we pause, slow down, and let's get a better picture on

18  what Mr. Eichelberger wants to do.

19          Thank you.

20          THE COURT:  All right.  Mr. Eichelberger, will

21  you respond to that and anything else in the letter

22  motion at this time.

23          MR. EICHELBERGER:  I would be happy to.  I will

24  start with belated discovery issues.  We get the

25  materials, we turn it over.  The fact that we get it

1  late in the game merely reflects the fact that things

2  happen quickly, particularly where you have someone such

3  as Mr. Chris Cutler who is facing his own criminal

4  charges.  We obviously could not talk to him unless we

5  got the permission of his attorney.  He's represented by

6  Mr. Bob Hallman.

7        We first interviewed Mr. Cutler on February the

8  19th of 2007.  A memorandum of that interview was

9  prepared, it was submitted to Mr. Liotti.  In addition,

10  we provided him with a 404(b) notice giving him the

11  general notice of the nature of Mr. Cutler's testimony.

12        So, we are not dealing with belated discovery

13  within the meaning of the case law that Mr. Liotti is

14  talking about at all.  I haven't seen the cases, but I'm

15  willing to venture a guess that what they are talking

16  about is discovery that is aggregated and then dumped

17  seven days before trial.  We have given material as we

18  have received it.

19        With respect to Mr. Cutler, he first came down

20  to South Carolina, I believe we brought him Thursday of

21  last week.  Because Mr. Cutler also has his own criminal

22  exposure here in this district he sought and was granted

23  appointed counsel.

24        Mr. Parks Small of the Federal Public

25  Defender's Office represents him.  Mr. Cutler has filed

1   a plea agreement with respect to his separate criminal

2   culpability -- Branca -- I'm sorry. We have got two

3   Christophers, one is Cutler, one is Branca. Friday of

4   last week, represented by Mr. Parks Small, was

5   Christopher Branca. I want to thank my agents for

6   correcting me on that.

7         So, we debriefed him on Friday of last week.

8   We haven't even had a chance to prepare a memorandum of

9   that, but we have provided general notice of the

10   testimony pursuant to 404(b).

11         I'm not sure but I think I may have actually

12   sent that 404(b) notice before we even had a chance to

13   interview Mr. Branca, because I knew that it was going

14   to happen so late in the game. We are just trying to

15   give what we have when we get it.

16         With respect to materials that were provided

17   this morning. When we interviewed Mr. Branca, he

18   advised us that he had on his own engaged in a chat

19   transcript with Mr. Giannone and we requested him to

20   retrieve that chat transcript. He did so. He provided

21   it to me yesterday. I copied it and I gave it to them

22   this morning. We propose to use that during the course

23   of our case.

24         Now, this notion of Branca and Cutler

25   testifying as coconspirators, they are not

1  coconspirators with respect to the charges that

2  Mr. Giannone is facing in this case.  They have in the

3  past engaged in significant criminal activities with

4  Mr. Giannone.  That's relevant in two respects.

5          One, it establishes their knowledge of his

6  pattern of illegal activities.  Second, it establishes

7  how they know the relevant information that they do

8  know.  Specifically, they know that he uses the online

9  identity Pit Boss 2600.  Further, the fact that they've

10  engaged in these prior illegal activities is a

11  confirming point within the chat transcripts.

12          Chat transcripts are under anonymous names.  So

13  we have to prove that those transcripts, in fact, link

14  back to this defendant.  One of the ways we do that is

15  by having a specific reference to Mr. Branca that is

16  raised in the chat transcripts to confirm, yes, in fact,

17  that happened.

18          "I was arrested in California for carding,"

19  that is, engaging in illegal credit card activity at

20  Sony and at Apple Stores.  That's exactly what

21  Mr. Branca says in the chats.  Mr. Branca --

22  Mr. Giannone, excuse me, was there.  Mr. Branca will

23  testify that they were there jointly on a carding

24  expedition.

25          So we have to establish intent to defraud as

1     part of our case in chief.  Case law tells us that not

2     only do -- not only does the subsequent conduct impact

3     on intent, but prior conduct as well.  The fact that one

4     is engaged in a pattern of conduct over a period of time

5     indicates that his intent is formed.  So, that's the

6     issue.  We are not looking at this as proving action

7     consistent with, though.  That would be inappropriate

8     under 404(b).

9          And with, then, the notion that Mr. Cutler and

10    Mr. Branca are testifying as fact witnesses, not as

11    coconspirators on these charges, then the line of cases

12    that deal with having to establish their credibility for

13    purposes of establishing a coconspirator statement as an

14    admission, that's really what that addresses.

15         Our use of the declaration of Mr. Liotti does

16    not circumvent the Fifth Amendment because Mr. Liotti,

17    in consultation with his client, Mr. Giannone, elected

18    of their own free will to put this material before the

19    court.  The government should be free to use those

20    words.  They were spoken, they are admissions, and we

21    believe that we are entitled to use them.

22         MR. LIOTTI:  Judge, can I just respond briefly

23    to that?

24         THE COURT:  Yes.

25         MR. LIOTTI:  I know you don't want to have a

1    jury wait and I'm sure you want to move forward.

2            Judge, again, with all due respect to my able

3    colleague, Mr. Eichelberger, this sounds like an

4    Orwellian doublespeak as far as I can decipher it.  I

5    think what he needs to do here, Judge, is to please tell

6    us what his proffer is, because every time

7    Mr. Eichelberger opens his mouth or files a piece of

8    paper in this case, the case goes beyond and sometimes

9    way beyond what is contained in the indictment.  And

10   again, Judge, late discovery in this case is very

11   germane and very important.

12           For example, in a February 28th, 2007 letter

13   from Mr. Eichelberger, he blithely, in paragraph 3 on

14   page 1, refers to transcripts that were inadvertently

15   omitted from prior discovery materials containing

16   contact between Mr. Giannone under either the

17   Pit Boss 2600 or CIA INTEL names, and it goes on from

18   there.

19           I don't see why the government, Judge,

20   shouldn't be in a position to tell us precisely what the

21   404(b) evidence is in this case so that Your Honor can

22   make appropriate rulings.  This is all over the place,

23   Judge.  I'm sorry.

24           THE COURT:  They will be required to do so

25   before they mention any of it to the jury.

1          MR. LIOTTI:  Thank you, Judge.

2          THE COURT:  All right.  Okay.

3          First of all, as to the government's motion in

4    limine, this is entry No. 66, for permission to use

5    excerpts from the Liotti declaration, that motion is

6    granted.  The court finds that under Federal Rule of

7    Evidence 801(d)(1)(D), that these are statements that

8    were made by an authorized agent of the defendant acting

9    within the scope of his employment.

10         That the defense put forward a theory of

11   defense, very specifically naming individuals,

12   locations, times, details, and that the government is --

13   is able to use that to attempt to show that that was a

14   false exculpatory statement.  The government has made

15   enough of a proffer of the relationship of that

16   statement to other evidence that relates to the counts

17   at issue in the indictment that the government will be

18   allowed to do that.

19         Next as to the defense letter motion, I am

20   going to rule in part and defer in part.  To the extent

21   that Mr. Liotti is asking that we specifically address

22   any 404(b) testimony before it's offered, that motion is

23   granted and we will do that by means of a specific

24   proffer by the government before the testimony of any

25   witness who intends to -- from whom they intend to seek

1  to elicit 404(b) evidence, and they will not mention

2  that before that time.

3         As to the late discovery issue, at this point

4  the defense has shown no prejudice.  There is a -- part

5  of the problem here is that some of these witnesses were

6  identified by the defense and then the government was in

7  the process of locating them, interviewing them, and

8  finding out about them, and so it's not just government

9  evidence that was sitting around in the prosecutor's

10  desk.  This is evidence that has only been discovered,

11  primarily to some extent as a result of information

12  provided by the defense in the course of litigating the

13  case.

14         The government has not held back items they

15  had.  They have -- I don't have any indication that they

16  have waited to disclose this until the eve of trial.

17  They have provided it as they have received it, and they

18  have provided as soon as they had an idea that they were

19  going to be using these witnesses' information

20  concerning them and information under 404(b) notices.

21         So at this point the defense has failed to show

22  a basis for my excluding their testimony; however, I

23  will screen this testimony, as I said, to the extent it

24  contains 404(b) information before they testify.

25         As I understand it from the government's

1  response to this letter motion -- the several issues

2  that were issues have sort of gone away, as I see it.

3  Mr. Horn is now not going to be called; is that

4  correct?

5          MR. EICHELBERGER:  Correct.

6          THE COURT:  Mr. Cutler is a government's

7  witness?

8          MR. EICHELBERGER:  Yes.

9          THE COURT:  The computer that was turned over

10  by Mr. Awkal, A-w-k-a-l, to the government, the

11  government does not intend to use or refer to it --

12          MR. EICHELBERGER:  That's correct.

13          THE COURT:  -- or refer to the hacker manual

14  that was allegedly seen in the back seat of

15  Mr. Giannone's vehicle; is that correct?

16          MR. EICHELBERGER:  Bear with me for a second.

17          Mr. Daley has been dealing with Mr. Awkal.

18  What he tells me is that his testimony would be that

19  Mr. Giannone brought the computer to the place and was

20  setting it up, but there will be nothing about any about

21  forensic examination or the fact that Mr. Awkal turned

22  that computer over to the government after it was

23  abandoned by Mr. Giannone.

24          THE COURT:  All right.  And am I correct,

25  there's not going to be a reference to the hacker

1    manual?

2          MR. EICHELBERGER:  That is correct.  There will

3    not be a reference to the hacker manual.

4          THE COURT:  All right.  And to the extent that

5    the defense is asking me to suppress Mr. Awkal's

6    testimony because his name and ethnicity regarding

7    September 11th would be an issue, I deny that motion.

8          Also it appears that Mr. Hunter Moore and

9    Mr. Brett Johnson will not be called by the government

10   during its case in chief; is that correct?

11         MR. EICHELBERGER:  That's correct, Your Honor.

12         THE COURT:  All right.  And in terms of

13   sequestration of witnesses, I'm assuming both sides want

14   to sequester witnesses; is that correct?

15         MR. EICHELBERGER:  Yes, Your Honor.  We would

16   ask that Agents Smith and Kirby be the exceptions

17   pursuant to the rules of evidence.

18         THE COURT:  All right.  So it would be you and

19   the two agents and Mr. Daley?

20         MR. EICHELBERGER:  That's correct.

21         THE COURT:  Do you have some paralegal that is

22   going to be working the computer?

23         MR. EICHELBERGER:  She actually came in and she

24   helped us through it, and we are going to be running the

25   computer ourselves.

1          THE COURT.  Okay.  All right.

2          And with your group, Mr. Liotti, who do you

3  need in the courtroom?

4          MR. LIOTTI:  Judge, Mr. Smith and my client,

5  his parents -- my client's parents are back here --

6          THE COURT:  All right.

7          MR. LIOTTI:  -- on this side of the courtroom,

8  on our side.

9          THE COURT:  Do you intend to call them as

10  witnesses?

11          MR. LIOTTI:  I have to talk to Dr. Giannone

12  about that; it's possible he might be a witness.

13          THE COURT:  Do you think that it would be as to

14  any matter that another witness might be testifying to?

15  In other words, would it be something that sequestration

16  would be appropriate for, or is it just general --

17          MR. LIOTTI:  No sequestration as to them would

18  be appropriate --

19          THE COURT:  Well, you realize the risk.  If

20  he's not sequestered and if he wants to counter another

21  witness's testimony who has testified and he was

22  present, he's not going to be allowed to testify to it.

23          MR. LIOTTI:  I understand.

24          THE COURT:  Okay.  All right.

25          MR. LIOTTI:  Judge, I do have on that very

1  subject, while we are at it -- and I believe that this

2  was part of our motion in limine -- the government has,

3  it appears, two agents and two attorneys in the

4  courtroom.  I don't think I can prevent the government

5  from having two attorneys here and one agent, but I

6  think the practice that ordinarily is followed is that

7  it's one agent.

8          And if there's a second seat, fine, I can't

9  stop that, but I'm a little concerned about this

10  overpowering problem here of too many agents in the well

11  of the courtroom.  So, I would ask that they be limited

12  to having one agent.  I don't care who it is at any

13  given moment, but one agent, and if it's going to be two

14  attorneys, then two attorneys.

15          THE COURT:  All right.  Mr. Eichelberger, tell

16  me why you need both agents.

17          MR. EICHELBERGER:  Your Honor, the agents

18  worked, essentially, interchangeably throughout the

19  course of this case.  There are -- there is information

20  that one agent has that is -- may have that is unique to

21  that person, and so in order to effect a smooth

22  presentation of this and the necessary consultations

23  during the trial, we really do need to have both of them

24  available to us at any given time.

25          THE COURT:  I don't really see any prejudice to

that. We are often sending one agent out to get a
witness and they are back and forth in and out of the
courtroom. He's not sitting at counsel table, so I will
overrule that objection and allow you to have the other
agent in.

MR. EICHELBERGER: Thank you, Your Honor.

THE COURT: Now, are either -- are those
agents, are either of those agents going to be
testifying to matters that might be, in other words,
countering another witness's testimony? Did either of
them interview, you know, a defense witness or --

MR. EICHELBERGER: They've only been involved
with government witnesses that I'm aware of.

THE COURT: Okay. All right.

MR. EICHELBERGER: And both will be testifying,
both agents will be testifying.

THE COURT: And in what order?

MR. EICHELBERGER: Mr. Smith will testify
first; Mr. Kirby will testify second. There is some
overlap between their testimony, but Mr. Smith is going
to talk about the history, the background of the
investigation. Mr. Kirby will go more into the chat
transcripts themselves and the work that has been done
to link those chat transcripts to Mr. Giannone.

THE COURT: All right. Let's do this, let's

1  have Agent Kirby outside while Agent Smith testifies.

2          MR. EICHELBERGER:  That's fine.

3          THE COURT:  And then once they both testify,

4  they can both be in.

5          MR. EICHELBERGER:  That's fine.

6          THE COURT:  Okay.  All right.  Any other

7  matters before we bring the jury in?

8          MR. EICHELBERGER:  The only other matter -- I

9  raised the issue with Mr. Liotti about the proposed

10  exhibits.

11          THE COURT:  Yes.

12          MR. EICHELBERGER:  I have handed up a set of

13  those exhibits to Your Honor.  On Saturday I contacted

14  Mr. Liotti's office -- they were up in New York

15  preparing -- and offered to provide them a set.

16          They took me up on that and yesterday afternoon

17  I walked out onto Main Street and hand-delivered a set

18  of those exhibits to Mr. Liotti, and I advised him that

19  the practice of Your Honor is to inquire as to whether

20  we can agree to the admissibility of those documents.

21          We -- I've spoken with Mr. Liotti about that

22  matter a couple of times this morning.  He's given me a

23  tentative indication, but I will ask him to comment on

24  that point.

25          THE COURT:  All right.  Yes, sir.  Mr. Liotti,

1   it certainly would help if there are those that you

2   agree on, we can go ahead and introduce them.

3           MR. LIOTTI:  We agree, no objection.

4           THE COURT:  All right.  Then all government's

5   exhibits on the government's exhibit list are admitted.

6           MR. EICHELBERGER:  Thank you, Your Honor.

7           MR. LIOTTI:  I just have one other matter,

8   Judge, and this is part of the motion in limine to

9   suppress that we had presented to Your Honor.

10           I'm advised that the witness whose name is

11   Oussama Awkal, that's A-w-k-a-l, apparently also turned

12   over some of Mr. Giannone's mail to the government and

13   that was without Mr. Giannone's knowledge or consent.

14           So, I think to the extent that this witness had

15   knowledge or possession of things that belonged to

16   Mr. Giannone and to the extent that the government has

17   been able to use that in any fashion, either directly or

18   derivatively, I think I would ask, Judge, for Your Honor

19   to inquire of the government as far as the mail is

20   concerned.

21           THE COURT:  All right.  Why don't we do that

22   before the witness takes the stand?

23           MR. EICHELBERGER:  I think it's an easy

24   response, and that is that there was some mail that was

25   abandoned.  I do not believe it was ever opened by the

1    government.  It's the material that we got back from

2    Mr. Awkal, and we provided copies of that material to

3    counsel, but I didn't make any use of that information.

4    We didn't open it and make no use of any of that

5    unopened mail.  Again, it was abandoned at the A&W Auto

6    Clinic location in Holyoke, Massachusetts.

7              THE COURT:  So you are saying they were

8    unopened envelopes?

9              MR. EICHELBERGER:  Yes.

10             THE COURT:  You photocopied the envelopes?

11             MR. EICHELBERGER:  Photocopied the outside of

12   the envelope.

13             THE COURT:  But you didn't open them?

14             MR. EICHELBERGER:  No, I don't believe so.  No.

15             THE COURT:  Haven't been opened and haven't

16   been used?

17             MR. EICHELBERGER:  Correct.

18             MR. LIOTTI:  I'm advised, Judge, that the

19   envelopes were opened.

20             THE COURT:  Okay.

21             MR. EICHELBERGER:  If they were, I've never

22   seen them; I haven't made any use of them.

23             THE COURT:  You can tell this from the way they

24   are photocopied?

25             MR. LIOTTI:  I'm not quite sure.

1          THE COURT:  Well, what I will do is defer on

2    that until the government can get -- bring the originals

3    and let you look at them.

4          MR. LIOTTI:  That's fine, Judge.

5          THE COURT:  Okay.  All right.

6          One more thing, there was a matter mentioned in

7    one of these letters about your client's bond status,

8    Mr. Liotti.  Last week I received a message from the

9    probation office that there was -- that they had been

10   advised by the prosecution that your client had engaged

11   in a new criminal behavior while on bond.

12          And my response was that -- and they wanted to

13   know if they should prepare a petition for revocation of

14   bond and I advised them no, that I would deal with it

15   when we came to the trial.

16          It's my view at this point that since

17   Mr. Giannone is here it would severely complicate things

18   for us to take him into custody at this point in time,

19   and I would prefer to defer that until the end of the

20   trial.

21          Does the government have any objection to my

22   leaving him on bond during the trial and addressing this

23   matter at the conclusion of the trial?

24          MR. EICHELBERGER:  We do not have an objection

25   to that procedure, Your Honor.

1           THE COURT:  Okay.  That's what we will do,

2  then.

3           MR. LIOTTI:  Thank you, Your Honor.

4           THE COURT:  All right.  Anything else?

5           All right.  Mr. Eichelberger, how long will you

6  take to open?

7           MR. EICHELBERGER:  My opening should take 20

8  minutes, maybe 25.

9           THE COURT:  And, Mr. Liotti, will you be

10  opening for the defense?

11           MR. LIOTTI:  Yes, Your Honor.

12           THE COURT:  And how long do you anticipate you

13  will take?

14           MR. LIOTTI:  Probably about 10 minutes, in my

15  judgement.

16           THE COURT:  All right.  Well, let's get the

17  opening statements done and then we'll take a break.

18           MR. EICHELBERGER:  Thank you, Your Honor.

19           THE COURT:  All right.  You may bring the jury

20  in.

21           I will make a very brief opening charge to the

22  jury before you open.

23           MR. LIOTTI:  Judge?

24           THE COURT:  Yes.

25           MR. LIOTTI:  The podium and so forth, how do

1   you set that up in your courtroom?  Where do you want us

2   to stand during the opening?

3         THE COURT:  You are not tied to the podium, but

4   I do need you to be near a microphone, and the

5   microphones -- this ELMO here has a microphone.  You see

6   that?

7         MR. LIOTTI:  This one right here?

8         THE COURT:  That has a microphone.  So if you

9   are standing somewhat near there, that's good.

10        Also those items, those little gizmos there are

11   microphones.  I prefer for you not to stand that close

12   to the jury but sometimes --

13        MR. LIOTTI:  Sure.

14        THE COURT:  Somewhere in there.  You are not

15   too soft-spoken so I think we should have no trouble

16   hearing you.

17        MR. LIOTTI:  Thank you.

18        (Jury present)

19        THE COURT:  You need to come around and come

20   down to the front row, please.  Thank you.

21        Doug, would you pass them those pads and

22   pencils?

23        These pads and pencils are for your use if you

24   choose to take notes, you are not required to do so.  If

25   you decide to take notes, you should write your name on

1  the first page and start taking notes on the second

2  page.  And at short breaks you will be told just to turn

3  the pads over and leave them in your chairs, and at

4  longer breaks you will take them back and leave them in

5  the jury room and when the case is over your notes will

6  be shredded.  They are simply for your own personal use

7  if you choose to take notes.

8          All right.  Is there anyone who did not receive

9  a notepad or pen and who wants one?  Okay.

10          All right.  Good morning everyone.  I would ask

11  that you stand now and take your oath as jurors in this

12  particular case.  Please stand.

13          THE CLERK:  Please raise your right hand.

14          (Jury sworn by the clerk.)

15          THE COURT:  Thank you.  You may have a seat.

16          Now that you have been sworn in as the jury to

17  try this particular case, I want to give you some brief

18  preliminary instructions at this time.  I'm not going to

19  go over all of the law that will apply in this case, but

20  I want to give you enough so that you will understand

21  the procedures that we will follow and the issues that

22  you are going to be called upon to decide in the case.

23          As I told you during jury selection, you should

24  consider yourself the judges of the facts.  I will be

25  the judge of the law.  At the end of the case I will

1    provide you with typewritten jury instructions that you

2    will go over with me here in court, and you will be able

3    to take those jury instructions with you into the jury

4    room for your deliberations.

5            You will decide the disputed issues of fact,

6    and you will apply to those facts that you find the law

7    as I charge you.  So, you don't need to worry about

8    memorizing what I say or learning the law, you will have

9    it in writing and you will be able to take it with you

10   into the jury room.

11           Because you will be the judges of the facts,

12   it's very important for you to give careful attention to

13   the testimony and evidence presented for your

14   consideration during the trial.

15           But you should keep an open mind and you should

16   not form or state any opinion about the case one way or

17   the other until you have heard all of the evidence and

18   you have heard the closing arguments of the lawyers and

19   my instructions to you on the applicable law.

20           So because of that you must not discuss the

21   case during the trial in any manner, even among

22   yourselves, or with anyone else, or allow anyone to

23   discuss it with you or in your presence.

24           And you must not even speak in the hallways or

25   as you are coming and going to the courthouse to the

1    lawyers or to the others whom you may come to recognize

2    as being associated with this case.  They are not going

3    to speak to you; I don't want you to speak to them.  We

4    are not trying to be rude, we are trying to avoid even

5    any appearance of impropriety.

6          You will find some badges that say "juror" in

7    the jury room and before you go out for lunch, you

8    should take a badge, wear that badge when you are in and

9    around the courthouse.

10         You obviously don't have to wear it when you

11   walk downtown for lunch, but when you do -- when you are

12   around the courthouse, please wear the juror badge so

13   they may recognize you as being a juror and avoid

14   speaking about the case in your presence.

15         Now, the reasons for these cautions that I'm

16   giving you lies in the fact that it will be your duty in

17   this case to decide the case based solely on the

18   testimony and the evidence presented during the trial,

19   without consideration of any other matter whatsoever.

20         From time to time during the trial I may be

21   called upon to make rulings of law on motions or

22   objections made by the lawyers.  You should not infer or

23   conclude from any ruling that I may make that I have any

24   opinion on the merits of the case favoring one side or

25   the other.

1     If you hear me say "sustained" when an

2 objection is made and then the witness does not answer

3 the question, you should not speculate on what that

4 answer might have been.  If you hear me say "overruled"

5 and the witness does answer the question, you should not

6 give that answer any more weight or significance than

7 any other answer simply because it was objected to.

8     Now, from time to time a witness may blurt out

9 something that we don't expect before a lawyer has a

10 chance to object, and then the lawyer may ask me to

11 strike that testimony.  You have already heard it.

12     I may tell you that that evidence is stricken.

13 That means that you can't use it, you cannot consider it

14 even though you heard it.  You must not use it in

15 deciding what the facts are and you would be required to

16 follow such an instruction.

17     Sometimes evidence is received for only a

18 limited purpose.  At that point I would give you what we

19 call a limiting instruction.  You may use this evidence

20 only for this purpose and for no other purpose, and you

21 must not use it for any other purpose.

22     Now, at times it's necessary for me to confer

23 with the lawyers outside your presence.  That is because

24 I may be needed to rule on matters of law or procedure

25 that are required to be considered by the court alone.

1           On some occasions I may have to ask you to

2    return to the jury room for me to do that.  On other

3    occasions I may ask the lawyers to approach the bench.

4    When I do that, they will come up and speak with me at

5    the bench and we will turn on some white noise which

6    will come out of speakers that are behind your head.

7           It's not too loud; it's not too awful to have

8    that sound coming out of there.  And the purpose is so

9    that we can confer up here without having to send you

10   back to the jury room frequently.  It works fairly

11   well.  The jurors seem to prefer that to being herded in

12   and out of the courtroom every time there is an

13   objection made.

14          Now, during the process of the jury selection I

15   told you that we anticipate that this case will last

16   three or four days.  I can't tell you right now how long

17   it will last.  I will monitor the progress of the trial

18   as we move forward, and as we have any progress reports,

19   I will give them to you so you will have a better idea

20   of how we are moving in terms of the timing of the

21   trial.

22          Now, these preliminary instructions, as I told

23   you, are not all of the law.  And as I said, I will give

24   you full instructions on the law at the end of the

25   trial, but at this point there are a few initial matters

1  I want to bring to your attention.

2         As I told you during jury selection, an

3  indictment in a criminal case is simply the charging

4  paper.  It is simply a document that contains the

5  charges to be determined at the trial.  It is not

6  evidence against the defendant.

7         The defendant here, Mr. Giannone, has entered a

8  plea of not guilty and he is presumed by the law to be

9  innocent.  The government has the burden of proving him

10 guilty beyond a reasonable doubt, and if it fails to do

11 so you must find him not guilty.

12        Because the government has the burden of proof,

13 the government will go forward and present its testimony

14 and evidence first.  When the government finishes

15 presenting its evidence, you will hear the prosecutor

16 stand up and say, "The government rests."

17        At that point the defendant may call witnesses

18 and present evidence, if he wishes to do so.  But

19 remember, the law does not require any defendant to

20 prove his innocence or produce any evidence at all, and

21 no inference whatever may be drawn from the election of

22 the defendant not to testify in the event he elects to

23 do that.

24        Now, in terms of taking notes, I told you that

25 you are not required to take notes.  These are simply

1  for your own purposes, if you wish to remember.  You

2  will note that we have a court reporter.  This is Gary

3  Smith and he's taking down everything I say and

4  everything that everyone will say, but the preparation

5  of a transcript does not happen until after a trial is

6  completed.  In other words, it's not available for you

7  during the time of your deliberations.

8         So, if you think that there is something that

9  you think is significant, you would like to take notes,

10 you are welcome to do so.  If you do decide to take

11 notes, don't get so involved in notetaking that you

12 become distracted from the ongoing proceedings.

13        And if you do take notes, also, use these notes

14 only as aids to your memory.  If your memory later

15 differs from your notes, rely on your memory and not

16 your notes.

17        Also, you should not be unduly influenced by

18 the notes of other jurors.  Notes are not entitled to

19 any greater weight than the individual recollections or

20 impressions of each juror as to what the testimony was.

21        Now, as we go forward in this case, you, as I

22 said, you will not have complete typewritten transcript

23 at the time of your deliberations.  You will have,

24 however, the exhibits that are introduced in the trial.

25        This morning we have already admitted a large

1 number of exhibits into evidence and these exhibits will

2 be displayed at different times on your screens there in

3 the jury box, and at times an exhibit might actually be

4 passed to you to look at.

5        If you don't have an opportunity during the

6 trial to fully examine an exhibit, don't worry, you will

7 have hard copies of all the exhibits in the jury room

8 for your deliberations, and you will be able to fully

9 inspect them at that time.

10        As you listen to the testimony, remember that

11 you will be the sole judges of the believability or

12 credibility of the witnesses in this case.  In deciding

13 whether or not you believe or do not believe any

14 witness, you should consider his relationship to the

15 government or to the defendant, his interest, if any, in

16 the outcome of the case, his manner of testifying, his

17 opportunity to actually observe or acquire the knowledge

18 about which he is testifying, his candor, fairness,

19 intelligence, and the extent to which his testimony has

20 been supported or contradicted by other credible

21 evidence.  Remember, though, you may accept or reject

22 the testimony of any witness in whole or in part.

23        Now, in this particular case we have five

24 charges or counts.  The indictment has five counts, and

25 the count is the same thing as a charge.  There are

1 three charges of wire fraud under the federal wire fraud

2 statute and two charges of aggravated identity theft

3 under another federal statute.

4        The two charges of identity theft relate to or

5 go with a particular mail fraud count, and I will

6 explain more about that to you at the end of the case.

7        But we have three counts of wire fraud, counts

8 1, 3, and 4, and then we have two counts of identity

9 theft.  And identity theft in count 2 relates to the

10 wire fraud in count 1, and the identity theft charged in

11 count 5 relates to the wire fraud charged, I believe, in

12 count 4.

13        And so the government has the burden of proof

14 in all of these charges, and in order to prove someone

15 guilty of wire fraud, the government has to prove

16 certain essential elements, and has to prove each of

17 them beyond a reasonable doubt.

18        They have to prove that the defendant knowingly

19 devised or participated in a scheme to defraud or for

20 obtaining money or property by means of false pretenses,

21 representations, or promises; that the defendant did

22 this with an intent to defraud; and that the defendant

23 transmitted or caused to be transmitted by wire in

24 interstate commerce some communication for the purpose

25 of executing the scheme to defraud.

1          So those are the essential elements of a case

2     of wire fraud, and you will hear more about that and I

3     will give you more definitions of those terms in your

4     final jury instructions.

5          Now, the second charges, the counts 2 and 5

6     charges of identity theft, to prove that the government

7     would have to be able to prove three essential

8     elements.

9          First, that the defendant transferred,

10    possessed, or used a means of identification of another

11    person; second, that he did it, he acted knowingly, and

12    without lawful authority; and third, he acted during and

13    in relation to a specific fraud.  And when I refer to

14    the specific fraud, I'm referring to the wire fraud in

15    the other counts.

16          So, for example, if you found the defendant not

17    guilty of count 1, you would necessarily -- could not

18    find him guilty of count 2.  A finding of guilt on

19    count 1 is a necessary predicate to even considering

20    whether he's guilty on count 2 or not, and that's the

21    same thing as to count 5.  So, I will go into more

22    detail with you on that at a later time.

23          Now, when we begin the trial, what we do first

24    is we allow the lawyers for each side an opportunity to

25    make what we call an opening statement to you in which

1   they may explain the issues in the case and summarize

2   the evidence that they expect to come in.

3           Then after that, the government's attorneys go

4   first, as I said, and present their case.  Then the

5   defendant is given an opportunity to present any

6   evidence he wishes to present.  And then the government

7   is given the opportunity of a brief reply or rebuttal

8   case.  After that, the attorneys make their closing

9   arguments and then I give your instructions and you have

10  your deliberations.

11          The statements that the lawyers make now, as

12  well as the arguments that they will present to you at

13  the end of the trial, are to be considered by you

14  neither as evidence in the case, because evidence comes

15  from witnesses, and lawyers are not witnesses, or as

16  your instructions on the law, because your instructions

17  on the law come only from me.

18          But these statements or arguments are intended

19  to help you understand the evidence as it comes in, as

20  well as the issues or disputes that you may be called

21  upon to decide, and the positions taken by both sides.

22          Now, as we move forward, if you have a family

23  member or friend who is coming to court with you and

24  wishes to sit in and observe the proceedings, that is

25  fine, we just need to know it.

1      We need to know it so that when you are in the

2  courtroom they are welcome in the courtroom, but when

3  you are not in the courtroom we ask them to remain

4  outside.  We do that so that they won't hear things that

5  you are not supposed to be hearing, and it avoids any

6  possible allegation that they may have told you

7  something that was going on in the courtroom that you

8  were not supposed to hear.

9      It is not that we are trying to hide things

10  from you, it's simply that there are certain rules that

11  apply, and there are certain parts of the proceedings

12  that are done outside the presence of the jury, and then

13  the jury hears the evidence that the court considers to

14  be properly admissible.

15      Two of you are alternates, and at the end of

16  the trial if all of the regular jurors are healthy, I

17  will excuse the alternates before the deliberations

18  begin.  But we need alternates so that we don't end up

19  having to start over in a trial once we have begun, if

20  we lose someone due to an illness or a family problem or

21  something like that.

22      You will select your own foreperson.  That will

23  be your first order of business when you begin the

24  deliberations at the end of the case.  You will take a

25  vote and decide who you wish to have your foreperson be,

1 and that person doesn't have any more power than anyone

2 else, he's simply the person that would preside over the

3 deliberations and speak for the jury here in open court.

4          If you wish to bring something to drink into

5 the courtroom, you may do that, just be sure to place it

6 between the chairs and not in the walkways.  And if you

7 need a break before I call a break, raise your hand.  If

8 a juror raises his or her hand, I'm going to call a

9 break, I'm not going to ask you why you are raising your

10 hand.

11          Jurors are not allowed to raise their hand and

12 ask questions during the course of the trial for some

13 very good reasons that I will be happy to explain to you

14 after the trial is over.  So if jurors start raising

15 their hands, we are going to have a break and I'm not

16 going to ask you why, I will just assume that someone

17 needs a break.

18          We have in effect a rule of sequestration.

19 That means that only certain individuals are allowed to

20 be in the courtroom, who might be testifying, others are

21 being required to wait outside during testimony and can

22 only come in when they testify or after they have

23 testified.

24          And so from time to time there will be some

25 delay getting the next witness, and just understand that

1 they are not doing this to purposely delay the trial,

2 they are required to keep these witnesses outside and

3 they have to go out and get them in between.

4 It will be -- we will generally work until

5 1 o'clock each day. We'll generally take a midmorning

6 break and a midafternoon break. We normally take an

7 hour and 15 minutes for lunch, that's about as much time

8 as it takes you to walk somewhere or get -- get a lunch

9 and get back and get through security and get back up to

10 the jury room. But like I said, if anyone has a

11 problem, just let us know. We generally break at 5:30

12 each day.

13 On the first day we ask the jury to come at

14 10:00 because we have preliminary matters that we take

15 up starting at 9:30. And on subsequent days, we have to

16 ask the jury to be here at 9:30 so we get a full day

17 with the jury, from 9:30 to 5:30.

18 So, those are the procedures that we will be

19 following. I appreciate you all being here. By the

20 oath that you've just taken this morning you have become

21 active participants in the administration of justice,

22 perhaps for the first time, and you are now the judges

23 of the facts in this case.

24 So, please give your attention to the attorneys

25 as they make their opening statements.

1    Mr. Eichelberger.

2    MR. EICHELBERGER:  Thank you, Your Honor.  May

3 it please the court?

4    THE COURT:  Yes.

5    MR. EICHELBERGER:  Mr. Liotti, Mr. Smith.

6    Good morning.

7    THE JURY:  Good morning.

8    MR. EICHELBERGER:  I love the Internet.  The

9 Internet is a fascinating thing.  It's a place where we

10 can entertain ourselves; we can get information; we can

11 watch videos; we can play games; we can buy things.

12 EBay is a great place, you can bid on things.  If you

13 think about it, you can buy it on eBay.

14    But, ladies and gentlemen, there's a side of

15 the Internet that we don't like to think about.  There's

16 kind of a dark underbelly to the Internet, one where not

17 trinkets or bobbles are bought, sold, and traded like on

18 eBay, but there's a part of the Internet where people's

19 lives are bought, sold, and traded.

20    Now, by that I don't mean the physical lives of

21 their daily existence.  What I mean is, their economic

22 and their emotional lives are bought and sold and

23 traded.

24    And that's a little bit about what this case is

25 going to be about.  You are going to see that side of

1 the Internet and, I suspect, that you are never going to

2 exactly look at the Internet the same again after this.

3      Before I talk about the nature of that dark

4 underbelly of the Internet, I would like to reintroduce

5 myself.  About two weeks ago I came in here and we

6 picked a jury.  You folks were the ones selected for

7 this.

8      My name is Dean Eichelberger.  I'm an Assistant

9 United States Attorney and I will be prosecuting the

10 case.  Mr. Bob Daley was not with me during jury

11 selection, but he's going to be helping me with the

12 prosecution of this case.  Mr. Daley is also an

13 Assistant United States Attorney.

14      Special Agent Brad Smith with the United States

15 Secret Service, he's helped out immeasurably in the

16 preparation of this case, the investigation.  Similarly,

17 Special Agent Bobby Joe Kirby with the United States

18 Secret Service has fulfilled that function of being

19 somebody who worked closely with Mr. Daley and myself as

20 we brought this case to the presentation.

21      I apologize for the cough.  My voice has just

22 been incredibly scratchy and tired, so during the course

23 of the trial I apologize in advance.  I'm going to cough

24 some.  I have got water here.  I have got cough drops in

25 my pocket.  I will do my best, but please bear with me.

1          One other thing that is going to be used during

2     this trial is this computer, because the computer is

3     going to be used to display documents on those monitors

4     that are right there in front of you.  Now, there's an

5     old saying, to err is human, but to really foul things

6     up takes a computer.

7          Well, this computer may well make its presence

8     known at some point during the course of this trial.

9     And if that happens, just bear with us.  We will have to

10    log in -- we have to let the computer know we care,

11    periodically, about what is going on.

12         But that brings us back to what this case is

13    about.  Because, you see, what happened in this case

14    is -- I don't know -- two, three years ago, federal

15    agents managed to develop a window into this dark

16    underbelly.

17         A guy by the name of Brett Johnson was arrested

18    down in Charleston, South Carolina.  Brett Johnson, I've

19    got to tell you, is a person who for years has been

20    engaged in this type of buying, selling, and trading of

21    people's lives, their information, their credit cards.

22    Anything possible about them that someone could use for

23    fraudulent purposes, Brett Johnson was involved in that.

24         Well, when Brett Johnson got arrested down in

25    Charleston, law enforcement found out about his very

highly placed role in this underground economy. And
they thought this would be a good opportunity to use
Brett Johnson, to put him to work to try to draw other
people out of the Internet, people who knew of his prior
identity, gollumfun. Keep that name in mind, because
that's the name that Brett Johnson used throughout this
investigation.

What happened was, these agents brought Brett
Johnson, gollumfun, back here to Columbia, South
Carolina, and they set him up in an office at their
facility. And he was provided with a computer and
various other materials. They are going to talk in some
detail about how that worked.

And then his job was to come in somewhere
between four and six hours a day and simply be on that
computer as gollumfun and chat with people. And in the
course of those chats, you are going to hear testimony
about how one individual -- an individual who went by
two separate online names, Pit Boss 2600 and CIA INTEL.

This person, Pit Boss or CIA INTEL -- I will
just refer to Pit Boss for ease of reference, take it as
referring to either one -- but this person chatted
multiple times with gollumfun and the subject of the use
of people's lives: Their credit card information, their
names, Bank of America Premium debit cards, things that

would allow somebody who was bent on mischief to withdraw money from their accounts, or to purchase goods with that information. All of this was talked about during the course of these chats.

And there came a time where Pit Boss 2600 transferred people's lives -- information about them, about their credit cards -- on three separate occasions to gollumfun, to this investigation, three separate occasions. That's the three counts of wire fraud that are referenced in this indictment.

In connection with two of those times, he also gave the names of people that owned the accounts that were referenced. That's where counts 2 and 5 come in, the aggravated identity theft. And after -- in connection, I should say, with that third of the three times when there were -- 21 sets of information were transferred to gollumfun. The agreement had been made that Pit Boss 2600 would receive a payment of $600 for the lives of 21 people, the financial lives.

And these agents actually took $600 in cash and they placed it into a Bank of America business account, it was identified specifically by Pit Boss 2600.

And then in a chat they notified Pit Boss 2600 that that money was there. And within about an hour and a half, maybe an hour and 35 minutes, Mr. Jonathan

1  Giannone appeared at an ATM machine up in New York and

2  he punched in the codes and he withdrew $500 in cash,

3  money that came from the investigation.

4          But this case is a whole lot more than merely

5  having some chats and having Mr. Giannone show up.

6  Because we truly have a star witness in this case, and

7  the star witness in the case is the record of those

8  chats, the written words on a piece of paper.

9          Those chats, you will hear, were generated by

10  the computer program that was used for the

11  communication.  So I don't know if any of you have

12  children that like to get online and with AIM, AOL

13  Instant Messaging, and they'll be chatting, "Hi, how you

14  doing?"  Somebody says, "Great, how are you?"  And it's

15  back and forth and things flying at you.

16          They can also be set where they generate a

17  transcript of those chat sessions and that truly, ladies

18  and gentlemen, is going to be the star witness in this

19  case, those chat transcripts.

20          But it's more than merely having Mr. Giannone

21  show up.  Because during the course of these chat

22  transcripts, CIA INTEL/Pit Boss 2600 made specific,

23  factual references to things that happened out -- the

24  computer term is "in the real world."

25          So, for instance, if on one occasion -- and you

1    will hear testimony about this -- that Pit Boss 2600

2    says in a chat that took place on May the 26 of 2005, "I

3    was in Jacksonville yesterday."  These agents went out

4    and in a laborious process secured financial, business,

5    travel -- a number of records -- and they will show you

6    that on May the 25th, the day before the 26, on May the

7    25th, 2005, there was a financial transaction on

8    Mr. Giannone's bank account in Jacksonville, Florida.

9          You are going to see how that happens time and

10   time and time and time again.  We are going to show you

11   multiple instances where references to things in the

12   real world are borne out by the financial records, the

13   travel records of Mr. Giannone.

14         Now, as to linking the Pit Boss 2600 and the

15   CIA INTEL name together being one and the same person,

16   that will be done primarily through internal

17   consistencies within chats where it's CIA INTEL speaking

18   or Pit Boss 2600 speaking.

19         I will give you a teaser for some of those

20   things.  Pay attention to a cotton candy machine.  Why a

21   cotton candy machine?  You will see that there are chats

22   where at one time Pit Boss 2600 is asking about a cotton

23   candy machine, at another time CIA INTEL is asking about

24   the same thing.

25         Also, remember an online identity of Enhance,

1  E-n-h-a-n-c-e.  Enhance is referenced, first, through --

2  I think it's Pit Boss 2600 talking about how Pit Boss

3  purchased that identification.  Later in the chat CIA

4  INTEL says the exact same thing.

5          And, then, finally there's going to be,

6  actually, some specific cross-references where, for

7  instance, CIA INTEL says, "Contact me on AIM, use Pit

8  Boss 2600."

9          So, we will show you those to first establish

10 that Pit Boss and CIA INTEL are one and the same

11 person.  And then by linking that one person to the real

12 world, we will show you that this unified identity is,

13 in fact, Mr. Jonathan Giannone, and that Mr. Giannone

14 showed up an hour and a half after the money was

15 deposited and got his ill-gotten gain.

16          Well, in the course of this trial, though,

17 Mr. Giannone came up with an explanation for that fact.

18 He said that what really happened is a guy by the name

19 of Christopher Cutler -- Mr. Cutler will testify -- but

20 he says that Mr. Christopher Cutler purchased or had

21 agreed to purchase a Ford F-150 pickup and that there

22 was a 20 percent deposit that was required and that that

23 deposit equaled $600.

24          According to what Mr. Giannone said in this

25 case, Mr. Cutler is the true criminal, the one who sold

1    these 21 lives and then had that $600 deposited into

2    Mr. Giannone's account to satisfy that obligation on the

3    pickup.

4            We will present to you information, ladies and

5    gentlemen, that will convince you that that explanation

6    is false.  You will see how the necessary implications

7    of this purported pickup transaction is that this is the

8    first time Mr. Giannone and Mr. Cutler had any dealings

9    with each other, May of 2005.

10           Regrettably for Mr. Giannone, you will hear

11   that in February of 2005, three months before that took

12   place, Mr. Giannone paid for airline tickets for himself

13   and Chris Cutler to travel to Florida.

14           Additionally, in the chat, purported chat

15   transcript, Mr. Giannone says, "You remember me?  I'm

16   the guy Branca introduced to you at the car lot, May of

17   last year."  Branca is Christopher Branca.  Mr. Branca

18   also will testify.  Similarly he will say, no pickup

19   transaction.

20           Now, both Mr. Cutler and Mr. Branca have their

21   own criminal problems.  Mr. Cutler is charged in a

22   separate indictment in this court with having engaged in

23   some of the same type of activity, violating people's

24   lives, their financial lives.  Similarly, Mr. Branca has

25   signed a plea agreement in agreeing to plead guilty to

1 what we call a felony information charge with conspiracy

2 to do these very type of activities.

3      Let's go back to Mr. Brett Johnson.

4 Mr. Johnson, the person who worked with the Secret

5 Service, he has lots of criminal problems.  He's not

6 going to testify during the course of this case, but I

7 wanted to be up front with you about him.

8      While he was working with the Secret Service,

9 he had his own secret life.  He was engaging in

10 additional criminal activity.  When it was discovered,

11 he was put back into state custody.  When he got out of

12 state custody, he went on a cross-country fraud tour.

13 When he was arrested, he had $150,000 cash on his

14 person.

15      I'm going to tell you this up front because I

16 have nothing to hide with respect to Mr. Johnson or

17 Mr. Cutler or Mr. Branca.  But their credibility, such

18 as it is, really has nothing to do with the star

19 witness, which is the chat transcripts in this case,

20 those that were generated as they happened by operation

21 of the computer.  So that's what we are going to have in

22 this case.

23      By the way, we are going to have one other

24 witness, a guy by the name of Mr. Awkal.  Mr. Awkal

25 lives in Holyoke, Massachusetts.  You see, when

1  Mr. Giannone claimed to have sold the pickup, he made

2  specific reference having done it through A&W Auto

3  Clinic.

4         Well, Mr. Awkal is actually the owner of A&W

5  Auto Clinic.  Now, he will tell you that Mr. Giannone

6  had negotiated through an eBay transaction to purchase

7  that business, but Mr. Giannone did not go through with

8  it.

9         Mr. Giannone was not authorized to use the A&W

10 Auto Clinic business name.  Mr. Giannone never sold any

11 vehicles through that business, never transacted

12 business at that location.  That's testimony you are

13 going to hear from Mr. Awkal.

14        So all this testimony we are going to have

15 coming in, it's going to establish at its core a very

16 simple set of facts.  That is, the star witness, the

17 chats, will convince you that there were conversations

18 between Pit Boss and gollumfun, conversations dealing

19 with how to steal people's lives, their financial lives,

20 their emotional and mental well-being.

21        And that $600 was paid.  That an hour and a

22 half after notification that $600 was sitting in the

23 bank account, Jonathan Giannone was there punching those

24 numbers and pulling that money out.  And we're going to

25 show you that Jonathan Giannone was the person behind

1    Pit Boss 2600 the entire time.

2          We are going to do that through this series of

3    in-the-real-world encounters, transactions, places.  I

4    mean, you are going to hear about Florida, Hawaii,

5    Washington, D.C., California.  All these places where we

6    can tie Mr. Giannone to, places he specifically

7    references during these chats.

8          And then when this trial is over I'm going to

9    come right back to this very same place and I'm going to

10   talk to you about the chats.  I'm going to talk to you

11   about Mr. Cutler, Mr. Branca, Mr. Awkal, and I'm going

12   to explain the inferences.

13         I'm going to explain to you how that set of

14   facts ties together and how those facts prove beyond a

15   reasonable doubt that Mr. Giannone is guilty as charged

16   with three counts of wire fraud, two counts of

17   aggravated identity theft.

18         And I will stand here and I will ask you to

19   return a verdict that the evidence cries out for in this

20   case.  That is, I will ask you to return a verdict of

21   guilty on all counts.

22         Thank you for your attention.

23         THE COURT:  Mr. Liotti.

24         MR. LIOTTI:  Thank you, Judge.

25         Good morning, ladies and gentlemen.

1          THE JURY:  Good morning.

2          MR. LIOTTI:  How are you today?  Ah, let me

3  talk to you a little bit about this case, if I may.

4  When I listen to my able colleague, Mr. Eichelberger,

5  and he is pointing his finger at my client, it sounds

6  pretty forceful, doesn't it?  Sounds pretty persuasive.

7          Mr. Eichelberger doesn't use the phrase, "This

8  is what the evidence will show," but instead he fast

9  forwards to the end of this case as if the evidence were

10  already here and says Mr. Giannone is guilty, thereby

11  basically taking away from you an essential function

12  that is so important to this case and all others.

13  Because Judge Currie told you at the outset of this case

14  how important your function is.

15          And just like Judge Currie sits here and

16  presides over the law in this case, it's your job to

17  preside over the facts.  It's not Mr. Eichelberger who

18  is going to decide guilt or innocence here.  He has the

19  burden of proof under our constitution and he must meet

20  it or my client is not guilty.  This is the way our

21  system of justice works.

22          So Mr. Eichelberger and I will fight like cats

23  and dogs in the well of this courtroom.  It's an

24  adversarial system; it doesn't work unless we do that.

25  It's not personal between Mr. Eichelberger and I, it's

1   just us representing our respective clients.

2           So, now, let me talk to you about a couple of

3   things here.  The Secret Service is involved in this

4   case.  Mr. Eichelberger pointed to agents here and so

5   on.  When I hear Secret Service, I think about how

6   important our government is and how important their

7   function is.  No doubt about it.

8           However, I'm also a little bit, if I may say

9   it, old school, maybe a little bit antiquated, not state

10  of the art.  I am not at all a computer person.

11          But this is a case, as Mr. Eichelberger says,

12  that's based upon computers.  Okay?  Now, I don't know

13  whether you folks are computer people or not, but as a

14  lawyer, part of my function in testing the government's

15  proof is to raise questions, sometimes through

16  cross-examination.  And for us that's what this case is

17  going to be about, testing the government's proof.  Can

18  they make the proof beyond a reasonable doubt?

19          As you sit here now, if we posed the question

20  to you, how would you find my client, guilty or

21  innocent?  If you believe Mr. Eichelberger, then you

22  would say, "Guilty.  I have heard it all, guilty."

23  Okay?

24          But now draw back, listen to what I'm saying,

25  listen to what the Judge said to you.  You can't fast

1   forward.  That's not what we are here for.  That's why

2   you function as finders of the fact, judges -- judges,

3   yes, judges of the fact.  You are not wearing robes, but

4   you are judges of the facts in this case.

5           So to the extent that I raise questions about

6   the infalability of the Secret Service or the

7   government's case or certain witnesses that they put on,

8   I am hoping -- because this is the only way our system

9   works -- I'm hoping that you are raising some of the

10  same questions.

11          And the court at the end of the case is going

12  to talk to you about doubt.  They're going to give you a

13  charge on reasonable doubt.  The court is going to give

14  you a charge on circumstantial evidence.  And then you

15  are going to look at the facts as critically as you can

16  and take that law and see to what extent it may apply to

17  this case.

18          So Mr. Eichelberger is a very, very

19  accomplished lawyer, there is no doubt about it.  He's

20  very articulate.  There's no doubt about it.  But it's

21  your job not to be mesmerized by the aura of the United

22  States Government or by computers.  Okay?  That's your

23  job.

24          My job is to hopefully show you why the

25  government cannot prove their case.  I ask the

1 questions, hopefully you are going to listen to those

2 questions and the answers that we get from that.

3          Now, I want you to think about this:

4 Mr. Eichelberger has lots of fancy, good equipment

5 here.  Okay?  And all of this is somewhat new to our

6 system of justice, maybe 15 years old, 20 years old.

7 You never saw cases like this 20 years ago, and I have

8 been around long enough to know.  Most of you haven't

9 been around long enough to know.  All right.

10          But what do these cases also come down to?

11 Most importantly, what do they come down to?  And you

12 are going to hear the judge say something about this in

13 her closing remarks.  It's not about how many pieces of

14 paper or e-mails and so on are generated.  It's also,

15 for the most part, about people.

16          My client is not a computer.  My client is a

17 flesh and blood, 21-year-old person who sits here with

18 his parents.  Okay?  You are judging not the guilt or

19 innocence of a computer or a machine, you are judging

20 the guilt or innocence of a person.  Okay?

21          You are also -- and the judge will tell you

22 this is part of your responsibility -- I have to take a

23 drink.  It's only water.

24          The judge will also tell you that you have to

25 weigh the credibility of all the testimony and witnesses

1   that come before you.  We may not present any witnesses.

2          Now, you may be saying to yourselves, "Well,

3   why not?"  Well, the constitution tells us, and the

4   judge will reinforce this when she charges you later,

5   that we don't have to do that.

6          If you were on trial, you would not have to do

7   that.  You could sit over here just as we are and do as

8   little or as much as we want.  Why?  Because it's their

9   burden of proof.  They've got to push the ball up the

10  hill and get over the top, and only you can decide

11  whether they have done that.

12          And it's about -- not weighing the credibility

13  of the computer or the machine, right?  Because we know

14  they are infallible.  But it's about people coming into

15  a courtroom and taking an oath to tell the truth.

16  Machines don't take oaths, people take oaths.  People

17  testify under oath and swear to tell the truth before

18  Judge Currie, before our country, and before God.

19  That's what they do.  Okay?

20          So your job in being the finders of fact is to

21  weigh the credibility of the witnesses that you have

22  before you.  Now, you may hear Mr. Eichelberger --

23  again, my able colleague has mentioned a bunch of

24  names.  Some of those people may come before you and

25  testify.  You've got to weigh their credibility.  That's

1   your job.  No credibility, you can discount what they
2   said.
3          Because the court is going to tell you about
4   this little Latin phrase.  It's very important, though I
5   don't mean to throw Latin at you.  I don't mean to do
6   that, but it's important.  A Latin phrase, falsus in
7   uno, falsus in omnibus.  What does it mean?  The judge
8   is going to tell you a witness lies about one thing, one
9   thing, you can decide that they have lied about
10  everything.
11         If a fact witness is important to the
12  government's burden of proof, and maybe that's what they
13  are relying on for their burden of proof, you can say
14  they haven't met it.  That's the system.  That's the way
15  it works.
16         Now, let's talk about a couple of other
17  things.  Mr. Eichelberger's job -- in fact, he's
18  mandated by law to do this -- his job is to tell you
19  what the evidence will show, what he intends to prove,
20  what he intends to prove versus what the evidence will
21  show.  Listen to those words.
22         He did not use that phrase once during his
23  opening statement.  He talked about things that he's
24  going to do, but he didn't say, "The evidence will
25  show."  Okay?  Because he's going to do certain things.

1    It's up to you to decide whether that evidence is

2    credible or not.  It's something.  It's up there.  It's

3    a witness.  What's it worth?  Who decides?  You.

4            Now, a couple of other things.  You heard

5    Mr. Eichelberger say, and I believe, the court also

6    mentions, that there are certain stipulations and

7    exhibits that we have agreed will come into evidence.

8    Okay?

9            Those exhibits may or may not satisfy some

10   elements of the government's proof.  That's for you to

11   decide.  We are not fighting over those issues, whether

12   they are big or small or whatever they may be, things

13   like, would this communication travel over interstate

14   wires?  Okay?  If it's sent, presumably it could travel

15   over interstate wires.  We don't fight over things like

16   that.

17           We fight about culpability.  We fight about

18   guilt or innocence.  We fight -- as the judge said when

19   she read you the charges from the indictment -- we fight

20   about knowledge.  What was my client's actions in this

21   case?  What did he do or not do?  That's what you have

22   to focus on here.

23           Now, Mr. Eichelberger, as I said before is a

24   very able lawyer.  He would do well anywhere in these

25   United States, anywhere, he's that good.  Okay?  And so

1  are the agents, and so is his colleague over here, all

2  fine lawyers.

3          Again, it's not personal, but he's good at

4  what?  He's good at also injecting emotion into this

5  case.  And you've got to be careful about that as

6  finders of fact.  Why do you have to be careful -- I'm

7  not going to be much longer -- why do you have to be

8  careful?

9          You've got to be careful for this reason,

10  emotion can take away from your objective view of the

11  facts.  Okay?  So Mr. Eichelberger refers to taking the

12  lives of people away from them and hurting them or

13  destroying them financially, and he also said

14  emotionally.

15          As critical judges of the facts, you've got to

16  sit back and say, "Okay, what actually happened here?

17  What have they actually proven?"

18          Let's get past the smoke.  Let's get past the

19  mirrors.  Let's get past the emotion.  Let's not talk

20  about this case as if it were a capital punishment

21  case.  No one died here.  No one was hurt here.  You

22  need to know that.

23          This is a financial transaction case.  It's not

24  an assault case.  It's not a robbery case.  It's a

25  financial transaction case.  And I'm not saying that

1    doesn't make it serious.  Okay?  I'm not saying that at

2    all.  But I want you to be able to put it in the right

3    perspective.

4          In that regard, what must you consider?  At

5    some point you will probably hear about the notion of

6    losses, money that was either taken or not taken.  Now,

7    here is one for you.  I believe the evidence will

8    show -- I believe the evidence will show that there was

9    no actual loss in connection with this case, no actual

10   loss, no money taken.

11         So there's another concept that's thrown around

12   and it's esoteric, complicated.  Okay?  What does it

13   have to do with?  Well, the judge referred to it, so did

14   Mr. Eichelberger.  It's a so-called identity-theft case

15   in some counts in the indictment.

16         So now let's push back the forest; let's look

17   at the trees.  Okay?  Look at the trees.  What do you

18   see?  Mr. Eichelberger says there's an identity theft.

19   Okay?  Lives were ruined.

20         What will the evidence show or not show?  The

21   evidence will refer to an identity theft as something

22   that relates to taking someone's identity or some

23   portion of it.  What could that be?  A Social Security

24   number, a credit card number, a license, things of that

25   nature.

1          And Mr. Eichelberger says that that identity

2   theft was something that was sold for value.  Okay?  So

3   what you have in this case and the facts that you have

4   to determine is, was there a wire fraud in the context

5   of the law that Judge Currie gives to you and was there

6   an identity theft?

7          And remember, it's about people, because

8   machines make mistakes.  At the end of this case, ladies

9   and gentlemen, I submit, at the end of this case, after

10  you have heard the evidence here and lack thereof, I

11  submit that you will find my client not guilty on those

12  counts in which he is charged.

13          I thank you for your time.

14          THE COURT:  Ladies and gentlemen, we will take

15  a morning break now.  You should leave your pads in your

16  seats, turn them over.  We will take 10 minutes.  Do not

17  discuss the case with each other while we are on break.

18  Thank you.

19          (Jury not present)

20          THE COURT:  All right, 10 minute break.

21          MR. EICHELBERGER:  Thank you, Your Honor.

22          (Short recess)

23          MR. LIOTTI:  Just a point of information.  What

24  time does Your Honor take lunch?

25          THE COURT:  1 o'clock.

1            All right.  Are you ready to proceed with your

2    first witness?

3            MR. EICHELBERGER:  We are, Your Honor.

4            THE COURT:  All right.  You may bring the jury

5    in.

6            (Jury present)

7            THE COURT:  All right.  Mr. Eichelberger, you

8    may call your first witness.

9            MR. EICHELBERGER:  Call Special Agent Brad

10   Smith of the United States Secret Service.

11           THE COURT:  All right.  Mr. Smith, if you

12   would, step up beside the witness stand there and raise

13   your right hand and tell us your full name, sir.

14           THE WITNESS:  Bradley Steven Smith.

15                BRADLEY STEVEN SMITH, SWORN

16                   DIRECT EXAMINATION

17   BY MR. EICHELBERGER:

18   Q.  Good morning.

19   A.  Good morning.

20   Q.  Mr. Smith, would you please introduce yourself to

21   the jury?

22   A.  Hi.  My name is Brad Smith.  I'm an agent with the

23   Secret Service here in the Columbia field office.

24   Q.  Mr. Smith, how long have you been employed by the

25   United States Secret Service?

1  A.   In July it will be seven years.

2  Q.   And let's talk about your educational background for

3  a second.  Where did you get your undergraduate degree?

4  A.   I went to college at the Air Force Academy in

5  Colorado Springs.

6  Q.   That means that you served in the Air Force for a

7  period of time after that?

8  A.   Yes.  I did six years in the Air Force stationed in

9  Boston, Hanscom Air Force Base, and then three years at

10  Charleston Air Force Base.

11  Q.   During your service with the United States Air Force

12  did you further your education?

13  A.   I did.  While I was in Boston I got a master's

14  degree in finance at the Western New England College.

15  Q.   Now, if you would, just for purposes of background,

16  help us to understand the mission of the United States

17  Secret Service.

18  A.   Secret Service has a dual mission.  Most people know

19  us for the protection mission.  By law we provide

20  protection for the President and his family;

21  Vice-President and his family; and then any foreign head

22  of state that comes into the United States.

23       The protection -- by executive order we can

24  pick up other people.  If cabinet members -- if there's

25  deemed a credible threat, we can pick them up.  And then

1  during campaigns, while the people are out campaigning,

2  if there's credible threats with them, we will also

3  provide protection for those candidates.

4  Q.  So, since we are coming into the presidential

5  campaign season, you can be kind of busy?

6  A.  Yes, during a campaign there's a lot of travel.

7  Q.  All right.  Now, you are a field agent, though, down

8  here in Columbia, South Carolina, correct?

9  A.  That's right.

10  Q.  Now, has your entire service been down here in South

11  Carolina?

12  A.  Yes.

13  Q.  And in addition then to the protection mission of

14  the Secret Service, what else do you do?

15  A.  The Secret Service -- the other prong of our mission

16  is the investigative mission.  We started out -- the

17  agency was founded to investigate counterfeit money.

18  Over time, as the financial transactions have changed,

19  banking has changed, it's included things like checking,

20  the check systems, credit card systems, things like

21  that.  As the Internet has developed, we have also

22  included fraud that is perpetuated through the Internet.

23  Q.  All right.  Now, in connection then with Internet

24  fraud, did there come a time when the name Brett Johnson

25  came up?

1  A.  Yes.

2  Q.  How did that come about?

3  A.  Brett Johnson was arrested in Charleston.  He was

4  using counterfeit Bank of America cashier's checks to

5  pay for items that he won on eBay.

6  Q.  Now, you say he had won on eBay.  Let's -- we don't

7  know if our jurors have personal knowledge about how

8  eBay works.  I don't want an insider's view of what

9  happens, but give us a general idea of how eBay works

10  and how Mr. Johnson's fraud related to that.

11  A.  Sir, eBay is an Internet site that people auction

12  things off, items that they have and they want to put up

13  for sale.  They'll put it on eBay and people will bid on

14  it.  Through the eBay web system they'll bid on that

15  item, offering a certain amount of money for that item.

16        Brett Johnson was -- would look at certain

17  items and he would contact the people that are selling

18  that item through e-mail and he would offer them money

19  for it, you know, he would bid for it and tell them, "If

20  I win, can I pay by cash on delivery?" so that those

21  people would ship the item.  In some cases it was a

22  watch, some jewelry, would ship it to Mr. Johnson and on

23  delivery he would give them a counterfeit cashier's

24  check as payment for that item.

25  Q.  And the time came when he was caught?

1  A.  Yes.

2  Q.  So how did the fact that Mr. Johnson got caught

3  doing this eBay fraud bring him to your attention in

4  connection with this matter?

5  A.  When he was arrested, the arresting agency notified

6  us and said, "Well, Brett Johnson has been arrested, is

7  he -- is he known to the Secret Service?"  He was.

8          So we had agents go out, participate in an

9  interview with Brett Johnson and the other arresting

10  agency, conduct a consensual search of his apartment.

11  About a week later we had other agents come in and talk

12  to Brett Johnson.

13          Brett had claimed that he was this gollumfun

14  screen name and agents of the service were familiar with

15  that name.  They came and interviewed him, verified

16  that, you know, he was who he said he was.  So since he

17  was here in South Carolina, we decided to use him as

18  what we call a confidential informant here in Columbia.

19  Q.  Well, you said that he claimed that he was gollumfun

20  and that other agents came and interviewed him and

21  confirmed that he was gollumfun?

22  A.  Yes.

23  Q.  Why did we care?

24  A.  Well, gollumfun -- as we talked about these web

25  sites, you will understand that everyone uses a screen

1  name -- you know, they try and come up with the most

2  clever -- and need a screen name, and each of those

3  screen names has a reputation.  And gollumfun had a

4  strong reputation for the things that he did, so a lot

5  of people would probably want to claim that they were

6  gollumfun.

7  Q.  And what were the things that Brett Johnson did

8  through that name gollumfun?

9  A.  Brett Johnson was a fraudster.  I mean, he explained

10  to people how to commit fraud, he helped develop some of

11  the web sites that we had monitored.  So the stature of

12  him and his ability to kind of unite people and educate

13  them on these fraud schemes made him a popular person.

14  Q.  So Brett Johnson, not so much because he was Brett

15  Johnson, but because he was gollumfun, had developed a

16  recognizable name?

17  A.  Yes.

18  Q.  In the circle of fraudsters?

19  A.  Yes.

20  Q.  All right.  So then having identified and confirmed

21  that this gollumfun, Brett Johnson, was, in fact, the

22  gollumfun of all this fraud, how did you seek to use it

23  in connection with this undercover, online computer

24  investigation?

25  A.  We brought him to Columbia.  We put him up in an

1  apartment and we would have him come into our field

2  office and get back online using the gollumfun screen

3  name and see who he could chat with, you know, what

4  people would converse with him and what type of

5  fraudulent schemes those people were involved in.

6  Q.  Did gollumfun, during the course of this -- and I'm

7  going to, instead of referring to him as Brett Johnson,

8  we're going to refer to him as -- under his Internet

9  name, gollumfun.

10  A.  Uh-huh.

11  Q.  Did he initiate contact with other people during

12  this investigation?

13  A.  For the most part they came to him.  When he got

14  online through the chat programs and they saw gollumfun,

15  a lot of people would contact him.

16  Q.  Okay.

17  A.  I would say that he did initiate, sometimes, contact

18  with people.

19  Q.  Now, you said that he was working with the Secret

20  Service here at the Columbia field office.  Does that

21  mean he was kind of off on his own, doing his thing?

22  A.  No.  We -- in one of our offices we set up two

23  undercover lines.  Basically, it's a DSL connection,

24  it's a broadband connection.

25  Q.  We are starting to get into tech talk.  DSL?

1  A.  It's like a cable.  You know, like Time Warner Road

2  Runner.

3  Q.  Suffice it to say that's an Internet connection

4  through which a lot of data can flow so you can do

5  things very quickly as opposed to dial up, which may

6  take forever.

7  A.  Right.

8          MR. LIOTTI:  Objection, counsel testifying,

9  Your Honor.

10         THE COURT:  Sustained.

11  BY MR. EICHELBERGER:

12  Q.  Continue.

13  A.  We just set up two Internet connections through our

14  office, but did not come back to the Secret Service.

15  While he was on the computer we would monitor him.  His

16  computer was hooked up to a large-screen television so

17  that as he typed or did anything on the computer, we

18  would monitor it on that television.

19  Q.  The large-screen television, similar to what we see

20  in the back corner?

21  A.  Yes.

22  Q.  Large plasma screen?

23  A.  Yes.

24  Q.  So the computer is set up, two lines going out,

25  neither of which come back, monitoring with a large

1   screen.  What was the function of the large plasma

2   screen to this investigation?

3   A.  Well, we wanted to watch everything that he did.

4   You know, anything that he would do, whether it be

5   surfing on the Internet, chatting with people.  We

6   didn't want to have to stand over his shoulder and watch

7   it, we wanted to be able to sit and watch the screen and

8   see what was happening.

9   Q.  What steps did you use to document the chat sessions

10  that gollumfun would engage in?

11  A.  We used a program called Spector Pro.  It's

12  basically a program that could go on there and it will

13  record every keystroke, web site visited.  Activity on

14  the computer, basically, would be recorded.

15          In the Instant Messenger, the text -- the

16  chats, those text documents would automatically be

17  generated as you are chatting with someone on that

18  computer.

19  Q.  I want to make sure I understand because that's an

20  important point about the development or the generation

21  of chat transcripts.  Walk us through, again, how a

22  transcript, that is a written record of the chat

23  session --

24          MR. LIOTTI:  Objection counsel is testifying.

25          THE COURT:  He was, but he's not now.

1          Mr. Eichelberger, you don't need to summarize

2   the testimony, then restate the question, just move to

3   the next question.

4   BY MR. EICHELBERGER:

5   Q.  Can you walk us through that process, with the

6   development of a chat transcript?

7   A.  Sure.  When he logs on there's different chat

8   clients that we were using.  AOL Instant Messenger -- we

9   call it AIM -- and ICQ.  Each one of those has a

10  different identity.

11         Before each session that he would come in, we

12  would start the computer up.  We would start Spector

13  Pro.  So as soon as we started him on the -- that day's

14  operation, everything would be recorded via those chat

15  logs.

16         Now, while he's chatting with people, every

17  keystroke he touches and whatever is coming in on those

18  chats is going to be automatically generated onto a text

19  document through that program.

20  Q.  Is that chat transcript that is generated require

21  any interaction or -- by Mr. -- by gollumfun?

22  A.  No.  No, it's automatically generated, so anything

23  that goes on there, or any chat that is occurring

24  between our end and the other end is automatically

25  generated.

1  Q.  Did you have any back-up systems in place to track

2  chat activity?

3  A.  Yes.  We also used Camtasia, which is a program that

4  basically records everything that is happening on the

5  computer screen.  You set it so that everything that is

6  on the screen, it's recording it as everything is

7  occurring, and then it saves it as a large file, like an

8  mpeg, or a file that people may e-mail to you with

9  little funny videos that people always send on e-mail.

10  Q.  Okay.  With respect to the chat transcripts, did

11  gollumfun and Mr. Johnson have the ability to change

12  what was generated by the computer?

13  A.  No.

14  Q.  How did that work?

15  A.  With Spector Pro you can install it, and they call

16  it stealth mode -- kind of a cute term -- where you have

17  to have a specific hot-key combination to access that

18  program, and once that program comes up you have to have

19  a password to get into that information.

20  Q.  What is a hot-key combination?

21  A.  Hot-key combination is a series of keys that you

22  have to press all together to -- for something to

23  happen.  In this case we would have three different keys

24  you had to press all at the same time so that that

25  program would come up.

1  Q.  And is the hot-key combination so that you can

2  custom set for yourselves?

3  A.  Yes.

4  Q.  Was that hot-key combination known by Mr. Johnson?

5  A.  No.

6  Q.  Did Mr. Johnson know the password --

7          MR. LIOTTI:  Objection as to what Mr. Johnson

8  knew.

9          THE COURT:  Sustained.

10 BY MR. EICHELBERGER:

11 Q.  Had you told Mr. Johnson what the hot-key

12 combination was?

13 A.  No.

14 Q.  Had you told Mr. Johnson what the password was once

15 someone got past the hot-key combination?

16 A.  No.

17         MR. LIOTTI:  Objection to the form of the

18 question.

19         THE COURT:  Overruled.

20 BY MR. EICHELBERGER:

21 Q.  Now, with respect to chats that might be going on

22 between gollumfun and other persons, are these neatly

23 segregated chats, that they are going on one at a time?

24 A.  No.  The chats happen simultaneously with those chat

25 clients.  You can have multiple windows going at the

1  same time and it was not unusual for us to have 8 or 10

2  chats going at the same time.  So, we are constantly

3  switching between different chat clients, different

4  people trying to make sure we keep up with what everyone

5  is chatting about.

6  Q.  And the Camtasia file you referenced before, how

7  would that show these multiple chats?

8  A.  It's anarchy on the screen.  It's basically bringing

9  up a window, typing in a few lines to respond to them,

10  going to another window, type a response to them.  If

11  someone says, "Hey go check out a web site," and we

12  bring up our web browser to go check out a web site,

13  that is going to be thrown in there as well.

14         So it's really, as things progress, it's real

15  time, so things are kind of flying on and off the screen

16  as we go.

17  Q.  All right.  And similarly with then -- with respect

18  to chat transcripts, do they similarly show bringing up

19  web browsers and all the things that we're talking about

20  here?

21  A.  No.  No.  The chat -- the chat transcript will just

22  show what's sent and received in that specific chat.

23  Q.  All right.  Thank you.

24         Approximately how long did this investigation

25  go on where Mr. Johnson, acting as gollumfun, worked

1  with the United States Secret Service?

2  A.  Approximately 11 months.

3  Q.  And what if anything happened that caused that to

4  come to an end?

5  A.  We got to a point in the operation where Brett

6  Johnson or gollumfun was very prominent on a couple of

7  boards that we were looking at.  He held prominent

8  positions on them, and we also were starting to arrest

9  people based on the information we gathered.

10        Well, we went out to arrest a person in

11 California and when agents knocked on that person's

12 door, the apartment had been cleaned out and to us it

13 appeared that someone had tipped him off.

14        Also, at that same time, we lost our

15 positions -- our prominent positions on the boards.

16 Just all of a sudden we were cut off and, you know, lost

17 that position.  So, we sat Brett down and asked him why

18 all of this was happening.  And he admitted to us that

19 he had shared operational secrets, targets of the

20 operation with a member of the press.

21 Q.  All right.  So as a result of that, Mr. Johnson,

22 gollumfun, was taken off work with the investigation?

23 A.  Right.

24 Q.  Did it come to your attention that Mr. Johnson had

25 at some point engaged in additional fraudulent activity

1  while he was supposed to be working with you?

2  A.  Yes.

3          MR. LIOTTI:  Objection to the form of the

4  question.

5          THE COURT:  Sustained.

6  BY MR. EICHELBERGER:

7  Q.  Did Mr. Johnson engage in new crime?

8  A.  Yes, he did.

9  Q.  What happened?

10         MR. LIOTTI:  Objection to the form of the

11 question.

12         THE COURT:  Overruled.

13         If you have personal knowledge.

14         THE WITNESS:  Yes.

15 A.  We took Brett Johnson back into custody.  A couple

16 of agents took him down to Charleston and we went to the

17 apartment that we had been renting for Brett Johnson,

18 went through the apartment and found numerous

19 stored-value cards.  They are the -- they look like

20 credit cards -- they allow you to put money onto the

21 card, you know, like $500, and then slowly take that

22 money off through either purchases or ATM transactions.

23         We found a large amount of cash in his

24 apartment.  We also found FedEx/Kinko's cards which,

25 basically, they're a stored-value card where you go into

1  the FedEx/Kinko's locations, you put that into a

2  computer -- if you put 20 bucks on there, you can use

3  that to buy time on their computers.

4  BY MR. EICHELBERGER:

5  Q.  So Mr. Johnson did unauthorized activity?

6  A.  Yes, he did.

7  Q.  Did the fact that Mr. Johnson engaged in any

8  unauthorized activity, based upon your knowledge of the

9  process of generating the transcripts, have any effect

10  on the words that were recorded by the computers during

11  the chat sessions?

12          MR. LIOTTI:  Objection.

13          THE COURT:  Overruled.

14  A.  No, it did not.

15  BY MR. EICHELBERGER:

16  Q.  Thank you.  In the course of working on this

17  investigation, working on a day-to-day basis with

18  Mr. Johnson, did you come to develop an understanding of

19  terminology that we are going to see on some of these

20  chat transcripts?

21  A.  Yes, I did.

22  Q.  What I would like to do is ask you about just some

23  kind of esoteric terminology that is used in connection

24  with these chat transactions and ask you to give a basic

25  definition of terminology that we are going to see.

1  Okay?

2          Let's start off with the term dumps.

3  A.  Dumps are the information on the magnetic stripe of

4  a credit card.  If, like, you ever looked at your credit

5  card on the back of it, there's that black stripe,

6  that's a magnetic stripe.  That's what allows you to

7  slide through the point-of-sale terminal or your

8  self-help gas stations.

9          That information -- there's a lot of

10 identifiers and numbers on there that identify that

11 card, and it's magnetically encoded so that you can make

12 those purchases there.  Those -- the world we are

13 dealing with, those are referred to as dumps.

14 Q.  How about a COB?

15 A.  A COB is a change of billing.  A change of billing

16 will consist of a person's name, address, date of birth,

17 Social Security number, mother's maiden name.

18 Basically, the information you would provide to a credit

19 card company to open an account.

20          And a COB would include a line of credit.  And

21 with that COB you could notify that issuing bank or that

22 credit card company and purport to be that person and

23 change the billing address so that all correspondence

24 will now be sent to that new address.  You can order a

25 replacement card that will be sent to that new address.

```
 1  Q.  All right.  How about a full info?

 2  A.  Full info is basically -- excuse me -- a person's

 3  name, date of birth, Social Security number, address.

 4  Usually -- most of the same information as a change of

 5  billing, but it usually doesn't have a line of credit.

 6  You know, it won't have an account number with it.

 7  Q.  Based on your experience and training, Agent Smith,

 8  what kind of mischief can someone accomplish with dumps,

 9  with COBs, with full infos?

10            MR. LIOTTI:  Objection.

11            THE COURT:  Overruled.

12  A.  With dumps people have the capability of re-encoding

13  the information that they've received, that dump, onto a

14  different card.

15            Some things that we call white plastic, which

16  could be a blank piece of plastic with that magnetic

17  stripe, if they had the right equipment, they can

18  re-encode that magnetic stripe to mimic that of the card

19  that it was originally on and use those cards to make

20  purchases.  Usually purchases would be made at self-help

21  centers, gas stations.

22            If someone has the capability, they'll create

23  counterfeit credit cards to mimic exactly what the

24  original card looked like and then encode the back with

25  the dump on that magnetic stripe, and use that card to
```

1  go into a store, a retail store, and make purchases

2  using that card.

3  BY MR. EICHELBERGER:

4  Q.  How about with the COBs?

5  A.  COB.  They would contact the credit card company or

6  issuing bank, purport to be the person on the account

7  and tell them that you want to change the billing, so

8  that now all correspondence is going to that new

9  address.

10        The reason people would do that is to either

11  get a replacement card or it kind of lengthens the life

12  of that -- that stolen account.  With the dump, you

13  know, if you do it at the right time, you are going to

14  have 30 days, one billing cycle, to make your purchases

15  before someone who looks at their statement may say,

16  "You know, there is something going on here."

17        If you have those statements going to another

18  address, people that aren't really paying attention,

19  "Hey, I didn't get my monthly statement," you know, they

20  may not notice it for maybe another month.  You kind of

21  extend the life of that account.

22  Q.  Well, then, how about full infos?

23  A.  Full info, because it's all the personal identifiers

24  of someone, you can apply for lines of credit, you can

25  use them for fraudulent tax returns.  It really -- you

1   can do a various number of things with full information

2   of a person.

3           MR. EICHELBERGER:  Bear with me for just a

4   second.

5           Agent Smith, thank you for your testimony.

6           THE WITNESS:  Uh-huh.

7           MR. EICHELBERGER:  Mr. Liotti is going to have

8   some questions for you.

9           MR. LIOTTI:  Judge, where would you like me to

10  be?  Over here or over here?

11          THE COURT:  Either one.

12          MR. LIOTTI:  If it's all right with you, I will

13  be over here.  The microphone is a little bit higher.

14                   CROSS-EXAMINATION

15  BY MR. LIOTTI:

16  Q.  Agent Smith, good afternoon.

17  A.  How're you doing?

18  Q.  A couple of things.  Do I have it right that this

19  whole investigation involving Mr. Johnson lasted 11

20  months?

21  A.  Yes.

22  Q.  And when did it start?

23  A.  Started in May of 2005.

24  Q.  Now, Mr. Johnson is in custody right now, isn't he?

25  A.  Yes, he is.

1  Q.  And, in fact, he's right here in Columbia, isn't he?

2  A.  Yes.

3  Q.  And it's my understanding that the government does

4  not intend to call him as a witness in this case; is

5  that correct?

6  A.  Yes.

7  Q.  And the investigation began in '05, as I understood

8  your testimony, when the Secret Service did an interview

9  with Mr. Johnson; is that correct?

10  A.  Yes.

11  Q.  Were you present during that interview?

12  A.  Not for the first interview, no.

13  Q.  The information that you told us today came from

14  memoranda or other information that you gathered during

15  the course of your involvement in this case; is that

16  right?

17  A.  Yes.

18  Q.  Okay.  And at that time you learned that

19  Mr. Johnson's involvement in violating the law,

20  allegedly, had to do with him selling, or I should

21  say -- withdrawn -- indicating that he would give

22  cashier's checks for items transmitted by sellers over

23  the Internet, right?

24  A.  Yes.

25  Q.  Okay.  And this is, I think you told us, sort of an

1  eBay type thing where he would advertise on a web site

2  that he had cashier's checks and money available to buy

3  this product -- these products over the Internet,

4  correct?

5  A.  Not exactly.

6  Q.  Okay.  What did he do?

7  A.  He sent e-mails to the people selling those items

8  saying that he would like to purchase them and he asked

9  that they send the items cash on delivery.

10  Q.  I see.  So they were --

11  A.  And it would be a cashiers's check.

12  Q.  I interrupted you.  Did you finish what you were

13  saying?

14  A.  I just said that he would pay with a cashier's

15  check.

16  Q.  So they were advertising on eBay?

17  A.  Yes.

18  Q.  He looked at these products and said, "Gee, I like

19  this" or "I like that," and then he would contact them,

20  they would send the product to him, and at the same time

21  he would transmit a counterfeit cashier's check; is that

22  right?

23  A.  Yes.  He would hand it to the delivery person.

24  Q.  At that time when you were first investigating -- or

25  the Secret Service was first investigating that

 1  situation --

 2  A.  No, we were not.

 3  Q.  You were not.  Were local authorities investigating

 4  that?

 5  A.  Yes.

 6  Q.  Is that in Columbia, here in South Carolina?

 7  A.  No, sir.

 8  Q.  Where was that?

 9  A.  Charleston, South Carolina.

10  Q.  All right.  So it was a state police or local

11  authorities that were conducting that investigation; is

12  that right?

13  A.  Charleston City Police Department.

14  Q.  All right.  And they contacted you to find out if

15  you knew the name -- when I say "you," I'm talking about

16  the Secret Service.

17  A.  Yes.

18  Q.  But they contacted the Secret Service and presumably

19  other law enforcement agencies to find out if Brett

20  Johnson was known to you?

21  A.  Yes.

22  Q.  And, again, "you," meaning other law enforcement

23  agencies, right?

24  A.  (Nods head in the affirmative).

25  Q.  And as a result of that, the Secret Service then did

1   a check of some kind on Brett Johnson?

2   A.  Yes.

3   Q.  Okay.  And during that preliminary check by the

4   Secret Service you found that he was known to the Secret

5   Service, correct?

6   A.  Yes.

7   Q.  Okay.  Are you familiar with how he was known at

8   that point?

9   A.  No.

10  Q.  Well, do you have any knowledge as to whether the

11  Secret Service knew of him at that juncture because of

12  any credit card activity?

13  A.  The Secret Service did not know of him based on

14  credit card activity.

15  Q.  Okay.

16  A.  Not that I know of.

17  Q.  And as far as you know of, at that particular point

18  in time when you were notified by local authorities --

19  Secret Service being notified, there was no indication

20  of illegal credit card activity on his part; is that

21  correct?

22  A.  Correct.

23  Q.  Okay.  But nonetheless you had some knowledge of

24  potential illegal activity on his part; is that correct?

25  A.  Yes.

1  Q.  Okay.  And it might involve credit cards or it could

2  involve a whole bunch of other things, right?

3  A.  Yes.

4  Q.  And when the agents interviewed Mr. Johnson in

5  Charleston, they really didn't have any particular item

6  or things that they were looking at; is that correct?

7  A.  Just the counterfeit cashier's checks.

8  Q.  Okay.  Now, at that time do you know -- and I'm

9  talking about when the Secret Service conducted their

10  investigation, their interview of Mr. Johnson, that

11  first interview -- and you got this information from

12  data and memos and so forth that you have gathered,

13  right?

14  A.  Yes.

15  Q.  Okay -- did the name Jonathan Giannone surface at

16  that point?

17  A.  No.

18  Q.  So after that initial interview, did the Secret

19  Service continue its investigation of Mr. Johnson?

20  A.  No -- well, we used him -- that's when we made him a

21  confidential informant.

22  Q.  Okay.  But still your involvement at that point was

23  limited to cashier's checks and also eBay, correct?

24  A.  Correct.

25  Q.  And in that initial interview there was no

1  indication of credit card transactions by Mr. Johnson,

2  correct?

3  A.  Correct.

4  Q.  So now during this 11-month period -- which I think

5  you said began in May of '05?

6  A.  Yes, sir.

7  Q.  Okay.  May of '05 you're moving along with

8  Mr. Johnson, right?

9  A.  Yes.

10  Q.  And he's in custody during that whole period,

11  correct?

12  A.  No, sir.

13  Q.  Okay.  So, he was allowed to be out on bail by state

14  authorities; is that correct?

15  A.  Correct.

16  Q.  Did federal authorities have any agreement with

17  Mr. Johnson at that point?

18  A.  Just that we would testify when it came time for his

19  sentencing on those state charges.

20  Q.  Did you have any sort of a cooperation or plea

21  agreement with Mr. Johnson at that point?

22  A.  No.

23  Q.  Did you ever enter into a plea or cooperation

24  agreement with Mr. Johnson?

25  A.  Nothing written.

1  Q.  Never?

2  A.  No.

3  Q.  So while Mr. Johnson was out on bail from the state

4  case, the federal government had no hold on him at all;

5  is that correct?

6  A.  That's correct.

7  Q.  And yet he was talking to you about his involvement

8  with the cashier's checks and eBay because he was hoping

9  not to be prosecuted by the federal government; isn't

10  that right?

11  A.  We never really addressed the topic.  We focused

12  more on the investigation and using him.

13  Q.  Well, by virtue of his cooperation with you, even

14  though it was informal and not subject to a written

15  agreement, that helped him to get bail, didn't it?

16  A.  Yes.

17  Q.  Okay.  So, the federal government went to the state

18  court in Charleston and said, "This gentleman is

19  cooperating with federal authorities and therefore he

20  should be granted bail," right?

21  A.  Yes.

22  Q.  "He's working with us"?

23  A.  Correct.

24  Q.  Okay.  So, now he's out on bail and presumably if he

25  helped you, you would help him on his state charges;

1  isn't that right?

2  A.  We would testify in his behalf.

3  Q.  Right.  You would have written letters, you would go

4  before the judge, you would talk to the state

5  prosecutor, and you would say, "This gentleman helped us

6  in connection with a federal investigation," right?

7  A.  Yes.

8  Q.  And this gentleman also was able to cause the arrest

9  and prosecution, maybe even the conviction of certain

10  individuals, right?

11  A.  Yes.

12  Q.  And all of that would inure to Mr. Johnson's

13  benefit; isn't that right?

14  A.  Yes.

15  Q.  Okay.  So, now, while he is out, the Secret Service

16  is talking to him during that time, right?

17  A.  Well, as soon as he was out of jail he came to work

18  for us --

19  Q.  Okay.

20  A.  -- in the online --

21  Q.  Was that in May of '05, sir?

22  A.  Yes.

23  Q.  Okay.  So now you had a particular assignment for

24  him that you testified about during Mr. Eichelberger's

25  direct examination of you, right?

1  A.  Yes.

2  Q.  Okay.  And you wanted him to go on the Internet and

3  do certain things; isn't that right?

4  A.  Yes.

5  Q.  And perform certain transactions which you told us

6  about, right?

7  A.  Yes.

8  Q.  And you were monitoring what you described as chats,

9  right?

10 A.  Yes.

11 Q.  And you had two lines coming into Mr. Johnson,

12 right?

13 A.  No, one line was for Mr. Johnson, one line was for

14 an agent.

15 Q.  Okay.  And an agent, to the best of your knowledge,

16 was always there monitoring those chats; is that

17 correct?

18 A.  There would be times that an agent might not be

19 there.

20 Q.  And when those chats were made, these are written

21 communications that are sent out over the Internet; is

22 that right?

23 A.  Yes.

24 Q.  You would print the chats; isn't that right?

25 A.  Some chats we would.

1  Q.  And, again, when I say "you," I'm talking about the

2  Secret Service.

3  A.  Yes.

4  Q.  Okay.  And were local authorities also involved in

5  this process?

6  A.  At times.

7  Q.  Okay.  So somebody on the other end of the chat is

8  typing something out, you call it a textual message, I

9  think?

10  A.  Well, it's an instant message between us and another

11  party.

12  Q.  Okay.  But it can be printed out by a printer,

13  right?

14  A.  Yes.

15  Q.  Okay.  And then you collect that as a piece of paper

16  or what you call a hard copy, right?

17  A.  Right.

18  Q.  Okay.  The piece of paper becomes a hard copy and

19  that's the record of the chat communication?

20  A.  It's not what we would use as our record.

21  Q.  Now, you mentioned something called gollumfun.  Let

22  me just spell that, if I may, because I think that may

23  have been omitted before, so we have it for the record.

24          I have, Your Honor, G-o-l-l-u-m, as in Mary,

25  f-u-n, as in Norman; is that right?

1  A.  Yes.

2  Q.  What was gollumfun?

3  A.  It was a screen name.

4  Q.  And is that something that Mr. Johnson used?

5  A.  Yes.

6  Q.  Did Mr. Johnson use the name Pit Boss 2600?

7  A.  No.

8  Q.  Did he use the name CIA INTEL?

9  A.  No.

10  Q.  Now, you told us about something -- and, again, I'm

11  kind of a novice at this, if I misstate something,

12  please correct me.

13  A.  Okay.

14  Q.  You mentioned something called a dump, do you

15  remember that, d-u-m-p?

16  A.  I do remember that.

17  Q.  Okay.  Does the case against Mr. Giannone involve

18  cashier's checks?

19  A.  No.

20  Q.  Does the case against Mr. Giannone involve that

21  concept that you told us about, dumping?

22  A.  It involves dumps, yes.

23  Q.  Okay.  How does it involve that concept of dumping?

24  A.  When you are chatting with someone, they can cut and

25  paste text into that instant message.  In one of the

1  chats we had with Pit Boss 2600/CIA INTEL, within the

2  text of that chat the dump information was included in

3  it.

4  Q.  Now, you also mentioned -- that's one chat you said,

5  right?  One chat?

6  A.  Well, one chat we received -- we received dumps over

7  several chats.

8  Q.  So at some point, the Secret Service went to

9  Mr. Johnson and basically told him that instead of the

10 credit card stuff that he was doing, or in addition to

11 it, you wanted him to become involved in credit card

12 activities; is that right?

13 A.  We wanted him involved in any fraudulent scheme that

14 was out on these web sites.

15 Q.  Right.  And you were monitoring these chats and you

16 came with the idea, the Secret Service did, that you

17 wanted an investigation of credit card activity because

18 that, by the way, is what the Secret Service does,

19 right?

20 A.  Yes.

21 Q.  In addition to protecting the President of the

22 United States?

23 A.  Correct.

24 Q.  Right?  And those campaigning for the presidency of

25 the United States?

1  A.  Right.

2  Q.  Okay.  You mentioned that.

3          Now, you also mentioned something called C-O-B,

4  as in boy.  Do you remember that?

5  A.  Yes.

6  Q.  Okay.  And I wrote that down.  I think that refers

7  to change of billing; am I right?

8  A.  You are right.

9  Q.  Okay.  Is there a change of billing part of this

10  case, the case against Jonathan Giannone?

11  A.  No, sir.

12  Q.  Okay.  Now, you also mentioned something called

13  COD.  Do I have that right?

14  A.  No, sir.

15  Q.  No?  Just COB?

16  A.  Just COB.

17  Q.  Okay.  I'm sorry.  All right.  In any event,

18  somewhere along the line, while Mr. Johnson was working

19  with you and expecting to get the benefit of what he

20  could do as a result of working with the Secret Service,

21  he becomes sort of an entrepreneur, doesn't he?  Goes

22  out on his own and does things on his own without your

23  knowledge; isn't that right?

24  A.  Yes.

25  Q.  Okay.  So, he was violating his bail conditions,

1  correct?

2  A.  Correct.

3  Q.  He was violating his agreement with you; isn't that

4  right?

5  A.  That's right.

6  Q.  He's violating his agreement with state authorities

7  to not be involved in additional crimes, correct?

8  A.  Correct.

9  Q.  And he is, in fact, committing additional crimes, at

10  least according to the Secret Service, right?

11  A.  Yes.

12  Q.  When did you learn that Mr. Johnson was out there on

13  his own doing that?

14  A.  It was March 30th when we confronted him on our

15  operation.  We noted some things going funny on the

16  operation.

17  Q.  March 30th of '06?

18  A.  Yes, sir.

19  Q.  All right.  So, that's almost a year, 10 months

20  roughly, from the time when you first started working

21  with Mr. Johnson; is that right?

22  A.  Yes.

23  Q.  Thank you.  Agent, in looking back on that now and

24  based on the information that you have, when did

25  Mr. Johnson go off on this tangent and start getting

1  involved in this other criminal activity?

2  A.  I can't remember exactly, but I know it was the

3  beginning of '06 that he started doing these things.

4  Q.  Okay.  And then it became at least another two or

5  three months before the Secret Service learned of that;

6  is that right?

7  A.  Yes.

8  Q.  And that was notwithstanding the fact that on all of

9  the activities that he was doing for your agency, you

10  had an agent there with him as he was communicating over

11  the Internet, doing whatever he did from May of '05

12  onward; isn't that right?

13  A.  Yes.

14  Q.  So he must have had another computer, another wire,

15  something out there that you guys weren't watching and

16  supervising wherein he was making those communications

17  and committing those crimes; isn't that right?

18  A.  Yes.

19  Q.  As a result of that, Mr. Johnson was charged, wasn't

20  he, with additional criminal activity?

21  A.  Yes.

22  Q.  And that relates to wire fraud and identity theft;

23  isn't that so?

24  A.  Yes.

25  Q.  Some of the same charges that Mr. Giannone has

1  against him here; isn't that right?

2  A.  That's right.

3  Q.  When did the Secret Service first learn that

4  Mr. Johnson was involved in credit card fraud and

5  identity theft?  Is that the two-month or three-month

6  period that you were talking about, sir?

7  A.  He wasn't involved in credit card fraud.

8  Q.  What was he involved in?

9  A.  Wire fraud and identity theft.

10  Q.  Now, by wire fraud you mean that with some

11  knowledge, some criminal intent, Mr. Johnson was

12  communicating over the Internet and saying things over

13  the Internet that were not true?  In fact, they were

14  fraudulent; isn't that right?

15  A.  Well, what we charged him with, he didn't chat with

16  other people about.

17  Q.  What did you charge him with?

18  A.  With wire fraud.

19  Q.  And what's the substance of the charge against

20  Mr. Johnson?

21  A.  Filing fraudulent tax returns via the Internet.

22  Q.  Filing fraudulent tax returns over the Internet.

23  Now, am I right -- and I don't mean this as a frivolous

24  question.  I don't mean to sound impertinent, please.

25  And I say it very respectfully, but aren't we right --

1  so we have a full record here -- that tax returns have

2  to be sworn to when you sign them?

3          Don't you have to say this is a true

4  statement -- maybe not sworn to, maybe that's a bad

5  phrase -- don't you have to say on a tax return this is

6  a true and accurate tax return, as far as you know?

7  A.  Yeah.

8  Q.  Okay.  So, he was filing tax returns for himself?

9  A.  No.  He was using other people's information.

10  Q.  And was he trying to get tax refunds?

11  A.  Yes.

12  Q.  He was trying to get their refunds?

13  A.  Yes, he was.

14  Q.  By filing their tax returns for them over the

15  Internet?

16  A.  Yes.

17  Q.  Which you can do at the IRS, right?

18  A.  Yes.

19  Q.  Okay.  So that was one thing that you learned about,

20  and you charged him with that; is that correct?

21  A.  That's correct.

22  Q.  And when you learned about that did you then say,

23  "Okay.  Mr. Johnson, all bets are off.  That's it, no

24  more cooperation"?  Did you do that?

25  A.  Yes.

1  Q.  So at this juncture he is not a cooperator anymore.

2  You don't want him as a cooperator, right?

3  A.  No.  He's the subject of an investigation.

4  Q.  And I use these fancy words, cooperator;

5  Mr. Eichelberger used another fancy term, informant,

6  right?  He was both of those things, right?

7  A.  Yes.

8  Q.  In the vernacular, in the street sense, just so we

9  all understand what Mr. Johnson was, he is, in common

10  parlance, what we would refer to as a rat or a snitch;

11  isn't that right?

12  A.  Sure, if you want to call him that.

13  Q.  Okay.  But you know, and it's no disrespect to you,

14  but that's how we refer to some of these witnesses;

15  isn't that right?

16  A.  Yes.

17  Q.  Okay.  So, in addition to doing all of those illegal

18  things with cashier's checks and now IRS returns -- tax

19  returns, taking people's money and their tax refunds,

20  he's also violated his agreement, even as a snitch,

21  where he told you and told state authorities, "You know

22  what, I'm going to go out there and make cases against

23  people so I can get a break on my case, right?

24  A.  Yes.

25  Q.  And again, with all due respect to you, the federal

1  government often is in the position, as they were in

2  this case, to some extent rely on the reliability of an

3  informant, correct?

4  A.  Yes, if you want to get with the bad guys, you've

5  got to get with them.

6  Q.  Okay.  So that means, then, that you were very

7  upset -- the Secret Service was very upset when you

8  learned that he had betrayed the trust and confidence

9  that you had in him concerning what he was doing, right?

10  A.  Yes.

11  Q.  Because it could jeopardize an entire investigation;

12  isn't that so?

13  A.  That's correct.

14  Q.  And it really depends on what other witnesses you

15  have, what other evidence you have.  But you, as an

16  agent in looking at that case, now have to discount the

17  value of any potential testimony that Mr. Johnson might

18  offer, right?

19        MR. EICHELBERGER:  Objection, calls for

20  speculation.

21        THE COURT:  Overruled.

22  BY MR. LIOTTI:

23  Q.  Isn't that right?  You have to discount the value of

24  his testimony or potential testimony; isn't that right?

25        THE COURT:  You can answer, did you discount?

1              THE WITNESS:  I guess I would discount it.

2  He's a liar.  I mean, that's it.

3  BY MR. LIOTTI:

4  Q.  Thank you for your candor.

5  A.  Yes.

6  Q.  I don't think there is any secret about that?

7  A.  No.

8  Q.  You have to evaluate the case, and here is a guy who

9  you -- you believe committed these crimes and has lied

10 to you.  I mean, there is no doubt this guy was working

11 on the Internet at your behest -- Secret Service's

12 behest to try and gather information about potential

13 crimes out there, right?

14 A.  Right.

15 Q.  Now, when you went to him, did you say to

16 Mr. Johnson, "Look, this is the nature and scope of a

17 potential investigation.  These are the guys that we are

18 targeting, we want to get information about these

19 individuals"?  Did that happen?

20 A.  We didn't give him specific names.  We wanted him to

21 target specific web sites.

22 Q.  So, basically, he was just on sort of a search and

23 destroy mission.  He was out there on the Internet

24 trying to find people that he could essentially rat out,

25 to make cases against, and then give that information

1  over to you, right?

2  A.  He wouldn't give it over to us, we were there when

3  he was doing it.

4  Q.  Okay.  Except when he was doing his thing on the

5  side with the IRS, if he had somebody that he was

6  involved with there, you didn't know about that?

7  A.  No.  We weren't with him when he went home.

8  Q.  He withheld that information from you, didn't he?

9  A.  Yes.

10  Q.  So, for example, if he was getting copies of tax

11  returns, just let's say, hypothetically, from an

12  accountant, okay, and maybe an accountant was on -- in

13  it with him.  You didn't have the accountant's name,

14  right, or anyone else's name about that particular

15  criminal activity, right?

16  A.  Hypothetically, no we didn't have anyone else's

17  name.

18  Q.  Well, let's go back to the cashiers's check.  He

19  made up cashier's checks, presumably printed checks,

20  right?

21  A.  Yes.

22  Q.  Issued by some bank, maybe a phony bank, right?

23  Phony routing numbers on the bottom of the checks,

24  perhaps, but they looked like cashier's checks, right?

25  A.  Yes.

1  Q.  Now, Johnson, as far as you know, wasn't a printer,

2  so he was getting those cashier's checks from someplace,

3  right?

4  A.  I know that he did print some of those out and he

5  also received some.

6  Q.  He got some from some other source?

7  A.  Correct.

8  Q.  Okay.  Do you know that source?

9  A.  We know the screen name, but we don't know the

10  person associated with that screen name.

11  Q.  So if he used a printer, for example, you don't know

12  that?

13  A.  Yes, we do.

14  Q.  Okay.  Did he have a bank name on it?

15  A.  Yes.

16  Q.  Was it a legitimate bank?

17  A.  Yes.

18  Q.  Did he have full federal reserve numbers on the

19  bottom of those checks?

20  A.  I believe he had the right numbers.

21  Q.  You think you got everything that Mr. Johnson was

22  involved in on the cashier's checks, or do you think

23  he's still holding back information from you, or has?

24  A.  I think he probably held back information.

25  Q.  I'm sorry?

1  A.  I think he held back information.

2  Q.  Okay.  So, now, that's another problem with

3  Mr. Johnson, right?  Because in order to cooperate or to

4  be a good snitch, you have to be truthful, and that

5  means not just responding to questions that agents may

6  ask and not only doing their bidding and acting in

7  accordance with their supervision, but you are supposed

8  to be forthcoming with everything you know; isn't that

9  right?

10  A.  Yes.

11  Q.  And if you are -- if you committed a crime, such as

12  selling or giving phony cashier's checks, right, if you

13  have done that, the first order of business when the

14  agents sit down with a cooperator is for that individual

15  who would be cooperating to say, "I did it and this is

16  what I've done," right?

17  A.  Right.

18  Q.  But you allowed him to cooperate without knowing the

19  full picture; isn't that right?

20  A.  No.  In regards to those counterfeit cashier's

21  checks, we asked him all the questions, but I do believe

22  that he was probably into other things as well.

23  Q.  Well, let me ask you this:  Does it ever happen that

24  before you decide to have somebody cooperate, you have

25  them submit to a polygraph examination --

1           MR. EICHELBERGER:  Objection, Your Honor.

2           THE COURT:  Sustained.

3           MR. LIOTTI:  I'm not offering a polygraph.  I'm

4  just asking about the process, Judge.

5           MR. EICHELBERGER:  Objection --

6           THE COURT:  Sustained.

7  BY MR. LIOTTI:

8  Q.  Well, in deciding to have somebody cooperate, there

9  are some agents present, right?

10  A.  Yes.

11  Q.  And typically there are Assistant U.S. Attorneys

12  present, correct?

13  A.  Sometimes.

14  Q.  And you listen to what the would-be cooperator has

15  to say, and then with all of your experience, in your

16  case seven years with the Secret Service, you evaluate

17  the credibility of that would-be witness; isn't that

18  right?

19  A.  Yes.

20  Q.  And you decide, you have to make a judgment, "Is

21  this somebody we can trust," right?

22  A.  Right.

23  Q.  "Is this somebody that we can trust to come into a

24  courtroom or before a grand jury under oath, on a stack

25  of Bibles, and say, 'I'm telling you the truth, ladies

1  and gentlemen of the jury.  This is the truth.  This is

2  what I did.'"  That's what you have to satisfy yourself

3  about, right?

4  A.  Right.

5  Q.  Is this person going to be a good witness or a bad

6  witness, right?

7  A.  Right.

8  Q.  Can he look the jurors in the eyes and tell them a

9  true story, right?

10  A.  Right.

11  Q.  This guy couldn't do that, right?

12  A.  I wouldn't like him to.

13  Q.  Right.  Because he's a liar and he's a snitch and he

14  can't be trusted at all, right?

15  A.  Right.

16          MR. LIOTTI:  Excuse me one second, Your Honor,

17  please.  Judge, I just need one minute.  I'm sorry.

18          THE COURT:  Yes.

19          MR. LIOTTI:  Could I have this marked for

20  identification, Your Honor, please?

21          THE COURT:  Yes.

22          MR. LIOTTI:  Thank you.

23          MR. EICHELBERGER:  Subject to relevance.

24          THE COURT:  Ask Ms. Willis to put an exhibit

25  sticker on it, Mr. Liotti.

1           MR. LIOTTI:  We will do it letters or numbers?

2           THE COURT:  Numbers.  Defendant's 1 for

3  identification.

4  BY MR. LIOTTI:

5  Q.  Now, is it your testimony that at some point

6  Mr. Johnson had certain communications with somebody who

7  had a screen name of Pit Boss 2600?

8  A.  Yes.

9  Q.  And when did that occur?

10 A.  I believe we started chatting with him towards the

11 end of May of '05 through, you know, June, and continued

12 on through '05.

13 Q.  And how did the Secret Service or Mr. Johnson, if

14 you know, learn of that name, Pit Boss 2600?

15 A.  As we were sitting at the computer we were chatting

16 with people and a message popped up asking us to accept

17 a message from Pit Boss 2600.

18 Q.  And what about CIA INTEL?

19 A.  Just after Pit Boss popped up, it was an AIM message

20 saying, "Would you like to communicate with Pit Boss

21 2600?"  We said, no, and then almost 30 seconds or so

22 after that, CIA INTEL popped up on the other chat

23 client, ICQ, with a message.

24 Q.  Now, I understand that as part of your proof in this

25 case that at some point you believe you learned that Pit

1  Boss 2600 and CIA INTEL is, in fact, Jonathan Giannone,

2  right?

3  A.  Yes.

4  Q.  Okay.  But at that time, whenever you started seeing

5  that name Pit Boss 2600, and the other one, CIA INTEL,

6  there was no name associated with that at that point,

7  right?

8  A.  Right.

9  Q.  Okay.  When, for the first time, do you believe that

10  Jonathan Giannone's name appeared?

11  A.  Probably June 7th of '05, somewhere around that

12  date.  It was after that we put money in his account.

13  Q.  I'm not going to hold you to that exact date.

14  A.  Okay.

15  Q.  But you used the word "probably," so the lawyers in

16  this room, and hopefully the jurors, are wondering about

17  what you mean by probably.  Are you not sure of that?

18  A.  The exact date?  I know we put money into his

19  account on June 6th and I'm pretty sure I called Bank of

20  America the next day, June 7th, to obtain information on

21  that account.

22  Q.  All right.  Now, let's talk about that.  Again,

23  there were communications between Mr. Johnson and Pit

24  Boss 2600 and CIA INTEL, right?

25  A.  Yes.

1  Q.  And you were telling Mr. Johnson at some point to

2  transmit money to a bank; isn't that right?

3  A.  No.

4  Q.  Okay.  Was money -- I'm sorry.  Was money

5  transmitted?

6  A.  In what way?

7  Q.  Well, you just mentioned a moment ago money was

8  transferred.

9  A.  We deposited money into an account.

10  Q.  Okay.  That's what I'm asking.

11  A.  Yes.

12  Q.  And that was done on or about June 7th, right?

13  A.  Yes, I believe it was June 6th.

14  Q.  Okay.  Again, I'm not holding you to the exact

15  date --

16  A.  I'm sure you will.

17  Q.  -- that's why I'm saying on or about.  So if it's

18  the 5th or the 9th or whatever, it is what it is.

19  Okay?

20          So you deposited money into an account.  Where?

21  A.  Bank of America on Harbison Boulevard.

22  Q.  And where is that?

23  A.  On the -- you take 26 west here in Columbia.  It's

24  down by the mall.

25  Q.  Okay.  I just wanted to get Columbia.

1  A.  Yes.

2  Q.  So Bank of America.  And how much was put in there?

3  A.  $600.

4  Q.  And was that in Mr. Johnson's account or was it some

5  other account?

6  A.  No, it was in the A&W Auto Clinic bank account.

7  Q.  Okay.  So it was in an agent's bank account?

8  A.  I'm sorry?

9  Q.  Was it an agent's bank account?

10  A.  No.

11  Q.  Okay.  Tell me again whose bank account that was?

12  A.  A&W Auto Clinic is the name of the account with Bank

13  of America.

14  Q.  Oh, okay.  I got it.  A&W Auto, right?

15  A.  Yes, sir.

16  Q.  Okay.  And how did you come to get that name, A&W

17  Auto?

18  A.  It was sent to us in the chat.

19  Q.  Okay.  From whom?

20  A.  Pit Boss 2600 and CIA INTEL.

21  Q.  And did you come to learn what A&W Auto was?

22  A.  Yes.

23  Q.  Or is -- at that time.  What did you believe it was?

24  A.  It appeared to be a car dealership.

25  Q.  Okay.  And do you know where it was located?

1  A.  Yes.

2  Q.  Where?

3  A.  Holyoke, Massachusetts.

4  Q.  Do you know if it was incorporated in Holyoke,

5  Massachusetts?

6  A.  I do not know.

7  Q.  Did you ever check to see if it was an actual

8  entity, a legal entity?

9  A.  Yes.

10  Q.  Okay.  And what did you find?

11  A.  I found no record in the State of -- Commonwealth

12  database.

13  Q.  Did you check the state capital?

14  A.  No, just on the web site.  You go to the Secretary

15  of Commonwealth for Massachusetts.

16  Q.  So $600 went into a bank account under A&W Auto and

17  what happens thereafter?

18  A.  We go back and get online and notify Pit Boss 2600

19  that -- or CIA INTEL that $600 is in the account.

20  Q.  Presumably, you believe, at that point for the

21  purchase of an automobile; is that right?

22  A.  No.

23  Q.  Well, you said A&W Auto was an auto dealership.

24  A.  Correct.  But during the text of the chat we

25  received the 21 dumps and that was payment for those

1  dumps.

2  Q.  All right.  Let's take a look at that now.  Now, you

3  are talking about dumps.  So this goes back to what you

4  were testifying about on your direct examination, right?

5  A.  (Nods head in the affirmative).

6  Q.  Now, the dumps in this case you believe amounted to

7  credit card numbers; isn't that correct?

8  A.  That's correct.

9  Q.  Did they amount to anything else?

10  A.  Well, they could be debit cards.  Credit cards slash

11  ATM -- or debit cards.

12  Q.  Well, you speak very fast and sometimes I have to

13  listen more closely to you as a witness than I would --

14  A.  I will try to slow down.

15  Q.  But you say it could be, again, my lawyer ears are

16  kind of going up when you say "could be" or "probably"

17  and I have to ask the question.

18  A.  Uh-huh.

19  Q.  What was the information transmitted in those

20  dumps?  Was it just credit card numbers?

21  A.  Well, I mean, to be technical it was the track-two

22  data from either a credit card or debit card.

23  Q.  It was track-two data?

24  A.  Yes, on a magnetic stripe those -- all those numbers

25  and identifiers are called track information and that's

1  what was sent to us in the text of the chat.

2  Q.  Okay.  So you are saying there was some track-two

3  data on the magnetic tape and credit card numbers,

4  right?

5  A.  On the magnetic stripe on the back of a card

6  (indicating).

7  Q.  Right.  Careful now, we may have to mark your card

8  as an exhibit.

9  A.  Please don't.  On a credit card there's a magnetic

10  stripe on the back, and on that stripe is information

11  that is magnetically encoded on there, and that's what

12  allows you to use it at terminals.

13  Q.  I see.

14  A.  And that information is text, you know, it's letters

15  and numbers, things like that.  And you are able,

16  through certain devices, to find out what that text is

17  and then with that text you can include it into a chat

18  or a file or whatever you like.

19  Q.  Is that like a pin number?

20  A.  No, sir.  No, it is the account number, and then

21  there's also other numbers included in that that they

22  call an algorithm that are in that track.

23  Q.  Right.  And that's what gives you the authorization,

24  correct --

25  A.  Yes.

1  Q.  -- to use the card?

2  A.  That's what -- when you swipe through a machine,

3  that's what it reads.

4  Q.  All right.  So what you are saying though is, if I

5  understand you right, on the 21 dumps, what information

6  was transmitted were 21 numbers which included the

7  track-two information; is that correct?

8  A.  Yes.

9  Q.  Okay.  But there was no other information, such as

10 credit card holders' names or Social Security numbers or

11 anything of that sort?

12 A.  Correct.

13 Q.  And no dates of birth?

14 A.  Correct.

15 Q.  Am I right?  All right.  So, now that information,

16 you say, is transmitted to Brett Johnson; is that right?

17 A.  Yes.

18 Q.  Over the Internet in return for the $600 which you

19 say was deposited into a Bank of America account; is

20 that correct?

21 A.  That's correct.

22 Q.  Okay.  And again, the 21 numbers are coming from

23 this individual or individuals who identify themselves

24 as Pit Boss 2600/CIA INTEL and you are saying that's

25 Jonathan Giannone?

1  A.  Yes, sir.

2  Q.  Correct?

3  A.  (Nods head in the affirmative.)

4  Q.  I got it then, right?

5  A.  Yes, that's good.

6  Q.  Okay.  All right.  So what happens with

7  Mr. Johnson?  Now you've got the 21 numbers, what if

8  anything is done with the 21 numbers?

9  A.  We record them and we write them down.  I contacted

10 Bank of America to let them know that we had them.

11 Q.  Okay.  And do I have it right at that point

12 Mr. Johnson is not permitted to use those 21 numbers,

13 right?

14 A.  Right.

15 Q.  And you don't charge anything on those cards, right?

16 A.  Right.

17 Q.  So no one uses those cards, right?

18 A.  Right.

19 Q.  Okay.

20 A.  Hopefully.

21 Q.  So, as far as those 21 cards are concerned, there is

22 no, if I may use the term, actual loss with respect to

23 those credit card holders; is that correct?

24          MR. EICHELBERGER:  Objection, relevance.

25          THE COURT:  Overruled.

1  A.  At that time we didn't know of any loss associated

2  with them.

3  BY MR. LIOTTI:

4  Q.  Okay.  And since that time, with respect to those 21

5  cards, you have not learned of any actual losses; isn't

6  that so?

7  A.  No, there are actual losses associated with some

8  cards.

9  Q.  Among those 21?

10  A.  Yes, sir.

11  Q.  Okay.  So somebody may have been using those cards

12  improperly prior to the numbers being transmitted to

13  Mr. Johnson?

14  A.  No.

15  Q.  Those numbers were used improperly after the

16  information went to Mr. Johnson?

17  A.  Yes.

18  Q.  And do you have any way of knowing who that person

19  or persons are?

20  A.  No.

21  Q.  And do you have any way of knowing how much money

22  was actually taken as a result of those transactions?

23  A.  Yes.

24  Q.  How much?

25  A.  I don't know exactly.

1  Q.  Does $12,000 ring a bell with you?

2  A.  It's approximately 12,000.

3  Q.  Approximately 12,000?

4  A.  Yes.

5  Q.  But as you sit here now, you cannot say that

6  Jonathan Giannone -- you may believe whatever you

7  want -- but based on the evidence you cannot say that

8  Jonathan Giannone is responsible for that actual loss,

9  if you will?

10  A.  No, never made that claim.

11  Q.  Thank you, sir.

12         Okay, now --

13         MR. LIOTTI:  Judge, I don't want to delay the

14  testimony but this may be a -- I know it's about seven

15  minutes early, this may be a good time to break, if Your

16  Honor would allow that.

17         THE COURT:  That's fine.

18         MR. LIOTTI:  Thank you, Judge.

19         THE COURT:  All right.  Ladies and gentlemen,

20  we will break now for lunch.  We'll start back at 2:15.

21  Please take your pads and leave them in the jury room

22  during lunch.  Do not discuss the case with anyone or

23  allow anyone to discuss it with you.  And get the jury

24  tags before you go to lunch, they should be on the table

25  in there.

1          (Jury not present)

2          THE COURT:  All right.  You may not discuss

3   your testimony with anyone while you are at lunch.

4          THE WITNESS:  Okay.

5          THE COURT:  Don't talk about this case.

6          And I will advise him not to talk about the

7   case while he's at lunch.  Okay, 2:15.

8          MR. EICHELBERGER:  Thank you, Your Honor.

9          (Lunch recess)

10          THE COURT:  All right.  Does either side have

11   anything before we bring the jury back?

12          MR. EICHELBERGER:  Nothing from the government,

13   Your Honor.  Thank you.

14          MR. LIOTTI:  Nothing, Judge.  Thank you.

15          THE COURT:  All right.  You may come back up.

16          And you may bring the jury in.

17          (Jury present)

18          THE COURT:  Good afternoon, everyone.  We are

19   ready to get underway with the continuation of the

20   cross-examination of Agent Smith.

21          MR. LIOTTI:  Thank you, Judge.

22   BY MR. LIOTTI:

23   Q.  If I may, Agent, just a few more questions and then

24   we will be done.

25          At some point during that 11-month period that

1  you told us about, was there a time when you learned

2  that Mr. Johnson was preparing to jump bail?

3  A.  No.

4  Q.  Was there a time that you learned that he was

5  preparing to travel outside of the jurisdiction?

6  A.  No.

7  Q.  Or even outside of the continental United States?

8  A.  Well, when we started our investigation on him, you

9  know, we -- he had often talked about going to Brazil.

10  Q.  Now, Agent, there was a point in time when you had

11  collected some, I will say, 75 DVD-type disks with

12  information on it, correct?

13  A.  Yes.

14  Q.  Okay.  Could I show you what has been marked as

15  Defense Exhibit 1 for identification and ask you if you

16  can identify this document?

17          MR. LIOTTI:  Can I just walk up, Judge?

18          THE COURT:  Yes.

19          MR. LIOTTI:  Thank you (handing).

20  BY MR. LIOTTI:

21  Q.  Can you identify that?

22  A.  It's a screen shot of an MSN Hotmail e-mail account.

23  Q.  And who is it by?

24  A.  BrettTheVetMan@hotmail.com, is the account name.

25  Q.  Do you recognize that as a communication sent or

1  received by Brett Johnson?

2  A.  Yes.  I mean, this was an e-mail account that he

3  used.

4  Q.  Okay.  And does he make reference in that

5  communication to --

6         MR. EICHELBERGER:  Objection, hearsay.

7         THE COURT:  Sustained.

8  BY MR. LIOTTI:

9  Q.  Did you obtain a copy of that during the course of

10 your investigation?

11 A.  If it came from those CDs, then that was obtained

12 during our operation.

13 Q.  Okay.  And that is a business record that you have

14 maintained during the course of this investigation?

15 A.  Well, those CDs are generated from Camtasia and

16 Spector Pro and we maintained those throughout the

17 investigation.

18 Q.  And it would be your responsibility to maintain that

19 business record as part of the investigation?

20 A.  Yes.

21        MR. EICHELBERGER:  Objection, characterization

22 as a business record.

23        THE COURT:  Well, are you referring, Agent

24 Smith -- are you saying that this document that

25 Mr. Liotti has offered you -- or has handed to you is

1  something that was recorded from one of the Secret

2  Service computers?

3          THE WITNESS:  Yes.  As Brett Johnson would be

4  on that computer, it would be four to six, seven, eight

5  hours a day.  We had Camtasia, which is the recording

6  software, going, and everything that happens on that

7  screen is recorded.

8          And at the end of the day or at the end of the

9  week we would take each of those days and record the

10 Camtasia file and, as well as the Spector Pro data, and

11 put it onto a CD or a DVD and then put that into

12 evidence.

13         THE COURT:  All right.  I just wasn't sure

14 whether this was something they found on his home

15 computer when they searched his apartment in Charleston

16 or whether this was something that came off of the

17 Secret Service computers.

18         You may proceed.

19         MR. LIOTTI:  I would offer it as an exception

20 to the hearsay rule.

21         THE COURT:  All right.

22         Mr. Eichelberger?

23         MR. EICHELBERGER:  Your Honor, it's hearsay

24 within hearsay.  If I could take a look at it for a

25 second.  I had just a brief moment to look at it.

1           THE COURT:  All right.

2           MR. EICHELBERGER:  Sidebar, if we could?

3           THE COURT:  All right.

4           (Bench conference)

5           MR. EICHELBERGER:  It's a little bit of a

6  complicated issue.  First off, I'm not sure which -- is

7  the testimony that this info at fedmedical.com; is that

8  Johnson's e-mail?

9           MR. LIOTTI:  Apparently it is.  That's what I

10 have been advised.

11          MR. EICHELBERGER:  By?

12          THE COURT:  Well --

13          MR. EICHELBERGER:  I'm clear what it is, plus

14 it's already been -- it's already been annotated,

15 emphasis drawn to something.  It's speculative.  It's

16 speculative as to what is going on.

17          THE COURT:  Okay.  So, is this showing that it

18 was the Hotmail account of Brett Johnson?  That's what

19 the agent was saying, right?

20          MR. LIOTTI:  Yes, I believe so.

21          THE COURT:  Okay.  So this would be an e-mail

22 he's received?

23          MR. LIOTTI:  There's no testimony --

24          MR. EICHELBERGER:  Whether that's spam or

25 unsolicited, it really gets into all kinds of

1  speculation.  It could be unsolicited.

2          THE COURT:  Well, what I'm saying is, I think

3  you were offering it, Mr. Liotti, to show that -- well,

4  I'm not really sure why you were offering it, but this

5  is e-mail which looks like spam to him.

6          MR. LIOTTI:  Right.

7          THE COURT:  So what would be the relevance?

8          MR. LIOTTI:  Well, there are some other

9  Hotmails that we have, and which we received from

10  Mr. Eichelberger, which refer to the fact that he was

11  cooperating with the Secret Service.

12          And apparently he communicated this to people

13  who are not involved in the investigation at all.

14          THE COURT:  Right.

15          MR. LIOTTI:  And this is part of an ongoing

16  dialogue that he was having with someone about traveling

17  outside the country, in this case to Britain.

18          MR. EICHELBERGER:  That's speculation as to

19  whether he was having a conversation at all.  That could

20  well give this spam e-mail -- we're running into 403

21  issues --

22          THE COURT:  This particular document is not

23  admissible other than just to show that this was his

24  Hotmail address but --

25          MR. LIOTTI:  Just one second.

1        Could we offer it, Judge, to show that that is

2  his e-mail account, just for that limited purpose?

3        MR. EICHELBERGER:  It's been acknowledged by

4  the witness that that's his e-mail account.

5        THE COURT:  The problem is you just have to cut

6  it off right here.  This bottom part is not going in

7  because it has no relevance.

8        MR. LIOTTI:  Okay.

9        THE COURT:  If you want to offer it -- just cut

10 it.

11       MR. LIOTTI:  We can do that.

12       THE COURT:  Okay.

13       MR. LIOTTI:  As redacted, I can hold it and --

14       THE COURT:  She can cut it with some scissors.

15       MR. LIOTTI:  Thank you.

16       (In open court)

17       THE COURT:  She's got to step outside for just

18 a moment.

19       Ladies and gentlemen of the jury, what I'm

20 doing is, I'm admitting this document, which is a page

21 of someone's e-mail inbox, and I'm admitting the top

22 half of it to show that -- what e-mail address

23 Mr. Johnson was using on Hotmail, but I'm not admitting

24 the inbox information.  I have found that that is not

25 relevant, so we are cutting it off and we are just going

1  to admit the top part of the document.  Okay?

2         MR. LIOTTI:  Should I continue, Judge, while --

3         THE COURT:  Sure, go ahead.

4         MR. LIOTTI:  -- she is doing that?  Very good.

5  BY MR. LIOTTI:

6  Q.  Agent, if I may, you mentioned before something

7  about IRS tax returns and so on and how Mr. Johnson was

8  attempting to recover refunds --

9  A.  Yes.

10  Q.  -- IRS returns.  Did he do this off of the computers

11  and so forth that you had set up for his cooperation?

12  A.  No.

13  Q.  Okay.

14         MR. LIOTTI:  Could I have this marked for

15  identification, please?  Your Honor, may I place this

16  before the witness?

17         THE COURT:  Sure.

18         MR. LIOTTI:  Thank you.

19  BY MR. LIOTTI:

20  Q.  Agent, I'm placing before you what has been marked

21  as Defendant's Exhibit 2 for identification.  Please

22  take a look at that and tell me if you can identify it.

23  A.  It's a form 1040, address and residency 2004.

24  Q.  Okay.  Have you seen that before?

25  A.  No.

1  Q.  Do you know if that was part of the discovery

2  material that the government provided to us with the

3  DVDs that you've testified about?

4  A.  It's possible.

5  Q.  Okay.  Do you know if that was generated by

6  Mr. Johnson while he was cooperating with you?

7  A.  I don't know.

8  Q.  Okay.  All right.  Just to go back to that last

9  exhibit that the judge has instructed the jury on, that

10 would be Defendant's Exhibit 1 for Identification --

11         THE COURT:  Well, it's admitted now.

12         MR. LIOTTI:  Yes, it's been received in

13 evidence now.

14 BY MR. LIOTTI:

15 Q.  Could I ask you to identify that please and, in

16 particular, I would direct your attention to the

17 receiver's name on that Hotmail?

18 A.  BrettTheVetMan@hotmail.com.

19 Q.  And as far as you know that is the Hotmail address

20 for Brett Johnson?

21 A.  One of many, yes.

22 Q.  All right.  Now, did you learn at some point that

23 while he -- while he was cooperating with the United

24 States Government that Mr. Johnson was advising friends

25 and acquaintances that he was cooperating with the

1   United States Government?

2   A.  Yes.

3          MR. LIOTTI:  Could I have this marked as one

4   exhibit for identification, please?

5          THE COURT:  So you want it to be Defendant's --

6   Defendant's No. 3 for ID?

7          MR. LIOTTI:  Yes.  It has multiple pages,

8   that's why I said -- I'm sorry.

9          Judge, if Your Honor pleases, I've asked your

10  able clerk to mark this as Defendant's Exhibit 3 for

11  Identification.  It consists of three, four, five, six

12  pages of marked copy.

13         I'm showing that to Mr. Eichelberger because

14  he's asked for a copy.

15         MR. EICHELBERGER:  Objection on the grounds of

16  relevance.  Also on the grounds that they have been

17  modified by highlighting certain portions of text, Your

18  Honor.  They are not exactly as the screen printouts

19  would originally be.

20         MR. LIOTTI:  I haven't offered them yet, Judge.

21         THE COURT:  All right.

22         MR. LIOTTI:  If I may, just a few more

23  questions, Your Honor, please?

24         THE COURT:  Go ahead.

25  BY MR. LIOTTI:

1  Q.  Now, just so we understand this -- I think you said

2  this as part of your direct testimony, but let me ask

3  you again just so we can be very clear about it.

4        When you have someone who is acting as an

5  informant or otherwise cooperating with the government,

6  they are considered to be a confidential informant,

7  correct?

8  A.  Correct.

9  Q.  And that means, if I have it right, that they are

10 not supposed to be talking about their work, as far as

11 you are concerned, with anyone, right?

12 A.  Right.

13 Q.  Because that can jeopardize the integrity of the

14 investigation, correct?

15 A.  That's correct.

16 Q.  Okay.  I would like to place before you a document.

17 Just ask you if you can identify it.  It's marked as

18 Defendant's Exhibit 3 for Identification only,

19 consisting of six pages.  Would you take a look at that

20 and tell me if you can identify it?

21 A.  Yes, I recognize it.

22 Q.  And what is that?  What do you know it to be?

23 A.  An e-mail.

24 Q.  Okay.  And was it received or sent by Mr. Johnson,

25 as far as you know?

1  A.  Yes, as far as I know.

2  Q.  And is Mr. Johnson -- or can you conclude from that

3  document that Mr. Johnson was communicating with people

4  outside of the scope of your investigation?

5  A.  Yes.

6  Q.  Okay.  Do you have any way of knowing how many

7  people he spoke to?

8  A.  No.

9  Q.  Or communicated with?

10 A.  No.

11 Q.  Is it fair to say that it was more than one?

12 A.  Oh, yes.

13 Q.  Okay.  And when did you first learn that he was

14 doing that?

15 A.  We saw this e-mail.  He had told people,

16 unfortunately, before he actually came to work for us

17 what he was going to be doing.  We interviewed those

18 people regarding that, made them understand what the

19 consequences were.  "We," meaning the Secret Service.

20 We also found out at the end of the investigation that

21 he was telling people he was a Secret Service agent,

22 pretty much.

23 Q.  When did you find that e-mail for the first time --

24 and, again, when I say "you," I'm talking about the

25 Secret Service -- to the best of your knowledge?

1  A.  It's dated June 20th, and --

2  Q.  That was June --

3  A.  I can't remember exactly when we saw it, but we knew

4  that he had communicated with people in Charleston about

5  him working for us.

6  Q.  That was June 20th of '05?

7  A.  Yes.

8  Q.  And nonetheless you, then, allowed him to continue

9  cooperating with you for another 10 months,

10  approximately?

11  A.  10 months, yes.

12  Q.  Thank you, Agent.

13          MR. LIOTTI:  No further questions.

14          THE COURT:  Redirect?

15                  REDIRECT EXAMINATION

16  BY MR. EICHELBERGER:

17  Q.  With respect to Mr. Johnson's status as a

18  confidential informant, to your knowledge, at any time

19  during this investigation did Mr. Johnson give any

20  information about Jonathan Giannone himself that was not

21  reflected in chat transcripts?

22  A.  No.

23  Q.  At any time during the investigation did Mr. Johnson

24  provide any confidential information based upon

25  face-to-face contacts with anyone during the course of

1 the investigation?

2 A.  No.

3 Q.  With respect to the comment that you made in

4 response to a question that there were a couple of times

5 when Mr. Johnson was not directly in the presence of

6 either yourself, Special Agent Kirby, or some other

7 Secret Service agent, approximately how long of a period

8 would Mr. Johnson have been by himself?

9 A.  It would vary; maybe 5, maybe 10 minutes.  You know

10 if we had to go to the bathroom or if we had a chat with

11 someone that was regarding, you know, a fraudulent

12 scheme, if they wanted -- to say, "Hey, are you -- you

13 want to get involved in this?"

14         And I would have to go -- go to the boss and

15 say, "Hey, you know, this is what we've got going on.

16 Do we want to, you know, further this?"

17 Q.  All right.  During the periods of time that

18 Mr. Johnson was by himself, were the -- was the

19 monitoring software, that is the software -- both the

20 Camtasia and the transcript-generating software, was it

21 turned off?

22 A.  No.  No, it stayed on the entire time he was there.

23 Q.  Based upon everything that you know -- well, let me

24 come back to that in a second.

25         With respect to -- I think you testified that

1  there were three times that dump information came

2  through?

3  A.  Yes.

4  Q.  In any of those dumps, was there information other

5  than simply the track-two data that came through on

6  those e-mail chats?

7  A.  Yes, there was.

8  Q.  What type of information?

9  A.  On some of the tracks that would have the account

10  information, it would also have the account holder's

11  name.  Just first and last name.

12  Q.  First and last name?

13  A.  Yes.

14  Q.  Specifically, there were three transactions.  Do you

15  recall which of those three?

16  A.  I know the one on June 6th had several names --

17  Q.  That was the 21 --

18  A.  That was the 21 numbers.  And I'm pretty sure the

19  first communication we had or the -- the first time we

20  received dumps, which might have been May 27th,

21  somewhere around there, had that information as well.

22  Q.  All right.

23  A.  And then the middle one, the second one, from what I

24  remember, it had the account information and then it

25  just said "your name."  So it didn't have an identifying

1  name.

2  Q.  Now, I want to make sure that we understand

3  Mr. Johnson's function in this investigation.  Was he

4  supposed to go out and deal face-to-face with anyone?

5  A.  No, everything was done on the computer.

6  Q.  And the computer had both Camtasia and the

7  transcript monitoring?

8  A.  Yes, and there's people supervising.

9  Q.  With respect to loss, counsel asked about potential

10  loss.  In the course of preparing for this trial did you

11  and Agent -- and Agent Kirby go through bank records to

12  determine how much would have been available had you

13  folks, in fact, been bent on mischief?

14  A.  Yes.

15  Q.  Approximately how much?

16  A.  It was approximately 130,000 that was available on

17  the cards that were sent to us.

18  Q.  But the person who sent them didn't know that you

19  were law enforcement?

20  A.  Correct.

21  Q.  Now, based upon everything that you know, all these

22  details about Mr. Johnson's past, present, and continued

23  illegality, do you have any concerns at all about the

24  accuracy of the chat transcripts?

25  A.  No.

1           MR. LIOTTI:  Objection, move to strike.

2           THE COURT:  Overruled.

3           MR. EICHELBERGER:  Thank you.  That's all.

4           THE COURT:  Agent, when you say 130,000 was

5    available, you mean that that's the maximum credit line

6    on those cards?

7           THE WITNESS:  Ma'am, they were debit cards --

8           THE COURT:  Oh, they were debit cards.

9           THE WITNESS:  -- drawn specifically on an

10   account, and we looked at the statements and that was

11   the available balance for those cards at the time we

12   received them.

13          THE COURT:  Okay.  Thank you.

14          All right.  Anything else, Mr. Liotti, for this

15   witness?

16          MR. LIOTTI:  No, Your Honor.  Thank you.

17          THE COURT:  Thank you.  You may step down.

18          You may call your next witness.

19          MR. EICHELBERGER:  Call Special Agent Bobby

20   Kirby.

21          Your Honor, if I could, we do have a

22   stipulation that I want to reference at this time.

23          THE COURT:  All right.  Ladies and gentlemen, a

24   stipulation is an agreement between the parties that --

25   that something is established, it's not in dispute, and

1  therefore it's not necessary to call a witness to

2  testify to it.  You will have a copy of the stipulation

3  with you in the jury room.

4          MR. EICHELBERGER:  Your Honor, it's stipulated

5  by and between the parties that on June 7, 2006, at

6  approximately 3:50 p.m. Eastern Daylight Time,

7  Mr. Giannone made a withdrawal of $500 from an automated

8  teller machine located at 152 North Village Avenue, Rock

9  Hill Center, New York.

10         Second, that the funds were withdrawn from

11 account numbered 9505552565 in the name of A&W Auto

12 Clinic.

13         Third, that Mr. Giannone is the true owner of

14 Bank of America account 9505552565 in the name of A&W

15 Auto Clinic.

16         And fourth, that Bank of America personnel

17 opened the account based on information provided by

18 Jonathan Giannone.

19         Thank you, Your Honor.

20         THE COURT:  Thank you.  Do you have, actually,

21 a document that has been signed?

22         MR. EICHELBERGER:  Your Honor, I have -- it has

23 my original signature and it has faxed signatures of

24 Mr. Liotti and Mr. Giannone.

25         THE COURT:  That's fine.  Would you hand that

1  up to Ms. Willis, please?

2          MR. EICHELBERGER:  I will.

3          THE COURT:  Thank you.

4          All right.  Agent Kirby, you may come on up and

5  be sworn.  If you will just stand right next to that

6  witness box, raise your right hand, and give me your

7  full name, please.

8          THE WITNESS:  Bobby Joe Kirby, Jr.

9          THE COURT:  All right.  Keep your hand up,

10 please.

11               BOBBY JOE KIRBY, JR., SWORN

12         MR. EICHELBERGER:  Thank you for your patience,

13 Your Honor.  We were making sure the computer was going

14 to be up and running.

15                   DIRECT EXAMINATION

16 BY MR. EICHELBERGER:

17 Q.  Good afternoon, Agent Kirby.  If you would, please

18 introduce yourself to the jury.

19 A.  I'm Agent Bobby Joe Kirby, Jr., a special agent with

20 the United States Secret Service in Columbia.

21 Q.  Mr. Kirby, how long have you been employed by the

22 United States Secret Service?

23 A.  A little over four years.

24         THE COURT:  Agent Kirby, would you sit up

25 closer to the mike, please?  Thank you.

1   BY MR. EICHELBERGER:

2   Q.  And before becoming employed by the United States

3   Secret Service, where did you get your education?

4   A.  Francis Marion University.  I have a bachelor in

5   business economics, and I have a master of business

6   administration from the University of South Carolina.

7   Q.  Right here in Columbia?

8   A.  Yes, sir.

9   Q.  The four years that you have served with the United

10  States Secret Service, where have those been served?

11  A.  Here in the Columbia field office.

12  Q.  All right.  Agent Kirby, in preparation for your

13  testimony in this case here today, would you go through

14  the process that you undertook to prepare together -- to

15  put chat transcripts together and the review that you

16  undertook?

17  A.  For the actual trial or the operation itself?

18  Q.  In preparation for trial.

19  A.  Okay.  Preparation for the trial we had a lot of

20  chat transcripts; organized those by dates.  Usually had

21  them in order, ended up being 170 pages of chats we

22  had.  At that time I started going line by line through

23  the chats looking for things that I could tie to, as

24  they call, the real world.  Maybe a place, maybe a

25  financial transaction that he talked about in the chat.

1           At that time I got -- I sent subpoenas for

2   business records for such things as checking accounts,

3   credit card accounts, travel statements from car rental

4   companies, airlines, that sort of thing.

5   Q.  All right.  Now, with respect to these various

6   accounts' information -- let's start from a common

7   premise, that is the bank account for Mr. Giannone.  Did

8   you see economic activity between that bank account and

9   any of these other sets of records that you obtained?

10  A.  We did.  That A&W Auto account, which the $600 was

11  put into and made the $500 withdrawal, there were two

12  payments to an AmEx, American Express, credit card, so

13  that's how we obtained the credit card -- that's one of

14  the ways.

15  Q.  How about payment for travel?

16  A.  Right.  There was also payment for travel that was

17  mostly either on his credit card statement or his joint

18  checking account, also Bank of America.

19  Q.  The joint checking account was with -- who was the

20  other person on that account?

21  A.  Jordan Giannone.

22  Q.  Now, with respect to review of these various chats,

23  let's start out with -- we have heard reference, a

24  Camtasia file, shall we?

25          What we need to do -- we are going to put into

1  evidence at this point, it's already been admitted,

2  Government's Exhibit 1A -- and I would like for you

3  to -- before we start playing it, give the jury an idea

4  of what they are going to see.  We are going to show it

5  to them and I'm going to want you to give a kind of

6  play-by-play as we go through it, if you would?

7  A.  Camtasia, that's just -- simplest way I look at it,

8  if someone is sitting at a computer, if you had a video

9  camera just shooting everything that happens on the

10  screen, that's basically what Camtasia does.  It just

11  records everything happening on the computer screen,

12  sort of like a video recorder.

13  Q.  And with respect to your review of all the chats

14  through this investigation, where does the Camtasia

15  sequence that we are going to watch fit into the

16  contacts from either CIA INTEL or Pit Boss 2600?

17  A.  Actually, what you will see here is at the very

18  beginning of the first day that we made contact with Pit

19  Boss 2600 or CIA INTEL.  At the very beginning we will

20  show how -- our operation, when we came in, we would

21  automatically bring the computer up, we would begin

22  recording, so it records everything that we do while

23  we're on that computer.

24          So, in the very beginning you will see the

25  computer screen as we did, our desktop, all the icons

1  that are on it, that sort of thing.  And then we will

2  forward to the part where Pit Boss 2600 makes initial

3  contact with gollumfun.

4  Q.  I'm going to check the screen back here and see if

5  we can't -- I think we have got it the largest size.

6          All right.  Let's go ahead, then, and start, if

7  we could, and publish 1A.

8          And, again, as things happen, Agent Kirby, if

9  you would, tell us what we are seeing.

10  A.  I will.  As you can see in the bottom it says

11  Camtasia, a studio, on the bottom task bar.  That's just

12  where we started Camtasia and it's actually running at

13  the time.  You'll see the red and green bulb that keeps

14  flashing.

15  Q.  You can actually -- you can touch your screen and --

16  to tell them where you are referring.

17  A.  The red and green bulb is flashing now.  That

18  actually shows that Camtasia is up and running.  At this

19  time you will see ICQ, which is an Internet chat client.

20  Q.  Lets's freeze the screen, please.

21          The computer has reared its ugly head.  Let's

22  start it again.  Fortunately it was short.

23  A.  When it comes back you will see on the right-hand

24  side of the screen, it's an ICQ.  It shows our buddy

25  list, which -- everyone that we have been talking to so

1  far in the investigation, so it will pop back up.

2       MR. EICHELBERGER:  Mr. Daley, when the ICQ box

3  comes up, pause it.

4       THE WITNESS:  There.

5       MR. EICHELBERGER:  Okay, pause, please.

6  BY MR. EICHELBERGER:

7  Q.  Again, touch the screen so we know exactly what it

8  is you are talking about.

9  A.  If you look here.

10  Q.  You can draw a circle if you want.

11  A.  That's the ICQ screen I'm referring to.  We are

12  about to sign on the ICQ and, like I said, that's just

13  an Internet chat client --

14  Q.  All right.

15  A.  -- that we used during the investigation.

16       MR. EICHELBERGER:  Continue to play, please.

17       THE WITNESS:  Okay.

18  BY MR. EICHELBERGER:

19  Q.  This is real time?

20  A.  Right.  This is, actually, as he's doing it, that's

21  why it's just so -- I mean, if we sat there for five

22  minutes, you would just see this for five minutes.

23  Q.  What just happened?

24  A.  He's going now -- AOL AIM.  If you -- in the middle

25  of the screen.  He's about to attempt to sign on AIM,

1 which we used a lot.

2 Q.  Do I read that correctly?  It says AOL instant

3 manager, gollumfun?

4 A.  That's the messenger, right.  We are logging on as

5 gollumfun.

6 Q.  Okay.  So that's the online identity of Mr. Brett

7 Johnson; is that correct?

8 A.  Correct.

9 Q.  Okay.

10        MR. EICHELBERGER:  Continue, please.

11 A.  Oh, and one more thing.  If you look over to ICQ,

12 the place that I circled, that is actually our ICQ

13 number.  That's just the number that is assigned to

14 gollumfun.

15 BY MR. EICHELBERGER:

16 Q.  All right.  We have got two things we are talking

17 about now, we have got AOL Instant Messenger and we have

18 got ICQ.

19 A.  Right.

20 Q.  Tell us what those are and how they relate to each

21 other, or perhaps don't relate to each other.

22 A.  Both of these are just Internet chat clients.  If

23 you are logged onto the Internet, you can log in through

24 ICQ or you can go to AIM Instant Messenger; you can use

25 Yahoo, Windows Messenger.  It's just a way of having

1  real -- real-time communication with someone.  You type

2  in something, they see it, they type an answer back.

3  So, it's basically just a way of communicating real

4  time.

5  Q.  Just different protocols for chat?

6  A.  Right.

7  Q.  And I believe -- who is the corporate entity behind

8  AOL Instant Messenger?

9  A.  America Online.

10  Q.  Okay.  How about ICQ?

11  A.  ICQ, and I'm not sure of the -- it stands for "I

12  seek you," but I'm not sure about the company.

13  Q.  When you say it stands for "I seek you," you mean,

14  "I seek," as in s-e-e-k, and you, y-o-u?

15  A.  Right.

16  Q.  The letters are just a shorthand of "I seek you"?

17  A.  Yes, sir.

18  Q.  Let's continue with the Camtasia file, please.

19  A.  And if I remember correctly, a couple of times the

20  AIM's sign-in, the America Online, which it's trying to

21  do now, didn't go through for some reason, but we

22  eventually get signed on.

23  Q.  All right.

24  A.  See, that's the message here, that "AIM cannot be

25  reached," so we attempted to do it again.  At this time

1    he's just bringing up -- a lot of things we did, we

2    would bring up web pages to check to see, you know, new

3    postings out on the Internet.  We would check our

4    different -- we had e-mail accounts, we would check

5    that, that we were dealing with individuals with, so we

6    would also do that, also.

7            As you can see now, he's attempting to go to

8    MailVault, which that is just one place that we had an

9    e-mail account.

10           And, again, it's saying now AIM couldn't be

11   reached, so there was a problem with the service at that

12   time.

13           Now, we've jumped forward a couple of hours,

14   that was just the beginning, showing the setup.  Now

15   he's actually checking our firewall logs.  We were just

16   going through some things -- stop right here.

17   Q.  When you say firewall logs, what do you mean?

18   A.  We had a firewall on our computer that, you know,

19   keep it -- it kind of blocks certain things we don't

20   want to happen, like if someone is trying to get into

21   our computer, something of that sort, we try and block

22   it with a firewall.

23   Q.  You may have heard the term "hackers," trying to

24   get --

25   A.  Right.

1  Q.  Okay.

2  A.  Now, if you look here, this is actually a message to

3  gollumfun from the user Pit Boss 2600.  It's saying he

4  sent us a message, would we like to accept it.  And this

5  is coming through, actually, AIM, America Online's

6  messenger.  And it happens pretty quickly, but you will

7  see we reject this message.  We don't --

8  Q.  So we should watch the cursor?

9  A.  Right.  And it's going to -- it's going to be pretty

10  quick.  Not until it starts --

11          MR. EICHELBERGER:  Continue to play, please,

12  Mr. Daley.

13  A.  So that was the first initial contact that we had

14  with Pit Boss 2600.

15  BY MR. EICHELBERGER:

16  Q.  Initiated by Pit Boss 2600?

17  A.  Right.  Right.

18  Q.  So the contact has been rejected?

19  A.  Right.  Now, we are just -- if you see on the screen

20  now, we are talking with an individual on the screen now

21  through ICQ, which is here (indicating).

22  Q.  And that is someone that's unrelated to this

23  investigation?

24  A.  Unrelated, right.  Stop right here.

25          Now, we have a message that pops up here at the

1  bottom right.  It has -- if you see the 296, and I can't

2  even read the rest of it.

3  Q.  It looks like 632892 or perhaps 842?

4  A.  That's actually from ICQ and it's telling us that we

5  have an individual -- a message from an individual that

6  we do not have on our contact list.  So this is the

7  first initial contact and, actually, this ICQ number, as

8  you'll see in a second, belongs to CIA INTEL.

9  Q.  Well, let's continue.

10  A.  Camtasia is pretty boring sometimes.

11  Q.  Well, it's recording things at the same time as they

12  happen in real life.

13  A.  Right.

14          Okay.  That was another user that is not

15  related to this case so we keep going.  We just stop

16  here.

17          MR. EICHELBERGER:  Freeze, please.

18          THE WITNESS:  This is an ICQ message that pops

19  up from the individual CIA INTEL at 6:18 p.m.  And he's

20  saying, "Hey."  So that is his first contact with

21  gollumfun.

22          MR. EICHELBERGER:  Continue.

23          THE WITNESS:  And from there we will begin a

24  small chat.

25          MR. EICHELBERGER:  Let's see -- let's pause for

1  a second.

2  BY MR. EICHELBERGER:

3  Q.  There is some typing going on in the bottom half of

4  that ICQ dialogue box.  What is happening?

5  A.  That's -- gollumfun is actually typing in his

6  message.  You will see it as he types.  The letters pop

7  up on the screen, so that's as he's typing.

8          MR. EICHELBERGER:  Continue playing, please.

9          THE WITNESS:  So gollumfun begins, then, the

10 conversation, "Greetings.  Nice name you have there."

11 And he just went and changed it, make it an uppercase G,

12 uppercase R.

13         So now we have sent -- actually, when he sent

14 the message, you saw it pop up in the top of the screen,

15 so he had actually sent it to CIA INTEL.

16         Now -- well, it's already gone.  At the bottom

17 you can see it will start flashing orange --

18         MR. EICHELBERGER:  Freeze, please.

19         THE WITNESS:  -- when you get a message and you

20 aren't on ICQ.  You are still logged on, but it's just

21 showing -- while you're doing something else, if it

22 starts flashing you know you have a new message that you

23 haven't read yet.

24 BY MR. EICHELBERGER:

25 Q.  But now we have a dialogue box that's got the

1  beginning, "Hey," then the response was sent,

2  "Greetings.  Nice name you have there."

3  A.  Right.

4  Q.  Now, we have what appears to be two lines from CIA

5  INTEL?

6  A.  Right.  CIA INTEL has posted -- he came back with

7  our response.  And now he's saying "Hey, get me on AIM,"

8  which, again, is AOL Instant Messenger.

9           MR. LIOTTI:  Your Honor, may I approach?  A

10  sidebar?

11           THE COURT:  Yes.

12           MR. LIOTTI:  Thank you.

13           THE WITNESS:  And at that time he gives --

14           THE COURT:  Wait just a minute.

15           THE WITNESS:  Oh, sorry.

16           (Bench conference)

17           MR. LIOTTI:  Judge, I believe that this witness

18  is testifying as an expert and he has not had a Daubert

19  hearing or anything of that genre to determine the

20  reliability of his proffered testimony.  He's just

21  throwing stuff out there and I don't believe it's been

22  submitted to Your Honor in the form of a proffer or

23  anything else.

24           MR. EICHELBERGER:  He's not testifying as an

25  expert.  He's merely recounting what is going on

1  on-screen.

2          THE COURT:  He's just saying what is happening

3  on the screen.  I don't see that as expert testimony

4  either.

5          MR. LIOTTI:  All right.

6          THE COURT:  Okay.

7          MR. LIOTTI:  I understand.  Thank you.

8          (In open court)

9  BY MR. EICHELBERGER:

10  Q.  I'm sorry.  Did I -- I think I asked you about the

11  two lines that came up under CIA INTEL?

12  A.  Right.  As I was saying, CIA INTEL is -- his

13  response back to us.  He says, "Hey, get me on AIM,"

14  which is AOL Instant Messenger, and he gives us his AIM

15  name, which is Pit Boss 2600.

16          MR. EICHELBERGER:  Let's continue playing,

17  please.

18          THE WITNESS:  And at that time, gollumfun types

19  in "Who are you?"

20          Now, if you see, CIA INTEL responds with

21  "markrich" at 6:20 p.m.  That name, actually, was

22  familiar to the investigation.

23          So at this time -- if you begin playing

24  again -- he knows who he's speaking with now.  And you

25  will see that we will open up an AIM window in just one

1  second.  We have opened up AIM on the side and actually,

2  now, he's going in.  He's highlighting Pit Boss 2600

3  from the CIA INTEL message.  He's just copying and

4  pasting that to keep from having to type it in, in AIM.

5          Now, this is an AIM message box.  He just

6  pasted that Pit Boss 2600 ID into the "to" box, so now

7  he's beginning to communicate with Pit Boss 2600 on the

8  AIM chat line.

9          MR. EICHELBERGER:  Thank you.

10 BY MR. EICHELBERGER:

11 Q.  Continue.

12 A.  Again, he's typing in his message, "Greetings."  And

13 if you see, it tells you when Pit Boss is typing.  Pit

14 Boss responds, "Long time."  And you can see gollumfun

15 typing here.

16 Q.  Very slowly.

17 A.  Right.  "Very long time.  How goes it?"  Pit Boss

18 responds, "Good.  You?"

19          And, basically, we just have a conversation now

20 on AIM with the individual Pit Boss 2600.

21 Q.  In real time.

22          MR. EICHELBERGER:  Let's go ahead and clear the

23 screen now, please.

24 BY MR. EICHELBERGER:

25 Q.  I mean, we could continue with this Camtasia but

1  it's kind of painfully slow.

2  A.  Well, as I said, it's real time.  These weren't the

3  only two individuals we were speaking with.  Some nights

4  we would speak with 10 to 20, maybe even 30 individuals

5  at the same time, so we would be bouncing back and

6  forth.

7  Q.  And then in connection with preparation for this

8  case, you made reference earlier to 170 pages of chat

9  transcripts?

10  A.  Correct.

11  Q.  Now, give us the interplay between what we saw on

12  the Camtasia files versus what we can expect to see from

13  the transcript files.

14  A.  Okay.  The Camtasia files, it's just a recording, so

15  we used some other programs -- we began with the program

16  called Spector Pro.  It basically -- just everything

17  that was typed on the screen -- if we talked with CIA

18  INTEL it would form a file for CIA INTEL, everything

19  that is typed by him or to him.

20          If it was typed by him, it logs it into that --

21  it's a text file, basically, and then our response would

22  also be logged into that text file.  So it's just a

23  running transcript of our conversations.

24  Q.  And before the trial started we put into evidence 20

25  separate transcripts of chat sessions between gollumfun

1  and either Pit Boss 2600 or CIA INTEL; is that correct?

2  A.  Correct.

3      MR. EICHELBERGER:  At this point, Your Honor,

4  we'd like to publish portions of Government's Exhibit 1

5  through 20.

6      THE COURT:  All right.

7      MR. EICHELBERGER:  Let's start, if we could.

8  Let's bring up Government's 1, page 1.

9      And just so we demonstrate what we are going to

10 do here, we can actually zoom in on the text so it's

11 easier to read by everyone, and within a zoomed box we

12 can scroll so everyone will be able to follow along with

13 us as we read.

14     For ease of reference I will read the part of

15 either Pit Boss 2600 or of CIA INTEL, as appropriate,

16 and I will ask Special Agent Kirby to read the parts

17 from gollumfun.

18     Let's begin back down where it says Pit Boss

19 2600, "Sup."

20     Let's go ahead and get that up, Mr. Daley, if

21 we could.  Good.  And let's go ahead and scroll within

22 there so that's at the top of our box.

23     THE COURT:  Can you tell us what date this was?

24     MR. EICHELBERGER:  I'm sorry.  Yes.

25     Scroll back down to the bottom, please.

1  BY MR. EICHELBERGER:

2  Q.  This chat transcript, the very first chat transcript

3  was on what day?

4  A.  May 23rd, 2005.

5         MR. EICHELBERGER:  Mr. Daley, again, if you

6  would scroll to where Pit Boss is first identified.  You

7  scrolled too far.  We will have you trained on this

8  before the trial is over.  There we go.  And I'm going

9  to read the part of Pit Boss.

10  BY MR. EICHELBERGER:

11  Q.  "Sup.  Long time old guy, long time, long time."

12  A.  "Very long time.  How goes it?"

13  Q.  "Good.  You?"

14  A.  "Well, getting back to business.  I take it that

15  529allite is your buddy?"

16  Q.  "520allite (sic)?"

17  A.  "Hm -- just someone that wanted to verify it was

18  really me on IAACA.  Thought it might have been you.

19  Guess not though."

20  Q.  "Oh, no.  I'm just a lurker these days."

21  A.  "Well, I used to be a lurker and did minor business

22  under bogart, but I think it's time to come out of

23  retirement.  Strange times these days."

24  Q.  "Eh, a lot of people I know got busted.  Remember

25  Enhance?  The kid I bought the name from."

1  A.  "Its been a D long time since we spoke.  Yep, I

2  remember Enhance.  He went down too?  F."

3          MR. EICHELBERGER:  For the record, Your Honor,

4  where -- with expletives, with the blessings of the

5  court and counsel, we will refer to them by letter

6  rather than by actual word, the jury can read them.

7          THE COURT:  All right.

8  BY MR. EICHELBERGER:

9  Q.  "He's sitting in jail right now in NH, got picked up

10 on a carding charge by SS.  Can't get bail because of

11 probation.  Made the news."

12 A.  "That's F'd up.  Most everyone I knew was snagged

13 also.  F'ing shame.  Time to rebuild -- at least for

14 me."

15 Q.  "Yeah, I never got pinched.  I've been staying under

16 the radar for a while.  I used to have that chump CC

17 Suppliers work for me."

18 A.  "Same here.  I'm guessing it's where (sic) I retired

19 before the SS set up the VPN through Cumba."

20 Q.  "Same."

21 A.  "Can't believe enhance got caught.  He was a good

22 kid."

23 Q.  "You know his real name, right?"

24 A.  "No.  I never asked real names and told people never

25 to tell me.  Little rule of mine."

1 Q. "Ah, I was gonna link you to the story."

2 A. "You know anyone on Samurai that can verify me so I

3 can get my A on over?"

4 Q. "Apparently he was running crews" --

5          MR. EICHELBERGER: We need to go to page 2.

6 And back to the zoom box, please. Excellent.

7 BY MR. EICHELBERGER:

8 Q. "Apparently he was running crews, paying friends a

9 percent to in store. One of them got busted, he never

10 knew."

11 A. "Well, you can still link me. I guess it doesn't

12 matter any longer."

13 Q. "The kid told the cops that enhance was this big

14 carder. Blah, blah. They set up him and the rest is

15 history."

16 A. "Fram'd was running crews for a while also, not to

17 the extent Enhance was, though."

18 Q. "Well, S. So was I. I was just slick about it."

19 And a smiley face emoticon. And then there is a URL for

20 www.Boston.com/news/local/New_Hampshire/articles/2005/02

21 /11/teen_charged_in_credit_card_fraud_police_say_

22 information_gleaned_on_wireless_networks_online?mode=PF.

23 A. "Heh. You know, I often advised against that. More

24 money; more risk though."

25 Q. "It's funny how they twist the story around.

1  Wireless hacker -- heh, heh -- he bought dumps from my

2  guy."

3  A.  "So how much time is Enhance looking at?  Anyone get

4  to talk to him?  Heh, yeah, wireless hacker."

5  Q.  "I attempted to bail him out but they have a bail

6  hold.  I visited him in Boston in Jan., a few weeks

7  before he got busted."

8  A.  "I know he did.  LE doesn't give a S about that

9  though.  It sounds better if it's all on him.  He's

10  young though, might not get too much time."

11  Q.  "I haven't been following the case.  CC Suppliers

12  got busted in Orange County for carding Apple and the

13  Sony store, only did 30 days."

14  A.  "Well, you are a good man for trying to bail him

15  out.  I remember doing the same for Fra'd before I

16  retired, and another fellow."

17  Q.  "Yeah, no one should spend time as a pretrial

18  inmate.  That's the worst."

19  A.  "30 days.  That's a good one.  Doesn't really send

20  the message that carding is a bad thing, does it?"

21  Q.  "Plus three years' probation.  Eh, I have been

22  staying away from it."

23  A.  "They can do the probation standing on their head,

24  no biggie."

25  Q.  "The spots I have been hitting are pretty much blown

1  up."  Then in parentheses, "Apple."

2  A.  "Well, I was trying to stay away from it, but I

3  wasn't very profitable this year.  S, I think, as well

4  come back full time."

5  Q.  "The game has changed."

6          We will wait for the screen to catch up to us.

7          "The game has changed big time.  Where you

8  around during the Citibank era?"

9  A.  "I see the game is a wee bit different these days.

10  COBs are still working though.  Looks like people are

11  starting coming back for business too.  Nope, I missed

12  out on the Citibank and the cash-outs, was doing my own

13  thing then."

14  Q.  "Ah, man, that was so much fun."

15  A.  "Yeah, it figures my ignorant A would sever all ties

16  and then a gold mine appears."

17          MR. LIOTTI:  Objection, may we be heard at

18  sidebar?

19          THE COURT:  Yes.

20          (Bench conference)

21          MR. LIOTTI:  Your Honor, I object to this whole

22  line of inquiry on the grounds of relevancy.  I don't

23  see any connection to our case.  They see Pit Boss 2600

24  and CIA INTEL, but nothing else that connects us to this

25  indictment.

1        MR. EICHELBERGER:  During the course of the

2   investigation, Your Honor -- we fronted that in our

3   pretrial brief.  Pursuant to Rule 104, it's information

4   coming in, subject to satisfaction of a condition, that

5   condition being the linkage of Pit Boss and CIA INTEL,

6   which has already been done, and the second linkage

7   being, taking that unified identity and linking it to

8   Mr. Giannone, which will be done through the course of

9   the 20 exhibits.

10        THE COURT:  I'm going to allow it, but if you

11  can't link it, I will strike it all.

12        MR. LIOTTI:  Thanks, Judge.

13        Judge, can I just state on the record, so the

14  jurors are aware of my objection just to relevance, and

15  Your Honor can then make your ruling on the record so

16  the jurors know why I objected?

17        THE COURT:  At this time?

18        MR. LIOTTI:  At this time, please.

19        THE COURT:  Okay.

20        MR. LIOTTI:  Thank you, judge.

21        (In open court)

22        MR. LIOTTI:  Your Honor, if you please, I

23  object on grounds of relevance.

24        THE COURT:  Overruled.

25  BY MR. EICHELBERGER:

1  Q.  Agent Kirby, I believe we are at the line that

2  reads, "Black Ops went down."

3  A.  "They all went down."

4  Q.  "They did an entire news thing on him.  How he is

5  this loser who lives with his mother, former mortgage

6  broker."

7  A.  "Papers said Back Ops was the only one to bond out.

8  Maybe more have since, don't know."

9  Q.  "Scarface did.  He messaged me the other day and was

10  like, what up, N?  He disappeared, though."

11  A.  "Are you sure Scarface is out?  He was looking at a

12  lot of time."

13  Q.  "He posted bail and I verified it was actually him.

14  He changed all of his user names."

15  A.  "You read the indictment?  They have a boatload of

16  charges on Scarface."

17  Q.  "Yeah, I accidentally ran into him on his new user

18  name."

19  A.  "Scary S.  Time to be very careful from now on.

20  People can't be lazy anymore."

21  Q.  "And he was, like, 'How did you get this name?'  My

22  dump guy got us confused.  Weird.  But I haven't seen

23  him in a while.  He told me he was bouncing."

24  A.  "I would like to speak to him.  I've always liked

25  him.  Maybe I will run into him sometime."

1  Q.  "I can give you his last known ICQ.  He banked away

2  a lot of money over the years, though."

3  A.  "Well, I can try his ICQ, if you don't mind.  He

4  must have an S-load of money saved."

5  Q.  "327539466."

6  A.  "I will try to get up with hi.  I hope he's okay."

7  Q.  "Funny, after the news came out -- Deck lived real

8  close to me."

9  A.  "Deck was okay.  I always liked him.  It was just a

10  couple of idiots that led to TESC downfall.  Deck wasn't

11  one of them."

12  Q.  "Any word on Mac?"

13  A.  "No.  Last I heard, everyone was still inside.  A

14  lot of them going to be doing some serious time.  It

15  really upsets me."

16  Q.  "Is Fram'd out?"

17  A.  "Not that I know."

18  Q.  "I'm assuming everyone is in local jails in the

19  areas they were arrested."

20  A.  "From what I understood, many were moved to New

21  Jersey.  That's the way it sounded, anyway."

22  Q.  "Did you see the news story from a few days ago?"

23  A.  "Nope, what story?  I'm aware that El Mariachi is

24  trying to rofit from the SC downfall as best he can."

25  Q.  "Yes.  He wrote a book.  He was always a F."

1  A.  "Hee, hee."

2  Q.  Then Pit Boss references a URL at news.yahoo.com/

3  news?tmpl=story&u=/bw20050520/bs_bw/b3935001mz001

4  gollumfun caret --

5          I'm sorry, that's -- next line yours.

6  A.  "Hey, are you still well connected enough that you

7  can verify me either on Samurai or IAACA?"

8  Q.  "I'm not connected at all.  I'm just nobody these

9  days and happy as a nobody.

10          "The story starts with an unlikely

11  partnership.  Andrew Mantovani was a part-time student

12  at Scottsdale Community in Arizona.  David Appleyard was

13  a one-time mortgage broker who lived in Linwood, New

14  Jersey, just outside of Atlantic City.  This is the duo

15  who led the ShadowCrew from 2002 until they were

16  arrested last fall, according to an indictment filed in

17  U.S. District court in New Jersey."

18  A.  "Growl.  Well, I wish I could accomplish what I

19  needed to as a nobody, but, heh, no matter."

20  Q.  "What are you looking to do?"

21  A.  "Well, I'm looking to make a good pile of money.  To

22  do it I think I need to bring the gollum name out, unite

23  a few folks, get a little organized, and conduct

24  business.  Basically, just what Phoenix, Mr. X, and

25  myself did with CL and SC.  I need a place where I'm

1  comfy doing business."

2  Q.  "The operation was quite sophisticated.  Mantovani

3  who used the handle ThnkYouPleaseDie.  Wasn't that

4  Deck?"

5  A.  "Yep, that was Deck."

6  Q.  "Well, to make a good pile of money, in store

7  online?"

8  A.  "Yeppers.  I might do a little physical plastic, but

9  I never liked that and I'm not the type that would

10  employ a crew."

11  Q.  "What part of the country are you:  west, east,

12  midwest, south?"

13  A.  "South."

14  Q.  "In store is real easy there."

15          MR. EICHELBERGER:  Next screen, please.

16  A.  "Yep, but not in chain stores.  Best Buy is still a

17  B here."

18  BY MR. EICHELBERGER:

19  Q.  "Hey, Apple Store, dude, is the easiest.  I've F'ing

20  walked out with two $3,000 laptops on a Simon card."

21  A.  "I will try that.  On a Simon card.  LOL."

22  Q.  "Yeah."

23  A.  "That's funny S."

24  Q.  "I got the best bin I've seen in years now for dumps

25  and the best connects for it, for 2K" -- $2,000 -- "I

1  can get like 150 to 180 dumps."

2  A.  "Reading that article you sent.  It looks like they

3  overlooked kidd entirely.  Ten, again, maybe kidd was

4  Deck as well.  Well, I might have to round you up for

5  dumps when the time comes.  How much you getting out of

6  each dump?

7  Q.  "2 to 4,000."

8  A.  "Very nice."

9  Q.  "Do you still have an MSR?"

10  A.  "No.  When the wife split she threw away a S-load of

11  things away:  IDs, diplomas, templates, and the trusty

12  206."

13  Q.  "Ah."

14  A.  "Yeah.  Good riddance, though.  Much better off.  I

15  can finally afford some stuff for me."

16  Q.  "Heh.  Another scam I got going is a Rolex gig."

17  A.  "I got a few nice fakes still lying around.  Got

18  them doing cashier's checks for COD orders.  Needless to

19  say it really Ps one off to as a fake cashier's check

20  for a fake Rolex.  Not something to make me appy."

21  Q.  "Heh."

22  A.  "Happy."

23  Q.  "Well, I found a connect to get fakes that you can't

24  even tell are fakes.  The use real gold, diamonds, and

25  everything."

1  A.  "Which ones you dealing in?  I've got the Daytona

2  and Yachtmaster."

3  Q.  "Are expensive fakes, though.  Submariner."

4  A.  "Anniversary or regular?"

5  Q.  "Reg."

6  A.  "How much you paying for them?  Come with boxes and

7  papers?"

8  Q.  "Yeah.  950.  Could sell to an eBay sucker for an

9  easy 4,000."

10  A.  "Good deal.  What do the D things look like when you

11  open them up?  Jap movement or Swiss?"

12  Q.  "Swiss."

13  A.  "Good deal."

14  Q.  "I figure I could make an easy 20K real quick

15  husslin' them."

16          MR. EICHELBERGER:  The next page, please.

17  A.  "Any luck thus far?"

18  BY MR. EICHELBERGER:

19  Q.  "Yeah.  I sold one.  I also got this other connect

20  in Long Beach that hijacks F'ing containers off the

21  docks.  We got 50 plasmas."

22  A.  "Heh.  You need any help getting money in pocket

23  from them, I will walk you through an easy way to do

24  it.  Sounds like you have your S together, though.  Now,

25  that's the way to go."

1  Q.  "They are looking for about 1,000 each."

2  A.  "What brand and size?"

3  Q.  "Not sure.  I just got a text message from my guy

4  and he's meeting up with them later tonight to find out

5  the details.  I believe Sony."

6  A.  "What size?"

7  Q.  "Not sure.  I want to say 50.  Let me call now."

8  A.  "That's quite a deal.  Let me know which Sony it is

9  as well.  Why aren't you selling them on eBay?"

10  Q.  "I don't have any in hand."

11  A.  "How soon can you get them?"

12  Q.  "I know these guys jack S all the time.  They've

13  called before with 500 ATVs.  All sorts of S."

14  A.  "Yeah.  No interest with ATVs, prefer electronics.

15  Plasmas are right up my alley."

16  Q.  "I can get them, like, this week.  ATVs have numbers

17  on them anyway."

18  A.  "Well, you certainly whetted my appetite.  $1,000

19  each?  Find out the model number for E.  If nothing

20  else, I can certainly help offload them on eBay."

21  Q.  "I just called."

22  A.  "Okay."

23  Q.  "He won't find out until around 10 p.m. PST time."

24  A.  Okay.  Hit back tomorrow with the info.  Okay?  You

25  really have these?"

1  Q.  "Yeah."

2  A.  "Good deal.  Good chunk of money to be made of

3  that."

4  Q.  "How much do you think one can make?"

5  A.  "Depends on the model.  Find out the model number

6  and we can go from there.  They can be eBayed and cased

7  out with extremely minimal risk."

8  Q.  "Heh.  You got a good eBay account?"

9  A.  "EBay is good to go."

10  Q.  "Cool."

11  A.  "Get back with me tomorrow.  Okay?"

12  Q.  "No doubt.  You got better ideas with the Rolex?"

13  A.  "Good deal.  God to see you around and run into

14  someone I know.

15          "Better ideas with Rolex?  That's probably the

16  best idea.  The only other thing is old escrow switch,

17  but that takes money up front.  Airline insurance is

18  another way to go."

19  Q.  "Airline insurance?"

20  A.  "Yeah.  It's in your luggage.  You buy insurance, it

21  goes missing or destroyed.  Escrow, you buy a real one

22  using escrow and then switch the fake one."

23  Q.  "You have done this before?"

24  A.  "Sunking did the airline deal.  The escrow deal is

25  rampant across eBay right now."

1  Q.  "Heh.  My watches, though, you can't tell they are

2  fake."

3  A.  "Well, you got to keep up-to-date on things, heh.

4  You taken them to a jeweler yet, a Rolex dealer?"

5  Q.  "A jeweler, yes."

6  A.  "The pop the back of it and look at the numbers?"

7  Q.  "Yep."

8  A.  "Good deal."

9  Q.  "Checking a few other things too.  Mine have all the

10  2005 updates."

11  A.  "They have the Zenith movement or what?"

12  Q.  "Zenith movement?"

13  A.  "Yep.  Rolex watches have a couple of different

14  movements to them depending on the model or the year of

15  production.  I was wondering if you knew which movement

16  yours had."

17  Q.  "Not sure.  Gotta eBay it in a few days."

18  A.  "Well, you did find out about those plasma units.

19  Those are much easier to deal with."

20  Q.  "I will."

21  A.  "Okay.  I'm out then.  Good to hear from you.  It's

22  been a while.  Nice to know you are still around."

23  Q.  "BTW.  How do I know you're the real you?"

24  A.  "What do you want, a few chums thrown in?  How about

25  the rantings of the madman, El Mariachi, which verify

1  me?"

2  Q.  "Heh.  Talk to you later."

3  A.  "Or if you can round up anyone that's done business

4  with me in the past."

5  Q.  "Everyone I know."

6  A.  "Or anyway, you can come up with any gollum

7  question, I can answer it."

8  Q.  "Is un custody.  Which vendor did I get into a huge

9  fight with that almost got me banned?"

10 A.  "Which vendor?  I remember me banning people or

11 threatening to ban people over god, though e may not

12 have went by that name then."  In parenthesis, "It was

13 greywolf.  And that would have been credit related.  ID

14 related would have been lighthawk or Kevlar.  I'm trying

15 to remember, it's been a while."

16 Q.  "Listguy."

17 A.  "You are absolutely right.  You are raising all

18 kinds of H and so was he.  I kept trying to get it

19 straightened out but bot of you were hardheaded, you

20 wouldn't budge."

21 Q.  "Yeah."

22 A.  "I remember you posted out the A about him and I

23 kind of remember you even had your signature saying

24 something about it.  Maybe I'm imagining that, though.

25 It's been a while."

1 Q.  "Yeah.  All right.  Peace, out."

2 A.  "Take care.  Peace, gollum."

3 Q.  "Peace."

4 A.  "Hey, if want further verification, I can send you

5 over a convo I had with El Mariachi earlier today."

6          And that's repeated twice.

7 Q.  Let's go back to the first page of Government's 1.

8 There's a --

9          MR. EICHELBERGER:  We don't need to make that

10 change on the screen, Mr. Daley.

11 BY MR. EICHELBERGER:

12 Q.  There is a reference to a person having been picked

13 up by a carding charge by SS.  What is SS in reference

14 to?

15 A.  Secret Service.

16 Q.  Are you familiar with the reference to IAACA, which

17 is contained within this chat?

18 A.  Yes, sir.

19 Q.  And what is it?

20 A.  It's a web site -- acronym for International

21 Association for the Advancement of Criminal Activity.

22 Q.  Let's move forward, please, to Government's

23 Exhibit 2, beginning at the first page.

24          First question I want to ask you is, what date

25 is Government's Exhibit 2?

1  A.  May 26, 2005.

2  Q.  Beginning at the beginning, once again I will read

3  the part of Pit Boss, you will read the part of the

4  undercover investigation or gollumfun.

5          "No good word on the hols, they only come with

6  plastic."

7  A.  "Growl."

8  Q.  "Growl.  Figured that was coming."

9  A.  "Yeppers.  Why no holos by themselves?"

10 Q.  "No idea.  Dude, my friend hit Apple yesterday, they

11 totally knew."

12 A.  "Heh.  What happened?"

13 Q.  "They let him card the S.  The guy came out from the

14 back with the laptops and everything, all laughing and

15 S.  And it's like, quote, anything else you want, sir?

16 We got printers, scanners, all kinds of S."

17 A.  "Heh."

18 Q.  "Three laptops, one swipe."

19 A.  "Good deal.  I'm buying some cards as we speak.

20 Sorry about delay in responding."

21 Q.  "I can sell you some seriously good dumps."

22          And, again, there is smiley emoticon.

23          "Actually, you know what" --

24          MR. EICHELBERGER:  At this point, Your Honor,

25 there is about six lines of data.

1          Rather than reading all that, if I could simply

2  ask the agent --

3  BY MR. EICHELBERGER:

4  Q.  Are we, there, talking about the track-two data that

5  would be encoded on the back of a credit card?

6  A.  Yes, sir.

7  Q.  All right.  We will skip down to where Pit Boss 2600

8  says, "Free."

9  A.  "Heh.  You are an excellent fellow.  LOL."

10  Q.  "Those will make you very happy.  If you like them,

11  2000 for 200."

12  A.  "Just seeing them flash up almost gives me a

13  hard-on, heh.  That's a good deal.  Let me try these out

14  for size.  Okay?"

15  Q.  "No problem.  My guy got 9,000 off one yesterday,"

16  then "dumps by markrich," with a smiley emoticon.

17  A.  "Heh.  I like you more and more by the day."

18  Q.  "Yeah.  I was an A-hole back in the day."

19  A.  "Here I was losing faith in you over those holos.

20  You are a good man, sir.  Heh."

21  Q.  "Did you pick up Business Week?"

22  A.  "No.  Why?"

23  Q.  "ShadowCrew, front cover."

24  A.  "Which issue date?  I take it I wasn't mentioned?

25  No respect, no respect."

1  Q.  "Hold.  May 30, 2005."

2  A.  "Okay.  I'll look it up."

3  Q.  "It mentions the busted folks."

4  A.  "Well, I guess it's a good thing I wasn't

5  mentioned.  Heh."

6  Q.  "Indeed, funny how they credit Deck and Black Ops

7  for running the site, not you, mac, onthefringe."

8  A.  "Oh, well, no.  Credit where credit is due I

9  suppose."

10 Q.  "Hey, whatever happened to that guy midwestdirect?"

11 A.  "Oh, what was his F'ing nickname?  Hold a second,

12 it'll hit me.  Gemini."

13 Q.  "Yes."

14 A.  "Don't know.  He disappeared."

15 Q.  "Shame.  The Jacksonville Apple store is cake,

16 BTW."

17 A.  "Hey, you know any good e-gold exchanges?

18        Jacksonville?  I thought you were hitting the

19 Yankee game the other night."

20 Q.  "Yeah.  I flew down to Jacks yesterday to take care

21 of some stuff.  The bullionexchange.com, direct

22 deposit."

23 A.  "Let me check.  I'm hoping I can deposit in my

24 area."

25 Q.  "You make a deposit at a Wells Fargo or a Bank One,

1  and," parenthetically, "Bank One deposits can be made at

2  Chase."

3  A.  "No Wells or Bank One here.  Growl."

4  Q.  "Nor over here.  They used to take Washington

5  Mutual."

6  A.  None of those here either.  None of them take WU or

7  MoneyGram any longer?"

8  Q.  "Not sure."

9  A.  "Growl again."

10 Q.  "I thought Black Ops was an ex-KGB agent or some

11 crap."

12 A.  "Oh, no, I knew who he was.  He just liked to think

13 he was a supersp."

14 Q.  "Heh.  A former mortgage broker."

15 A.  "Hey, track one on those dumps you sent.  Any

16 specific format to follow or do you have a generic that

17 will work?"

18 Q.  Bear with me for a second.  I think we may have

19 skipped a page in reading.  There we go.

20 A.  "Yeppers."

21 Q.  "Sucks, some guy is selling blanks on IAACA."

22 A.  "Eyeless?"

23 Q.  "Yeah, expensive as F."

24 A.  "Yep.  I'm ordering from him."

25 Q.  "I get them for 20 bucks a blank."

1  A.  "20.  How much extra for encoding and dumps and

2  embossing?"

3  Q.  "Don't know about the embossing because I have my

4  own embosser, and dumps, I told you the prices."

5  A.  "I certainly like you mare and more each day.  You

6  got any scans of what you are handling?  Eyeless sent

7  scans my way, not bad at all.  Question mark."

8  Q.  "Not sure."

9  A.  "Good quality, though?"

10 Q.  "Heh, to be honest, I could tell they are fake."

11 A.  "Hmm.  Worked at Apple store, though, right?"

12 Q.  "The signature strip is printed."

13 A.  "Okay."

14 Q.  "Apple, I use real cards."

15 A.  "Ah, I see."

16 Q.  "Simons, my reals, other people's reals, and I just

17 encode over them."

18 A.  "Heh."

19 Q.  "They don't even look at the card, you slide it

20 yourself."

21 A.  "That's a D good deal."

22 Q.  "Sometimes they ask to see ID before you slide it."

23 A.  "I'll try those dumps out in the next day or so,

24 okay?"

25 Q.  "90 percent of the time I show my ID on my own, real

1  quick, then slide the card.

2          "Okay.  You know listguy is in jail, right?"

3  A.  "Yep, swiping ATM cards.  They locked his A right in

4  the ATM room until the police showed up."

5  Q.  "He got out on bail for a few months.  I think he

6  was sentenced to around eight years."

7  A.  "You know, he actually had an MBA."

8  Q.  "Yeah, I heard.  People in India work cheap."

9  A.  "Hey, track one on those dumps you sent.  Any

10  specific format to follow or do you have a generic that

11  will work?"

12  Q.  "Yeah, give me one as a sample."

13          And there's track-two data continuing, and if

14  you would read beyond the track-two data.

15  A.  "Name to go on would be Steven Rea."

16  Q.  Responding with track-two data, "Steven, slash,

17  Rea," more data.  And Pit Boss says, "It's basically

18  doing the upwards caret slash upwards caret and six

19  zeros at the end."

20  A.  "God deal.  So where is the expiration in that?

21  It's been a while.  Jan. of 2005?"

22  Q.  "Oh, S, that expired."

23  A.  "I'm betting that dump probably won't work for me,

24  heh?"

25  Q.  "My bad."

1  A.  "No prob."

2  Q.  And then there's another track-two data and dump

3  with referencing the name Hoefle, H-o-e-f-l-e, slash

4  Donna slash L Bank of America, National Association,

5  Platinum.

6  A.  "You didn't have to do that, but thanks much.  You

7  skimming or buying these?"

8  Q.  "Buying."

9  A.  "Good deal.  Okay.  I'll try those out.  So do I

10  need to go through you if I need any more of these dumps

11  or what?"

12  Q.  "Yeah, but I'm not making anything off you."

13  A.  "That's fine."

14  Q.  "I can't believe we are reunited."

15  A.  "Heh.  Well, hopefully these forums can come

16  together a bit better than they have been.  I hope so

17  anyway."

18  Q.  "Yeah.  I'm thinking of starting my own forum,

19  Shadowcrewinc, try to reunite all the old-timers that

20  aren't doing time."

21  A.  "Yeah.  You like that SC name, eh?  The old SC

22  domain opens up in July."

23  Q.  "I'm sure someone back-ordered it."

24  A.  "Maybe."

25  Q.  "BRB."

1  A.  "Hey, any idea who the F M-i-n-h Corp. is?"

2  Q.  "Nope."

3  A.  "Dip S wanted me to contact him on Yahoo.  Posted

4  over on mazafaka."

5  Q.  "HRM, no idea.  Prob some B."

6  A.  "Yeah, probably.  He was banned as a ripper after

7  posting for me to contact him."

8  Q.  "Just ordered 100 AmEx."

9  A.  "Sweet."

10  Q.  "$600."

11  A.  "What percent success you getting out of those

12  AmEx?"

13  Q.  "Eh, when they work, they work well."

14  A.  "You of the opinion I need to move directly over to

15  AmEx?"

16  Q.  "They are call for auth havy."

17  A.  "Then why you going to the trouble?"

18  Q.  "Cheap enough."

19  A.  "Ah, understood."

20  Q.  "$6 a dump, can't beat it.  Gas, groceries -- gas

21  mainly.  My car loves gas."

22  A.  "So, what?  You go in with five to ten and when you

23  get a call FR" -- for "auth, you just pull out another?"

24  Q.  "Oh, just self-swiping" --

25           I'm sorry, that's your line.

1  A.  "Oh, just self-swiping or actually shopping?"

2  Q.  "Yeah.  I like how the last fours all, all the

3  same.  My last four on my real one is 1001, which is

4  very, very, very common with AmEx."

5  A.  "Ah, good deal, very smart.  No troub from anyone

6  yet?"

7  Q.  "Nope."

8  A.  "You have come a long way since the SC days, heh."

9  Q.  "I've never ordered AmEx from this guy, though.  I

10  used to get 'em from Tron.  These could work for

11  powerbooks.  I got a group of kids who are going to try

12  them."

13  A.  "Well, I thought you were probably still getting

14  from Tron."

15  Q.  "No.  I just ordered a batch from my guy."

16  A.  "Good deal.  You hook me up with AmEx so I can try

17  one of those nifty powerbooks?"

18  Q.  "Yeah.  I only have a few right now.  Are you going

19  tonight?"

20  A.  "Maybe, I need to get my A offline."

21  Q.  "You got an encoder?"

22  A.  "Yes, I do.  Well, I say I do, a buddy of mine."

23  Q.  "You got an AmEx plastic?"

24  A.  "Not that I would want to use.  Do I need to find

25  some AmEx plastic I'm comfy with?"

1  Q.  "Eh.  It depends on your state.  Are you in FL?"

2  A.  "Well, South Carolina.  I thought you knew that."

3  Q.  "Never tried S there.  New York is hard as F.  You

4  should be good."

5  A.  "Well, I might give it a go."

6  Q.  "Encode one of those Visas and grab a 17 inch.  Feel

7  rejoiced" -- there's a misspelling -- "that you just

8  made 2,000."

9  A.  "Indeed, going to try that ASAP.  Applewise, I would

10  need to go to Charlotte."

11  Q.  "Which is in NC?"

12  A.  "Now, how am I going to repay your generosity?

13  Correct, NC."

14  Q.  "Don't worry about it?"

15  A.  "Well, I will worry about it.  Tell you what, if I

16  find something I think is profitable, I will let you in

17  as well.  Fair enough?"

18  Q.  "Naw, I don't care.  I'm all about helping people

19  from the old days."

20  A.  "Well, thanks for everything thus far.  Like I said,

21  you have come a long way.  Heh, sounds like a Virginia

22  Slims ad, eh."

23  Q.  "Yeah, I used to be an A-hole in the SC days."

24  A.  "Well, I'm steadily rebuilding myself in these

25  forums so I have some good contacts if you need

1  anything. I wouldn't say you are an A-hole.  I would say

2  that you were as experienced as you seem to be now.

3  That only comes with time."

4  Q.  "Ack, sorry.  I X'd out of your IM."

5  A.  "No prob."

6  Q.  "Can you repaste it?"

7  A.  "Well, I'm steadily rebuilding myself in these

8  forums, so I have some good contacts if you need

9  anything.  I wouldn't say you were an A-hole.  I would

10 say that you were -- I would say that you were as

11 experienced as you seem to be now.  That only comes with

12 time."

13 Q.  "Ah, okay.  I still think we should start our own

14 forum.  It's just a big liability."

15 A.  "Well, maybe later.  I think that starting another

16 forum right now would dilute the community even

17 further."

18 Q.  "I am away from my computer right now."

19        Mr. Kirby, in connection with work on -- with

20 respect to this chat, at page 2 of Government's 2,

21 there's a reference to Pit Boss having flown down to JAX

22 yesterday, that would have been May the 25th of 2005.

23 When checking records, what if anything did you find

24 related to that statement?

25 A.  Checking the joint interest checking account with

1  Bank of America and the name of Jonathan Giannone or

2  Jordan Giannone, on May 25th, 2005, there was an ATM

3  network withdrawal at Discount Stores in Jacksonville,

4  Florida.

5  Q.  And that's referenced in Government's Exhibit 2A; is

6  that correct?

7  A.  Yes, sir.

8  Q.  And that is a statement for what type of an account?

9  A.  It's a Fleet One Premier account, with Bank of

10  America.

11  Q.  All right.  Similarly, with respect to Government's

12  Exhibit 2B, what if anything does it reflect?

13  A.  The affidavit?  Is that what you are referring to?

14  Q.  I'm sorry, was there an American Express statement

15  as well, Government's 2B?

16  A.  Oh, I see it.  On May 25th, 2005, on the AmEx card

17  for Jonathan Giannone, Southwest Airline ticket was

18  purchased from Jacksonville, Florida, to Ft. Lauderdale,

19  Florida.  Date of departure being May 25th.  Passenger

20  name, Jonathan Giannone.

21  Q.  Does the record that you are showing -- looking at,

22  show the last four digits of the AmEx card that's

23  referenced?

24  A.  Shows the last four as 1001.

25  Q.  Thank you.

1  A.  There is also another purchase, also on 5-25 of

2  '05.  A jetBlue airline ticket from Ft. Lauderdale,

3  Florida, to La Guardia International Airport -- or JFK

4  airport in New York.  Date of departure also 5-25,

5  passenger name, Jon Giannone.

6  Q.  Now, with respect to the Fleet One Premier

7  statement, who is the owner of that statement?  That's

8  Government's Exhibit 2.

9  A.  It's a joint account, Jonathan Giannone or Jordan

10  Giannone.

11  Q.  And with respect to Government's 2B, the American

12  Express statement, that's for the card with the last

13  four digits of 1001, who is the owner of that account?

14  A.  Jonathan Giannone.

15  Q.  Thank you.  Moving on, please, to Government's

16  Exhibit 3.  What's the date of chat in Government's

17  Exhibit 3?

18  A.  May 29th, 2005.

19  Q.  Again, I will read the part, in this case, of CIA

20  INTEL, and if you would read Gollum or gollumfun.

21          CIA INTEL said at 11:28 p.m., "Hey."

22  A.  "Greetings."

23  Q.  "Yankees suck -- to see them lose."

24  A.  "Sox fan myself."

25  Q.  "Yankee stadium is always fun."

1  A.  "Never been.  So who is this?  Mark?"

2  Q.  "Yes, Pit Boss 2600."

3         And that's where we will stop with Government's

4  Exhibit 3.

5         MR. EICHELBERGER:  Moving on, please, to

6  Government's Exhibit 4.  You will have to double click

7  within that bar and bring Government's Exhibit 4 back

8  up, please.  Thank you.

9  BY MR. EICHELBERGER:

10  Q.  What's the date of the chat in Government's 4?

11  A.  May 31st, 2005.

12  Q.  I will read the Pit Boss 2600 lines.

13         "Sup?"

14  A.  "Greetings.  AmEx last four is 1003."

15  Q.  "Been looking into this PicPay S.

16         "Growl.  I don't have that last four."

17  A.  "D.  PicPay."

18  Q.  "Some guy was selling it at 25 percent.  It's an

19  e-gold mock-up.  Did some Googlin on it.  It's cool, but

20  they take months to cash you out."

21  A.  "Hey, none of those cards were good, all were

22  declined."

23  Q.  "No S?"

24         And then we have a listing of approximately --

25  appears to be three dumps, that is track-two data,

1  relating to Bank of America Platinum card.

2          Skipping over, if you would, Agent, read

3  beginning where gollum says, "No S."

4  A.  "No S.  None of them for anything.  Those look like

5  the same batch, interchange direct indicates them as

6  debit; is that correct?"

7  Q.  "Yeah.  They are BoA debits.  I would have checked

8  them out but I wasn't sure on when you were going to use

9  them."

10  A.  "That's okay.  I got around to it today.  I'll just

11  re-encode and try again."

12  Q.  "My bad."

13  A.  "Heh.  No problem.  Just letting you know.  I'll

14  check those dumps out this evening.  Will advise on how

15  they work."

16          That line is repeated, "I will check those

17  dumps out this evening.  Will advise on how they work."

18  Q.  "Cool."

19  A.  "Thanks again.  I'm getting cards from eyeless

20  tomorrow also."

21  Q.  "What stores are you F'ing?"

22  A.  "Well, going to try Office Depot, Home Depot, and

23  Lowes."

24  Q.  "Nice.  Be careful."

25  A.  "Will do.  Home Depot here rarely looks at the

1  card."

2  Q.  "In NY they UV it."

3        And that's where we will stop publishing from

4  Government's Exhibit 4.

5        Read on, please, to Government's Exhibit 5.  If

6  you would, what's the date of the chat in Government's

7  Exhibit 5?

8  A.  June 3rd, 2005.

9  Q.  I will read the lines for Pit Boss 2600, and if you

10  would, read the lines for gollumfun.

11        "Man, rental cars don't verify S."

12  A.  "Hey, laptop, grill, LCD TV," in parentheses, "Sony

13  Vega, on those dumps you sent."

14  Q.  "Good.  I am 22."

15  A.  "Very good."

16  Q.  "I chalked my real ID to say I'm 30."

17  A.  "LOL."

18  Q.  "So I can rent wherever I want.  They don't even

19  check my ID."

20  A.  "Okay.  So where you get those groovy dumps?"

21  Q.  "Heh.  You need some?"

22  A.  "Oh, yes.  I like a lot."

23  Q.  "How much did you get off one dump?"

24  A.  "1999 on one, $1698 on one, $699 on third."

25  Q.  "Nice.  You got any e-gold?"

1  A.  "Very nice.  No e-gold right now, sent it to

2  eyeless, who, by the way, hasn't sent the items yet.

3  Went through escrow though, so no big deal.  So, I might

4  have some e-gold back fairly soon if numbnuts doesn't

5  ship."

6  Q.  "Ah, I needed some and it's a bitch for me to get."

7  A.  "Go through wahl in Tampa, good legit exchanger."

8  Q.  "Heh, I flew down to Boston, rented a car with a

9  forged document."

10  A.  "Heh.  Good deal."

11  Q.  "Carded, carded, carded.  Went to Cape Cod and

12  partied.  Drove back to NY."

13  A.  "You are a busy camper."

14  Q.  "And hit stores all the way down to NY."

15  A.  "So I'm guessing I need to go through you for more

16  of those dumps, eh?"

17  Q.  "Yeah.  I go through a guy I know personally."

18  A.  "How much?"

19  Q.  "What do you need?  How many?"

20  A.  "Say five to ten at a time.  I don't like to have

21  them laying around, as they might die."

22  Q.  "Ah, I don't have any left and I have to buy in

23  bulk."

24  A.  "Ah, gotcha."

25  Q.  "I might" --

1          That's the next page.

2          "I might hit up D.C. tomorrow a.m."

3  A.  "Heh.  Good deal."

4  Q.  "BRB.  I got to run to the office and get my mail."

5          And then CIA INTEL on the same date, 7:24 p.m.,

6  "Sup, boss man."

7  A.  "Hey there."

8  Q.  Back to the first page of Government's Exhibit 5

9  there is a reference where Pit Boss says that he flew to

10 Boston, rented a car with a forged document.  With

11 respect to Government's Exhibit 5A, which is in

12 evidence, what does it show?

13 A.  I have a statement from Dollar Thrifty Operations

14 doing business as Thrifty Car Rental.  A car rental in

15 the name of a Jonathan Giannone, time out was June 2nd,

16 2005, from Revere, Massachusetts, time in was June 3rd,

17 2005, in New York.

18 Q.  And Revere, Massachusetts is how far from Boston?

19 A.  As I understand, it's a short distance.  I'm not as

20 sure to the exact location.

21 Q.  All right.  With respect to Government's Exhibit 5B,

22 an American Express statement, what does it reflect?

23 A.  On -- purchase for an airline ticket from United

24 Airlines on June 2nd, 2005.  It's from New York, New

25 York, to Boston, Mass.  Date of departure 6-2 of '05.

1  Passenger name, Mr. Jonathan Giannone.

2  Q.  And, again, the American Express that was used to

3  pay for the airline ticket from New York to Boston,

4  Massachusetts, was owned by who?

5  A.  What was that question again?

6  Q.  The American Express card, whose was it that was

7  used to pay for this ticket?

8  A.  Jonathan Giannone.

9  Q.  Thank you.  Moving on, please, to Government's

10  Exhibit 6.  What's the date of the chat referenced in

11  Government's Exhibit 6?

12  A.  June 4th, 2005.

13  Q.  You've got the first line this time.  I will be

14  reading the CIA INTEL lines.

15  A.  "Greetings.  Dump fellow got with you yet?"

16  Q.  "Neg."

17  A.  "D."

18  Q.  "I think I have some I can hook you up with."

19  A.  "Hee, hee.  How much?"

20  Q.  "I have 21."

21  A.  "All plats and valid, question mark?"

22  Q.  "All Platinum.  Same bin, didn't check them."

23  A.  "Give me a price."

24  Q.  "HRM, 600 good?"

25  A.  "Sounds good.  Let me see what the piggy bank says

1  and I will let you know.  Okay?"

2  Q.  "E-gold?"

3  A.  "Yeah.  I will need to transfer funds into it

4  though.  I go through wahl in Tampa."

5  Q.  "Let me make it easier.  You got a BofA around?"

6  A.  "Heh, okay.  Yep, I have a BofA."

7  Q.  "Just drop the cash in my account.  Cool?"

8  A.  "I know you ain't going to give me a real account

9  info, that's just silly."

10  Q.  "Heh."

11  A.  "But yeah, that's fine."

12  Q.  "One of my corporations."

13  A.  "Okay.  Shoot."

14  Q.  "Bank of America.  Make sure you tell them it's a

15  Fleet account."

16  A.  "Okay.  I can't deposit till Monday though, right?"

17  Q.  "Don't worry about it.  Account: 9505552565,

18  ACK9505552565, name: A&W Auto Clinic, address: 395 Maple

19  Street."

20  A.  "Groovy."

21  Q.  "Holyoke, MA 1" -- excuse me -- "01040."

22  A.  "Sweet.  I will get that there ASAP, get that in

23  there.  Okay, I'm out to round up the cash.  I will get

24  up with you tomorrow to confirm, send on Monday, okay?"

25  Q.  "You need the S now?"

1  A.  "Wait till tomorrow.  Okay?  I can't use them

2  tonight anyway."

3  Q.  Next page.

4        "No problem."

5  A.  "Thanks much, I appreciate it.  It really is good

6  getting in contact with you again."

7  Q.  "You got to grow some balls and go get some

8  powerbooks."

9  A.  "LOL.  I'm thinking very much about that, especially

10  how those last three turned out."

11  Q.  "Dude, that's all I use them for.  I use the AmEx

12  for gas."

13  A.  "Heh.  I'm learning.  I'm learning.  Anyway, let me

14  get off here and start rounding up money.  Okay?"

15  Q.  "Have fun."

16  A.  "18 TR, period, and thanks again."

17        MR. EICHELBERGER:  And, Your Honor, again, the

18  stipulation between the parties is, is that the account

19  number and name that is referenced in this chat is, in

20  fact, the account that is opened with information

21  provided by Mr. Giannone and that he is the owner of

22  that account.

23        THE COURT:  All right.  We need to take our

24  afternoon break now.

25        MR. EICHELBERGER:  Thank you.

1          THE COURT:  Ladies and gentlemen, you may leave

2   the pads in your seats, just turn them over.  Do not

3   discuss the case while you are on break.  We will take

4   10 minutes.

5          (Jury not present)

6          THE COURT:  All right, we will take a 10-minute

7   break.

8          MR. EICHELBERGER:  Thank you, Your Honor.

9          (Short recess)

10         THE COURT:  I'm working on the jury

11  instructions.  Are there -- were there any statements

12  allegedly made by the defendant after his arrest to the

13  police or to whoever arrested him?

14         MR. EICHELBERGER:  No, Your Honor.

15         THE COURT:  There is no issue concerning that?

16         MR. EICHELBERGER:  I don't believe there are.

17         THE COURT:  Okay.  All right.  Thank you.

18         All right.  You may bring the jury back in.

19         (Jury present)

20         THE COURT:  All right.  You may continue.

21         MR. EICHELBERGER:  Thank you, Your Honor.

22  BY MR. EICHELBERGER:

23  Q.  All right.  Mr. Kirby, let's move to Government's

24  Exhibit 7, please.  Need to first ask you, what is the

25  date of the chat transcript referenced in Government's

1 Exhibit 7?

2 A.  June 6, 2005.

3 Q.  You will read gollumfun, I will read CIA INTEL.

4 A.  "Hey, you online?  Hello, ready to do business

5 here.  Growl.  Pit Boss, I'm ready to deposit funds,

6 want to talk to you quickly first.  Hello, bank's going

7 to close soon."

8 Q.  And it says, "CIA INTEL is away.  I am currently

9 away from the computer."

10 A.  "Now it comes with an away message?  WTF."

11 Q.  "TEA."  And then, "Yeah."

12 A.  "Hello.  Hello."

13 Q.  "Hey."

14 A.  "Okay.  Got dumps?  I might still be able to make it

15 to the bank before they close."

16 Q.  "Sure."

17          MR. EICHELBERGER:  And at this point, Your

18 Honor, we have, I believe, it's 21 dumps from Bank of

19 America, as the track-two data, in connection with -- it

20 appears one, two, three, four, five, six, seven, eight,

21 nine, 10 -- 11 of the 21.  There are names of account

22 owners that are included.  We will not read those into

23 the record, but slide over to where gollumfun begins

24 speaking at 4:25 p.m. on June the 6th of 2005.

25 A.  "Okay.  All right.  If I deposit first thing in the

1  morning?  I'm not sure if I can make it to the BofA in

2  25 minutes.  And the ones that aren't valid you

3  replaced?  Yes?  Hopefully.  Please."

4  Q.  "Yeah.  Might have to wait a week until the next

5  batch."

6  A.  "Good deal.  You will have the funds in the

7  morning.  I will check dumps and let you know which ones

8  are good to go.  Okay?"

9  Q.  You got a dump checker?

10  A.  "Nope, not right now.  Heh.  Check at the terminal.

11  Heh."

12  Q.  "Funny."

13  A.  "I thought you would like that one."

14  Q.  Next page.

15  A.  "You are a D fine man if these dumps work as well as

16  the last ones."

17  Q.  "You remember greywolf, the druggie?"

18  A.  "Yes, I liked the fellow," in parenthesis, "a bad

19  druggie though.  What about him?"

20  Q.  "I was just thinking of him.  Isn't he locked up?"

21  A.  "Yep, for a long time.  Was in on drug charges when

22  he got indicted on the SC busts."

23  Q.  "GD, have you ever been locked up?"

24  A.  "Not yet, let's hope it never comes."

25  Q.  "Not even the drunk tank?"

1  A.  "Nope.  H.  I didn't start drinking until last year

2  and I'm 35."

3  Q.  "GD."

4  A.  "Heh, yeah.  Former wife not a drinker and therefore

5  neither was I.  Ew girl is -- and I love it.

6          "So what made you think of greywolf?"  And we

7  have a failed to send message.  "So what made you think

8  of greywolf?"

9  Q.  Now, at this point we have got 21 dumps that came

10 through referenced in the 6-6-05 transaction.

11         In connection with preparation for this case,

12 Mr. Kirby, I want to put before you what is marked as

13 Government's Exhibit 7A.  That's in evidence.

14         If you would tell the jury what Government's 7A

15 is?

16 A.  It's a spreadsheet of the summary of the dumps that

17 we received, three on the 5-31 and the 21 from June 6.

18 Q.  All right.  And if you would just explain to the

19 jury what the information is that is contained on

20 Government's Exhibit 7A?

21 A.  Far left column, we have the date that we actually

22 received it.  Of course, the sender name in the second

23 column, who we actually received them from, the issuing

24 bank for all of the cards that we received -- all of

25 them were Bank of America -- followed by the account

1  number.  And the account name is after that.  That's

2  actually the account number associated with the card

3  number, and then the available balance.

4  Q.  Now, when you have available -- I'm sorry.  When you

5  have an available balance on these Bank of America

6  numbers, what does that mean?

7  A.  That's the amount of available credit that would

8  have been available from using those numbers.

9  Q.  This is available credit or were these debit cards?

10 A.  They were debit cards.

11 Q.  All right.  So, again, the numbers that were in

12 there as of the date you checked, what was the

13 cumulative total that a person bent on mischief would

14 have been able to make with the information that came

15 from either Pit Boss 2600 or CIA INTEL?

16 A.  $132,327.17.

17        MR. EICHELBERGER:  Your Honor, at this time we

18 have two stipulations I would like to read into

19 evidence.

20        THE COURT:  All right.

21        MR. EICHELBERGER:  First stipulation is that

22 the parties hereby stipulate that if any of the account

23 holders referred to in the indictment were called to

24 testify, they would state that the accounts and account

25 information referenced in paragraphs 3A, 3B, and 3C of

1  count 1; paragraph 2 of count 3; and paragraph 2 of

2  count 4 of the indictment were transmitted and used

3  without the authorization of the account owners.

4       And then, secondly, the next stipulation states

5  that the defendant, Jonathan Giannone, and the

6  government stipulate that the communications referenced

7  in paragraph 4 of count 1, paragraph 2 of count 3, and

8  paragraph 2 of count 4 each involved a wire transmission

9  in interstate commerce.

10      Those are the remaining two stipulations in

11 this case, Your Honor.  I would like to have them marked

12 and entered into evidence as, I believe, Government's 25

13 and 26.  Am I correct?  26 and 27, respectively.

14      THE COURT:  All right.  Granted.

15 BY MR. EICHELBERGER:

16 Q.  All right.  Let's move on to Government's

17 Exhibit 8.  And what was the date of the chat referenced

18 in Government's 8?

19 A.  June 7th, 2005.

20 Q.  Again, you will be reading gollumfun and I will be

21 reading CIA INTEL.

22 A.  "Greetings.  Funds deposited.  Please confirm.

23 gollum."

24 Q.  "Yep.  Did they give you any problems?"

25 A.  "None at all.  I'll be checking those dumps out

1   ASAP, putting on matching plastic."

2   Q.  "Oh, so you're going out hard this evening?"

3   A.  "Well, probably tomorrow.  Plastic will be done

4   tomorrow morn or the next day.  Taking them all out at

5   once."

6   Q.  "Nice.  Best Buy?  If you find a cotton candy

7   machine anywhere" --

8   A.  "Heh.  I never had any luck at est Buy."

9   Q.  -- "I will buy it off you."

10  A.  "LOL.  A cotton candy machine.  What the H you going

11  to do with that?"

12  Q.  "My girl loves cotton candy."

13  A.  "Hee, too funny.  You seriously want a cotton candy

14  machine?  I do not want to look for one of those D

15  things and then get stuck with it.  And what do they

16  cost?"

17  Q.  "Anywhere from 100 to $1200."

18          And we can stop publishing Government's 8 at

19  that point and let's go just to page 4, please, of

20  Government's 8.

21          And all I want to ask you right now, Mr. Kirby,

22  is at what time did this chat in which CIA INTEL was

23  advised that funds were deposited, what time did it end?

24  A.  2:15 p.m.

25  Q.  And was that clock accurate?

1  A.  Yes, sir.

2          MR. EICHELBERGER:  And again, Your Honor,

3  there's a stipulation that Mr. Giannone on this same

4  date appeared and withdrew $500 at approximately

5  3:50 p.m. that same day.

6          THE COURT:  All right.

7  BY MR. EICHELBERGER:

8  Q.  With respect to the $600, you have Government's

9  Exhibit 6 -- 8A with you -- excuse me --

10  Government's 8A?

11  A.  Yes, sir.

12  Q.  And what is Government's 8A?

13  A.  It's a customer receipt from Bank of America for

14  deposit for $600.

15  Q.  And who made that deposit?

16  A.  Agents of this service along with gollum.

17  Q.  Okay.  And what account was the $600 deposited into?

18  A.  The account that was given in the chat.  Most of it

19  here, the numbers are asterisked out except for the last

20  four, 2565.

21  Q.  It would be the A&W Auto Clinic account at Bank of

22  America?

23  A.  Correct.  Correct.

24  Q.  The information that was provided by CIA INTEL

25  during one of our chats?

1  A.  Correct.

2  Q.  Moving on now, please, to the chat that bears

3  Government's Exhibit Number 9, and please note we are

4  going to pick up quite a bit of speed on these now.

5          First off, Government's 9, what is the date?

6  A.  June 8th, 2005.

7  Q.  Again, you are gollumfun.

8  A.  "Well, you have fun with that $600 yet?"

9  Q.  "Heh, not yet.  You have funds with the numbers

10  yet?"

11  A.  "Well, weekend is coming up, heh, not yet."

12  Q.  And then Pit Boss says, "You find my cotton candy

13  machine?"

14  A.  "LOL.  Not yet, I'm looking though.  Can't believe

15  you really want one of those."

16  Q.  "Mark don't kid around."

17  A.  "LOL."

18  Q.  Then back to CIA INTEL at 5:06 p.m.  "Shortman:  But

19  will you hit up when I'm back?"

20          CIA INTEL says, "I need a cotton candy machine,

21  see if you can find one of those."

22          And that's where we will end publishing

23  Government's Exhibit 9.

24          At this point we can move on to Government's

25  Exhibit 10.  And let's establish, please, the date for

1  the chat reflected in Government's Exhibit 10.

2  A.  June 10th, 2005.

3  Q.  CIA INTEL says, "How are the numbers?"

4  A.  "Two have been good so far, one dead.  They are

5  going out later with some more."

6  Q.  "How much did you get off two?"

7  A.  "400 off one, 1200 off the other.  Good deal so

8  far."

9  Q.  "You're only going for $400 bucks, you stupid?"

10 A.  "Not me, one of the Fs I sent out.  I fixed his A

11 over it too."

12 Q.  "Did you find the cotton candy machine?"

13 A.  "Why F no, found one on samsclub.com.  Thinking

14 about COBing it or I can shoot you over a COB and you

15 can do it yourself."

16 Q.  "I have COBs, I'm just lazy.  I got my legit AmEx

17 Platinum today."

18 A.  "AmEx Plat, mmm, yummy."

19 Q.  "Same card number as my goldc."

20         And that's where we'll stop.  I want to refer

21 you please to Government's Exhibit 10.  What is

22 Government's Exhibit 10 -- 10A?  I'm sorry.

23 A.  10A is actually a statement for Jonathan Giannone,

24 American Express account.

25 Q.  And for -- what is the closing date for Government's

1  Exhibit 10A?

2  A.  May 13th, 2005.

3  Q.  So that's the statement that predates the chat in

4  Government's Exhibit 10; is that correct?

5  A.  Correct.

6  Q.  And what is the level of the American Express card

7  for Jonathan Giannone prior to 6-10-05?

8  A.  It's a Rewards Plus Gold Card.

9  Q.  And then with respect to Government's Exhibit 10B,

10  what is Government's 10B?

11  A.  The American Express statement in the name of

12  Jonathan Giannone, closing date June 14th, 2005.

13  Q.  Following this chat?

14  A.  Correct.

15  Q.  And what's the level of privileges on the American

16  Express card referenced in Government's Exhibit 10B?

17  A.  Platinum card.

18  Q.  We can move forward, please, to Government's

19   Exhibit 11.  What's the date of the chat referenced in

20  Government's 11?

21  A.  June 17th, 2005.

22  Q.  This one Pit Boss starts out saying, "Yo."

23  A.  "Yo."

24  Q.  "CC Suppliers stole $600 of my cash and three

25  powerbooks.  How about that?"

1 A.  "I'm a bit busy with these Fs that have jacked my

2 account right now.  Hey, you still have info on David

3 Renshaw Thomas?"

4 Q.  CIA INTEL responds, "Yeah, somewhere."

5 A.  "I need everything you have."

6 Q.  "But at the moment I'm searching for a Christopher

7 James Branca."

8 A.  "Heh.  Who the H is that?"

9 Q.  "CC Suppliers."

10 A.  "All right.  Good deal."

11 Q.  "He stole from me, dude.  I tried to help him out

12 and he robs me blind.  Now I'm in the hole big time."

13 A.  "Branca, as in C. Branca?"

14 Q.  "Yeah.  That's his name, Chris Branca, 30 Hintz

15 Street.

16           "Ooh, now, I'm even more P'd.  Wallingford,

17 Connecticut.  Why?"

18 A.  "C. Branca ripped me for a NetBank account about

19 four years ago."

20 Q.  "How much?"

21 A.  "A couple grand from what I remember.  Also screwed

22 a few others.  Not happy to know that he is C. Branca as

23 well."

24 Q.  "He's an F'ing chump.  I'm about to screw him over

25 royally."

1  A.  "Heh."

2  Q.  "I just prank called his house, told his parents

3  that I'm the Secret Service and that we have a warrant

4  and he should turn himself in."

5  A.  "D, that's cold-hearted."

6  Q.  "Now I'm going to call the SS and tell them he's

7  coming."

8  A.  "D, man, you should at least give him a chance."

9  Q.  "Dude, he trashed the hotel room, caused damage,

10  ordered 50 movies."

11  A.  "Ah."

12  Q.  "Took all the laptops and disappeared.  I went out

13  of my way to help him and this is how he repays me.  F

14  that.  Remember who was beat for over 6,000."

15  A.  "Yeah.  From el and the Fs either hacking my account

16  or doing a session-ID takeover."

17  Q.  "El prob did it for sure."

18  A.  "Yeah, 6K.  Good chunk of change.  How the F did you

19  let him beat you out of it?  You knew him, yes?"

20  Q.  "Yes, I put him in a hotel with all the stuff and he

21  bounced with it all this morning.  I just scared the S

22  out of his father and brother."

23  A.  "Oh, LOL.  I thought you were talking about that

24  3700 from the shortman deal.  You mean you actually had

25  the products?  D."

1  Q.  "Yes.  So add shortman over 10,000.  F.  Do me a

2  favor, post CC Suppliers info all over the place."

3  A.  "Oh, I will, I sure as F'ing will.  You should

4  contact him and tell him to message me.  I'm already

5  pissed at other things.  If I take it OT on him also, it

6  will go hard.  Gollum."

7  Q.  "He is MIA."

8  A.  "What do you mean MIA?  He will show up."

9  Q.  "Just post his info all over the place."

10  A.  "Good deal.  Since I can't see what you posted, what

11  did they say?"

12  Q.  "I didn't post."

13  A.  "Oh, I will, don't worry about that.  Gollum."

14  Q.  "You will?"

15  A.  "I said I would."

16  Q.  "Under gollumfun?"

17  A.  "And you feel uneasy doing this yourself because?"

18  Q.  "Mr. 3,000 isn't well known."

19  A.  "Let me guess, he knows your real name as well?"

20  Q.  "Of course -- well, sorta."

21  A.  "Yep, I thought as much.  I will take care of

22  things.  Okay?"

23  Q.  "Okay."

24         Moving on, please, to Government's Exhibit 12.

25  And first, what's the date of the chat transcript

1  referenced in Government's Exhibit 12?

2  A.  June 18, 2005.

3  Q.  CIA INTEL says, "You get your account back?"

4  A.  "Not yet.  Got an ICQ message from casino.  Says

5  he's waiting n smash.  Heard that a couple of other

6  names were compromised as well.  Not sure if a session

7  hack or what at this point.  You still pissed at

8  Mr. Branca?"

9  Q.  "Of course.  I just posted his info."

10  A.  "Oh, well, I wish you hadn't done that.  I was

11  wanting him to reimburse my A for that bank account he

12  owes me on.  Growl.  He's the dude with the BofA

13  debits?  I figured I could get an A of those in return

14  before I posted his info."

15  Q.  "He is the dude with the BoA debits?"

16  A.  "I don't know; I was asking you.  I figured that's

17  where you got those debits and the F owes me money from

18  way the H back, so" --

19  Q.  "No, he has nothing cool.  He's a brook as convicted

20  felon."

21  A.  "Ah, okay."

22  Q.  "Well, err, he sure as F isn't broke anymore.

23  Growl."

24  A.  "F.  I would agree with that.  Got a phone number

25  for him?  I might dial him up and ask where my funds

1    are.  Growl.  LOL."

2    Q.  Next page.  It's a posting.  "Registered; group:

3    readers; posts:  18; member number:  1893; join:

4    27 March '05.

5           "Here is complete information of a long time

6    ripper on ShadowCrew, carderplanet, and who knows

7    many -- and who knows how many other sites.

8           "User names: CC Suppliers, CBranca,

9    VendingMachine, who knows how many others.

10          "Location: Wallingford, Connecticut.

11          "Full legal name: Chris Branca.

12          "Legal address: 30 Hintz Drive, Wallingford,

13   Connecticut.

14          "Date of birth: 7-17-1986.

15          "Cell phone number: 203-368-8740.

16          "Home phone: 203-284-5825.

17          "Other useful information:  He is currently on

18   probation.  Probation officer's name: Patricia Warren;

19   probation officer's phone number: 203-877-1253; AIM

20   screen name: Chris SBBK."

21   A.  "D.  Ain't you a bit scared he will post the same

22   about you?"

23   Q.  "No."

24   A.  "LOL.  Okay."

25   Q.  "He doesn't have my real name."

1  A.  "Ah, good deal."

2  Q.  "He thinks he does, which is 10 times even better.

3  Besides I'm sure someone on IAACA got burned by him and

4  would be interested in using his information."

5  A.  "Amen.  Me."

6  Q.  "What are you doing?  I have already called his

7  probation officer many times giving her all sorts of

8  useful information."

9  A.  "Heh.  You really are going to F him over."

10  Q.  "Of course."

11          And we will stop publishing Government's 12 at

12  that point.

13          And if we could, let's move on, please, to

14  Government's Exhibit 13.

15  BY MR. EICHELBERGER:

16  Q.  To start out, what is the date of the chat

17  referenced in Government's Exhibit 13?

18  A.  June 20th, 2005.

19          MR. EICHELBERGER:  And, Mr. Daley, if we could,

20  we'll go to Exhibit 13, page 3, to start publishing this

21  chat.  And I will begin with the line of CIA INTEL at

22  10:15 p.m.

23  BY MR. EICHELBERGER:

24  Q.  "Did you ever find that mother F'ing cotton candy

25  machine?"

1  A.  "LOL.  Not yet."

2  Q.  "Just booked my travel arrangements thanks to CC

3  Suppliers."

4  A.  "Heh.  Meaning?"

5  Q.  "Meaning, I'm highly doubting I'll get my S back."

6  A.  "Ah, I would agree with that.  Spoke to F lately?"

7          MR. EICHELBERGER:  And we'll stop publishing

8  there and move over, please, to Exhibit 13, page 8, at

9  the very bottom.  If we can go to the very bottom where

10  it's 11:59 p.m.  It looks like we've got one page too

11  many.  If we could go back one page, please.  Should be

12  able to do it with the arrow.  There we go.

13  BY MR. EICHELBERGER:

14  Q.  At the bottom CIA INTEL at 11:59 p.m. says, "Hey,

15  you know what I'm going to school for, right?"  Next

16  page.

17  A.  "No.  What"?

18  Q.  "Law."

19  A.  "School.  I figured you were older."

20  Q.  "Grad school now."

21  A.  "Ah, good deal."

22  Q.  "Would like to be a DA for a few years.  Wanna get

23  the nickname."

24  A.  "LOL.  What H would you cause?"

25  Q.  "No deal Johnny."

1  A.  "Ah."

2  Q.  "Actually, most lawyers start as assistant DAs."

3  A.  "Ah, I didn't know that.  I figured a load started

4  out as public defenders."

5  Q.  "Yeah.  You can go either route.  DA is less work

6  though."

7  A.  "Ah."

8  Q.  "I'd go real easy on carding cases, though."

9  A.  "LOL."

10  Q.  "Don't they go pretty easy on them anyway these

11  days?"

12  A.  "Really?"

13  Q.  "Yeah.  CCF got 30 days."

14          MR. EICHELBERGER:  We'll stop publishing here.

15          If we could go back at the first part, I

16  believe it was page 3 of Government's 13, Mr. Daley, if

17  we could go there.

18  BY MR. EICHELBERGER:

19  Q.  And at the top where it said that CIA INTEL said

20  that he just booked travel arrangements through CC

21  Suppliers, Agent Kirby, Government's 13A, what does it

22  reflect?

23  A.  American Express credit card statement in the name

24  of Jonathan Giannone.

25  Q.  And are -- is there anything related to travel?

1   A.  On 6-20 with Independence Airlines the ticket was

2   purchased from JF Kennedy airport in New York to Dulles

3   Airport in D.C., date of departure, June 21st; passenger

4   name, Jonathan Giannone.

5   Q.  That's the same date as the chat for

6   Government's 13, 6-20-2005?

7   A.  Yes, sir.

8   Q.  Thank you.  Moving on, please, to Government's

9   Exhibit 14.  First thing, what is the date of the chat

10  in Government's Exhibit 14?

11  A.  June 28th, 2005.

12  Q.  Gollum starts.

13  A.  "It's down right now, should be back up in two to

14  three days, probably sooner."

15  Q.  "Ah, okay.  Did they give you your account back?"

16  A.  "Yep.  And I have been hearing some reports about

17  generous.  Any idea about that?"

18  Q.  "What kind of reports?"

19  A.  "Tron," in parentheses, "if it's the real one, said

20  that generous ripped them."

21  Q.  "No idea.  What's Tron's ICQ?"

22  A.  "41781, but it wasn't through ICQ, it was posted on

23  carders."

24  Q.  "Carders"?

25  A.  "Carders.ws."

1  Q.  "Under what forum?"

2  A.  "Hall of shame."

3  Q.  And then the conversation skips over to Pit Boss

4  2600.  "Sup."  This is bottom of the first page of

5  Government's 14, if we can go back.  "Sup."

6  A.  "How goes it?"

7  Q.  "I registered on that forum.  Not much."

8  A.  "Which one?"

9  Q.  "On my Sidekick, carder.ws."

10  A.  "Ah, got you."

11  Q.  And we'll stop publishing at that point.

12        What is a Sidekick?

13  A.  It's a T-Mobile device.  It's a telephone, slash,

14  electronic device.  You can send text messages, that

15  sort of thing.

16  Q.  Sort of like a fancy telephone?

17  A.  Right.

18  Q.  Moving on, please, to Government's Exhibit 15.  The

19  date of Government's 15?

20  A.  July 1st -- and on here is 2006, but I think that's

21  2005.

22  Q.  Were there any transactions on -- in July 1st of

23  2006, at all respecting this investigation?

24  A.  No, sir.

25  Q.  If -- it's a typographical error; it should be 2005?

1  A.  Correct.

2  Q.  And just for the record, that's the date that you

3  put in.  Was it generated by the computer itself in

4  terms of working together these chat transcripts?

5  A.  No, it was not.  I put the header date when I was

6  trying to organize into dates.

7  Q.  All right.  We're going to read a very short portion

8  of this starting with gollumfun.

9  A.  "Hello.  Just checking in.  Gollum."

10  Q.  "Hey."

11  A.  "Greetings.  How goes it?"

12  Q.  "Good.  Visiting a friend in CA" -- or California.

13         We'll stop there.  With respect to Government's

14  Exhibit 15 did you check -- referring to

15  Government's 15A, what is that?

16  A.  It is a statement from Dollar's Thrifty Car Rental.

17  A car rental was made in the name of Jonathan Giannone,

18  checked out on June 30th, 2005, in Santa Ana,

19  California, and it was returned on July 4th, 2005, in

20  Santa Ana, California.

21  Q.  And that was Thrifty Car Rental?

22  A.  Yes, sir.

23  Q.  And who is the person that is identified as having

24  rented the car at that time?

25  A.  Jonathan Giannone.

1  Q.  Similarly, with respect to Government's Exhibit 15B

2  in evidence, what does it reflect?

3  A.  It is the Fleet One Premier joint checking account

4  in the name of Jonathan Giannone or Jordan Giannone.

5  Q.  And what does it reflect, sir?

6  A.  Get there -- on July 5th, 2005, there wa a debit

7  card purchase at the China Village restaurant in

8  Fullerton, California.

9  Q.  With respect to Government's 15C, what does it

10  reflect?

11  A.  It's a statement of travel activity for Jonathan

12  Giannone.  On 6-30-2005, Jonathan Giannone boarded a

13  flight from JFK going to LAX, which is Los Angeles, and

14  then a connecting flight from Los Angeles to SNA, which

15  is Santa Ana, California.

16  Q.  What was the date of arrival in Santa Ana,

17  California?

18  A.  6-30-2005.

19  Q.  All right.  And with respect to Government's

20   Exhibit 15D, what does it reflect?

21  A.  American Express credit card statement in the name

22  of Jonathan Giannone.

23  Q.  Any transactions around this time in California?

24  A.  Yes.  On June 27th, 2005, United Airlines from New

25  York, New York, to Los Angeles, California, and then to

1 Santa Ana, California, and the return flight from Los

2 Angeles, California, to New York, New York.  Date of

3 departure 6-30 of 2005, passenger name, Jonathan

4 Giannone.

5 Q.  Thank you, sir.  Moving on, please, to Government's

6 Exhibit 16.  Again, let's establish the date of the

7 transaction on June -- of Government's Exhibit 16.

8 A.  July 2nd, 2005.

9 Q.  Gollumfun starts.

10 A.  "Sup."

11 Q.  "Yo."

12 A.  "Yo.  Yo.  Yo."

13 Q.  "Nothing.  You?"

14 A.  "Same here.  Need an iPod, one of those nifty photo

15 deals like I saw at Best Buy last night."

16 Q.  "So go to Apple and card one."

17 A.  "I need to, but you said you were out in Cali."

18 Q.  "Yes, I am, walking around, trying to find a

19 passport photo place."

20 A.  "Kinko's."

21 Q.  "Yeah, that's a good point.  Don't see one around,

22 though."

23 A.  "Phone book."

24 Q.  "Hey."

25 A.  "Question mark."

1 Q. "Get me the phone number for the Sheridon in

2 Pasadena, California."

3          And we can stop publishing at that point.  The

4 records we referred to back in Government's 15, 15A,

5 15B, 15C, or 15D, what did they reflect with respect to

6 presence in California, specifically to the Pasadena,

7 California area?

8 A.  There were transactions in California on each --

9 you're talking about from 15?

10 Q.  From 15.  Same time frame.  This is the day after.

11 A.  Right.

12 Q.  According to those records -- according to those

13 records is Mr. Giannone still in California?

14 A.  Yes.

15 Q.  Moving on, please, to Government's Exhibit 17.  And

16 at this point we will start publishing -- the first

17 thing we will do is establish the date of this chat.

18 A.  July 6, 2005.

19          MR. EICHELBERGER:  Mr. Daley, if we could go to

20 the second page of Government's 17.

21 BY MR. EICHELBERGER:

22  Q.  And we will start at 1:26 with the gollumfun line,

23 "So where is generous?"

24 A.  "So, where the H is generous now?  I haven't heard

25 from him in a while, though I did hear from Branca

1  yesterday."

2  Q.  "What did he say?"

3  A.  "Oh, he remembered ripping me and said he had to go

4  and would be back later.  I told him I would keep an eye

5  out for him.  Funny, he left before I had a chance to

6  issue a threat.  Kind of made me sad."

7  Q.  "Yeah.  He's supposedly in Cali."

8  A.  "Yeah.  Well, I would like a few more words with the

9  dip S."

10  Q.  "Yeah.  He's, like, I'm in Cali.  Yo, I'm like

11  cool.  So am I.  Let's hang out."

12          And we can stop there.  I want to refer,

13  please, to Government's Exhibits 17A and 17B.

14  Government's 17, the chat, indicates that CIA INTEL is

15  in California.  What does 17A show?

16  A.  It's the Fleet One Premier checking account -- joint

17  checking account in the name of Jonathan Giannone or

18  Jordan Giannone, shows a debit card purchase on 7-5 in

19  Fullerton, California.

20  Q.  All right.  And how about Government's Exhibit 17B?

21  A.  That is the American Express statement for the card

22  number in the name of Jonathan Giannone.  On 7-5 of

23  2005, Thrifty Car Rental at John Wayne airport in

24  California for the dates June 30th, 2005, until

25  July 4th, 2005.

1  Q.  Thank you.  Let's continue on, please, to

2  Government's Exhibit 18.  Government's 18, what is the

3  date of the chat session?

4  A.  September 25th, 2005.

5  Q.  We will read the first part, about midway down the

6  page, beginning at the top at 2057 with gollumfun's

7  line.

8  A.  "Hello.  Hello.  How goes it?"

9  Q.  "Hey, rough weekend."

10  A.  "Really?  Mine has been pretty sweet.  Sorry to hear

11  you had woes."

12  Q.  "Well, I was just in the wrong area."

13  A.  "Ah, I gotcha.  So nice profit this weekend?"

14  Q.  "No, just lots of traffic."

15  A.  "Gotcha, sorry to hear it."

16  Q.  "Bush protest, lame S."

17  A.  "LOL.  What kind of F protest?"

18  Q.  "A big one.  Watch the news."

19  A.  "LOL.  Don't catch much TV."

20  Q.  "It was, quote, one of the largest, end quote,

21  protest in years."

22  A.  "Hee.  Hee."

23  Q.  "Since the hotel I picked was right on the same

24  street as the White House, it was shut down."

25  A.  "Guess I missed out on that one.  Too F'ing busy I

1  guess."

2  Q.  "With thousands of protestors."

3  A.  "Hee.  Hee."

4  Q.  And we will stop reading Government's 18 at that

5  point.

6          I want to refer you, please, Agent Kirby, to

7  Government's Exhibit 18A.  What is Government's 18A?

8  A.  It says Dollar Thrifty Car Rental statement for a

9  car rented by Jonathan Giannone from Baltimore,

10  Maryland, DWI airport.  Time of checkout was

11  September 15th, 2005; time of return was October 13th,

12  2005.

13  Q.  And Baltimore airport is how close to Washington

14  D.C.?

15  A.  Fairly close.

16  Q.  All right.  With respect to Government's

17  Exhibit 18B, what does it reflect?

18  A.  The American Express credit card statement in the

19  name of Jonathan Giannone.

20  Q.  And?

21  A.  On 9-26 of 2005, there's a -- an electronic payment

22  to the Marriott in Washington, D.C.  Arrival date was

23  June 23rd, 2005; departure date 9-24-2005, in the amount

24  of $1,004.62.

25  Q.  And, again, that was an AmEx or American Express for

1  Jonathan Giannone; is that correct?

2  A.  Correct.

3  Q.  Let's move on, please, to Government's Exhibit 19.

4  Let's start with the -- establishing the date of the

5  chat transcript for Government's 19.

6  A.  October 23rd, 2005.

7          MR. EICHELBERGER:  Mr. Daley, if we could go to

8  page 4 of Government's 19.

9  BY MR. EICHELBERGER:

10  Q.  Beginning at the top.  "Teenagers get light S.  You

11  know the original enhance?"

12  A.  "No, I don't think so anyway."

13  Q.  "The enhance from way back in the day?"

14  A.  "I remember the name."

15  Q.  "The guy who sold me his user name.  He was a kid."

16  A.  "But not the product or the posts."

17  Q.  "Like 17."

18  A.  "Yeah, that was it."

19  Q.  "He got busted while on probation."

20  A.  "And" --

21  Q.  "On probation for a carding related, six months, aka

22  time served."

23  A.  "Six months was all he got"?

24  Q.  "Couldn't make bail.  Yes."

25  A.  "D."

1      MR. EICHELBERGER:  At this point, Mr. Daley,

2  could we go back to Government's Exhibit 1, page 1?

3  Here we have CIA INTEL talking about enhanced.  Let's go

4  back to Government's 1, page 1.  And if you could scroll

5  down, please.  Stopping right there.

6  BY MR. EICHELBERGER:

7  Q.  Let's begin reading in the line about midway down

8  for Pit Boss 2600, says, "Remember enhance, the kid I

9  bought the name from?"

10  A.  "It's been a D long time since we spoke.  Yep, I

11  remember enhance.  He went down too.  F."

12  Q.  "He's sitting in jail right now in New Hampshire.

13  Got picking up on a carding charge by SS.  Can't get

14  bail because of probation, made the news."

15      And that's all we need to read at this point.

16      And now, if we could, let's refer, please, to

17  Government's Exhibit 20.  Again, let's establish the

18  date of the chat, Government's 20.

19  A.  November 8th, 2005.

20  Q.  And let's move down, please, to the second session,

21  start where it references Tuesday, November the 8th,

22  8:21:05.  CIA INTEL says, "Hey, nosa is such a F'ing

23  ripper."

24  A.  "I agree.  Not much I can do though with zoomer's

25  sorry A calling the shots."

1  Q. "Scarface just gave me a tracking number."

2  A. "I love Scarface."

3  Q. "For TNT."

4  A. "One of the best vendors ever."

5  Q. "Posted instantly with the correct destination."

6  A. "Heh."

7  Q. "Scarface rocks."

8  A. "Yep."

9  Q. "I'm going to Hawaii tomorrow."

10  A. "Sweet.  Need a buddy?  Heh."

11  Q. "Cheap flight."

12  A. "How much"?

13  Q. "First class all the way, plus Hyatt, four nights,

14  $2300."

15  A. "Not bad."

16  Q. "Gonna do some work down there."

17  A. "Good deal."

18  Q. That's it for that chat transcript.

19        I'm going to refer you, please, to Government's

20  Exhibit 20A.  What is Government's 20A?

21  A. It is a travel statement for Jonathan Giannone from

22  United Airlines.

23  Q. And where is Jonathan Giannone going and what is the

24  date?

25  A. Let me get the right one.  On 11-9-2005, Jonathan

1  Giannone booked a flight from JFK in New York to LAX,

2  Los Angeles, and from LAX to HNL, which is Honolulu,

3  Hawaii.

4  Q.  You said booked the flight on 11-9, or is that the

5  date of leaving?

6  A.  That's actually the date he boarded the plane.

7  Q.  All right.  On 11-9?

8  A.  Correct.

9  Q.  All right.  And where was he flying to?

10  A.  Honolulu, Hawaii.

11  Q.  With respect to Government's Exhibit 20B, what does

12  20B reference?

13  A.  It's a car rental statement from Dollar Thrifty Car

14  Rental in the name of Jonathan Giannone.  A car was

15  rented on November 9th, 2005, in Honolulu, Hawaii, and

16  returned on November 14th, 2005, also in Honolulu.

17  Q.  9 through 14, how many nights would that be?

18  A.  Six.

19  Q.  10, 11, 12, 13?  Checked out on the 9th --

20  A.  Oh, yeah, car returned on the 14th.

21  Q.  Okay.  And Government's Exhibit 20C, please?

22  A.  American Express statement in the name of Jonathan

23  Giannone.

24  Q.  Does it reflect where Mr. Giannone was going to stay

25  while in Hawaii?

1  A.  Correct.  On 11-13 of 2005, there is a payment to

2  Hyatt Hotels Waikiki, Honolulu, Hawaii, in the amount

3  658.98.  There is also on 11-15 of '05, a Thrifty Car

4  Rental payment for a car rented in Honolulu on 11-9 of

5  '05 to 11-14 of '05, in the name of Jonathan Giannone in

6  the amount of 246.51.

7  Q.  Any records regarding the cost of the United

8  Airlines tickets from the United States over to Hawaii?

9  A.  I do not see United on here.

10 Q.  Is it on Government's 20A?  Is the information

11 contained on Government's 20A?

12 A.  20A was just the back for the United statement.

13 Q.  Does the statement from United, does not give the

14 price?

15 A.  No, sir.

16 Q.  All right.  Thank you.  Just a few more things and

17 then we will wrap up.

18        In connection with preparation for this case

19 did you do some work with respect to a purported chat

20 transcript between a imakemovies4free and a person who

21 went by the name of ElevenOnee?

22 A.  Yes, sir.

23        MR. EICHELBERGER:  Your Honor, at this time we

24 would like to read the excerpt that we had discussed

25 before the jury came out this morning.

1          THE COURT:  You may proceed.

2          MR. EICHELBERGER:  May I approach, briefly?

3          THE COURT:  Yes.

4          (Bench conference)

5          MR. EICHELBERGER:  My proposal, Your Honor, is

6   to say that in pleadings filed in connection with the

7   case, the defendant had made the following

8   representations, or something along that line, just to

9   identify who they are attributed to.

10         THE COURT:  Just say "the defense."

11         MR. EICHELBERGER:  Defense, I will.

12         (In open court)

13         MR. EICHELBERGER:  If I could read for the

14  record that in pleadings that were filed in connection

15  with this case the defense has made the following

16  statements:

17         "Chris Cutler is undoubtedly the individual who

18  sold the credit card numbers in question to Brett

19  Johnson and subsequently told Brett Johnson to deposit

20  the $600 into Jonathan's Bank of America business

21  account as a deposit on a Ford F-150 truck which Cutler

22  had arranged to purchase from Jonathan's A&W Auto

23  Clinic.  Jonathan conducted business at 395 Maple

24  Street, Holyoke, Massachusetts 01040, for several months

25  prior to going out of business.

 1          "Jonathan conducted a surreptitious online

 2     conversation with the aforementioned Chris Cutler.

 3     Jonathan utilized a newly-developed program called

 4     Camtasia Studio.  This program is designed to save what

 5     occurs on the screen in real time.

 6          "During that online conversation, Jonathan

 7     appears as imakemovies4free.  During the online

 8     conversation a discussion regarding a May 2005 attempted

 9     sale of a car through A&W Auto Clinic ensued.

10          "The back story of this sale involves a mutual

11     acquaintance of both Jonathan and Cutler, an individual

12     named Chris Branca.  It is Branca who referred Cutler to

13     Jonathan's car dealership.

14          "Cutler was interested in purchasing an F-150

15     Ford truck.  Jonathan told Cutler that he had one on

16     consignment from the previous owner of the dealership

17     and a 20 percent deposit, or $600, was required to hold

18     the truck.

19          "Because Jonathan's business was a new eBay

20     business, he had not set up a PayPal system for

21     accepting payments.  Therefore he would simply give a

22     potential purchaser his business account number.

23     Cutler, having been the individual who sold the credit

24     cards to Johnson, simply had Johnson deposit the $600

25     into Jonathan's account."

1        Your Honor, that concludes the reading of the

2   material from the defense pleadings.

3        THE COURT:  All right.

4        MR. EICHELBERGER:  If we could, I would like to

5   bring Government's Exhibit 21 up on the screen.

6   BY MR. EICHELBERGER:

7   Q.  Agent Kirby, in connection with this case did you

8   retrieve and obtain from the defense pleadings a

9   transcript of the purported transcript -- of the

10  purported conversation between imakemovies4free and

11  ElevenOnee?

12  A.  Yes, sir.

13  Q.  And is that what we have up on the screen now,

14  Government's Exhibit 21?

15  A.  It is.

16  Q.  Do you know the date that the chat actually took

17  place?

18  A.  November 13th, 2006.

19  Q.  November 13th of 2006.  In this case I will read

20  imakemovies4free and if you would read ElevenOnee.

21        "Yo."

22  A.  "Who's this?"

23  Q.  "John."

24  A.  "Question mark, John who?"

25  Q.  "John, Branca's friend, the guy you met at the car

1  lot."

2  A.  "Last year around May-ish."

3  Q.  "Yeah, what up" -- I'm sorry that's your line.

4  A.  "Yeah, what up."

5  Q.  Before we go any further, in connection with your

6  preparation, this is actually the exact transcript that

7  the defense prepared; is that correct?

8  A.  Correct.

9  Q.  Did you have a chance to compare this transcript

10  with the Camtasia file that's referenced?

11  A.  Yes, we did.

12  Q.  Is this chat transcript actually accurate in all

13  respects?

14  A.  No, sir.  There are some errors.

15  Q.  In what respect?  For instance, if we can refer

16  to -- after imakemovies4free says, "John, Branca's

17  friend, the guy you met at the car lot."  Who, in fact,

18  said the next line, "Last year around Mayish"?

19  A.  Imakemovies4free.

20  Q.  So that should have been my line, although it's

21  attributed to your character, that is, the Chris Cutler

22  character?

23  A.  Correct.

24  Q.  All right.  So let's back up and I will read that

25  line.  Is there another instance of that having

1  happened, by the way?

2  A.  To the best of my recollection there's a line left

3  out between 6 and 7.

4  Q.  All right.

5  A.  From ElevenOnee where he actually says, "Ah, Okay."

6  Q.  How about line 13?

7  A.  I can't really remember line 13.

8  Q.  Okay.  Well, let's start back at line 6.

9  A.  Okay.

10  Q.  "John, Branca's friend, the guy you met at the car

11  lot last year around Mayish."

12  A.  "Yeah.  What up?"

13  Q.  "Nothing much, chilling.  You?"

14  A.  "Funny.  FM."

15  Q.  "Yeah.  I have since taked up film at school after I

16  closed the car dealership business."

17  A.  "Kind of, umm, it was becoming a hassle."

18  Q.  "BRB."

19  A.  "I can see why.  Probably BC you take people's bread

20  and doesn't call back.  I sent you like C notes for a

21  car in your BoA account."

22  Q.  "Back.  What, question mark.  WTF are you talking

23  about?  Oh, I remember you saying you wanted to buy that

24  beat-up truck for your fishing boat stuff.  Your cell

25  was cut off" -- I'm sorry that's your line.

1  A.  "Your cell was cut off."

2  Q.  "Question mark."

3  A.  "I tried calling."

4  Q.  "I will give you your cash back.  No problem.  My

5  bad."

6  A.  "Naw, it's straight, doggie."

7  Q.  "You sure?  Can I send you a check back?  I remember

8  now you saying you were going to do it and, yeah, I

9  changed my cell phone number shortly after."

10  A.  "Yeah, it's cool."

11  Q.  "But my screen name never changed.  You should have

12  IMed me or something."

13  A.  "I was on a boat."

14  Q.  "Oh, okay.  Well, all right.  How is the fishing

15  going?  Catch anything good this year besides a cold?"

16  A.  "Fine."

17  Q.  "Yo.  Did you ever try to message me from the screen

18  name Pit Boss?  Pit Boss 2600?"

19  A.  "Yeah, that was me and John."

20  Q.  "Generous?"

21  A.  "Yeah."

22  Q.  "I never saw that name before, weird.  So, what up?

23  Where you at?  Still living in Southington or whatever

24  it was called?"

25  A.  "Naw, MA."

1  Q.  "Mass?"

2  A.  "Yep, that's where I fish out of."

3  Q.  "Oh, cool.  I go to MA a lot.  My bro goes to school

4  there."

5          Next page please.

6          "Maybe we can grab a drink or something on

7  me."

8  A.  "Sure, hit me up.  I GG though."

9          MR. EICHELBERGER:  Mr. Daley, can we go back to

10  the first page of Government's Exhibit 21?

11  BY MR. EICHELBERGER:

12  Q.  Now, with respect to line 6 and 7 where it says,

13  "John, Branca's friend, the guy you met at the car lot

14  around -- last year around Mayish," Agent Kirby, in

15  connection with preparations for this case, did you

16  obtain Government's Exhibit 21A from Southwest Airlines?

17  A.  Yes, sir, we did.

18  Q.  This chat took place on November the 13th, 2006; is

19  that correct?

20  A.  Yes, sir.

21  Q.  What does Government's Exhibit 21A reference as a

22  connection between Mr. Chris Cutler and Mr. Jonathan

23  Giannone?

24  A.  It shows Southwest tickets to be -- for a departure

25  date of February 4th, 2005, from Islip, New York, to

1  Orlando, Florida, for both Jonathan Giannone and

2  Christopher Cutler and paid for by Mr. Jonathan

3  Giannone.

4  Q.  Both tickets?

5  A.  Yes, sir.

6  Q.  Three months before Mr. Cutler purportedly met

7  Mr. Giannone for the first time at the car lot?

8  A.  Correct.

9  Q.  If we can clear the screen.  Go, please, to

10  Government's Exhibit 22 which is in evidence.  There is

11  a reference to Mr. Cutler being a fisherman.  Can you

12  tell us what Government's 23 is -- 22?  Excuse me.

13  A.  It's a manifest for a Sea Harvest, Inc., vessel

14  operator -- vessel, Captain Bob.  It's actually a crew

15  manifest.

16  Q.  And is this a record that was obtained from the Sea

17  Harvest, Inc., the operator of the vessel the Captain

18  Bob?

19  A.  Yes, sir.

20  Q.  Again, this is a business record?

21  A.  Correct.

22  Q.  What's the date and time out for the Captain Bob?

23  A.  November 9th, 2006.

24  Q.  And what's the date and time in for the Captain Bob?

25  A.  November 20th, 2006.

1  Q.  It goes out before the chat, comes in after this

2  purported chat?

3  A.  Correct.

4  Q.  If we could go to page 2 of Government's

5   Exhibit 22 -- excuse me, we need to go to page 3.  What

6  are we looking at on page 3?

7  A.  A listing of the crew.

8  Q.  And we have just blown up a name.  Who was on that

9  ship between November the 9th and November the 20th of

10 2006?

11 A.  Chris Cutler.

12 Q.  If we could, let's go forward now to Government's

13 Exhibit 23.  Again, what are we dealing with here?

14 A.  Sea Harvest, Inc., fishing vessel settlement

15 release.  The vessel was the Captain Bob.

16 Q.  Again, this is document -- business document that

17 was obtained from Sea Harvest reflecting the Captain

18 Bob?

19 A.  Correct.

20 Q.  What does it reflect as the date out for the ship --

21 fishing expedition?

22 A.  November 9th, 2006.

23 Q.  And ending on what date?

24 A.  November 20th, 2006.

25 Q.  And whose name is contained on line 3?

1    A.   Christopher H. Cutler.

2         MR. EICHELBERGER:  Agent Kirby, thank you.  My

3    voice is tired.  That's all I have.

4         THE WITNESS:  Thank you.

5         THE COURT:  All right.

6         Mr. Liotti, you may cross-examine.

7         We will break at 5:30.

8         MR. LIOTTI:  Judge, I was going to suggest -- I

9    know it's a half hour of wasted time -- but I was going

10   to suggest that we had been through a lot this afternoon

11   and I do have some legal matters that I would like to

12   take up with the court also.

13        THE COURT:  All right.

14        All right.  Ladies and gentlemen, I will excuse

15   you, then, until tomorrow morning at 9:30.  Remember,

16   tomorrow we will be starting at 9:30.  Please take your

17   pads and leave them in the jury room, and do not discuss

18   the case with each other or with anyone else, or allow

19   anyone to discuss it with you this evening.  And please

20   be in the jury room at 9:30 tomorrow morning.  Have a

21   safe drive.  Thank you.

22        (Jury not present)

23        THE COURT:  All right.  Agent Kirby, you may

24   step down.  You may not discuss your testimony with

25   anyone over the evening recess.

1    THE WITNESS:  Yes, ma'am.

2    MR. EICHELBERGER:  He took all of those

3 exhibits.  They've already been placed into evidence.

4 We'll simply hand them to madam clerk.  As a matter of

5 fact, I think we have here hard copies of 1 through --

6 got them all in now -- I think we've got them all into

7 evidence, so we will hand those to the clerk's office as

8 well.

9    THE COURT:  Okay.

10    All right.  Mr. Liotti?

11    MR. LIOTTI:  Judge, I take it Exhibit No. 24 is

12 not coming in through this witness?

13    THE COURT:  I don't -- we admitted all these

14 exhibits on this list before we started, so --

15    MR. LIOTTI:  That was not testified about.  And

16 I see it's in this package.  That's why I'm asking.

17    THE COURT:  It's listed on here as chat between

18 Giannone and Branca.

19    MR. EICHELBERGER:  It is.  Actually, we have

20 not published that document.  And there -- is there an

21 objection to 24?  In some respects I would be surprised

22 if there is not.  I would ask that I can retrieve

23 Government's 24 back from the clerk.

24    I will proffer to the court what

25 Government's 24 is.

1          THE COURT:  All right.  Well, we admitted all

2   of these exhibits this morning.

3          MR. EICHELBERGER:  I understand, Your Honor.

4          THE COURT:  So if you want to allow them to

5   withdraw it, you may.

6          MR. EICHELBERGER:  I really don't want to allow

7   them to withdraw it.  What Government's Exhibit 24 is,

8   Your Honor, is a chat that took place between

9   Mr. Giannone under the name ask_John@Mack.com and

10  Mr. Chris Branca, who will be testifying tomorrow.

11  Mr. Branca was operating under the name

12  canterfaith2150.

13          During the course of this chat there is

14  conversation about what charges Mr. Giannone is facing

15  and, specifically, at one point, there are what could be

16  construed as threatening language from Mr. Giannone to

17  Mr. Branca, and actually to Mr. Cutler, because he is

18  trying to find out who it is that is chatting with him.

19  He asks whether it is Cutler or Branca.

20          And then on the second page it says, and I'm

21  quoting from lines from Mr. Giannone, "You might as well

22  not even show up to be called as a witness because my

23  lawyers are going to drag you bad.  Spare yourself the

24  embarrassment, although I'm honestly looking forward to

25  it."

1          THE COURT:  Well, what was the part about the

2   charges?  You said that he asked him what charges he was

3   facing?

4          MR. EICHELBERGER:  What's going on is, there is

5   a chat where there are questions -- it is taunting in

6   some respect to where -- and, again, I will go back --

7   canterfaith, that is Mr. Branca, is saying from the

8   beginning, "You are in a federal indictment right now."

9   Response from Mr. Giannone, "Who is this?"

10          Branca, "I'm not at liberty to discuss."

11  Giannone, "Yeah.  Well, it sounds like you have the

12  wrong person."

13          Branca, "I'm sure it does."  Branca, "I can't

14  jeopardize what I have, I -- you cannot lie, I know you

15  are already indicted and your trial is starting."

16          That's the context, and they talk a little bit

17  more about those charges, and then Mr. Giannone tries to

18  fish out who it is he's talking to.

19          THE COURT:  Who initiated this?

20          MR. EICHELBERGER:  It was initiated by Mr. --

21  it appears to have been initiated by Mr. Branca.  And it

22  was before he was acting with the United States.  We

23  learned about this on Friday of last week and he

24  retrieved it and he brought it down.  He could lay a

25  foundation for it.

1          We entered into a plea agreement with

2 Mr. Branca Friday of last week.  This was done on his

3 own.  We had no involvement whatsoever with this, so the

4 4.2 contact issue, similarly, the Sixth Amendment issue,

5 we respectfully submit are not involved in connection

6 with this.  It's simply a chat between Mr. Branca and

7 Mr. Giannone, and we think it indicates threats against

8 what Giannone thinks is either Cutler or Branca.

9          THE COURT:  What was the date of it?

10          MR. EICHELBERGER:  That I don't know.  It is

11 not reflected on this, but it's obviously post

12 indictment and before Friday of last week.

13          THE COURT:  Well, what would the testimony be

14 about when it occurred?

15          MR. EICHELBERGER:  I'm not sure.  I think,

16 actually, Mr. Branca may be here and we could ask him

17 approximately when that --

18          Could you go check with him, Mr. Daley?

19          THE COURT:  Well, what I need to know is

20 whether it was before the government made contact with

21 Mr. Branca.

22          MR. EICHELBERGER:  That I don't know.  What I

23 do know is that we had no involvement whatsoever with

24 this chat transaction.  We obviously would not ask for

25 or authorize anything like this in connection with a

1  case.  He mentioned it.  We asked for him to retrieve

2  it.

3          THE COURT:  All right.  Mr. Liotti, you brought

4  it up, what did you want to say?

5          MR. LIOTTI:  Judge, having heard the

6  government's statements just now, I think I need to look

7  at Government's Exhibit 24 more closely tonight and I

8  would like to reserve on an objection to that being

9  presented to the jury under Rule 403.

10          THE COURT:  That's fine.  I will give you that

11  opportunity.

12          MR. LIOTTI:  If I may, Judge, I hate to

13  complicate this record, but frankly, I did not believe

14  that my adversary would be offering all those statements

15  that are really beside the point of this indictment.

16          For example, the statements about drugs and

17  prison time and sentences and charges against various

18  people.  I think that's way off in left field, Judge.

19  And I think under Rule 403, those statements, even

20  though the jury has seen it, heard it, and so on, I

21  think that's what I was trying to address this morning

22  when I said that my adversary should be prepared to go

23  forward with whatever 404(b) evidence he had.  But this

24  is, if not a 404(b) problem, it is a 403 problem.

25          And, I think, frankly, the prejudicial effect

1  far outweighs the probative value on a lot of this

2  stuff.  Much of the two hours and 45 minutes that we

3  heard from the witness was irrelevant.

4          I understand the need to prove a foundation on

5  who is Pit Boss, et cetera, but a lot of the colloquy

6  and conversation about some of those things that I just

7  described was just totally irrelevant, Judge.

8          And I did -- I did raise a relevancy objection,

9  which Your Honor overruled.  But I will tonight, Your

10  Honor, with the court's permission, go over each and

11  every one of those chats and see if I can be more

12  particular in raising the 404(b) issue again, and now

13  the 403 issue.

14          THE COURT:  All right.  From my listening and

15  observing of the transcripts, I did not see anything

16  that would have been considered 404(b).  It was all --

17  appeared to me pertinent to the transactions that are

18  the subject of the indictment.

19          There was some reference to other people being

20  involved in drugs.  None of that implicated

21  Mr. Liotti -- excuse me -- Mr. Giannone in any drug

22  activity at all.

23          But if you want to request a curative

24  instruction in the nature of some cautionary thing that

25  just because other people they are talking about may be

1  involved in drugs, you know, Mr. Giannone is not charged

2  with being involved in any drugs.  I will be happy to

3  consider something like that.

4        MR. LIOTTI:  I think that's an excellent

5  suggestion, Judge, and I thank you for that.

6        THE COURT:  All right.  Any other issues this

7  afternoon?

8        MR. EICHELBERGER:  I don't think so, Your

9  Honor.  Thank you.

10       If I could, Mr. Branca is going to try to get

11 the specific date of that chat transcript.  He advised

12 Mr. Daley that it was about two weeks ago, was the term,

13 and it would have been after he was first contacted by a

14 Secret Service agent, but it was well before we had any

15 kind of discussions with Mr. Branca as to whether he

16 would be a witness for the government.

17       So, again, it was something that he did on his

18 own with no involvement by the United States.

19       THE COURT:  All right.  We will get the

20 additional -- get the complete information on when it

21 was and provide to Mr. Liotti the date of when he was

22 first contacted by the Secret Service, who contacted

23 him, and what was said.

24       MR. EICHELBERGER:  We will do the best we can.

25       THE COURT:  So that we can determine whether --

1  whether he thought himself to be an agent of the

2  government, even if the government did not ask him to be

3  such.  We will consider that.

4          MR. EICHELBERGER:  Thank you, Your Honor.

5          THE COURT:  All right.  I have four sets of

6  drafted jury charges here with draft verdict forms that

7  I will give you to review this evening.  And this, as I

8  always have in my drafts, has the defendant not

9  testifying.  We'll take that out if he decides to

10 testify.

11         All right.  Anything -- now, Mr. Liotti, do you

12 have an idea how long you will be with this witness on

13 cross, the one who just left the stand?

14         MR. LIOTTI:  I think probably some time,

15 Judge.  I would estimate -- he testified for two hours

16 and 45 minutes, by my count, this afternoon.

17         THE COURT:  Right.

18         MR. LIOTTI:  So my guess is probably a couple

19 of hours, I think.

20         THE COURT:  Okay.

21         MR. LIOTTI:  I've got to go over each one of

22 these chat --

23         THE COURT:  And then the government -- who else

24 is up after that?  Who are you calling next?

25         MR. EICHELBERGER:  The witness we expect to

1  call after this witness is Mr. Christopher Branca.

2         THE COURT:  Okay.

3         MR. EICHELBERGER:  We'll also have

4  Mr. Christopher Cutler and Sam -- or Oussama Awkal, who

5  will testify.

6         THE COURT:  Okay.

7         MR. LIOTTI:  Will that roughly conclude the

8  government's case?

9         MR. EICHELBERGER:  That will roughly

10  conclude -- we may -- Special Agent Jack Booth, who

11  dealt with some forensics on the computer utilized in

12  connection with this purported chat transaction may

13  testify, but I'm not sure that that will be necessary.

14  His primary aspect was to establish the date of the

15  chat, and this agent testified that it was on November

16  the 13th.

17         MR. LIOTTI:  That being the case, Judge -- and

18  I don't want to make a statement prematurely -- but that

19  being the case, this case may be over tomorrow, at least

20  the government's part of it, and our case may be over

21  tomorrow too.  So, I just want the court to be aware of

22  that since you have been so --

23         THE COURT:  Well, I thought that might be the

24  case.  That's why I went ahead and gave you the jury

25  instructions tonight.  But when you just told me that

1  you have several hours cross-examination of Mr. Kirby, I

2  thought, well, maybe not.  But in any event, we will be

3  pretty well through the government's case, I would

4  think.

5        One of the things that I want to do is to

6  expedite the consideration by the court of any 404(b)

7  that you do intend to offer through either Cutler or

8  Branca.

9        MR. EICHELBERGER:  Yes.

10        THE COURT:  And I think it would be helpful if

11  you could specifically tell Mr. Liotti before you leave

12  what would that be.  And then we come in in the morning

13  at 9:15 and then you tell me what you seek to offer by

14  way of 404(b), and I can go ahead and rule on that so we

15  don't have to slow down once the jury is here.

16        MR. EICHELBERGER:  I understand.  Thank you,

17  Your Honor.

18        THE COURT:  All right.

19        MR. LIOTTI:  Judge, I want to thank you for

20  breaking early today.  I appreciate it.  Thank you.

21        THE COURT:  All right.  We'll see you at 9:15

22  in the morning.

23        (Thereupon, the proceedings were recessed.)

24  * * * * * * * * * * * * * * * * * * * * * * * * * *

25                    EXAMINATION INDEX

BRADLEY STEVEN SMITH
     DIRECT BY MR. EICHELBERGER          1-80
     CROSS BY MR. LIOTTI                 1-99
     REDIRECT BY MR. EICHELBERGER        1-148

BOBBY JOE KIRBY, JR.
     DIRECT BY MR. EICHELBERGER          1-154


* * * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER


          I certify that the foregoing is a correct

transcript from my stenographic notes in the

above-entitled matter.


s/ Gary N. Smith                    May 2, 2008
_____         _____

Gary N. Smith, CM
Official Court Reporter
United States District Court
District of South Carolina