```
1            IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF SOUTH CAROLINA
2                    COLUMBIA DIVISION


3


4   UNITED STATES OF AMERICA,     )     Cr. No. 3:06-1011
                                  )
5                                 )
    VERSUS                        )     Columbia, SC
6                                 )     March 6, 2007
    JONATHAN GIANNONE,            )
7                                 )
         Defendant.              )
8                                 )
    --------------------------)

9


10


11                  JURY TRIAL - VOLUME II

12       BEFORE THE HONORABLE CAMERON MCGOWAN CURRIE
            UNITED STATES DISTRICT JUDGE, and a jury.
13


14


15  Appearances:

16  For the Government:    DEAN EICHELBERGER, ESQ.
                           ROBERT DALEY, ESQ.
17                         Assistant U.S. Attorneys
                           1441 Main Street, Suite 500
18                         Columbia, SC  29201

19  For the Defendant:     THOMAS F. LIOTTI, ESQ.
                           DRUMMOND C. SMITH, ESQ.
20                         600 Old Country Road, Suite 530
                           Garden City, NY, 11530
21


22

    Court Reporter:     Gary N. Smith, CM
23                      901 Richland Street
                        Columbia, SC  2920
24                      (803) 256-7743

25        Stenotype/Computer-Aided Transcription
```

1          THE COURT:  All right.  Counsel, where do we

2   stand on 404 issues?

3          MR. EICHELBERGER:  Your Honor, I provided to

4   Mr. Liotti a brief summary outline form of what we view

5   as potential 404(b) evidence in this case so he would be

6   prepared to address his thoughts in terms of his

7   letter motion to the Court.

8          THE COURT:  You gave him something in writing?

9          MR. EICHELBERGER:  Yes, I did.

10          THE COURT:  Could I see it?  You don't have a

11   copy?

12          MR. EICHELBERGER:  I didn't make additional

13   copies.

14          THE COURT:  All right.  Then why don't you tell

15   me what it is and then I will ask him to respond to

16   each.

17          MR. EICHELBERGER:  I will.

18          THE COURT:  Okay.

19          MR. EICHELBERGER:  Your Honor, first, with

20   respect to Christopher Branca, is where most of the

21   information will come, we expect to develop that

22   Christopher Branca is the CC Suppliers that is

23   referenced extensively in the chat transcripts.  And he

24   will explain what the significance of that is, how the

25   name comes about, and how it's connected to Mr. Giannone

1    through the prior ShadowCrew associations.

2            Second point is that he was arrested in

3    California.  Again, that is a matter that is

4    specifically noted in the chat transcripts.  The chat

5    transcripts don't reflect that CC Suppliers or

6    Christopher Branca was in California with Mr. Giannone

7    and that the carding -- he actually makes reference in

8    the chat to -- he carded at two places: A Sony store and

9    an Apple Store.

10           Again, it will come out that Mr. Giannone was

11   involved in both of those incidents.

12           THE COURT:  Are you saying that Mr. Giannone

13   was there when Branca was arrested?

14           MR. EICHELBERGER:  Yes.  As a matter of fact,

15   Mr. Giannone himself, I believe, was arrested, but he

16   was not -- he was not convicted out in California.

17           THE COURT:  With Mr. Branca?

18           MR. EICHELBERGER:  Yes.

19           THE COURT:  Okay.  Was he -- he was charged and

20   tried or what happened?  With Mr. Giannone.

21           MR. EICHELBERGER:  I think he was dismissed.

22           THE COURT:  Okay.  But you don't propose to

23   have Branca testify to Mr. Giannone being arrested, do

24   you?

25           MR. EICHELBERGER:  Just the fact that he was

1  involved, he was there.  Mr. Giannone, he will testify,

2  was the source of the credit cards that were used during

3  the carding expedition.

4          THE COURT:  So you are saying you would not

5  have Branca testify that Mr. Giannone was arrested?

6          MR. EICHELBERGER:  I would not intend to go

7  into that, Your Honor, no.

8          THE COURT:  All right.

9          MR. EICHELBERGER:  Third, in the chats

10 Mr. Giannone expresses great indignation over an

11 accusation that Mr. Branca stole $600 and three

12 laptops.  It was in the chats we read yesterday.

13 Mr. Branca is going to admit that he, in fact, did that,

14 and that the $600 and the three laptops came from yet

15 another carding expedition.

16          THE COURT:  Between the two -- with the two of

17 them?

18          MR. EICHELBERGER:  Yes.

19          THE COURT:  All right.

20          MR. EICHELBERGER:  In the chats there is

21 reference to Mr. Giannone having called Mr. Branca's

22 parents posing as a Secret Service agent, telling them

23 that there was a warrant for Mr. Branca's arrest and he

24 needed to turn himself in, and Mr. Branca will testify

25 about that as well.

1        THE COURT:  Well, he wasn't a party to that

2   call.  What would he testify to?

3        MR. EICHELBERGER:  Even if he were not a party

4   to the call, the fact that his parents were contacted by

5   someone purporting to be the Secret Service would be

6   confirming of the chat transcript that has already been

7   published to the jury, and his knowledge of the fact

8   that his parents were contacted by someone purporting to

9   be with Secret Service would be one of those confirming

10  details that links this defendant to the anonymous

11  identification Pit Boss 2600 or CIA INTEL.

12       THE COURT:  I don't see how you get around the

13  hearsay problem with that.

14       MR. EICHELBERGER:  Not really a hearsay issue,

15  Your Honor, it's the fact that it happened.  We are

16  not --

17       THE COURT:  It's the truth of the fact that it

18  happened.

19       MR. EICHELBERGER:  Pardon?

20       THE COURT:  It's the truth of the fact that it

21  happened.  He -- you want to prove that, in fact,

22  Mr. Giannone did make this call, correct?

23       MR. EICHELBERGER:  We want to establish the

24  fact that the call was made and then, the fact that the

25  call was made links back to the chat transcript itself.

1   I -- in my preparation -- I will address this with

2   Mr. Branca, he should be here a little bit later.  I'm

3   not sure but what Mr. Branca and Mr. Giannone may have

4   had separate conversations about that, but I don't want

5   to represent to the Court on that point.

6           But my basic point here is that we are not

7   asserting that for the truth of the matter asserted that

8   Mr. Giannone is the one who did it, but rather the fact

9   that his parents were contacted by someone claiming to

10  be with the United States Secret Service.  Again, that's

11  one of those confirming, corroborating details with what

12  is in the chat transcripts.

13          THE COURT:  By any chance did Mr. Branca turn

14  himself into the Secret Service as a result of that

15  phone call?

16          MR. EICHELBERGER:  I don't believe he did.

17          THE COURT:  All right.  Okay.

18          MR. EICHELBERGER:  Mr. Branca knows that

19  Mr. Giannone went by the name of Mark Rich in the

20  ShadowCrew days and, if the Court will recall, in the

21  very first conversation between CIA INTEL and gollumfun,

22  Mr. Giannone identified himself as Mark Rich, which

23  prompted the LOL comment and long time -- it was a

24  conversation of recognition of the Mark Rich name.

25          And, again, that kind of requires going into

1  just a very little bit about ShadowCrew, the history of

2  what was going on.

3         THE COURT:  Well, I don't know anything much

4  about ShadowCrew.  I have seen some references to it but

5  I don't know much about it.

6         MR. EICHELBERGER:  We have seen those

7  references, Your Honor, and I kind of tried to stay away

8  from them because it is a little bit of a mine field.

9  But ShadowCrew is a major indictment that came out in

10  October of 2004.

11         It was, essentially, a broad international

12  conspiracy of the exact type activity that we are seeing

13  in this case, that is buy, sell, and the trading of

14  credit cards, confidential information, full infos.

15         Mr. Branca will acknowledge that CC Suppliers

16  was his ShadowCrew name, Mark Rich was Mr. Giannone's

17  ShadowCrew name, and they knew it because they knew each

18  other in the real world.

19         So, it's part of -- in a case such as this

20  where we have an anonymous ID that is doing this

21  chatting, we have to be able to go out and show all the

22  corroborating details as to why the CIA INTEL and Pit

23  Boss personas are, in fact, Jonathan Giannone.  And,

24  again, the Mark Rich name and its history through the

25  ShadowCrew days is part of that proof.

1           THE COURT:  What would you propose to have the

2    witness tell about ShadowCrew?

3           MR. EICHELBERGER:  Very little.  Simply that it

4    was a prior involvement of people engaging in credit

5    card fraud.

6           THE COURT:  And that it was -- that there was

7    an investigation and arrests, or just that there was

8    this --

9           MR. EICHELBERGER:  I don't know that we would

10   get into investigation and arrests.  There is one angle

11   where the fact of the indictments may come out, and

12   that's because Mr. Branca recalls his introduction of

13   Mr. Cutler to Mr. Giannone within the context of -- that

14   it came about prior to the ShadowCrew indictments.

15          THE COURT:  Are the various conversations that

16   we heard about yesterday, when they were discussing

17   people who have been arrested or whether they are in

18   jail or not, are those all related to the ShadowCrew, or

19   something later?

20          MR. EICHELBERGER:  I believe that many of them

21   are.  Mantovani clearly was a ShadowCrew person.  I

22   think there -- I know that there are in the chat a -- a

23   reference to CC Suppliers being referenced in the

24   ShadowCrew indictments.  I'm not sure that was included

25   within the portions that we published.

1    But yes, it's all part and parcel of what is

2 going on there.  ShadowCrew -- what's happening here,

3 Your Honor, is that this transaction, this whole series

4 of events that we are seeing unfolding is sort of a

5 reunion of a couple of ShadowCrew people -- gollumfun

6 and Mark Rich, who now goes by Pit Boss 2600 and CIA

7 INTEL.

8    And that's referenced out from the very first

9 chat where they talk about kind of the good old days and

10 the means of proving that gollumfun is, in fact, the

11 gollumfun from ShadowCrew.  That's the whole point of

12 that transaction within the chats.

13    THE COURT:  All right.  Is it the government's

14 position that this -- that all of this is admissible

15 only under 404, or do you also take the position that

16 this is admissible as substantive evidence?

17    MR. EICHELBERGER:  We take the position it's

18 admissible as substantive evidence in part because we

19 have to prove intent to defraud and that -- all this

20 evidence goes into that, plus the fact that it's

21 identification information.  It's absolutely

22 inextricably intertwined into the chats and the

23 identification of Mr. Giannone.

24    So, it all becomes part of the government's

25 case, in part by virtue of how far afield Mr. Giannone

1  went when discussing ShadowCrew, talking about some of

2  the players in ShadowCrew, and identifying himself on at

3  least two occasions by his ShadowCrew nickname.

4          THE COURT:  Is the government taking the

5  position that it is essential that the term ShadowCrew

6  be used or that there be reference to, I guess, that

7  name?  The fact of an investigation of that case, and

8  the fact of arrests and indictments of people who were

9  involved in it?

10          MR. EICHELBERGER:  Those things are not

11  essential to the government's case, but the general

12  context -- again, in order to establish that Mr. Branca

13  and, indeed, Mr. Cutler, that they have a foundation

14  whereupon they can testify of their personal knowledge

15  to names used by Mr. Giannone, we need to be able to

16  establish what that background of that context was.

17          Again, we don't intend to try to drive a

18  semi-truck through the 404(b) window -- or the

19  inextricably intertwined window -- but we do need to lay

20  some foundation about that relationship.

21          And in addition, Your Honor, these witnesses

22  will be on the witness stand -- Mr. Branca and

23  Mr. Cutler will be on the witness stand admitting that

24  they have engaged in extensive criminal activity, both

25  are facing criminal charges.

1       Mr. Cutler has signed a proffer agreement, he

2   is charged in this court.  Mr. Branca has, in fact,

3   signed a plea agreement whereby he agrees to plead in

4   this court to a felony information charging him with

5   conspiracy.

6       So, they are going to be talking about that,

7   plus they are going to be talking about their prior

8   history of illegal activities.

9       Now, in part, that's because if I were not to

10  do so, then counsel may be able to stand up and

11  cross-examine them on a history of criminal activity and

12  it might appear to the jury that I was trying to hide

13  what these witnesses truly are.

14      But the problem is if you bring out the

15  criminal history of necessity, in our view it brings out

16  the association with Mr. Giannone in connection with

17  that criminal history.

18      THE COURT:  And of the two, Branca and Cutler,

19  are you saying Branca was indicted in ShadowCrew?

20      MR. EICHELBERGER:  Branca was referenced in

21  ShadowCrew.  He was -- I would characterize him as an

22  unindicted coconspirator.  Again, I have --

23      THE COURT:  He doesn't have a conviction from

24  that?

25      MR. EICHELBERGER:  No, he does not.

1          THE COURT:  Neither does Cutler?

2          MR. EICHELBERGER:  Neither does Cutler.

3          THE COURT:  And Branca has a conviction from

4 California?

5          MR. EICHELBERGER:  Yes.  He pled guilty out in

6 California.

7          THE COURT:  And then he has a plea agreement

8 here, you said?

9          MR. EICHELBERGER:  Yes, he does.

10          THE COURT:  And Cutler has charges here and

11 where else?

12          MR. EICHELBERGER:  He has a prior -- I think it

13 was receiving stolen goods.  But, again, I candidly

14 acknowledge that this is a can of worms, but by using

15 the term "can of worms," I mean it's -- all these

16 intertwined facts that really, all of it, you cannot

17 neatly or surgically excise one fact from the other

18 without doing damage to the background and how it is

19 that they know what they know.

20          THE COURT:  All right.

21          MR. EICHELBERGER:  And I think that's the

22 specifics as to Mr. Branca.

23          As to Mr. Cutler, it's significantly shorter.

24 But, again, Mr. Cutler will testify about his history of

25 dealings with Mr. Giannone, the history of having

1  traveled up and down the East Coast in connection with

2  various fraud schemes.  And in part that's necessary to

3  rebut or to prove that the purported chat transcript

4  that's in evidence as Exhibit 21 is a false and

5  fraudulent document, that it is a fraud upon this court

6  and upon his own attorney.

7         That document purports that Mr. Giannone and

8  Mr. Cutler first met in May of 2005 at the A&W Auto

9  Clinic.  The evidence already -- we have in evidence

10  plane tickets in February of 2005 where Mr. Giannone

11  paid for a trip for himself and for Mr. Cutler to

12  Florida.

13         Now, interestingly, in the -- I think it was in

14  the motion letter that counsel filed over the weekend,

15  in that one they said that was the only trip that they

16  ever had and it was for the purposes of visiting a

17  mutual friend in Florida.  It went on to say, and they

18  have had no other contact since.

19         Well, again, that's not possible because it's

20  absolutely inconsistent with the prior assertion that

21  Mr. Cutler and Mr. Giannone met in May of 2005 at the

22  A&W Auto Clinic.

23         And, again, Mr. Cutler will testify that he has

24  had a fairly extensive history of engaging in illegal

25  activity with Mr. Giannone.  They met in New York City,

1 the introducing agent was Mr. Chris Branca.  Chris

2 Branca brought Chris Cutler down to New York City where

3 they were down there -- essentially everything that goes

4 on in this case, Your Honor, revolves around carding,

5 that's what Mr. Giannone does.  And that's the people he

6 associates with and those are the witnesses that he has

7 chosen for the government to present.

8           THE COURT:  All right.

9           Mr. Liotti?

10          MR. LIOTTI:  Judge, I can say a few things

11 right now, preliminarily.

12          May I have that back?

13          MR. EICHELBERGER:  Sure.

14          MR. LIOTTI:  I can say a few things now, Judge,

15 but I will need some time to speak with my client.  I'm

16 going to suggest that while I can address some of the

17 issues that my able adversary mentioned this morning,

18 perhaps during the morning break we can discuss it more

19 fully and perhaps we can stipulate or agree on some of

20 these matters as not being something that we could

21 properly object to.

22          THE COURT:  All right.  We can wait.  I'll

23 just -- you want me to tell you my initial reaction to

24 it?

25          MR. LIOTTI:  Sure.

1          THE COURT:  I can always be persuaded

2    otherwise, but my initial reaction to it is that to the

3    extent that Branca and Cutler are going to testify about

4    things that have already been mentioned in the chats,

5    then I would allow it because it corroborates the

6    identification of your client in the -- in the chats as

7    being the individual who is Pit Boss 2600 and CIA INTEL,

8    and so the government would be allowed to do that, not

9    under 404(b) but as part of their substantive case in

10   chief.

11          I don't think, however, it is necessary for the

12   government to have these individuals testify about

13   ShadowCrew, about -- in other words, they can say that

14   they know him from prior dealings without describing it

15   as some massive investigation that resulted in

16   indictments and lots of arrests of people.

17          And they don't have to talk about that, because

18   that's really not necessary to anything in the case, it

19   seems to me.  So -- they are really going for

20   identification and they don't need to -- they don't need

21   to put in evidence, for example, of his -- of your

22   client's arrest, if he was arrested in California.  The

23   fact that he was known as Mark Rich is enough without

24   saying he was known as Mark Rich during the ShadowCrew

25   situation.  So, it seems to me that we could limit that.

1          In terms of Cutler, the fact of this

2   traveling -- that they were in these other places and

3   they knew each other, in my view, is probably sufficient

4   without saying what they were doing when they were

5   traveling.

6          In other words, it may be -- I don't know

7   exactly what the details of Mr. Cutler's testimony would

8   be, but if he testifies that he was in Orlando, Florida,

9   with Mr. Giannone in February before this May event and

10  that he had traveled with him many times all over the

11  country, or whatever, he doesn't necessarily have to say

12  that they were carding on all those events.

13         And so to remove prejudice or potential

14  prejudice from using -- which would -- what might be

15  considered pure 404(b) rather than inextricably

16  intertwined with the identification issue, I would be

17  inclined to sort of limit it in those ways.

18         But if these people are going to take the stand

19  and you want to cross-examine them fully as to their

20  background, you may be bringing out a good bit of this

21  information anyway, and that's what you need to discuss

22  with your client, I guess, and decide whether you even

23  want to object to any of this.

24         MR. LIOTTI:  There is obviously an "opening a

25  door" problem and the trap that my able adversary has

1   set for me; hopefully, I won't walk through it.  But the

2   question for me as a defense lawyer right now is, what

3   can I do to limit, if anything, some of the prejudicial

4   information that I believe is tangential to the actual

5   indictment itself?

6           And I don't think I need to get into some of

7   those areas on cross-examination, so I'm trying as best

8   I can as a defense lawyer to keep them out of the case,

9   because I think it does open up, perhaps, the can of

10  worms that Mr. Eichelberger referred to.  But it is also

11  a Pandora's box of sorts -- so we can use both of those

12  metaphors or analogs to describe the problems here.

13          I think, Your Honor brilliantly yesterday

14  suggested that there might be a cautionary instruction

15  to the jury -- or limiting instruction, however you

16  choose to describe it -- but that would have to do, as I

17  understand it, with yesterday's information contained in

18  the chats indicating, among other things, for example,

19  that anything that they heard or saw with respect to

20  drugs, for example, or prison time, or things of that

21  nature, those things, and much of what Mr. Eichelberger

22  is offering today, are not, as I understand it, admitted

23  for the truth of those matters.

24          What he's trying to do is use those matters as

25  a means of identifying Jonathan Giannone and thereby

1  tying him to Pit Boss 2600 and CIA INTEL, et cetera.

2          So, I think the cautionary instruction, if Your

3  Honor pleases, would include something about the fact

4  that these items are not being offered for the truth of

5  the matters asserted therein.  And then, I'd like to --

6  after the break perhaps -- address some of your other

7  comments and the other 404(b) issues.

8          THE COURT:  All right.  I can give a, what I

9  would call a cautionary instruction to the jury when

10  they come back in this morning, or I can wait until

11  after your cross-examination.

12          Obviously, you are getting ready to

13  cross-examine the agent on those transcripts that we --

14  that we are talking about, and I'm not sure -- well,

15  that's just a strategy matter as to whether you want me

16  to say this to the jury at this point in time or not.

17          I will give them a cautionary instruction --

18  normally what I would do is wait until there is what I

19  call 404(b) that I'm actually admitting.  If I'm

20  admitting something that is purely 404(b), then I would

21  give a cautionary instruction, which is a very strong

22  cautionary instruction, at that time.  It's a limiting

23  instruction that we give whenever we use 404(b) material

24  only --

25          MR. LIOTTI:  Judge, may I just respond to that

1  briefly?

2          THE COURT:  Yes.

3          MR. LIOTTI:  I think no matter what happens on

4  the cross-examination, even if I fall through the trap

5  that Mr. Eichelberger has so ably set for me here, I

6  think we will still ask for and need under both 404(b)

7  and 403, a cautionary instruction.  So --

8          THE COURT:  Well, at this point there hasn't

9  been any 404 information admitted in the trial of the

10  case.

11          MR. LIOTTI:  Yes, ma'am.

12          THE COURT:  So there is no need for a 404(b)

13  cautionary -- or limiting instruction at this point.

14  The only type of instruction that I was considering,

15  based solely on the transcripts, was something, saying,

16  "Mr. Giannone is not charged -- there are discussions of

17  a number of other individuals who may have been involved

18  in other criminal activity.  This is not a drug case,

19  this is a case in which Mr. Giannone is charged with

20  wire fraud and with identity theft, and those matters

21  are only being admitted because they were discussed, but

22  you should not consider those as any charge or any

23  accusation that Mr. Giannone was involved in those

24  particular activities."

25          MR. LIOTTI:  They are, perhaps, more than

1 collateral. They are irrelevant except on the issue of

2 identification, that's what they are being offered for.

3 Even though I'm sure the government wants to play on the

4 prejudice that naturally ensues from that kind of

5 testimony and that's doing their job, I suppose, but

6 it's my job to say it's too prejudicial and not

7 sufficiently probative.

8          THE COURT:  All right.  Having heard what I

9 would likely say, do you want me to say it?

10          MR. LIOTTI:  Well, I think, maybe, this can

11 wait until after the break, because I think I have to

12 give you more of a shopping list, Your Honor, if you

13 please.  It's not just drugs, but there are some other

14 things, I think, layered in the chats that you might

15 want to also include in the cautionary instruction.

16          THE COURT:  All right.  Well, you can propose

17 something after the break.

18          MR. LIOTTI:  Yes, Your Honor.  Thank you.

19          THE COURT:  All right.  Okay.  Anything before

20 we bring the jury in?

21          MR. EICHELBERGER:  One final matter, Your

22 Honor.  I mentioned to Mr. Liotti this morning that as I

23 was going over things last night, I realized that I had

24 omitted one very brief line of questioning from Agent

25 Kirby, so I would ask to be able to reopen direct on

1  him.  It's going to take less than five minutes,

2  probably more like two or three minutes.

3          THE COURT:  Any objection, Mr. Liotti?

4          MR. LIOTTI:  No, Your Honor.  That's a

5  professional courtesy that I would hope both sides would

6  extend to each other.

7          Judge, I do have one other matter, though, that

8  I would like to take up.

9          THE COURT:  Go ahead.

10          MR. LIOTTI:  If Your Honor pleases.  Judge,

11  this relates to what I was saying yesterday -- I forgot

12  to stand before.  I apologize, Judge --

13          This relates to what I was saying yesterday

14  about the nature of the hearsay testimony, and I cited

15  to Your Honor the Bourjaily case and the requirements

16  for the government making out a showing by a

17  preponderance of the evidence that the testimony is

18  relevant and also reliable.

19          Now, I am concerned, frankly, and this is just

20  a general proposition that I am positing with the Court

21  now, as well as Mr. Eichelberger, I am concerned because

22  of the alleged prior history, let's say, between

23  Mr. Branca and Mr. Giannone.  And I say as proffered by

24  the government, because I'm not agreeing that this is

25  the prior history, but this is what I'm gleaning from

1  the chats that I have seen.

2          Apparently there's a lot of bad blood between,

3  at least, Mr. Branca and Mr. Giannone.  Because among

4  other things, the government contends that my client,

5  for example, called his parents and acted, during that

6  conversation, as a Secret Service agent, saying that

7  Mr. Branca should surrender himself and so forth.

8          So, that engenders, I'm sure, a lot of emotion

9  into this case, or at least potential emotion, and I'm

10 concerned that Branca and Cutler will volunteer, when

11 they get on that stand.  And I have to ask the Court and

12 Mr. Eichelberger to try and limit that as much as

13 possible.  So --

14         THE COURT:  I will be glad to do that.  I can

15 bring Mr. Branca in before he testifies in front of the

16 jury and basically scare him a little bit so that he

17 will be careful --

18         MR. LIOTTI:  Thank you.

19         THE COURT:  -- about what he says.

20         Okay.  All right.  I've got a little problem

21 here.  I can't get this computer to work so I'm going to

22 take about three minutes and go ask the computer tech to

23 come in here.  If anybody wants to take a short break

24 while I'm doing that, and then we will get the jury in

25 and get started.

1          MR. EICHELBERGER:  Thank you, Your Honor.

2          (Short recess)

3          THE COURT:  Okay.  All right.  I think we are

4    ready now.  You may bring the jury in.

5          And, Agent Kirby, you may come back up.

6          (Jury present)

7          THE COURT:  Good morning, ladies and gentlemen.

8          THE JURY:  Good morning.

9          THE COURT:  We are having a few little computer

10   problems this morning, but we are trying to get

11   underway, so hopefully things are settled down.

12          Agent Kirby had finished his direct yesterday,

13   but Mr. Eichelberger remembered something else and so

14   he's been asked -- he's asked for permission to go back

15   into his direct and add a little bit, and Mr. Liotti has

16   graciously agreed to that.  And so Agent Kirby is going

17   to continue on direct for a few more minutes.

18              BOBBY JOE KIRBY, JR., RESUMED

19              DIRECT EXAMINATION - CONTINUED

20   BY MR. EICHELBERGER:

21   Q.  Good morning, Mr. Kirby.

22   A.  Good morning.

23   Q.  We will be very short.

24          I neglected to ask you yesterday, in connection

25   with the deposit of $600 into the A&W account -- I

1  believe it was on June 6th of 2005; is that correct?

2  A.  Yes, sir.

3  Q.  -- did you obtain and review bank records for the

4  A&W account leading up to that deposit?

5  A.  Yes, I did.

6  Q.  And if you would, just tell the jury how much money

7  was in that account prior to the $600 deposit?

8  A.  If I remember correctly, it was at a zero balance.

9  The statement had cleared and there was at least a zero

10  balance, or close to that, for the month prior, I would

11  say.

12  Q.  Thank you.

13          MR. EICHELBERGER:  That's all I have.

14          THE COURT:  All right.  Mr. Liotti, you may

15  cross-examine.

16          MR. LIOTTI:  Thank you.

17                     CROSS-EXAMINATION

18  BY MR. LIOTTI:

19  Q.  Good morning, Agent.

20          MR. LIOTTI:  Good morning, ladies and

21  gentlemen.

22  A.  Good morning.

23          MR. LIOTTI:  And good morning, Your Honor.

24          THE COURT:  Good morning.

25  BY MR. LIOTTI:

1 Q.  If I may, Agent, I would like to just ask you a few

2 questions about your testimony yesterday.  Now, being a

3 novice as I am concerning computers, I looked at these

4 exhibits and I noted that you had dates on the top of

5 each one of the government exhibits, correct?

6 A.  Correct.

7 Q.  Now, did you have any e-mail addresses on these

8 things or any other address as to the location from

9 whence they came?

10 A.  Those -- that's not really applicable.  An e-mail

11 address isn't involved with instant messaging and chats.

12 Q.  Okay.  But there is no identifying information

13 concerning where this chat is emanating from; isn't that

14 correct?

15 A.  The only identifying information is the name or ICQ

16 number, or ICQ name, associated with that person.

17 Q.  Right.  So an e-mail address would provide

18 information about the source of the chat, right, the

19 location from which it emanated, correct?

20 A.  You are referring to e-mails?

21 Q.  Yes.

22 A.  Which are not involved in this chat.

23 Q.  I understand, but I'm just pointing out that we

24 don't have an address, do we, as to where these things

25 came from?

1  A.  That is true.

2  Q.  So, anywhere in the universe of the Internet,

3  someone by the name of Pit Boss 2600 could be

4  communicating with the other person on the other end of

5  this chat who's referred to as gollumfun; isn't that

6  correct?

7  A.  That is correct.

8  Q.  Okay.  And gollumfun could be anywhere also,

9  correct?

10  A.  That is correct.

11  Q.  Okay.  Now, do I have it right that when you

12  referred to gollumfun you are referring to in the

13  government exhibits as Brett Johnson?

14  A.  Correct.

15  Q.  Okay.  So it's the government's contention here that

16  Pit Boss 2600 -- you believe to be Jonathan Giannone --

17  was involved in these chats, as you describe them, with

18  Brett Johnson?

19  A.  Correct.

20  Q.  Okay.  Anywhere in here among these exhibits do you

21  see a reference to the actual name Brett Johnson?

22  A.  No, you don't.

23  Q.  Okay.  Anywhere in here -- I think, except for

24  perhaps the last chat that I saw yesterday -- do you see

25  a reference to Jonathan Giannone?

1  A.  Not as I recall.

2  Q.  Okay.  So, it is at least a possibility that

3  somebody who has that name Pit Boss 2600 could be saying

4  they are Pit Boss 2600 and not be Pit Boss 2600; is that

5  correct?

6  A.  I would say that is incorrect.

7  Q.  Couldn't happen?  There's only one person who can

8  use that name?

9  A.  That's not what I'm saying.

10  Q.  I'm sorry?

11  A.  That's not what I'm saying.

12  Q.  Okay.  What are you saying?

13  A.  More than one person can use that name.  That name

14  has a user name and a password.  If the original owner

15  for that account gives someone that user name and

16  password, they could use that account.

17  Q.  Okay.  So that is more precise and I appreciate

18  that.  So, the caveat that you are adding is that

19  anybody can use that name except they have to have a

20  password, correct?

21  A.  That's correct.

22  Q.  Okay.  So, if the person who originated that name

23  Pit Boss 2600 decided to give out the name and the

24  password, or if other people learned of it, then those

25  people could use that name, correct?

1  A.  That is correct.

2  Q.  Okay.  And the same thing with gollumfun, correct?

3  A.  Correct.

4  Q.  Okay.

5          THE COURT:  Mr. Liotti, excuse me just a

6  moment.

7          We must have a major hearing going on in the

8  ceremonial courtroom and a lot of people out there in

9  the hall.  Would you mind stepping out and asking them

10 if they could be quiet?

11         THE CSO:  Yes, ma'am.

12         THE COURT:  Thank you.

13         MR. LIOTTI:  Thank you, Judge.

14         THE COURT:  Thank you.

15         MR. LIOTTI:  Should I continue?

16         THE COURT:  You may proceed.

17         MR. LIOTTI:  Thank you.

18 BY MR. LIOTTI:

19 Q.  All right.  So that's by virtue of just addresses

20 and names.  And the same thing would be true of the

21 other name that you mentioned here, which is CIA INTEL,

22 correct?

23 A.  That's true.

24 Q.  In order to use that name somebody would have to

25 have the name and the password, right?

1 A.  Correct.

2 Q.  Okay.  Now, let's go on a little bit further.  Now,

3 in this case it's the government's theory that

4 Mr. Giannone is Pit Boss 2600 and he is CIA INTEL,

5 correct?

6 A.  Correct.

7 Q.  Okay.  And you are endeavoring to establish that by

8 offering these government exhibits and showing travel

9 plans are referred to by Pit Boss 2600, or CIA INTEL,

10 and then offering some travel records for Mr. Giannone

11 which may coincide with what's referred to in the chats

12 in the way of travel; isn't that so?

13 A.  Travel is one means.

14 Q.  Okay.  But that's what you have in these 24

15 government exhibits, right?

16 A.  We have travel, also credit card statements,

17 personal banking accounts.

18 Q.  Okay.  But that's the identity part of it that you

19 are trying to show.  That's how you are trying to link

20 Mr. Giannone up with the wire fraud and the identity

21 theft, that's how you are trying to show it's him,

22 correct?

23 A.  That is one means we are showing it's him.

24 Q.  Right.  And that will be -- and the Court will

25 charge the jury on this -- but that would be in the

1  nature of circumstantial evidence, correct?

2  A.  It's according to how you look at it.

3  Q.  Okay.  Because you don't have in the chats

4  themselves Jonathan Giannone saying, "It's me.  This is

5  who I am," correct?

6  A.  That's correct.

7  Q.  All right.  So, let's go a little bit further.  Now,

8  the first chat that we have a record of, I believe, is

9  on or about May 26 of '05.

10  A.  I think it's May 23rd.

11  Q.  23rd?  May 23rd of '05.  Now, at that point

12  Mr. Johnson is in custody and he's out on bail and he's

13  working with the Secret Service; isn't that right?

14  A.  He's working with us.

15  Q.  And there are agents who are seated right next to

16  him while he's on the Internet, correct?

17  A.  Correct.

18  Q.  And the agents are there and they are suggesting to

19  him, among other things, what he should say to

20  Pit Boss 2600 in the form of a chat, right?

21  A.  That's incorrect.

22  Q.  Okay.  But Brett Johnson, a/k/a -- also known as

23  gollumfun, is involved in the chat activity with Pit

24  Boss 2600?

25  A.  He's the person at the keyboard.

1  Q.  As part of the investigation?

2  A.  Correct.

3  Q.  Which you, that is the Secret Service, is

4  monitoring?

5  A.  Correct.

6  Q.  Right?  So, as we look at the chats, Brett Johnson

7  is essentially being fed information by the Secret

8  Service to elicit responses from Pit Boss 2600; isn't

9  that right?

10 A.  That is incorrect.

11 Q.  Well, as we look at the chats, you tell me, didn't

12 Brett Johnson most of the time either restate what Pit

13 Boss 2600 said or raise a question about that?

14 A.  I can't really answer that question without looking

15 back at the chats.  Give me a specific --

16 Q.  But what you said to Brett Johnson, that is the

17 Secret Service, was to try and get Pit Boss to talk a

18 lot on the chat, right?

19 A.  That is incorrect.

20 Q.  Try and get Pit Boss 2600 or CIA INTEL or whomever

21 else you may have been investigating at the time to

22 implicate themselves in a crime; isn't that right?

23 A.  That is incorrect.

24 Q.  So, is it your testimony here that the Secret

25 Service did not provide any portion of a script or the

1  content of any statements made by Brett Johnson in

2  connection with these various chats?

3  A.  That's correct.

4  Q.  Nothing?

5  A.  We did not tell him what to say, there was no

6  script.

7  Q.  Okay.  But Brett Johnson was advised of the content

8  of the investigation.  He knew what you guys were going

9  after; isn't that right?

10  A.  It was an investigation.

11  Q.  Okay.  And you informed him that he could help

12  himself if he was able to get the goods on some other

13  people, implicate other people in criminal activity;

14  isn't that right?

15  A.  I really can't speculate.  I did not have that

16  conversation with Mr. Johnson.

17  Q.  So, it's your testimony here that that would be

18  speculation on your part to suggest that Brett Johnson

19  was trying to help himself in these chats?

20  A.  I'm testifying that I did not have a conversation

21  with Brett Johnson prior to the investigation beginning.

22  Q.  All right.  But you have been doing this for four

23  years, right?

24  A.  That's correct.

25  Q.  Okay.  So you know how these investigations go down,

1  right?

2  A.  I would hope so.

3  Q.  Okay.  And you are involved in a computer fraud

4  investigation and you want to know who is involved in

5  computer fraud, right?  Who Brett Johnson knows?  You've

6  got somebody who is working the inside of computer

7  fraud, you believe, right?

8  A.  That's correct.

9  Q.  He's cooperating.  You want him to get the goods on

10 people, don't you?  You want him to make cases, and he

11 knows he's got to make cases because if he doesn't he

12 doesn't get credit for it, correct?

13 A.  It's an investigation.

14 Q.  Right.  So there's no doubt in your mind, there's no

15 speculation here about what Brett Johnson was

16 endeavoring to do when he was speaking with or chatting

17 with Pit Boss 2600, right?

18 A.  It's an investigation.

19 Q.  Is there speculation about it?

20 A.  Not that it's an investigation.

21 Q.  It's a criminal investigation, right?

22 A.  I agree.

23 Q.  By the federal government?

24 A.  Correct.

25 Q.  Okay.  And by the way, when you say chat, chat to me

1   connotes speaking, right?

2   A.  Internet chat is typing.

3   Q.  Right.  Okay.  We are talking about written

4   documents and only written documents here, right?

5   A.  Correct.

6   Q.  So, for example, a chat would not enable you, if you

7   are sitting next to Brett Johnson while he's chatting

8   with somebody over the Internet, to tape record a

9   conversation with that person, right?

10  A.  I'm not sure if I understand your question.

11  Q.  Well, tape recording has to do with the spoken word,

12  okay?  The chat, even though it sounds like people are

13  speaking, it really relates to typing, right?

14  A.  Correct.

15  Q.  So you couldn't tape record a conversation based on

16  these chats, right?

17  A.  The conversation is words typed on a screen which is

18  being recorded via Camtasia, as we spoke about

19  yesterday.

20  Q.  You don't want to answer my question?

21  A.  That it -- it was your question.

22  Q.  Okay.  Are there any tape recordings of

23  conversations, actual voice conversations, between Brett

24  Johnson and Jonathan Giannone?

25  A.  Tape is audio.  There is no audio; there is video.

1  Q.  Okay.  So, this is it, right, no tape recordings?

2  A.  Video recordings of the chats that took place of the

3  conversation.

4  Q.  But just the actual written documents?

5  A.  All they were, were words typed on the screen and

6  that's what you had.

7  Q.  I heard you say that three or four times now.

8  A.  Correct.

9  Q.  Okay.  Now, during the course of your investigation

10  were you concerned about zeroing in on the address of

11  Pit Boss 2600?

12  A.  Define "address."

13  Q.  Okay.  Location where Pit Boss 2600 actually was

14  when he was chatting with Brett Johnson?

15  A.  The first thing we wanted to do was find out who was

16  behind the name.  Once you do that, you find a physical

17  address associated with that person, yes.

18  Q.  Okay.  So, this started on May 23rd or thereabouts.

19  When is the first time that Brett Johnson says, "I'm

20  Brett Johnson, who are you?"

21  A.  I can't recall if that was said.

22  Q.  Do you know if that was ever suggested by the Secret

23  Service during the course of this investigation?  You

24  know, let's get the names out there.  Let's try and get

25  his name, whoever this person is?  Was that suggested?

1  A.  We never suggested anything to Mr. Johnson.

2  Q.  Well, wasn't that kind of an obvious part of the

3  investigation?  You just told me that that's the first

4  thing that you look for, you want to get the actual name

5  of the person, right?

6  A.  That's the investigation.

7  Q.  And as the investigation, you want to get the actual

8  name of the person, correct?

9  A.  That is the purpose of the investigation.

10  Q.  All right.  That's the first order of business, get

11  the name out there.  So, do you think you can get the

12  name out there a little more quickly if Mr. Johnson

13  said, "I'm Brett Johnson, who are you?"

14  A.  That's not the way these operations work.

15  Q.  Oh, I understand.  Computer people don't want to

16  reveal their identity, but you need to know the identity

17  as part of the investigation, correct?

18  A.  That's what we do during the investigation.  That's

19  our job.

20  Q.  I know.  I know.  I'm just asking you whether you

21  posed that question or Mr. Johnson poses the question in

22  that fashion just to see what you may get back?

23  A.  Actually, that was -- that question was posed, the

24  first three -- the second chat.

25  Q.  It was posed?

1  A.  Yes, it was.

2  Q.  Okay.  Do you remember which government exhibit

3  that's in?

4  A.  The first one.

5  Q.  Okay.  Could I see that please?

6          MR. EICHELBERGER:  I will show it to you.

7  BY MR. LIOTTI:

8  Q.  Let's take a look at Government Exhibit No. 1.  And

9  this is with Mr. Eichelberger's assistance, pointing out

10  a particular sentence, he was kind enough to provide you

11  with a copy of Government Exhibit 1, take a look at the

12  first page of that document.  Do you have it, sir?

13  A.  Yes, sir.

14  Q.  All right.  Now, down at the bottom you will see Pit

15  Boss 2600.  That's the person who's chatting, correct?

16  A.  Correct.

17  Q.  If I misstate anything, Agent, please tell me.

18  Okay?

19  A.  Yes, sir.

20  Q.  Right after that "You know his real name, right?"

21  And then we go to gollumfun, "No, I never ask real names

22  and told people never to tell me.  Little rule of

23  mine."  Okay.  Who were they referring to in that

24  conversation?

25  A.  I guess they would be referring to Enhance since it

1  was a couple of lines before that.

2  Q.  Someone else, correct, other than that Pit Boss 2600

3  or gollumfun; is that right?

4  A.  Correct.

5  Q.  Okay.  So, the actual question -- I think you can

6  give that back --

7  A.  May I interrupt you one second?

8  Q.  Sure.

9  A.  Your original question is addressed at the top of

10 the page, where we actually asked, "Who are you?"  That

11 was your original question.

12 Q.  Okay.  Let's focus on that.  You can hold on to that

13 for a moment.

14 A.  Okay.

15 Q.  Let's focus on that.  The question is, "Who are

16 you?"  Okay?  And the initial response was a name that

17 you had mentioned yesterday, which is Mark Rich; is that

18 correct?

19 A.  Correct.

20 Q.  Now, do you know that name Mark Rich?

21 A.  I did not know that name at the time.

22 Q.  But Mark Rich is a pretty well-known name; isn't it?

23 A.  I know it now, learned it through the investigation.

24 Q.  Wasn't there a Mark Rich who was pardoned by

25 President Clinton on the last days of his

1  administration, a Mark Rich?

2  A.  I couldn't answer that.

3  Q.  You are not sure?

4  A.  I couldn't answer that.

5  Q.  All right.  In any event, those two references that

6  we see here, are those the references that you are

7  talking about or referring to as far as names are

8  concerned?

9  A.  You asked a direct question, did we ever ask who was

10  on the other end, and that first conversation, the one

11  we just spoke of, that question was asked.

12  Q.  My question to you is:  Is this the only time that

13  that was done, as far as you can recall?

14  A.  I cannot answer that question.

15  Q.  Because you don't recall?

16  A.  It's 170 pages of chats.

17  Q.  I can understand that.  I'm just asking you if you

18  recall or not?

19  A.  I do not recall.

20  Q.  If you don't recall, just tell me you don't recall.

21  A.  I think there's one more instance that I can think

22  of, but I can't recall exactly where it is.

23  Q.  I'm not asking you to memorize everything.  I just

24  want to know if you can recall it or not.

25  A.  I cannot recall any specific --

1 Q. When that name Mark Rich was thrown out there on the

2 first page of that first exhibit, did the Secret

3 Service, to the best of your knowledge, do anything at

4 that stage to investigate the veracity of that

5 statement, the truthfulness of that statement?  The

6 existence of Mark Rich?  Did you do any --

7 A.  There was no need to.

8 Q.  Sir --

9         MR. LIOTTI:  Your Honor, I have to -- I'm

10 sorry.  I have to ask that the witness be admonished

11 because he's not responding to my questions.  My

12 question is, did he, and he gives me an answer of,

13 "There was no need to."  It's a yes or no question.

14         THE COURT:  Answer yes or no, if you can.

15         THE WITNESS:  No.

16 BY MR. LIOTTI:

17 Q.  All right.  So the answer is no?

18 A.  Correct.

19 Q.  All right.  Now, can we stick by that little ground

20 rule, if I ask you a question which calls for a yes or

21 no response, can I have a yes or no response?

22 A.  If it's yes or no.

23 Q.  Thank you.  All right.  In Government Exhibit 2, and

24 I should give you that --

25         THE COURT:  He has the whole packet.

1          MR. LIOTTI:  Again, you are using the judge's

2   copy.

3          Judge, I don't know if you need the originals

4   or whatever, I'll be happy to provide you with what we

5   have.

6          THE COURT:  That's all right.

7   BY MR. LIOTTI:

8   Q.  Now, the jurors do not have copies of some of these

9   things in front of them so I will try to identify them,

10  and if the jurors are taking notes they may wish to make

11  notes on some of these matters.  We'll try to be as

12  clear as possible.

13         All right.  In this conversation of May 26,

14  '05, you are monitoring and supervising and watching

15  over Brett Johnson and he's involved in this

16  conversation with Pit Boss 2600 and one of the things

17  that you are looking at during the course of the

18  investigation is any leads that you can spot, anything

19  at all that may allow you to further your investigation

20  and determine the actual identity of Pit Boss 2600;

21  isn't that right?

22  A.  Correct.

23  Q.  Okay.  So in doing that, you see a reference, the

24  guy -- this is Pit Boss 2600 now chatting, "The guy came

25  out from the back with the laptops and everything" --

1   continuing -- "all laughing and" -- pardon the

2   expression.  I'll follow his S language.

3           MR. LIOTTI:  Judge, I don't know if we should

4   be reading accurately or just --

5           THE COURT:  It's fine.  They are in evidence.

6           MR. LIOTTI:  Okay.

7   BY MR. LIOTTI:

8   Q.  And Pit Boss 2600, "And is like, 'Anything else you

9   want, sir?  We got printers, scanners, all kinds of

10  S.'"

11          Okay.  So, when you see things like that as

12  part of the investigation, don't you want to know about

13  the scanners, the laptops, any product, anything that

14  may have been stolen out there, or where someone's

15  credit card has been improperly used to buy some

16  product?  Yes or no.

17  A.  Yes.

18  Q.  Okay.  So when you see things like that throughout

19  the transcripts, was there a part of the investigation

20  concerning those matters wherein the Secret Service is

21  attempting to find out about theft of product, for

22  example?

23  A.  Yes.

24  Q.  Okay.  So, what if anything was done with regard to

25  that statement:  "Printers, scanners, all kinds of S"?

1   Anything at that point that you can recall?

2   A.  I cannot recall at that exact point.  We contacted

3   Apple many times, but that's a very broad statement.

4   Q.  Again, the answer to my question would be either a

5   yes or a no; if you don't recall, the answer would be

6   no.

7           THE COURT:  It wasn't a yes or no question.  It

8   was:  What if anything was done?

9           MR. LIOTTI:  I think there was one after that,

10  but, okay, I don't want to argue with the Court.

11  BY MR. LIOTTI:

12  Q.  Let's go down further on Government Exhibit 2.

13  Government Exhibit 2 at the bottom, Pit Boss 2600,

14  "2K" -- that would be $2,000, right?

15  A.  Yes.

16  Q.  -- "for 200 --" credit cards?  Is that right?  Or

17  credit card information?

18  A.  Credit card information.

19  Q.  Dumps?

20  A.  Dumps.

21  Q.  Okay.  Dumps.  So, here's a situation where the

22  Secret Service can allegedly buy 200 dumps for $2,000,

23  and we heard later on in the case that there's a $600

24  transaction that takes place, right?

25  A.  Correct.

1  Q.  And 21 dumps, that's the government's case, right?

2  A.  Correct.

3  Q.  Okay.  Yes or no would be good.

4  A.  Yes.

5  Q.  Okay.  But here, there's a situation where you can

6  buy 200 dumps for $2,000, right?  So, again, the Secret

7  Service doesn't say anything to Mr. Johnson like, "We

8  will front the two grand, let's get the 200 dumps in

9  here."  Nothing like that, right?  Yes or no, sir;

10 nothing like that, right?

11 A.  No.

12 Q.  So, that was a lead, apparently, that was not

13 pursued during the chat, right?

14 A.  I would disagree, but I have to answer yes or no.

15 Can I disagree?

16 Q.  You can say you disagree.

17 A.  Thank you.

18 Q.  Does that make you feel better?

19        Then Pit Boss 2600 says, "My guy got 9K off one

20 yesterday.  9K off one yesterday.  Dumps by Mark Rich,"

21 you see that?

22 A.  Yes.

23 Q.  Again, did the Secret Service do anything to follow

24 that lead, to pursue that investigation?  "9K, Mark

25 Rich"?

1  A.  No.

2  Q.  Now, was that because the Secret Service had

3  concluded that there was no Mark Rich; yes or no?

4  A.  No.  Can I explain why?

5  Q.  I'm not asking for your explanation.

6  A.  Okay.

7  Q.  I'm asking for a yes or no.

8         Okay.  Now, going to the second page of

9  Government Exhibit 2, about three quarters of the way

10  down on that page there is this language:  Pit Boss

11  2600, "Yeah.  I flew down to JAX yesterday to take care

12  of some stuff," right?

13  A.  Yes.

14  Q.  Okay.  Now, the government believes that that would

15  be Jacksonville, Florida, correct?

16  A.  Correct.

17  Q.  And the government at some point pulled up some

18  records from Jonathan Giannone, and these were flight

19  records that you obtained from American Express; isn't

20  that correct?

21  A.  Correct, but that wasn't what we pulled up for this

22  statement.

23  Q.  Okay.  Let me ask you -- take a look at 2B if you

24  would, please.

25  A.  Okay.

1  Q.  You see 2B?

2  A.  Yes, sir.

3  Q.  Is there a reference on 2B to Jonathan Giannone?

4  A.  Yes, sir.

5  Q.  I think you may have to go to the second page.

6  A.  I'm there.

7  Q.  Now, are these American Express records for Jonathan

8  Giannone?

9  A.  Yes, sir.

10  Q.  Okay.  And this follows -- 2B, of course, follows

11  Government Exhibit 2.  So what I'm asking you now is, is

12  there a reference on 2B to a flight to Jacksonville,

13  Florida?

14  A.  There's a reference to a flight from Jacksonville,

15  Florida.

16  Q.  Where is that?

17  A.  Third down, 5-24-05, a Delta Airlines flight from

18  Jacksonville, Florida to JFK in New York, passenger

19  name, Jonathan Giannone.

20         THE COURT REPORTER:  Could you repeat the date?

21  A.  Oh, 5-24 of '05, Delta Airlines, from Jacksonville,

22  Florida, to JFK, New York, passenger name, Jonathan

23  Giannone, date of departure 5-25.

24  BY MR. LIOTTI:

25  Q.  Now, do you also see on the same day a flight from

1  Ft. Lauderdale, Florida, also 5-25?

2  A.  Southwest Airlines?  That the one you are

3  referring --

4  Q.  I think it's jetBlue, isn't it?  The next one down?

5  A.  Oh, right below -- right above that is Southwest

6  Airlines, 5-25-05.

7  Q.  Well, that's Jacksonville.  I'm asking you about the

8  one underneath that.

9  A.  But you said Ft. Lauderdale.  That is from

10  Jacksonville, Florida to Ft. Lauderdale also.

11  Q.  Jacksonville to Ft. Lauderdale, and then

12  Ft. Lauderdale to New York; is that correct?

13  A.  Correct.

14  Q.  Okay.  So, we left out, I believe, Ft. Lauderdale

15  from that little scenario.  And then, also -- by the

16  way, when did you secure this American Express bill?

17  A.  It was probably a couple of weeks ago.  We didn't do

18  this in the beginning, this was done in preparation for

19  trial.

20  Q.  So, you didn't have this until a couple of weeks

21  ago?

22  A.  Approximately a month ago, maybe.

23  Q.  Okay.  All right.  So in any event, what you are

24  hanging your hat on here, in one respect, in terms of

25  the identity of Jonathan Giannone, is a conversation via

1  chat which occurred on 5-26-05, where a Pit Boss 2600

2  says he flew down to JAX yesterday to take care of some

3  stuff; is that right?

4  A.  Correct.

5  Q.  Okay.  So that statement, "I flew down to JAX,"

6  relates to the identity of Jonathan Giannone, but --

7  which you corroborated, you believe, a month ago; is

8  that right?

9  A.  Yes, sir.

10  Q.  Now, let's go to the next page, Government Exhibit

11  2.  Pit Boss 2600 refers to someone with an MBA, you see

12  that at the bottom of the page?  Go all the way down at

13  the bottom, three lines up from the bottom.

14  A.  Oh, the third page, yes.

15  Q.  Okay.  So, there's a reference to someone with an

16  MBA, a master's in business administration, who is

17  sentenced to eight years, and the statement on the last

18  line indicating that people in India were cheap; do you

19  see that?

20  A.  Yes, sir.

21  Q.  Okay.  Referring to the same person, correct?  Is

22  that correct?

23  A.  As far as the "people in India work cheap" and the

24  "MBA"?

25  Q.  Or maybe Pit Boss 2600 is talking about outsourcing,

1   correct?

2          MR. EICHELBERGER:  Calls for speculation,

3   objection.

4          THE COURT:  Sustained.  You can ask him what it

5   says.

6   BY MR. LIOTTI:

7   Q.  In any event, with that information in hand about a

8   person probably of Indian extraction who was convicted

9   or given eight years and who had received an MBA, did

10  the Secret Service do any investigation of that person

11  to see if such a person was in the federal system

12  somewhere?

13         MR. EICHELBERGER:  Your Honor, I'm going to

14  object under 403.  I would like to be heard at sidebar

15  if I could?

16         THE COURT:  All right.

17         (Bench conference)

18         MR. EICHELBERGER:  I would just like to make my

19  objection known that -- I mean, I understand what

20  Mr. Liotti is doing, but if we go through each and every

21  one of the instances of what wasn't done, it's going to

22  take forever, and that's certainly going to be a waste

23  of the jury's time.  So, we ask that the Court place a

24  reasonable limitation on it under Rule 403.

25         THE COURT:  Overruled.

1          MR. EICHELBERGER:  Thank you.

2              (In open court)

3  BY MR. LIOTTI:

4  Q.  So my question stands, sir.  Did you do anything --

5  did the Secret Service do anything as far as that

6  individual is concerned?

7  A.  Not to my knowledge.

8  Q.  Now, just to go back a little bit.  As far as

9  Mr. Johnson is concerned, how does the government set

10  him up in this chat system that you devised?  How was

11  that all established?  What was done exactly by the

12  government to provide Mr. Johnson with the necessary

13  equipment so he could reach out to people in the

14  Internet?

15  A.  One computer was purchased for use by Mr. Johnson,

16  another computer was purchased for use by the agents who

17  were monitoring, also a large-screen television where

18  the agents could watch what was happening on the

19  television rather than having to look at his computer

20  screen.

21  Q.  And how would people be attracted to Mr. Johnson?

22  What would be their vehicle for finding out that he

23  existed and was engaged in some type of business?

24  A.  He had a very well-known name in that community so

25  most people came to him when they recognized his name.

1  Q.  And that would be gollumfun?

2  A.  Correct.

3  Q.  Okay.  So did he have a Web site?

4  A.  Not at the time we were dealing with him.

5  Q.  Okay.  So it was just gollumfun?

6  A.  That's the name we used in the investigation, yes.

7  Q.  Okay.  And I guess you are telling us that other

8  people aside from Pit Boss 2600 communicated with

9  Mr. Johnson over that gollumfun name?

10  A.  Yes.

11  Q.  Okay.  And are some of them named in this case, such

12  as Chris Branca?

13  A.  Yes.

14  Q.  And also Chris Cutler?

15  A.  Yes.

16  Q.  They communicated with Mr. Johnson?

17  A.  Yes.

18  Q.  And they are not reflected -- their communications

19  with Mr. Johnson aren't reflected in any of these chats,

20  right?

21  A.  That is correct.

22  Q.  Now, there's a reference in the chats to -- let's go

23  to page -- I guess this would be the fourth page.  At

24  the bottom it says page 12 of 170, but it's actually the

25  fourth page on this particular exhibit, which is

1   Government Exhibit 2.  Do you have that?

2   A.  Yes, sir.  Yes, sir.

3   Q.  All right.  There's something called a forum.  Do

4   you see that in the middle of the page, about three

5   quarters of the way down?  Pit Boss says, "I'm thinking

6   of starting my own forum."

7   A.  Yes, sir.

8   Q.  Okay.  What is a forum?

9   A.  A forum is -- the simple way of putting it, it's a

10  Web site.

11  Q.  And you mentioned later in your testimony about an

12  auto company or auto sales company.  A&W, was it?

13  A.  A&W Auto Clinic.

14  Q.  Right.  Now, if that was a Web site, that would be a

15  forum, correct?

16  A.  A forum is a little bit different than a basic Web

17  site.  It's just a simple way of explaining it.

18  Q.  But you sell product or you can sell product over

19  eBay and on a Web site, correct?

20  A.  Yes.

21  Q.  All right.  Now, let's go to the next page.  All

22  right.  Pit Boss 2600 in the first quarter of the page

23  talks about $6 a dump.  So, I just did the math on $6 a

24  dump times 21 of these dumps that the government says

25  were sold by Mr. Giannone and that's $126, right?  Six

1  times 21, 126; correct?

2  A.  Correct.

3  Q.  So Pit Boss 2600 is telling Mr. Johnson that you can

4  get a dump for $6; isn't that right?

5  A.  Well, actually, if you look at the bottom of the

6  page prior, he just says that he ordered 100 AmEx dumps,

7  so that's where it comes into the conversation.

8  Q.  He's also saying that dumps are available for $6 a

9  dump, correct?

10  A.  To him from his supplier, that's correct.

11  Q.  Okay.  So doesn't that present the question to the

12  Secret Service, which I'm sure was asked of Mr. Johnson,

13  well, why should you or we pay $600 for 21 dumps when

14  you can get them for six bucks each?  I'm asking.

15  That's my question.

16  A.  Well, there were a lot -- we spoke with a lot of

17  different people.  There were different dumps -- prices

18  for different vendors.  It's just like any business.

19  You are going by the validity, the success rate, that

20  sort of thing.  That drives price.

21  Q.  But didn't it seem a little bit foolish in that

22  scenario that you should overpay by over $400 -- over

23  $450 -- $470 for dumps?  Doesn't that seem incredulous

24  to you at the time?

25  A.  Not really.

1  Q.  Yes or no?

2  A.  No.

3  Q.  No.  Okay.  Now, going to the last page of

4  Government Exhibit 2, Pit Boss refers to South

5  Carolina.  Now, you had told us, and I think your fellow

6  agent told us earlier, that when you were monitoring

7  Mr. Johnson he was here in Columbia, right?

8  A.  Yes.

9  Q.  But Pit Boss in the first four or five lines of that

10 chat says that he "never tried S" -- to use your word or

11 letter -- "there," right?

12 A.  Yes.

13 Q.  Now, just going to Government Exhibit 2B, Government

14 Exhibit 2B, of course, as you just mentioned, it is an

15 American Express billing statement from June of '05

16 covering the previous month of May of '05, right?

17 A.  Yes.

18 Q.  Okay.  Since you just got this a month ago, you

19 didn't really expect to find that Jonathan Giannone, who

20 you contend is involved in computer fraud, mail fraud,

21 computer theft, ID, and so on, would be involved in

22 using his own name and his own credit card back then in

23 May of '05?  You didn't expect to find that, right?

24            MR. EICHELBERGER:  Objection.

25 BY MR. LIOTTI:

1  Q.  Isn't that why you waited until one month ago to

2  subpoena American Express records?

3          MR. EICHELBERGER:  Objection, Your Honor, calls

4  for speculation.

5          THE COURT:  Overruled.

6          MR. LIOTTI:  Was that sustained?

7          THE COURT:  It was overruled.

8  BY MR. LIOTTI:

9  Q.  Can you answer my question?

10  A.  Can you repeat it?

11  Q.  Yes, sir.

12  A.  Thank you.

13  Q.  You say you got the American Express records a month

14  ago, here is Jonathan Giannone supposedly, according to

15  you, advertising to Brett Johnson that he can buy 21

16  dumps for $600.  Why would someone like Jonathan

17  Giannone -- it's a why question -- okay?  You can

18  answer.  Why would someone like Jonathan Giannone use

19  his own name and his own credit card after having that

20  chat --

21          MR. EICHELBERGER:  Objection --

22  BY MR. LIOTTI:

23  Q.  -- back in '05?

24          MR. EICHELBERGER:  -- calls for speculation.

25  BY MR. LIOTTI:

1  Q.  Why would he do that?

2         THE COURT:  Sustained.  You've changed the

3  question and it is now objectionable.

4  BY MR. LIOTTI:

5  Q.  Going back to my original question, you didn't

6  expect that somebody who had access to all of these

7  dumps would use his own credit card to make a flight,

8  would you?

9  A.  I can't really say if I expected to or not, it was

10  just one way of tying him to those chats.

11  Q.  But if we follow what you are saying, sir, you are

12  telling me that people involved in this enterprise, in

13  this business of computer fraud and identity theft,

14  don't want anyone to know who they are, so they hide

15  their names, right?  They try to secrete their names,

16  and your first order of business is to find out what you

17  can about who they are.  Okay?  Didn't occur to you in

18  '05 or '06, didn't occur to you until '07, a month ago,

19  to look at American Express records for Jonathan

20  Giannone; isn't that right?

21  A.  That was for preparation for trial, yes.

22  Q.  Right.  And Mr. Giannone was charged in this case

23  back in -- what?  August of last year?

24  A.  That's correct, I believe.

25  Q.  So, no subpoenas were issued to American Express in

1  August, September, October, November, December, maybe

2  January, right?

3  A.  Correct.

4  Q.  Okay.  Because somebody who is involved in credit

5  card fraud would most likely, if they are trying to hide

6  their identity and, as you say, wouldn't use their own

7  American Express card to take a flight anywhere, right?

8  A.  You are asking for me to speculate as to about why

9  he did it.  People make mistakes.  We see it in a lot of

10  investigations.

11  Q.  Okay.  In any event, it is undisputed that with

12  respect to that flight that you testified about,

13  Jonathan Giannone used his own American Express card,

14  not a dump, to fly somewhere; isn't that right?

15  A.  Yes.

16          MR. LIOTTI:  All right.  Judge, I'm going to

17  try to speed up because it's becoming a little tedious

18  for everyone.  I'm sorry.  But a couple of things I do

19  have to cover, though.

20          THE COURT:  All right.

21  BY MR. LIOTTI:

22  Q.  Now, I just want to go back briefly to Government

23  Exhibit 1 for a second because you did give us some

24  testimony about that yesterday.  There's a reference

25  about a quarter of the way down to 529allite; do you see

1  that?

2  A.  Yes, sir.

3  Q.  Okay.  When that name -- that's another chat name, I

4  take it, right?

5  A.  Yes.

6  Q.  Okay.  Used by someone, correct?

7  A.  Yes.

8  Q.  Not, as far as you know, Jonathan Giannone or Brett

9  Johnson, right?

10 A.  Correct.  I would not know who that name belonged

11 to.

12 Q.  Okay.  But when you get names like that and they are

13 popping up, doesn't the Secret Service want to know who

14 these people are?

15 A.  Yes.  Yes, sir.

16 Q.  Was there any investigation conducted on 529allite?

17 A.  No, not at that time.

18 Q.  Okay.  Because, realistically, it would help your

19 investigation if you could identify who the actual

20 people were behind these screen names and then, perhaps,

21 go to them with the information that you have at your

22 disposal and say, "Look.  Here's a photograph of Brett

23 Johnson, do you know him?  Do you know Chris Branca?  Do

24 you know Chris Cutler?  Do you know Jonathan Giannone?"

25 Okay?  "Have you had any dealings with them?"  That

1  would help your investigation, right?

2  A.  Yes.

3  Q.  Okay.  But the Secret Service didn't do anything

4  along those lines, correct?

5  A.  When all you have is a screen name, it's very

6  difficult.  If that's all you have, there's no starting

7  point.

8  Q.  Now, on the same page there's a reference to someone

9  by the name of NH, right?  About three quarters of the

10 way down --

11         MR. EICHELBERGER:  Could I inquire which page

12 we are on?

13         MR. LIOTTI:  Yes.  I'm sorry.  It's Government

14 Exhibit 1.

15         MR. EICHELBERGER:  Thank you.

16         MR. LIOTTI:  Sure.

17 BY MR. LIOTTI:

18 Q.  Government Exhibit 1, about three-quarters of the

19 way down, "NH"?

20 A.  Correct.

21 Q.  And then "SS," right?

22 A.  Yes.

23 Q.  Okay.  And then reference to one or both of those

24 individuals being on probation and not being able to get

25 bail and so on, right?

1  A.   NH actually refers to a place.

2  Q.   Okay.  New Hampshire?

3  A.   Yes, sir.  I would --

4  Q.   And SS is a person, right?

5  A.   SS, Secret Service.

6  Q.   Okay.  But they are talking about some person, not

7  Brett Johnson and not Pit Boss, correct?

8  A.   They are talking about Enhance, a couple of lines

9  above.

10  Q.   Somebody else in the system, right?

11  A.   Correct.

12  Q.   And there's a reference to a chump CC, right?

13  A.   Yes, CC -- chump CC Suppliers.

14  Q.   A Cumba also, C-u-m-b-a?

15  A.   Yes, sir.

16  Q.   Were there any investigations done with respect to

17  any of those screen names?

18  A.   Yes.

19  Q.   And what was done, as far as you know, with respect

20  to chump CC?

21  A.   I couldn't tell you on that exact name.

22  Q.   Okay.

23  A.   Of those names that you just called, we identified

24  two that I know of.

25  Q.   Now, it's fair to say, right, that the Secret

1  Service has access not only to screen names but also to

2  passwords; isn't that so?

3  A.  I would say --

4  Q.  Passwords?

5  A.  Our own passwords, not a user's passwords.

6  Q.  So, during the course of your investigation you are

7  telling us that you never learned of passwords, for

8  example?

9  A.  You mean in a person we are chatting with, their

10  personal passwords?

11  Q.  Yes, sir.

12  A.  I would say no.

13  Q.  So, did you know the password for Brett Johnson, if

14  he was making a call to somebody and wanted to chat with

15  somebody, did you know his password?

16  A.  We did.  We set that password.

17  Q.  And it would be right to say that whenever you get

18  information about passwords, the Secret Service, the

19  FBI, the DEA, anybody who is involved in criminal

20  investigations keeps a log and that information, right,

21  password information you withhold; isn't that so?

22  A.  Of our own passwords?

23  Q.  Your own passwords, and any other passwords that you

24  learn during the course of an investigation, such as

25  Mr. Johnson's, for example?

1  A.  Well, it's our password.  I mean, a lot of times it

2  might be in our head.  It's our password.

3  Q.  My question to you is:  If you learn of someone

4  else's password -- let's say you learned of Pit Boss

5  2600's password, you would keep that as part of your

6  investigation; isn't that right?

7  A.  I really think that's -- we don't have any access of

8  coming across that password.  I mean, if we did, we

9  wouldn't be able to use it because that is getting into

10 some areas that we can't go down as law enforcement.

11 Q.  You are saying that you can subpoena American

12 Express records but the federal government would have

13 some difficulty as part of a criminal investigation to

14 use a password that they learned of?  Is that what you

15 are telling us?

16 A.  Yes, if we -- if we tried to log into someone else's

17 account.

18 Q.  Okay.  So, if we go past all of that -- and let's

19 just assume that you do have access to some passwords

20 for a moment, you keep a record of those, do you not?

21 A.  It's hypothetical, but I mean, we would probably

22 make reference to it.

23 Q.  You have never seen a case in your four years as a

24 Secret Service agent investigating computer fraud where

25 passwords are kept and stored as part of an

1  investigation?  You have never seen that?

2  A.  Our own passwords I have seen.

3  Q.  Just your own, that's it?

4  A.  Or if we have someone that gives us access, they

5  sign over their account to us, we have that password

6  logged.

7  Q.  Voilà, that's what I'm asking you.

8  A.  Yes, but they assign that account over, that is

9  true.

10  Q.  You keep that information, you keep it?

11  A.  Yes.

12  Q.  Okay.  So certainly if you had the password for Pit

13  Boss 2600, you would have kept that, right?

14  A.  In some fashion we would have.  We'd have made

15  reference to it.

16  Q.  Well, you know the password for Pit Boss 2600 now,

17  right?

18  A.  I do not know.

19  Q.  You don't know it?

20  A.  No.

21  Q.  You don't have any record of that?

22  A.  No, sir.

23  Q.  Did you ask Mr. Branca if he had that information?

24  A.  I never did.

25  Q.  Well, let me correct myself again.  How about the

1  Secret Service, do you know if they asked Mr. Branca

2  during the course of this investigation if he had a

3  password for Pit Boss 2600?

4  A.  I would speculate that question probably wasn't

5  asked.  I mean, to get someone's password is very --

6  Q.  Listen to my question, please.  Okay?  I said, do

7  you know whether the Secret Service asked Mr. Branca if

8  he had a password for Pit Boss 2600?  Do you know?  Yes

9  or no, sir.

10  A.  No, sir.

11  Q.  Thank you.  Did you ask that same question of Chris

12  Cutler?  Yes or no -- the Secret Service, you -- when I

13  say you, that's what I mean.  You know that?

14  A.  I can only answer for me, but I would say no for

15  myself.

16  Q.  Thank you.

17          MR. LIOTTI:  Bear with me, Judge.

18  BY MR. LIOTTI:

19  Q.  Yesterday you made reference to something called

20  ICQ.  Do you remember that?

21  A.  Yes, sir.

22  Q.  What was that referring to?

23  A.  An Internet chat client--

24  Q.  An Internet chat -- the last word?

25  A.  I said client.  That's what -- it's just a program

1  someone uses to communicate online, real-time chats.

2  Q.  Now, on page 3 of Government Exhibit 1, it's 3 of

3  170, all the way down near the bottom, about six lines

4  up, gollumfun is chatting, he says, "Well, I can try his

5  ICQ.  If you don't mind.  He must have had an S-load of

6  money saved."  Do you see that?

7  A.  Yes, sir.

8  Q.  Okay.  So, there was a program available to

9  Mr. Johnson that he could use; is that correct?  This

10  ICQ program that you are talking about?

11  A.  Right.  To communicate with other individuals.

12  Q.  Okay.

13  A.  Yes.

14  Q.  Was that done as part of the investigation?

15  A.  Yes, sir.

16  Q.  What individuals did Mr. Johnson communicate with as

17  part of the ICQ?

18  A.  That would be very hard to say.  I mean, it's an

19  Internet chat client.  We had its own -- I mean, it has

20  its own buddy list.  The buddy list probably had 50 or

21  60 individuals in it, so I can't really tell you which

22  ones and who --

23  Q.  Now, on these chats -- by the way, you can also have

24  a three-way chat, can't you, or a four-way chat?

25  A.  Usually it's one-on-one.  If there's three way,

1  someone that we are talking to, if they are talking with

2  someone else, they would cut and paste a part of their

3  chat where we could read it.

4  Q.  So, were there any three-way chats or any

5  communications made by Mr. Johnson with the ICQ program,

6  or whatever he was using, to communicate with Chris

7  Branca and/or Chris Cutler and/or Pit Boss 2600?

8  A.  Did we communicate with those?  Is that what you are

9  asking?

10  Q.  Yes.

11  A.  Yes.

12  Q.  Using that program?

13  A.  Well, using that -- it's according to what they were

14  registered on.  If they were registered on ICQ, we spoke

15  with them through ICQ, but if they were registered on

16  AIM, America Online, we spoke to them through AIM or

17  America Online.  It's all according to what they were

18  registered on.

19  Q.  Okay.  Now, let's go to page 5 of the same exhibit,

20  Government Exhibit 1. You conducted an investigation of

21  Mr. Johnson and, in fact, he was charged for sending out

22  phony cashier's checks, right?

23  A.  He was actually arrested by the locals for that.

24  Q.  Right.  But for that, correct?

25  A.  For counterfeit cashier's checks.

1  Q.  Okay.  So he's actually been charged and he's out on

2  bail and he's with you when this conversation of

3  May 23rd of '05 occurs, right?

4  A.  He's working for us at that time, yes.

5  Q.  And Mr. Johnson is having this discussion with Pit

6  Boss 2600 and he's telling Pit Boss 2600 that he's doing

7  precisely that, right?  "Got them doing cashier's checks

8  for COD orders."  That's what he says in the middle of

9  the page, right?

10  A.  Let me get there.  Oh, I see.

11  Q.  Correct?

12  A.  What was the question again?

13  Q.  Right in the middle of the page.

14  A.  I found it.

15  Q.  That's what he's saying in this chat.

16  A.  Where he's talking about the Rolexes?

17  Q.  No.  Right in the middle of the page.

18  A.  That's where I am, but I mean --

19  Q.  Right here, sir.  Take a look.

20  A.  Right.  They begin talking about a Rolex gig.

21  Q.  But gollumfun is speaking, "Got them doing cashier's

22  checks for COD orders."  You see that, right?

23  A.  Yes, sir.

24  Q.  Okay.  So that's what Mr. Johnson is doing and he's

25  telling people that.  In this case telling Pit Boss 2600

1  that, and Pit Boss is referring to laptops and dumps and

2  Rolex watches, or phony Rolex watches that he could get

3  access to; isn't that right?

4  A.  Yes.

5  Q.  Okay.  So there's also reference on here to

6  something called a Simon card at the top of the page.

7  Do you see that?

8  A.  Yes, sir.

9  Q.  And that's -- that's in big-type letters.  What's a

10 Simon card?

11 A.  Best of my knowledge a Simon card is a stored-value

12 card.  It's about the size of a credit card where you

13 can place money on that card and go to an ATM machine

14 and withdraw it.

15 Q.  Okay.  So, you buy it for cash, in other words; is

16 that right?

17 A.  Yes, sir, you would purchase the card.

18 Q.  You go in and if you need, let's say, to make some

19 international phone calls or what have you, you pay $50

20 and you get a card that allows you to use minutes up to

21 $50; isn't that right?

22 A.  Well, that would be a phone card, but this isn't

23 actually a phone card.

24 Q.  But it's like that; it works like that?

25 A.  Similar.

1  Q.  Except you can buy, actually, merchandise, let's

2  say?

3  A.  Right.  A lot of stored-value cards -- a lot of

4  people don't have bank accounts.  You can get a stored-

5  value card and have money placed on that card and use it

6  at an ATM machine so --

7  Q.  So then Pit Boss says that for $2,000 he could get

8  150 to 180 dumps, right?

9  A.  Yes.

10  Q.  Okay.  So does Brett Johnson take him up on that?

11  Instead of that $600 transaction, does he say, "Gee,

12  that sounds like a good idea.  Why don't I just send you

13  two grand, and send me the 150 to 180 dumps?"  Then the

14  Secret Service would have a much bigger case, wouldn't

15  they?  Instead of $600 and 21 dumps, you would have 150

16  to 180 dumps, right?

17  A.  Well, taking it out of the context of the chat I'm

18  not sure if that was an offer or not at that time.

19  That's what he said he was getting them for from his

20  supplier, that wasn't actually offered to us.

21  Q.  Wouldn't it make sense to not wait -- if the Secret

22  Service has got all this information about alleged crime

23  taking place out there in the community and you find out

24  about this in May of '05, doesn't it make sense for the

25  Secret Service to say, "Whoops, we got a crime going on

1  out there.  We've got to speed up this investigation.

2  Let's bring it to a head.  Let's close it down.  Let's

3  offer them two grand and let's get 150 to 180 dumps and

4  see if we can conclude the investigation that way"?

5  Doesn't that make sense, instead of waiting until 2006

6  to do this, the 21 dumps and $600?

7  A.  If it worked like that, that would be the best

8  route.

9  Q.  But it wasn't even tried in this case, right?  There

10  wasn't a single instance where the Secret Service said

11  to Mr. Johnson, "We will front the $2000," right?  You

12  didn't do that, did you, the Secret Service?

13  A.  That's not correct.

14  Q.  Okay.  Is there anywhere in the chats where

15  Mr. Johnson says, "I will buy 150, 180, 160 dumps for

16  $2,000.  I got the money"?

17  A.  No.

18  Q.  So with respect to chats, the communications are

19  running over some kind of a phone line, aren't they?

20  A.  Yes.

21  Q.  Okay.  So it goes from one phone line to another, or

22  a receiver, right?  A call is originated at one end and

23  it goes to somebody here, let's say Columbia, South

24  Carolina, comes from somewhere out there, right?

25  A.  Comes from somewhere out there.

1  Q.  Okay.  Is there a way to tap into that phone line

2  and find out where the call is coming from?

3  A.  That's not really a phone line.  I mean, that's one

4  way.  If you had a modem that's how you dial out to the

5  Internet, but then once you get on the Internet -- I

6  mean, it's a little more complicated than that.  It's

7  not like a direct connection.

8  Q.  What I'm asking you is this:  Can you -- if you

9  know, mechanically, and you may not, but if you do -- is

10 it possible to come before Her Honor, Judge Currie, for

11 example, with a wiretap order and a request for a taping

12 of conversations or chats, or tracing a chat, and you as

13 an agent would come before the judge and swear to

14 certain allegations that you believe a computer crime is

15 occurring and you want a search warrant and you want to

16 be able to trace that call and put a tap on

17 Mr. Johnson's modem or phone line, whatever, is that

18 physically possible?  Can that be done to trace a chat?

19 A.  It's not the same as the telephone call so I would

20 say the two aren't the same.  It's not like a wiretap

21 issue.

22 Q.  Okay.  But you -- I know it's not a wiretap issue,

23 but I'm asking you if that can be done, mechanically,

24 with all the state of the art that the federal

25 government has at its disposal, can that be done?

1  A.  Not to my knowledge.

2  Q.  Was that ever discussed in the context of this

3  investigation, what could be done or not done along

4  those lines?

5  A.  Yes, many times.

6  Q.  Now, while you gave us some very important technical

7  information yesterday, you are not testifying as an

8  expert, at least that's what Mr. Eichelberger has

9  informed us; is that correct?

10  A.  That's correct, yes.

11  Q.  Were there experts involved in this investigation

12  for the Secret Service and were consulted on that very

13  subject, if you know?

14  A.  I couldn't answer that question.

15  Q.  Is that because you don't know?

16  A.  I don't know the answer, right.  Correct.

17  Q.  You don't know?

18  A.  Correct.

19  Q.  Right?  Okay.  So you can tell me that.

20  A.  I did, I thought.  Sorry.

21  Q.  Thank you.  Now, I would like to go to Government

22  Exhibit 5, which would be page 32 for Mr. Eichelberger.

23       Pit Boss 2600 says something about his age.

24  Now we've got a little identification information, at

25  least according to the chat, and this occurs on June 3rd

1  of '05, right?

2  A.  Correct.

3  Q.  So, Pit Boss 2600 says, "I'm 22."  Do you see that?

4  A.  Yes.

5  Q.  Okay.  And we are not saying that's a truthful

6  statement made by the alleged Pit Boss 2600, but do you

7  know how old Jonathan Giannone was on June 3rd of '05?

8  A.  No, I do not.

9  Q.  How old was Chris Branca?

10  A.  I do not know.

11  Q.  How about Chris Cutler?

12  A.  Do not know.

13  Q.  Well, if I tell you that Jonathan Giannone's

14  birthday is January 2nd, 1986, does that surprise you?

15  A.  No, sir.

16  Q.  So he was not 22 back then?

17  A.  Correct.  But if you -- you take it out of context

18  of the chat again.  A couple of lines earlier he talks

19  about rental cars don't verify anything.  He talked

20  about real ID --

21  Q.  Sir, you answered my question, now you are

22  volunteering.  You are going past the answer that I

23  asked you for.

24  A.  Yes, sir.

25  Q.  And you keep doing that.

1          MR. LIOTTI:  And, Judge, I would most

2  respectfully, once again, ask that you admonish the

3  witness and please tell him not to volunteer.

4          THE WITNESS:  Sorry.

5          THE COURT:  That's the only volunteering we've

6  had since you asked for that last admonition.

7          MR. LIOTTI:  All right.

8          THE COURT:  Mr. Liotti, how much longer do you

9  need on this witness?

10          MR. LIOTTI:  I would say an hour, Judge.

11          THE COURT:  Okay.  We will go ahead and take

12  the morning break.

13          Ladies and gentlemen, you should turn your pads

14  over, leave them in your seats.  Do not discuss the case

15  while you are on break and we will take 10 minutes.

16          Agent Kirby, you are still on cross so you may

17  not discuss the case.

18          THE WITNESS:  Thank you.

19          (Short recess)

20          THE COURT:  All right, folks.  We are going to

21  get underway, have a seat, please.

22          (Jury present)

23          THE COURT:  All right.  We are ready to

24  continue with the cross-examination of Agent Kirby.

25          MR. LIOTTI:  Thank you.

1  BY MR. LIOTTI:

2  Q.  Agent Kirby, if I may, back in August of last year

3  you submitted an affidavit to this court --

4          MR. EICHELBERGER:  Objection to hearsay, Your

5  Honor.

6          MR. LIOTTI:  I didn't finish the question.

7          THE COURT:  Go ahead.

8          MR. LIOTTI:  Thank you.

9  BY MR. LIOTTI:

10 Q.  You submitted an affidavit to this court that would

11 cause the court to issue an arrest warrant for Jonathan

12 Giannone; isn't that correct?

13 A.  Yes.

14 Q.  And that affidavit that you submitted to a judge of

15 this court authorizing the issuance of a warrant for the

16 arrest of Jonathan Giannone was dated, approximately,

17 August 14th, 2006; isn't that right?

18 A.  I can't recall -- yes.

19 Q.  And much of the information referred to in your

20 affidavit and indeed the information that you have told

21 us about here occurred back in May and June of 2005;

22 isn't that right?

23 A.  Yes.

24 Q.  And essentially there was no new information

25 gathered after, approximately, June of 2005; isn't that

1  right?

2  A.  Any new information?

3  Q.  Well, let's take chats, for example.  When was the

4  last chat that Pit Boss 2600 and gollumfun had?

5  A.  Right off the top of my head I think it was maybe

6  February of 2006.

7  Q.  Okay.  When did the transaction -- the $600

8  transaction transpire?

9  A.  June 2005.

10  Q.  June of 2005?

11  A.  Yes.

12  Q.  And that's the transaction that has been testified

13  about where $600 was deposited into a Bank of America

14  account, correct?

15  A.  Correct.

16  Q.  And at some point -- I think your fellow agent told

17  us -- 11 months following May of '05, Mr. Johnson was

18  removed from his position as a confidential informant;

19  isn't that right?

20  A.  That is incorrect.  He was removed in March of '06,

21  if I recall correctly.

22  Q.  Okay.  So, maybe it was 10 months; is that what you

23  are saying?

24  A.  The investigation?

25  Q.  Yes.

1  A.  It was 10 months.

2  Q.  10.  Okay.  Not 11, that's your correction?

3  A.  Oh, I must have misunderstood.  That's right.

4  Q.  Okay.  Now, in authorizing the arrest of -- or

5  commending to a federal judge here in this district the

6  arrest of Mr. Giannone, you indicated that was the case

7  that he was removed --

8           MR. EICHELBERGER:  Your Honor, objection to

9  hearsay, relevance, both.  May we approach?

10          THE COURT:  Yes.

11          (Bench conference)

12          MR. EICHELBERGER:  I just want to make sure we

13  don't get too far down this, Your Honor.  Where we seem

14  to be heading is bringing out statements that were made

15  in the affidavit and arrest warrant.  Of course, we are

16  trying this case based on an indictment and not an

17  arrest warrant.

18          So first off, statements that the agent may

19  have made in the affidavit, even though they were under

20  oath are, in fact, hearsay.  And furthermore, statements

21  that were made in connection with the affidavit --

22  hearsay is permitted in such affidavits, so we are

23  actually getting into a situation here where we have the

24  very real danger of putting hearsay in front of this

25  jury merely because -- it's taken from a document that

1  is not relevant.  That is the affidavit in support of an

2  arrest warrant which incorporates hearsay, so it's not

3  relevant and there's hearsay.

4          THE COURT:  So what -- where are you going?

5          MR. LIOTTI:  Judge, there are some statements

6  that he made about the investigation and so on.  I'm not

7  going that far afield.  I'm not going to be asking all

8  of this.  Some of it is highlighted.  There's just a

9  couple of areas about the $600 and the deposit, and I'm

10  using that information and when that happened.

11          On June 7th, for example -- and that he did not

12  or the Secret Service did not commend the arrest until

13  August of '06.  So there was this hiatus of, you know,

14  all this time when they had all this information at

15  their disposal.

16          THE COURT:  Well, you can do that without

17  publishing statements that are in the affidavit in

18  support of a warrant, can't you?

19          MR. LIOTTI:  I think I can, but I really do

20  dispute the fact that this is hearsay.  We have the

21  declarant on the stand.  This is a document that is

22  filed with the court.  These are his statements, made

23  under oath before a neutral magistrate.  I don't see how

24  that's hearsay.

25          MR. EICHELBERGER:  If I can respond.  That does

1  not make an exception to the hearsay rule.  What it

2  makes it is an out-of-court declaration and the only

3  way, in my view, to get to those is if there's a prior

4  inconsistent statement, and there's been no showing of a

5  prior inconsistent statement, therefore the hearsay

6  objection, in our view, still stands.

7          MR. LIOTTI:  With all due respect it's not an

8  out-of-court statement.  If a document is filed with the

9  courthouse, it's an in-court statement.

10          THE COURT:  I disagree.  It's an

11  out-of-this-court statement, out of this proceedings,

12  therefore you -- you can use it if you have what you

13  think is an inconsistency, you can use it to ask him

14  questions about facts that are cited in there, but you

15  can't just publish.

16          MR. LIOTTI:  I'm not going to read.  I haven't

17  read any portion of the actual affidavit.  I have asked

18  him questions about statements that he may have made and

19  he can admit or deny that.  I can use the document to

20  refresh his recollection, that's all I'm doing.  I'm not

21  reading from it.

22          THE COURT:  If you have an inconsistency.  At

23  this point, I haven't heard any inconsistency.

24          MR. EICHELBERGER:  And our relevance objection

25  still stands as well, Your Honor, in that this is an

1  indictment.  We don't try cases on complaints, we try

2  them on indictments.

3           MR. LIOTTI:  But it's a prior statement.

4           THE COURT:  I understand that, but it can be

5  used to show a prior inconsistency.  Okay?

6           MR. LIOTTI:  Okay.  But in order to get

7  there -- if I was going to do that -- I still have to

8  ask him a foundational question about, you know, "Did

9  you make the statement?  Do you recall saying this?"

10          THE COURT:  "Have you ever said this?"

11          MR. LIOTTI:  Yes.

12          THE COURT:  And then if he says yes, then you

13  stop.

14          MR. LIOTTI:  Exactly.  No problem with that.  I

15  have no problem with that.

16          MR. EICHELBERGER:  Thank you, Your Honor.

17          (In open court)

18  BY MR. LIOTTI:

19  Q.  Did you, as part of this investigation and this

20  case, indicate that Mr. Johnson was removed as a

21  confidential informant?

22  A.  Yes.

23  Q.  Did you also indicate that Mr. Johnson was a

24  fugitive with an outstanding federal arrest warrant?

25  A.  Yes.

1           MR. EICHELBERGER:  Objection as to relevance,

2  Your Honor.

3           THE COURT:  Overruled.

4  BY MR. LIOTTI:

5  Q.  Did you also indicate that he had an outstanding

6  state bench warrant?

7  A.  Yes.

8  Q.  And did you also indicate that all activities under

9  your investigation were monitored by agents of the U.S.

10  Secret Service?

11  A.  Yes.

12  Q.  Now, since Mr. Johnson kind of pulled the wool over

13  your eyes during that 10-month period, or 11-month

14  period, was there an investigation done on Mr. Johnson

15  when you learned that he had done that?

16  A.  Yes.

17  Q.  And in that regard, aside from speaking to

18  Mr. Johnson, did you speak to other people?

19  A.  During the Johnson investigation?

20  Q.  Yes.

21  A.  Yes.

22  Q.  And you spoke to people who had received cashier's

23  checks and so on; is that right?

24  A.  I can't really answer that one.  I did not.

25  Q.  Again, I sort of misspeak and I may be

1  mis-describing what I'm really asking you.  When I say

2  "you," I'm referring to the Secret Service.

3  A.  Well, I'll just say this once, I mean, just kind of

4  to explain things.  It was kind of a joint effort, so

5  one thing that another agent might have been doing, it

6  was in the investigation, but I don't have direct

7  knowledge of the details to that.

8  Q.  I'm just asking you that question and all others, if

9  you have knowledge.

10  A.  No.

11  Q.  If you don't have knowledge you can just tell me you

12  don't?  Okay?

13  A.  Okay.

14  Q.  All right.  Now, did you also indicate that on or

15  about June 7th, 2005, Johnson made a deposit of $600

16  into an account, 950552565, at the Bank of America

17  located at 301 Harbison -- that's H-a-r-b-i-s-o-n --

18  Boulevard, Columbia, South Carolina, at 1:26 p.m.  Did

19  you say that?

20  A.  Yes.

21  Q.  Now, as of June 7th, '05, you had knowledge of a

22  bank account at the Bank of America where Mr. Johnson

23  had sent his $600, correct?

24  A.  Yes.

25  Q.  And at that point in time you could trace the

1  location of that account; isn't that right?

2  A.  Yes.

3  Q.  Where it was opened and who had opened it, correct?

4  A.  Yes.

5  Q.  Okay.  So when, in relation to June 7th of '05, did

6  you, meaning the Secret Service, if you know, trace that

7  account?

8  A.  Trace that account, it was almost immediately.

9  Q.  That was done immediately?

10  A.  Very short --

11  Q.  You have say yes or no.

12  A.  Yes, a very short time frame after we learned of

13  that account.

14  Q.  Your best recollection is that happened around June

15  of '05?

16  A.  Yes.

17  Q.  And in June of '05, in that regard, the Secret

18  Service did what?

19  A.  Determined the owner of the account, who opened the

20  account, whose name it was in, that sort of thing.

21  Q.  Okay.  And the $600 you said -- the government says

22  was paid for 21 dumps, correct?

23  A.  Yes.

24  Q.  Okay.  That being the case in June of '05, at least

25  according to the government, you had knowledge that an

1  alleged crime had been committed, a federal crime,

2  right?

3  A.  Yes.

4  Q.  And yet it wasn't until August of '06 that the

5  Secret Service acted on that information and pursued a

6  an arrest warrant against Mr. Giannone; isn't that

7  correct?

8  A.  Correct.

9  Q.  And when you pursued that arrest warrant on

10  Mr. Giannone, you advised the court here that you knew

11  where Mr. Giannone was located; isn't that right?

12  A.  We had an address, yes.

13  Q.  Okay.  So the answer to my question would be yes?

14  A.  Yes.

15  Q.  At that time, in August of '06, when you are

16  applying for the arrest warrant, did you also apply to

17  the court for a search warrant?

18  A.  No.

19  Q.  But a search warrant, differentiated from an arrest

20  warrant, authorizes you, with the imprimatur of a

21  federal judge, to go to a certain location and make a

22  certain search --

23        MR. EICHELBERGER:  Your Honor, I have to

24  object.  It's not relevant.

25        MR. LIOTTI:  That's Mr. Eichelberger saying

1  it's not relevant.

2          MR. EICHELBERGER:  I object, relevance.

3          THE COURT:  Overruled.

4          MR. LIOTTI:  Thank you.

5  BY MR. LIOTTI:

6  Q.  So the search warrant would define the area to be

7  searched, and you had a location for Mr. Giannone,

8  right?  You knew where he could be found, in other

9  words, right?

10  A.  Yes, sir.

11  Q.  That's why you got the arrest warrant.  But for some

12  reason not explained to us here, you did not apply for a

13  search warrant; isn't that correct?

14  A.  That is correct.

15  Q.  And a search warrant would allow you to go to

16  Mr. Giannone's location and, if the court granted it,

17  search whatever area is permitted, correct?

18  A.  Correct.

19  Q.  And by doing that you could, for example, seize

20  computers, seize hard drives in computers, seize DVDs,

21  disks, all sorts of information that might be there, but

22  at least you could make the search, right?

23  A.  Yes.

24  Q.  Okay.  You could, for example, make a search for

25  chats, right?

1  A.  Yes.

2  Q.  Now, if you found a chat, let's say, at

3  Mr. Giannone's location labeled 26 -- Pit Boss 2600 or

4  CIA INTEL, that might give you additional corroboration

5  for a claim that Mr. Giannone is Pit Boss 2600 or CIA

6  INTEL; isn't that right?

7  A.  Yes.

8  Q.  But you didn't do that?

9  A.  No.

10  Q.  Basically, you relied on what Mr. Johnson gave you?

11  A.  That's not correct.

12  Q.  Now, another point, if I may.  You had the location

13  of the bank, Bank of America.  Okay?  You had the

14  account number and you also had the account name; isn't

15  that right?

16  A.  Yes.

17  Q.  What was the account name that the $600 from

18  Mr. Johnson was deposited into?

19  A.  A&W Auto Clinic.

20  Q.  And that bank account originated where?

21  A.  The bank account?  It was opened in New York, I

22  believe it was.

23  Q.  In Rockville Center, Long Island, New York, the name

24  of the account being A&W Auto Clinic; isn't that

25  correct?

1 A.  Yes, to the best of my knowledge.

2 Q.  Okay.  And that account was opened in

3 approximately -- see if this refreshes your recollection

4 now -- April 15th of '05; is that correct?

5 A.  I remember it was early '05.

6 Q.  Now, when did your field office in Columbia, South

7 Carolina relay the information that you had from June in

8 '05 to the New York field office so you could find out

9 who opened that account here -- well, there in New York?

10 A.  I can't recall.

11 Q.  Does it refresh your recollection that that was not

12 done until approximately August of '06?

13 A.  I think we had it before then, I'm pretty sure.  I

14 mean, I can't be -- I can't give you a date.

15        MR. LIOTTI:  Your Honor, could I have this

16 marked just for identification, please?

17        THE COURT:  Yes.

18        MR. LIOTTI:  Thank you.

19 BY MR. LIOTTI:

20 Q.  Agent Kirby, I'm placing before you now a document

21 that has been marked as Defense Exhibit 5 for

22 Identification and I ask you in looking at that,

23 particularly -- particularly the lower portion of it,

24 item No. 26, does that help you refresh your

25 recollection as to when the Columbia field office

1  communicated with the New York field office?

2  A.  Yes.

3  Q.  When was that?

4  A.  August 10th, 2006.

5  Q.  Thank you, sir.  May I have that back?

6  A.  (Handing).

7  Q.  So you got all this information on Pit Boss 2600 and

8  it's not communicated -- and the bank account

9  information is not communicated for over a year; is that

10 right?

11 A.  I would say that's not correct.

12 Q.  Well, you had the bank information in June of '05

13 and you communicate to the New York field office in

14 August of '06.  Am I wrong, or is that 14 months?  Yes

15 or no.

16 A.  That would be yes.

17 Q.  Okay.  So, it was 14 months.  All right.

18          Now, when was Mr. Johnson re-arrested?

19 A.  By the Secret Service?

20 Q.  Well, however you got custody of him, either by the

21 state or by the Secret Service.  I'm not sure who made

22 the arrest.

23 A.  Well, the last arrest was September 2006 by the

24 Secret Service.

25 Q.  All right.  And is Mr. Johnson cooperating with

1  either federal or state authorities at this juncture?

2  A.  He signed a plea agreement.

3  Q.  I'm asking you if he is cooperating with federal or

4  state authorities at this juncture?

5  A.  It's hard to define cooperation, but I would say no.

6  Q.  Is he represented by counsel?

7  A.  Yes.

8  Q.  Do you know if the government is going to provide a

9  5K1 letter for Mr. Johnson?

10         MR. EICHELBERGER:  Objection, Your Honor.

11  Objection.  Speculation.

12  BY MR. LIOTTI:

13  Q.  Do you know?

14         THE COURT:  Sustained.  Sustained.

15         MR. LIOTTI:  Sustained?

16         THE COURT:  Yes.

17  BY MR. LIOTTI:

18  Q.  Do you know whether the federal government has

19  any -- has had any discussions at this juncture with

20  Mr. Johnson about cooperation from September, when he

21  was re-arrested, until now?

22  A.  I couldn't answer that.

23  Q.  You are not sure?

24  A.  I'm not sure.

25  Q.  Do you know if he has been asked to cooperate

1  against Jonathan Giannone?

2  A.  Again, I'm going to say I'm not sure.

3  Q.  Do you know if he's entered into any kind of a

4  cooperation agreement with state authorities?

5  A.  The state charges are rolled into the federal case.

6  Q.  So there are no state charges presently?

7  A.  Right.

8  Q.  Do you know whether the United States Government

9  plans on giving him credit --

10         MR. EICHELBERGER:  Objection, calls for

11  speculation.

12         MR. LIOTTI:  May I finish the question?

13         THE COURT:  Yes, go ahead.

14  BY MR. LIOTTI:

15  Q.  Do you know if the United States Government plans on

16  giving him credit for any cooperation that he may have

17  given to state authorities pursuant to Federal

18  Sentencing Guidelines Section 5K2.2?

19         MR. EICHELBERGER:  Objection.  Calls for

20  speculation.

21         THE COURT:  Sustained.

22  BY MR. LIOTTI:

23  Q.  Now, you have mentioned the name -- the screen name

24  CIA INTEL.  When did you become aware of that name?

25  A.  As we saw, that first chat yesterday, on May 23rd,

1  they were introduced at the same time -- almost the same

2  time, Pit Boss and CIA INTEL.

3  Q.  Would that have been on or about June 7th of '05?

4  A.  No, that would have been May 23rd of '05.

5  Q.  CIA INTEL?

6  A.  Yes.

7  Q.  Okay.  Now, I think it's the government's case that

8  you are saying Pit Boss 2600 and CIA INTEL are the same

9  person and they are both Jonathan Giannone, right?

10 A.  Yes.

11 Q.  And Jonathan Giannone was is both, right?

12 A.  Or was both at the time that this went on.

13 Q.  Okay.  Now, yesterday Mr. Eichelberger was sharing

14 with us in Government Exhibit 8, and I believe some

15 exhibits thereafter, something about a cotton candy

16 machine.  Do you remember that?

17 A.  Yes, sir.

18 Q.  Okay.  Is that code language for something other

19 than cotton candy?

20 A.  I just assumed it to be a cotton candy machine.

21 Q.  Okay.  So we are not talking about credit cards when

22 you testified about cotton candy?

23 A.  No, sir.

24 Q.  Okay.  Because I was just wondering what that had to

25 do with the investigation of anything.  I guess it was

1  just part of the chat that was then taking place, some

2  discussion about a cotton candy machine that Pit Boss or

3  CIA INTEL wanted to buy for his girlfriend; is that

4  right?

5  A.  Yes.

6  Q.  And apparently was not successful in doing that,

7  right?

8  A.  Well, it wasn't a top priority, so I would say

9  right.

10 Q.  Apparently there's a scarcity of cotton candy

11 machines out there, right?

12        MR. LIOTTI:  Just want the Court to know I'm

13 winding down, Judge.

14        THE COURT:  All right.

15        MR. LIOTTI:  It will take me about 15 to 30

16 minutes to fully wind down, but I'm getting there,

17 Judge.

18 BY MR. LIOTTI:

19 Q.  Now, I would like to direct your attention, if I

20 may, to Government Exhibit 9.

21        MR. LIOTTI:  This would be, Mr. Eichelberger,

22 page 46.

23        MR. EICHELBERGER:  Thank you.

24        MR. LIOTTI:  You're welcome.

25 BY MR. LIOTTI:

1  Q.  Let's go to the first quarter of that page.  Pit

2  Boss 2600 refers to gollumfun as Mark; is that right?

3  A.  That's incorrect.

4  Q.  Is that a typo?

5  A.  No, sir.

6  Q.  Is that gollumfun referring to Pit Boss, is that

7  what you are saying?

8  A.  No, that's not what I'm saying.

9  Q.  By the way, you weren't a party or weren't present

10  for each and every one of these chats, were you?

11  A.  That's correct.

12  Q.  I'm sorry?

13  A.  That is correct.

14  Q.  So I don't know exactly how many chats we have here,

15  out of let's say these 20 exhibits that we have got on

16  the chats, how many were you present for?

17  A.  I have no way of answering that.

18  Q.  Okay.  And some of your testimony -- I'm not saying

19  all of it, Agent, but at least some of it -- has to do

20  with your interpretation of some of the language that's

21  used, right, in the chats?  Correct?

22  A.  There's not really a lot to interpret, sir.  I mean,

23  as far as, like, acronyms and that sort of thing:  SS,

24  NH, that sort of thing, I would say --

25  Q.  Yes.  You are trying to figure out what's actually

1  being communicated?

2  A.  Yes.

3  Q.  This would be your version or the government's

4  version of what you believe is being said in the chats?

5  A.  Yes.

6  Q.  Correct?  So, for example, JAX you are saying is

7  Jacksonville, right, or things of that nature?

8  A.  Can I explain that one a little, or do you want a

9  yes or no?

10  Q.  Just answer my question, if you would.

11  A.  Yes.

12  Q.  Okay.  Thank you.  Now, I would like to go to

13  Government Exhibit 11, if I may.

14          MR. LIOTTI:  Page 69 of your paperwork,

15  Mr. Eichelberger.

16  BY MR. LIOTTI:

17  Q.  Agent, is this the first time, and this is

18  June 17th, '05, that at least in these chats we see the

19  name Christopher James Branca appearing?

20  A.  I'm not sure if that was the first instance or not

21  without reviewing all the chats.

22  Q.  You think it may have occurred before that, but in

23  any event it does appear in this one, correct?

24  A.  Yes, sir.

25  Q.  All right.  Thank you.  Now, gollumfun, Brett

1  Johnson says, with respect to Christopher James Branca,

2  "Who the hell is that?"  Right?

3  A.  Yes.

4  Q.  And CIA INTEL refers to Branca as a supplier; is

5  that right?

6  A.  Actually, he refers to him as CC Suppliers, which is

7  a screen name.

8  Q.  Okay.  That was one of the names that Mr. Branca

9  had.  He may have had more than that, but that was at

10  least one name that CIA INTEL says he had, correct?

11  A.  Yes.

12  Q.  Okay.  And then CIA INTEL says that Branca stole

13  from him; isn't that right?  If you go down just past

14  the middle of the page.

15  A.  I see that line.  What was the question again?

16  Q.  CIA INTEL says that Branca stole from him; isn't

17  that right?

18  A.  Yes.

19  Q.  Okay.  And then if we go to the next page, this is

20  page 70, gollumfun indicates that "Branca ripped me for

21  a NetBank account about four years ago," right?

22  A.  Yes.

23  Q.  So now in this conversation, or this chat, you've

24  got CIA INTEL and gollumfun both saying that they are

25  ripped off by Chris Branca, right?

1  A.  Yes.

2  Q.  Mr. Branca, we have already learned, is going to be

3  a witness for the government in this case, correct?

4  A.  Yes.

5  Q.  Okay.  And then CIA INTEL indicates the following,

6  if you go about -- almost to the half-page mark, there's

7  an indication that CIA INTEL called Mr. Branca's parents

8  and said that he was the Secret Service, right?

9  A.  Yes.

10  Q.  And also further down, about three quarters of the

11  way down, CIA INTEL says he's going to call the Secret

12  Service on Branca, right, because CIA INTEL says he's

13  ripped off by Branca, right?

14  A.  Yes.

15  Q.  Okay.  And he says, among other things, that Branca

16  trashed a hotel room, caused damage, ordered 50 movies,

17  took laptops, and then disappeared, right?

18  A.  Yes.

19  Q.  So CIA INTEL is pretty well upset with Chris Branca

20  and he says that to gollumfun, a/k/a Brett Johnson, who

21  says he's ripped off also by this guy, right?

22  A.  Yes.

23  Q.  And CIA INTEL --

24          MR. LIOTTI:  Further down on page 71,

25  Mr. Eichelberger, about three quarters of the way down.

1  BY MR. LIOTTI:

2  Q.  -- indicates that he's ripped off by Mr. Branca over

3  10K, $10,000, right?

4  A.  That's actually a cumulative between a deal he had

5  with --

6  Q.  No.  About three quarters of the way down, right

7  here, sir.

8  A.  I see it.

9  Q.  See it?

10  A.  Yes.

11        THE COURT:  What's your pending question?

12        MR. LIOTTI:  I'm sorry?

13        THE COURT:  What is your pending question?

14        MR. LIOTTI:  No.  I just asked him if it was

15  over $10,000.

16  BY MR. LIOTTI:

17  Q.  And that's what CIA INTEL indicated, right?

18  A.  He said over $10,000.

19  Q.  Okay.  And then the same thing in the next

20  government exhibit.  The next government exhibit, which

21  is 12.  Mr. Johnson, with the Secret Service sitting at

22  his side and monitoring these conversations or chats,

23  asked a question of CIA INTEL, the question being, "Are

24  you still pissed off at Mr. Branca?"  CIA INTEL, "Of

25  course."

1          And then there's some indication in Government

2  Exhibit 12 about Mr. Branca having apparently been

3  convicted of something, that he's from Connecticut --

4          MR. LIOTTI:  It's page 74, Mr. Eichelberger.

5  BY MR. LIOTTI:

6  Q.  -- and that he's from Connecticut.

7          And then CIA INTEL says -- and this is on page

8  74, page 2 of the exhibit that you have before you,

9  sir.

10  A.  Yes, sir.

11  Q.  Okay?  CIA INTEL says, "He doesn't have my real" --

12  and then it's left blank.  "My real" -- you would

13  interpret from that --

14          MR. EICHELBERGER:  Objection as to what --

15  calls for speculation.

16          MR. LIOTTI:  Well, he's already indicated that

17  he's interpreted certain things, I just asked him?

18          THE COURT:  Go ahead.

19  BY MR. LIOTTI:

20  Q.  Would you interpret from that that CIA INTEL was

21  saying that he, meaning Branca, doesn't have his real

22  name?

23          MR. EICHELBERGER:  Objection, calls for

24  speculation.

25          THE COURT:  Sustained.

1  BY MR. LIOTTI:

2  Q.  But in any event, it says, "He doesn't have my

3  real -- "  Okay?  And then it goes down, Mr. Johnson

4  indicates, "Ah, good deal."  CIA INTEL says, "He thinks

5  he does."  Is that correct?

6  A.  That is correct.

7  Q.  Okay.  Now, in some of these transcripts we also see

8  language about escrow or escrow accounts.  Do you see

9  that, sir?

10  A.  I recall escrow being discussed.

11  Q.  Okay.  And with respect to credit card transactions,

12  what is an escrow account?

13  A.  I really can't speak about -- as far as the escrow

14  accounts.  I know it's the way people do business, but

15  as far as in this aspect I would be guessing.

16  Q.  And in this one, if you go to page 77, about three

17  quarters of the way down, it's probably page 4, I think,

18  in the exhibit before you, sir, CIA INTEL says, "I might

19  call the Secret Service on Mr. Branca," correct?  Is

20  that correct?

21  A.  Where was that again?

22  Q.  "I might call the Secret Service on Mr. Branca."

23          MR. EICHELBERGER:  Objection.  It misstates the

24  document.

25  BY MR. LIOTTI:

1  Q.  "I might call the Secret Service;" is that what it

2  says?

3  A.  Yes.  Yes.

4  Q.  He's referring to Mr. Branca there, isn't he?

5  A.  Without reading the whole chat I wouldn't be able to

6  speculate off the top of my head.

7  Q.  You don't remember that?

8  A.  It's 170 pages of chat.

9  Q.  Okay.  And now, after this information -- now, this

10  conversation takes place on June 18th of '05, right?

11  That's what it says on the front page, page 73.

12  A.  Yes.

13  Q.  Now, you have information about an individual by the

14  name of Branca.  Does Mr. Johnson do anything to try and

15  stir up some business with Mr. Branca?

16  A.  I can't recall if Mr. Branca was the subject of the

17  investigation.

18  Q.  So you are not sure if he tried to set him up,

19  Branca, in a little government sting?  You know, you

20  call him up, "Hey, what's happening?  You remember me?

21  You ripped me off for $4,000 a few years back.  You got

22  any dumps available?  How much do you want for them?"

23  Nothing like that?

24  A.  Without viewing the chats with Mr. Branca I couldn't

25  answer that.

1 Q.  But as far as you can recall you can't remember

2 anything like that happening?

3 A.  We had several chats with Mr. Branca.

4 Q.  Okay.  But I'm asking, did you do a little

5 government sting on Mr. Branca to try and catch him?

6 A.  He was part of our investigation, yes.

7 Q.  The answer is yes?

8 A.  He was part of our investigation, yes.

9 Q.  Okay.  So when, in all of this, did you finally

10 arrest Mr. Branca?

11 A.  We never actually arrested Mr. Branca.

12 Q.  How did Mr. Branca come to be arrested or in

13 custody?

14 A.  In -- actually, in preparation for this trial.

15 Q.  So does that mean in the last month or so he's been

16 in custody?

17 A.  He's -- he's never been in custody.

18 Q.  Ah, so he hired a lawyer?

19         MR. EICHELBERGER:  Objection, relevance.

20         THE COURT:  Overruled.

21 BY MR. LIOTTI:

22 Q.  Did he hire a lawyer?

23 A.  I'm not sure if he hired one.  I think one was

24 appointed.

25 Q.  But he's been cooperating with you?  Mr. Branca?

1  A.  Yes.

2  Q.  People don't just come in and pop into your office

3  and say, "Hey, can I cooperate with the federal

4  government today?  I have nothing else to do.  You know,

5  I'm kind of out of work, things have been slow, I would

6  like to cooperate with the federal government," that

7  kind of thing?

8  A.  Does that happen?

9  Q.  Yes.

10 A.  No.

11 Q.  No.  So Mr. Branca had his own problems, didn't he?

12 A.  He does.

13 Q.  He does.  And he's been working with you folks in an

14 effort to try and work those off, right?

15 A.  He's been cooperating with us on this investigation.

16 Q.  But is he charged federally?

17 A.  The details of that I would have to go to

18 Mr. Eichelberger on that.  I know something has been

19 done, but the extent, I'm not sure.

20 Q.  I'm just asking if you know whether he's been

21 charged.

22 A.  To my knowledge not officially charged.

23 Q.  Not officially charged?

24 A.  To my knowledge.

25 Q.  But the heat was on.  You know what I mean by heat,

1  right?  The heat.  You know, you are the heat;

2  Mr. Eichelberger is the heat, right?  The heat was on

3  Mr. Branca and maybe you showed up with a business card

4  and said, "Please call us," and then he got an attorney,

5  then the attorney calls you, and so far -- what?  He's

6  out of jail and he hasn't been charged, right?

7  A.  He was not in jail.

8  Q.  Right.  I'm saying he's out of jail, that means he's

9  on the street at liberty, walking around out there.

10  A.  Correct.

11  Q.  Okay.  Conducting business, doing whatever he wants

12  to do, and he's working with you guys.  And so far he

13  hasn't been charged federally; is that right?

14  A.  Best of my knowledge.

15  Q.  Okay.  And that's after you investigated everything

16  relating to Government Exhibit 12, wherein all of this

17  activity is indicated in 12 and 11 and so on about

18  Mr. Branca, and not charged, right?

19  A.  That is correct.

20  Q.  Pretty good lawyer, huh, that he has?  Pretty good

21  lawyer, right?

22  A.  Well, that doesn't come into play.

23  Q.  You just want to give him a pass because he's a nice

24  guy and he's cooperating?

25  A.  That's not the case either.

1  Q.  All right.  Let's go to Government Exhibit 13.  Let

2  me see if I have anything here.

3          By the way, do you know if the federal

4  government has imparted to Mr. Branca the contents of

5  these chats where CIA INTEL, for example, says these

6  things about him, that he's going to call the Secret

7  Service and call his parents and all that?

8  A.  I -- I don't know the answer to that.

9  Q.  You know, just kind of to bait him a little bit, you

10  know --

11          MR. EICHELBERGER:  Objection, argumentative.

12          THE COURT:  Sustained.

13          MR. LIOTTI:  I didn't finish the question.

14  BY MR. LIOTTI:

15  Q.  Just to bait him a little bit --

16          THE COURT:  Sustained.

17          MR. LIOTTI:  Okay.

18  BY MR. LIOTTI:

19  Q.  By the way, Agent, while I'm searching for my next

20  question here, yesterday you testified about how you

21  were born and raised in Columbia, South Carolina -- no?

22  But you --

23  A.  No.

24  Q.  You had two degrees from Columbia, South Carolina,

25  or at least South Carolina, right?

1  A.  It's not correct.

2  Q.  Okay.

3  A.  I have one degree from South Carolina.

4  Q.  Okay.  Where was the other one from?

5  A.  Francis Marion University.

6  Q.  Okay.  And you have lived here for how long?

7  A.  Four years.  I moved here when I came on with the

8  service.

9  Q.  That doesn't have anything to do with this

10 investigation, does it?  How long you have lived here in

11 Columbia, South Carolina?

12 A.  I would think not.

13 Q.  Okay.  I just wasn't sure.

14          MR. LIOTTI:  Almost done, Judge.  Just double

15 check.

16 BY MR. LIOTTI:

17 Q.  Okay.  Government Exhibit 16, page 102.  Do you have

18 that before you?

19 A.  Yes, sir.

20 Q.  Thank you.  Going to the next to the last line on

21 that.  Again, this is a conversation or a chat on

22 July 2nd of '05.  In this particular chat Pit Boss 2600

23 refers to, "I'm on my Sidekick."  Do you know what a

24 Sidekick is?

25 A.  It's a mobile device, telephone.

1  Q.  Now, can you have a chat on a Sidekick?

2  A.  I have never had one but I've heard you can.

3  Q.  Now, did I hear you right yesterday, or maybe it was

4  your fellow agent the other day -- yesterday -- who made

5  reference to Mr. Branca being at sea at some point?

6  A.  Yes, at some point.

7  Q.  Okay.  In fact, we can jump ahead just a little bit,

8  if you don't mind, and I may have to come back to some

9  of these exhibits, but I would like to jump ahead to --

10 let's see, this is Government Exhibit 22.

11        MR. LIOTTI:  It doesn't have a page reference,

12 Mr. Eichelberger.

13 BY MR. LIOTTI:

14 Q.  And also Government's Exhibit 23, also without a

15 page reference.  Do you have those before you?

16 A.  I have -- yes, sir.

17 Q.  Okay.  Now, a Sidekick -- a Sidekick, like a mobile

18 phone and so forth, can be used to communicate even at

19 sea, can it not?

20 A.  I would say there's a lot of factors involved with

21 that.  You have to have a tower close.

22 Q.  All I want to know if it's possible.  Is it possible

23 for that to happen?  For example, you have a

24 ship-to-shore phone that works, right?

25 A.  Yes.

1  Q.  Okay.  So if that works, that primitive device, a

2  ship-to-shore phone works, then certainly a mobile phone

3  would work, right, or a Sidekick might work in terms of

4  communicating with land, so to speak, right?

5  A.  Of my knowledge, based on distance.

6  Q.  You are not sure how far out at sea it might work,

7  right?

8  A.  Correct.

9  Q.  Okay.  But depending upon the distance it could

10 work?

11 A.  It could.

12 Q.  Yes.  Thank you.  So, was it your testimony

13 yesterday that either Mr. Branca or Mr. Cutler were out

14 at sea at a certain time and they could not have

15 communicated as Pit Boss 2600 or CIA INTEL because they

16 didn't have access to a communication device, a

17 laptop --

18        MR. EICHELBERGER:  Objection, Your Honor,

19 misstates the evidence from yesterday.

20        MR. LIOTTI:  I asked if that was his testimony.

21 BY MR. LIOTTI:

22 Q.  Was that your testimony?

23        THE COURT:  You may answer.

24 A.  Can you repeat the question?

25 BY MR. LIOTTI:

1  Q.  Sure.  I'm really directing your attention, in

2  particular, to Government Exhibits 22 and 23, the vessel

3  Captain Bob and so on, the crew manifest, all of that.

4  And No.3, crew member Christopher Cutler appears on

5  Government Exhibit Number 23 as No. 3 among the crew and

6  he's out at sea, according to this document, at least,

7  from November 9th, '06, until November 20th, '06.  Am I

8  right so far?

9  A.  Yes, sir.

10  Q.  Okay.  And I thought it was your testimony that he

11  could not communicate from where he was out at sea.  He

12  could not send a chat or an e-mail and so on because he

13  just didn't have the requisite equipment from where he

14  was?

15  A.  I would still say that.

16  Q.  You would still say that?

17  A.  Yes.

18  Q.  Okay.  I thought I was on the right track but I

19  wasn't sure.  Okay.  But now you would say that if he

20  had the right equipment, such as a Sidekick, for

21  example, he could have done that, right?

22  A.  As I said, it was based on distance.  Deep-sea

23  fishing, probably not.

24  Q.  Okay.  But in these two documents that you have,

25  that would be 22 and 23, we don't know exactly where he

1  was, right?

2  A.  That is correct.

3  Q.  Okay.  Thank you.  Now, let me direct your attention

4  to Government Exhibit 17, and in particular page 104 in

5  that document.  And now about a little more than halfway

6  down -- and this, by the way, is a chat that occurred on

7  7-6-05; is that right?

8  A.  Yes, sir.

9  Q.  Okay.  Now, on 7-6-05, were you able to ascertain

10  where Mr. Giannone was on or about that date?

11  A.  I can't recall if that was one of the dates that we

12  spoke about yesterday or not.

13  Q.  All right.  Well, let's go to -- in the first

14  exhibit I was just asking you about, that's Government

15  Exhibit 17, CIA INTEL says that he's going to the

16  Bahamas, right?  Now, let's just take a look at -- I'm

17  just trying to find it.

18  A.  I can answer your original question if you want

19  me --

20  Q.  I'm just trying to find out -- at some point did you

21  learn that on or about July 6 and July 7th, those dates,

22  that Mr. Giannone was in Fullerton, California?

23  A.  Yes.

24  Q.  You did learn that?

25  A.  Yes.

1  Q.  Thank you.

2         MR. LIOTTI:  Almost done, Judge.

3  BY MR. LIOTTI:

4  Q.  Let me direct your attention, if I may, to

5  Government Exhibit 19.

6         MR. LIOTTI:  Which would be page 142,

7  Mr. Eichelberger.

8         MR. EICHELBERGER:  Thank you.

9         MR. LIOTTI:  You're welcome.

10 BY MR. LIOTTI:

11 Q.  Again, about halfway down on that page, CIA INTEL

12 refers to, "Yeah, W.A. has better dumps."  Do you see

13 that?

14 A.  Halfway down?

15 Q.  About halfway down, sir.  Again, without flashing it

16 in front of the jury.  Do you see it right here, sir?

17        MR. EICHELBERGER:  Which page again?  Sorry.

18        THE WITNESS:  137, is that the page number?

19 BY MR. LIOTTI:

20 Q.  142.

21 A.  Oh, I'm sorry.

22 Q.  Do you have that?

23 A.  Yes.

24 Q.  Did you ascertain who W.A. is?

25 A.  I'd say that was a screen name but that was all we

1  knew at the time.

2  Q.  So in answer to my question, did you ascertain who

3  W.A. is --

4  A.  No.

5  Q.  Thank you.  Now, let me direct your attention to

6  Government Exhibit 20.  There's a reference -- and there

7  was some reference to this yesterday about CIA INTEL

8  going to Hawaii.  Do you remember that?

9  A.  Yes.

10  Q.  Did Mr. -- did you learn whether Mr. Giannone used

11  his own credit card for a trip to Hawaii?

12  A.  Yes.

13  Q.  And he did?

14  A.  Yes.

15  Q.  Also in that same -- on that same chat, we have a

16  reference to someone by the name of Nosa, N-o-s-a.  Did

17  you ascertain who Nosa is?

18  A.  True identity, no.

19  Q.  The answer would be no?

20  A.  No.

21  Q.  Thank you.  There's also a reference to --

22  withdrawn.

23          And did you also learn that in that trip to

24  Hawaii that you testified about yesterday that

25  Mr. Giannone used his own AmEx card to rent a car?

1  A.  Yes.

2  Q.  And also -- withdrawn.

3          Did you ever ask or did -- when I say you,

4  again, the Secret Service -- did they ever ask, as far

5  as you know, or make an inquiry or an investigation

6  regarding whether Mr. Cutler had a Sidekick with him on

7  his sea cruise or whatever that was?  Did you ask him

8  about that?

9  A.  That might have been discussed with Mr. Cutler

10 during interviews, but I wasn't there, so I would have

11 to say no.

12 Q.  Did the Secret Service inquire about whether

13 Mr. Cutler ever used a Sidekick or a mobile phone?

14 A.  Again, I wasn't there to speak with Mr. Cutler.

15 Q.  Okay.  Now, directing your attention, if I may, to

16 Government Exhibit 21A.

17          MR. LIOTTI:  That is just labeled as page 1,

18 Mr. Eichelberger.

19 BY MR. LIOTTI:

20 Q.  And in particular A-1 -- I think is the page

21 reference -- did you learn at some point that

22 Mr. Giannone had used his own -- not only his own credit

23 card, his AmEx card, but also his frequent flyer miles

24 to travel?

25 A.  Yes.

1  Q.  And those were his, not someone else's, correct?

2  A.  Correct.

3          MR. LIOTTI:  Judge, may I have just one moment,

4  please?

5          THE COURT:  Yes.

6          MR. LIOTTI:  No further questions.  Thank you.

7          THE COURT:  Redirect?

8          MR. EICHELBERGER:  Prior to redirect may we

9  have a brief sidebar?

10          THE COURT:  Yes.

11          (Bench conference)

12          MR. EICHELBERGER:  There are a lot of questions

13  about Mr. Giannone using his true identification on

14  travel.  I have been advised by the agents that as a

15  juvenile Mr. Giannone was actually stopped at an airport

16  for using a false identification.  Now, that's not on

17  his NCIC, so that's part of the reason I wanted to raise

18  it as an issue, but it certainly would lay the

19  foundation for why Mr. Giannone -- notwithstanding the

20  security concerns at airports -- but it would certainly

21  explain why Mr. Giannone would be using his own name and

22  own credit card information for travel.

23          THE COURT:  No.

24          MR. EICHELBERGER:  I anticipated that, but --

25          MR. LIOTTI:  Thank you.

1          MR. EICHELBERGER:  Thank you.

2          (In open court)

3                    REDIRECT EXAMINATION

4  BY MR. EICHELBERGER:

5  Q.  Mr. Kirby, I'm going to ask you, first off, a couple

6  of questions about your experience as a Secret Service

7  agent in connection with the travel that you have

8  undertaken in some of the various missions.  In

9  connection with that, would I safely assume you have to

10 go through airport security rather regularly?

11 A.  Yes, sir.

12 Q.  In connection with going through airport security,

13 what type procedures does a traveler have to go through,

14 particularly with respect to current -- or I should

15 refer to, security precautions that were in place around

16 2005?

17 A.  Main thing, verification of identity.

18 Q.  Okay.  To your knowledge do airport security

19 officers check one's identification?

20 A.  Yes.

21 Q.  Do they compare that with the name that is being

22 used for travel?

23 A.  Yes.

24 Q.  What if anything would happen, based upon your

25 experience, if those did not match up?

1  A.  There's a problem --

2          MR. LIOTTI:  Objection.  Calls for speculation

3  on the part of the witness, beyond the scope

4  cross-examination.

5          THE COURT:  Sustained as to speculation.

6  BY MR. EICHELBERGER:

7  Q.  In connection with this online undercover

8  investigation which lasted -- what was it?  11 months?

9  A.  10 or 11 months.

10  Q.  While the investigation was going on, while it was

11  active, were there any people who were arrested?

12  A.  During the investigation?

13  Q.  While the investigation was actively operating?

14  A.  We brought about all of ours at the same time.

15  Q.  Now, why would that be?

16  A.  That was -- it was a -- wanted to get all the people

17  involved in the online undercover investigations.  There

18  was a certain time given where -- that was the time

19  where we would act --

20          MR. LIOTTI:  Objection.  Calls for speculation

21  and move to strike the testimony.

22          THE COURT:  Overruled.

23  BY MR. EICHELBERGER:

24  Q.  Specifically with respect to June 7th, 2005, based

25  upon your understanding, your experience with undercover

1  investigations, if an arrest was effected then, what

2  impact would that have on the ability to pursue an

3  undercover investigation?

4           MR. LIOTTI:  Objection.  Calls for

5  speculation.

6           THE COURT:  Sustained.

7  BY MR. EICHELBERGER:

8  Q.  You have testified that arrests for people who were

9  caught up in this investigation were done at

10  approximately the same time?

11  A.  Yes.

12  Q.  Could you tell us the reason for that?

13           MR. LIOTTI:  Objection to the form of the

14  question.

15           THE COURT:  Overruled.

16  A.  If one person was arrested that was a major part of

17  our investigation, it would virt -- it would be the end

18  of the investigation.

19  BY MR. EICHELBERGER:

20  Q.  With respect to Mr. Johnson and his operations, his

21  activities during the course of this investigation, if

22  Mr. Johnson had in his head an intent to accomplish

23  something illegal or something in his own interests,

24  what if any impact would that have on the integrity or

25  the accuracy of the chat transcripts that we've

 1  discussed here?

 2          MR. LIOTTI:  Objection, calls for speculation.

 3          THE COURT:  Sustained.

 4  BY MR. EICHELBERGER:

 5  Q.  With respect to the chat transcripts, did

 6  Mr. Johnson have any ability to affect what went into

 7  them?

 8          MR. LIOTTI:  Objection.

 9          THE COURT:  Overruled.

10  A.  There was no way he could act -- go in and change

11  the chats, if that's what you are asking.

12  BY MR. EICHELBERGER:

13  Q.  That is what I'm asking.

14  A.  Whatever was typed while we were monitoring him,

15  that is what shows in the transcripts.

16  Q.  In the course of this investigation did you have to

17  rely in any respect on Mr. Johnson's honesty to have

18  confidence in the integrity or the accuracy of the

19  chats?

20          MR. LIOTTI:  Objection to the form of the

21  question.

22          THE COURT:  Sustained.

23  BY MR. EICHELBERGER:

24  Q.  Did Mr. Johnson have anything to do with how the

25  chats are generated?

1              MR. LIOTTI:  Objection, asked and answered.

2              THE COURT:  Overruled.

3    A.  No.

4    BY MR. EICHELBERGER:

5    Q.  Now, with respect to Government's Exhibit 2, we were

6    talking -- there was a question raised about 200 dumps

7    for $2,000.  Do you recall that?

8    A.  Yes.

9    Q.  Could you grab Government's Exhibit 2 again,

10   please?  Do you have it in front of you?

11   A.  Yes.

12   Q.  I would specifically like you to read the line that

13   comes immediately prior to the statement about 200 for

14   2K.  What does Pit Boss 2600 say?

15   A.  "If you like them."

16   Q.  "If you like them"?

17   A.  Correct.

18   Q.  Does that mean that -- well, strike that.

19              I would be asking you to interpret.  The words

20   speak for themselves.

21              MR. LIOTTI:  Objection, move to strike.

22              THE COURT:  Overruled.

23   BY MR. EICHELBERGER:

24   Q.  With respect to Mr. Johnson's activities during the

25   course of this undercover investigation you testified

1  that you did not feed information to Mr. Johnson for him

2  to use.  What was Mr. Johnson's function in this

3  undercover investigation?

4  A.  To actually get into the world where he was -- his

5  nickname was well known, and to speak with people as he

6  usually would.

7  Q.  And based upon your dealings with Mr. Johnson

8  throughout the course of this investigation, did he

9  appear to be fluent in the language that was used by

10  people in this undercover investigation?

11        MR. LIOTTI:  Objection to the form of the

12  question.

13        THE COURT:  Overruled.

14  A.  He was very familiar.

15  BY MR. EICHELBERGER:

16  Q.  With respect to the various people that Mr. Johnson

17  had contact with, people -- did at any time during this

18  investigation, do you recall whether people used their

19  true names?

20  A.  None that I can recall.

21  Q.  In connection with your experience in dealing with

22  this investigation, do people generally use their true

23  names --

24        MR. LIOTTI:  Objection.  The witness hasn't

25  been qualified as an expert.  This goes beyond the res

1  gestae.

2          MR. EICHELBERGER:  Actually, I asked whether --

3  within connection with this investigation people used

4  their true identifications with respect to the

5  investigation.

6          THE COURT:  He's already -- that's been asked

7  and answered.

8          MR. EICHELBERGER:  Thank you.

9  BY MR. EICHELBERGER:

10 Q.  With respect to whether or not Mr. Giannone ever

11 identified himself by name, do you recall a transaction

12 where -- whether it was Pit Boss 2600 or CIA INTEL --

13 was talking about his desires to go to school?

14 A.  Yes.

15 Q.  Do you recall what nickname that person wanted to

16 get?

17 A.  Yes.

18 Q.  In the chosen profession?

19 A.  Yes.

20 Q.  What was that nickname?

21 A.  No-deal Johnny.

22 Q.  No-deal Johnny.

23         MR. LIOTTI:  Objection.  Beyond the scope of

24 cross-examination.  Move to strike.

25         THE COURT:  Denied.

1  BY MR. EICHELBERGER:

2  Q.  With respect to -- I want to -- I feel like we had a

3  little bit of confusion about what ICQ is.  Again, tell

4  us what is ICQ.

5  A.  It's a means of communicating on the Internet with

6  another individual, online chat.

7  Q.  Is it analogous to an instant message service by

8  AOL?

9  A.  Yes.

10 Q.  In connection with the two identities in this case

11 that are linked, Pit Boss 2600 and CIA INTEL, do those

12 names have a link to a particular means of communication

13 over the Internet?

14 A.  I'm not sure if I understand your question.

15 Q.  Where did the name CIA INTEL first appear?  Was it

16 in an AIM message or was it in an ICQ message?

17 A.  CIA INTEL's, ICQ.

18 Q.  Okay.  So CIA was an ICQ name?

19 A.  Right.

20 Q.  And what was Pit Boss 2600?

21 A.  AIM.

22 Q.  AOL Instant Messenger?

23 A.  Right.

24 Q.  With respect to having three-way communications -- I

25 wanted to make sure we didn't have a misunderstanding

1  there -- during the investigation dealing with Pit Boss

2  2600 and/or CIA INTEL, to your knowledge was there ever

3  any three-way communications involving gollumfun and

4  either of those two names?

5  A.  It was one-on-one chat between gollumfun and CIA

6  INTEL or gollumfun and Pit Boss.

7  Q.  So, the answer would be there was no three-way

8  communications?

9  A.  Correct.

10 Q.  Thank you.  With respect to questions regarding

11 whether the Secret Service had ever paid $2,000 in

12 connection with any one person offering goods, services,

13 information.  To your knowledge did the Secret Service

14 ever pay that amount to anyone during the investigation?

15 A.  Not to my knowledge.

16 Q.  With respect to this ongoing, online investigation,

17 if you had to estimate, how many user names came up,

18 came within the scope of this investigation?

19 A.  Hundred -- hundreds.

20 Q.  Hundreds, plural?

21 A.  Some users had two to three user names, yes.

22 Q.  With respect to those user names, if all you have is

23 the user name, without more, does that provide you with

24 sufficient information to identify that person in the

25 real world?

1  A.  No.

2  Q.  With respect to the monitoring of Mr. Johnson's

3  activities, did you monitor Mr. Johnson 24 hours a day?

4  A.  No, we did not.

5  Q.  With respect to the use of a cell phone, have you

6  ever had occasions driving down the road where a cell

7  phone stops working?

8  A.  Yes.

9          MR. LIOTTI:  Objection.

10          THE COURT:  Overruled.

11  BY MR. EICHELBERGER:

12  Q.  And why would that be?

13  A.  Loses the signal.

14  Q.  That's on major highways?

15  A.  Yes.

16          MR. LIOTTI:  Judge, is the witness testifying

17  as an expert?

18          THE COURT:  No.

19  BY MR. EICHELBERGER:

20  Q.  With respect to Government's Exhibit 17, if you

21  would turn to that please, it will be referenced as page

22  104.  And, again, I want to follow up on a question that

23  was asked about CIA INTEL's statement, "Naw, I'm going

24  to the Bahamas."  Do you see that?

25  A.  Yes.

1  Q.  Do you see that's in quotes?

2  A.  Yes.

3  Q.  Do you have any way of knowing whether CIA INTEL is

4  making that as a statement for himself or merely

5  recounting a statement that another person made to him?

6  A.  No.

7          MR. LIOTTI:  Objection to the form of the

8  question.

9          THE COURT:  The answer was no.

10  BY MR. EICHELBERGER:

11  Q.  With respect to documentation that was pulled

12  together during the course of this investigation -- I'm

13  just going to wrap up with this final series of

14  questions -- were you able to establish that there were

15  transactions on Mr. Giannone's account in Jacksonville,

16  Florida, on or about May 25th of 2005?

17          MR. LIOTTI:  Objection.

18          THE COURT:  Overruled.

19  A.  Yes.

20  BY MR. EICHELBERGER:

21  Q.  Were you able to establish that there were

22  transactions on Mr. Giannone's accounts reflecting

23  travel in or around California at or about the same time

24  as chats reflected him saying that he's in California?

25  A.  Yes.

1  Q.  Similarly, were you able to establish travel for

2  Mr. Giannone about the time he said he was in

3  Washington, D.C.?

4          THE COURT:  Let's step back a minute.  About

5  the time who said?

6  BY MR. EICHELBERGER:

7  Q.  About the time Mr. Giannone -- I'm sorry.  The time

8  that Pit Boss 2600 and/or CIA INTEL said that he was in

9  Washington, D.C. --

10  A.  Yes.

11  Q.  -- were you able to establish that?

12  A.  Yes.

13  Q.  At or about the time that Mr. -- that Pit Boss 2600

14  and/or CIA INTEL said that he had just received his

15  Platinum American Express card, were you able to

16  determine whether he had, in fact, received a Platinum

17  American Express card?

18  A.  Yes.

19          MR. LIOTTI:  Objection.

20          THE COURT:  Overruled.

21  BY MR. EICHELBERGER:

22  Q.  With respect to travel involving a trip from Boston

23  to New York that was reflected within the chat

24  transcript attributed either to CIA INTEL or Pit Boss

25  2600, the records reflect a trip of that nature?

1    A.  Yes.

2              MR. EICHELBERGER:  Thank you.  That's all I

3    have.

4              THE COURT:  All right.  Thank you, sir.  You

5    may step down.

6              All right.  Ladies and gentlemen, I'm going to

7    go ahead and send you to lunch now.  I need to take up a

8    matter of law with the attorneys and ask you to be back

9    at 2:15.

10             MR. LIOTTI:  Judge, just for the record, I have

11   no recross-examination.

12             THE COURT:  I didn't see a basis for any.

13             Anyway, you may take your pads.  Leave them in

14   the jury room.  Do not discuss the case with your --

15   with each other or with anyone else, or allow anyone to

16   discuss it with you, and please be back at 2:15.

17             Thank you.

18             (Jury not present)

19             THE COURT:  Are you calling Mr. Branca as your

20   next witness?

21             MR. EICHELBERGER:  We do plan to call

22   Mr. Branca as our next witness.

23             THE COURT:  Is he here?

24             Mr. Small, are you representing him?

25             MR. SMALL:  Yes, Your Honor.

1    THE COURT:  Okay.  I want to speak with him

2  before he testifies to make sure about limitations on

3  his testimony.

4    MR. SMALL:  That will be fine.

5    THE COURT:  All right.

6    MR. EICHELBERGER:  You want him to take the

7  stand or just come on up --

8    THE COURT:  No, he can just come on up with his

9  attorney.

10    CHRISTOPHER J. BRANCA

11    VOIR DIRE EXAMINATION

12  BY THE COURT:

13  Q.  Mr. Branca, I'm Judge Currie, I understand you are

14  going to be a witness in this case called by the

15  government; is that correct?

16  A.  Yes, ma'am.

17  Q.  And Mr. Parks Small of the Federal Public Defender's

18  Office represents you?

19  A.  Yes, he is.

20  Q.  I'm not familiar with your agreement with the

21  government but I assume that you are testifying pursuant

22  to some sort of agreement with the government?

23  A.  Yes, I am.

24    THE COURT:  All right.  Mr. Small, can you tell

25  us just briefly what the nature of that -- has he signed

1  a plea agreement?

2         MR. SMALL:  Yes, Your Honor, he has.

3         THE COURT:  Has the plea agreement been turned

4  over to Mr. Liotti?

5         MR. EICHELBERGER:  It has, Your Honor.  It was

6  faxed to him last week.

7  BY THE COURT:

8  Q.  Okay.  When you testify later, probably right after

9  lunch, we are staying away from certain issues in your

10  testimony.  And what we are -- I guess the best way to

11  describe this is that in the course of your background

12  you may have been involved in something called

13  ShadowCrew --

14  A.  Yes.

15  Q.  -- that led to some persons being indicted,

16  arrested, and serving some time.  It's my understanding

17  that your testimony -- that you are able to testify, if

18  you are allowed to do so, that Mr. Giannone was involved

19  in ShadowCrew?

20  A.  Yes.

21  Q.  Is that correct?  All right.  What I want to avoid

22  is testimony that he was arrested when you were in

23  California.  In other words, you may testify that you

24  were arrested --

25         MR. EICHELBERGER:  Your Honor, if I could, I

1 just want to make sure there's --

2        THE COURT:  I understand those are two

3 different things.

4        MR. EICHELBERGER:  Two different things,

5 exactly.

6        THE COURT:  I'm just going in chronological

7 order in terms of the way it was mentioned this morning.

8 BY THE COURT:

9 Q.  It's my understanding you and Mr. Giannone may have

10 been arrested in California for carding; is that right?

11 A.  Yes, ma'am.

12 Q.  And that he was -- I guess charges at some point

13 were dismissed against him?

14 A.  Yes, Your Honor.

15 Q.  And what happened with your charges?

16 A.  I was sentenced to 60 days --

17 Q.  Okay.

18 A.  -- in the county jail.

19 Q.  All right.  You may testify that you were arrested

20 and what happened to you.  You may testify that

21 Mr. Giannone was with you in California when that

22 occurred.

23        As to whether he was actively involved in

24 carding with you, I will give you more information on

25 that after I hear from the defense on their position on

1  that.  I may limit your testimony on that.

2          But under no circumstances would I allow you to

3  testify that he was arrested and that the charges

4  against him were dismissed.  Do you understand that?

5  A.  Yes.  Okay.

6  Q.  There, similarly, was a theft of some money and some

7  laptops, I believe, by you from him at some point in

8  time; is that correct?

9  A.  Yes, ma'am.

10  Q.  And you are going to testify to that, which is

11  okay.  The question of whether or not that -- those

12  laptops came from another carding scheme that the two of

13  you were involved in, you may be limited on whether you

14  can testify that he was involved in that carding with

15  you.  Okay?

16  A.  Yes.

17  Q.  And we will tell you more about that.

18          There is some indication that he made a call or

19  may have made a call to your parents or a parent of

20  yours concerning your involvement --

21  A.  Yes, ma'am.

22  Q.  -- at some point in time.  I assume you did not

23  receive that call, it was a parent who received it?

24  A.  Yes, Your Honor.

25  Q.  And you learned of it from your parent, I assume?

1  A.  Yes.

2  Q.  If you don't have direct personal knowledge of

3  that -- in other words, I'm not going to be able to let

4  you testify that your mother told you that Jonathan

5  Giannone had called her or that someone had called her

6  and said thus and so.  There are going to be some

7  hearsay issues there.

8          So when we get into that you would be able to

9  say that as a result of this telephone call or as a

10  result of learning that a call had been made, you took

11  certain action, if you did.  I don't know if you did

12  anything as a result of that.  See what I'm saying?

13  A.  Yes.

14  Q.  I just don't want you to tell what your mother heard

15  or what your mother told you, it's secondhand.  All

16  right?

17  A.  Understood.

18  Q.  Okay.  And then on the ShadowCrew description of

19  what happened in the ShadowCrew days, stay away from

20  discussing it as ShadowCrew.  You can say that there

21  were prior dealings in the past when you knew

22  Mr. Giannone to be Mark Rich, if that's true, for

23  example.

24          In other words, we are going for -- the

25  relevant issue here is identification, the relevant

1 issue is not what he did in the past.  The relevant

2 issue is whether or not the person who purports to be

3 Pit Boss 2600 and CIA INTEL is Mr. Giannone or not.

4 A.  Yes, Your Honor.

5 Q.  And so we are not -- we are trying to stay away from

6 other bad acts or other crimes that are not charged in

7 this indictment, but which you may be tending to mention

8 to describe your prior activity.  Okay?

9         So, I want you to try to think about

10 identification issues and not conduct issues.  In other

11 words, "He used the name Mark Rich," not, "He used the

12 name Mark Rich when we were carding together."  Does

13 that make sense to you?

14 A.  Yes, Your Honor.

15 Q.  Okay.  All right.  Any questions?

16 A.  No.

17 Q.  Okay.  I may give you some more specific

18 instructions on items of -- as we have questions asked

19 by Mr. Eichelberger, there might be an objection, and

20 depending on my ruling on the objection I would give you

21 an instruction at that time on that particular item.

22 Understand?

23 A.  Understood.

24         THE COURT:  Okay.  All right.  Anything,

25 Mr. Small?

```
 1            MR. SMALL:  There would be no objection to me
 2   talking to him over the lunch hour about these things
 3   just to reinforce --
 4            THE COURT:  No, I think -- right --
 5            Mr. Liotti, do you have any problem with his
 6   attorney reinforcing my instructions to him over the
 7   lunch hour?
 8            MR. LIOTTI:  Judge, I appreciate your
 9   instructions.  I was going to inquire of the Court,
10   because we have had some difficulty trying to get copies
11   of the transcript here, but I wonder if we could just
12   have your instructions copied for Mr. Eichelberger and
13   the Court and ourselves and also the witness.  Just your
14   instructions right now, because I think they were
15   somewhat complicated and there was quite a bit to
16   remember there, and I just want to make sure that we are
17   all on the same page about it, that's all.
18            (Off record discussion)
19            THE COURT:  Gary can give you a rough
20   transcript of what I just told him after lunch.
21            All right?
22            MR. LIOTTI:  That's fine, Judge.
23            THE COURT:  Okay.  But you -- again, I'm asking
24   you if you object to him talking to his attorney over
25   lunch about limiting his testimony?
```

1          MR. LIOTTI:  Not at all.

2          THE COURT:  All right.  That's fine.

3          MR. EICHELBERGER:  Your Honor, if I may.  I

4  would suggest the Court have a similar colloquy with

5  Mr. Chris Cutler, who is in a similar situation.

6  Mr. Cutler is present, but his attorney, Bob Hallman, is

7  not at this time.  Of course, Mr. Hallman's office is

8  right across the street.

9          THE COURT:  All right.  Well, at some point

10  prior to Mr. Cutler's testimony we can do that.

11          MR. EICHELBERGER:  Thank you, Your Honor.

12          THE COURT:  Okay.  All right.  Thank you.  We

13  will be in adjournment until 2:15.

14          MR. EICHELBERGER:  Thank you, Your Honor.

15          MR. LIOTTI:  Thank you, Judge.

16          (Lunch recess)

17          THE COURT:  All right.  Before we bring the

18  jury back in, when we broke for lunch the court security

19  officer who is actually a different one from the one we

20  have now, told me that he had noticed that Juror No. --

21  a juror, who he believes to be Juror No. 12 named Rita

22  Smith -- he's not exactly sure if that's the name and

23  number of the juror, but it's the juror who is sitting

24  on the back row all the way at the end away from where

25  court security sits, and he said she was a

1  younger-looking, blondish woman -- has been sleeping.

2           He said he noticed that she was sleeping

3  after -- after the morning break and she was either

4  sleeping or she had her eyes closed.  She appeared to be

5  sleeping to him.  And so I did not observe it myself but

6  I wanted to bring it to your attention.  I don't know if

7  you observed it.  And I ask you what you would like, if

8  anything, for me to do about it.

9           MR. EICHELBERGER:  If I may consult?

10          THE COURT:  All right.  If she is the juror

11 that he thinks she is, that means that she is a regular

12 juror.  Let me find the list.  That's right.  She's not

13 an alternate, according to the list.  I could either

14 make some comment that it's very important to stay awake

15 and alert and if you think you have a problem with this,

16 let me know.  Or if you want me to dismiss the juror and

17 seat an alternate -- seat the first alternate, I can do

18 that.

19          I can't guarantee you that I have the right

20 name.  He only -- he has a list of names and when they

21 come in in the morning he checks them off as they

22 arrive, and he believes that this was the second juror

23 he checked off and brought up this morning, and so

24 that's why he thinks that that's who it is.  But he has

25 not engaged her in conversation other than identifying

1  her to bring her upstairs to confirm that that is the

2  juror.  But it probably is.

3         MR. LIOTTI:  Judge, I have Rita Smith as being

4  Juror No. 7, and Juror No. 12 I have as James Canter,

5  that's from the jury selection.  Now, that may have been

6  changed.

7         THE COURT:  Well, the final jury list, when we

8  printed it out.

9         MR. LIOTTI:  Okay.

10        THE COURT:  Once they were selected it's an

11 alphabetical list and she became Juror No. 12 on the

12 alphabetical list.

13        MR. LIOTTI:  I see.

14        THE COURT:  She is a regular juror, she

15 probably did have a different juror number.

16        THE CLERK:  167.

17        THE COURT:  She was 167 on the original list.

18 So if you want to look at the questionnaire, you can

19 look at 167.  But she is -- she is a regular juror and

20 not an alternate.

21        MR. LIOTTI:  Judge, do we agree that the first

22 alternate is Churchill Sterling?

23        THE CLERK:  Yes.

24        THE COURT:  Is that right?

25        THE CLERK:  Yes.

1       MR. LIOTTI:  So Mr. Sterling would be taking

2  over for Ms. Smith?

3       THE COURT:  That's correct.

4       MR. LIOTTI:  May I just have a moment, Judge,

5  please?

6       THE COURT:  Yes.

7       MR. LIOTTI:  Judge, we would agree to excuse

8  Ms. Smith.

9       THE COURT:  If it is Ms. Smith.  We first have

10 to determine for sure if it is Ms. Smith.

11      MR. LIOTTI:  Well, I have to be certain of

12 that.

13      THE COURT:  I understand.

14      MR. EICHELBERGER:  Your Honor, I think the

15 government would prefer that the Court simply admonish

16 the juror that it's important they stay awake, stay

17 alert.  I don't want to set a dangerous precedence

18 because I actually think that there may have been some

19 others that perhaps dozed off at various times yesterday

20 during the reading of the chat transcripts.  I don't

21 want to create a situation where this becomes an issue.

22 So, I think that if the Court could simply inquire

23 delicately into the issue and advise they really need to

24 give their best and pay attention.

25      THE COURT:  When you say inquire into the

1 issue --

2          MR. EICHELBERGER:  As the Court had

3 previously --

4          THE COURT:  You mean simply making a statement

5 to them?

6          MR. EICHELBERGER:  Yes.  Yes.  Rather than

7 making a direct inquiry to single out any particular

8 individual.

9          MR. LIOTTI:  Judge, I'm afraid it's already an

10 issue, that's why Your Honor, I think, is addressing

11 it.  So, we can't, you know, make it a non-issue at this

12 point.

13          Maybe the Court would want to bring in

14 Ms. Smith and speak with her about whether she was

15 asleep or not.  I would have no objection to Your Honor

16 doing that in chambers, or at sidebar, without counsel

17 being present.

18          THE COURT:  I think I need to do something more

19 than just admonish.  The court security officer

20 indicated that it was an extended period of time, it

21 wasn't just nodding off for a minute here or there, that

22 she did appear to be sleeping for pretty much the whole

23 period after the morning break.  Now, I don't know how

24 that happened without any of the rest of us noticing it.

25          MR. LIOTTI:  I'm shocked with that

1 scintillating cross-examination, Your Honor.

2 THE COURT: But I do think that I would at

3 least need to -- to bring her in and speak with her,

4 which I could do. I won't do it off the record, I would

5 only do it on the record. But I could do it here at

6 the -- you know, so that she would not be embarrassed,

7 but on the other hand I think you need to hear what she

8 says.

9 MR. EICHELBERGER: I understand.

10 THE COURT: All right.

11 MR. LIOTTI: And Judge --

12 THE COURT: I guess the way to do this is to

13 ask for Rita Smith and then when she walks through the

14 door if she's not the person that -- I know what the

15 woman looks like who is sitting on the far corner and so

16 if that's not the person, then we would have to try

17 again for that person.

18 MR. LIOTTI: We'll rely on you, Judge, because

19 I don't remember who is sitting over there.

20 THE CSO: Bring her in?

21 THE COURT: Yes, ask Rita Smith.

22 (Juror present)

23 JUROR RITA SMITH

24 VOIR DIRE EXAMINATION

25 BY THE COURT:

1  Q.  Hello, Ms. Smith, if you would, just step right over

2  here next to where the witness stand is.  I need to ask

3  you a few questions.

4          An issue has arisen concerning whether or not

5  you may have fallen asleep this morning during the

6  cross-examination.

7  A.  I was resting my eyes.

8  Q.  You were resting your eyes?  So you were awake

9  during the whole process?

10  A.  Because my contact I had scratched, so I put glasses

11  on and I'm just closing my eyes.

12  Q.  Okay.  All right.  So you are confident that you

13  were awake during the entire cross-examination?

14  A.  Yes.

15  Q.  Okay.  We are not trying to embarrass you, it's just

16  important for us to know, and it was a matter of

17  concern.  All right.

18  A.  (Nods head in the affirmative).

19  Q.  Do you feel like this problem with your contact is

20  causing you such difficulty that it's distracting you

21  from the proceedings at all?

22  A.  Somewhat.  And I scratched it and the doctor told me

23  to start wearing glasses again and I'm not used to them.

24  Q.  Right.

25  A.  Because it's -- it's dizziness.

1  Q.  You are having dizziness from your glasses?

2  A.  Yes.  If I step down and look up and look down, it's

3  giving me a headache.

4  Q.  So you have a headache?

5  A.  Yes.

6  Q.  Well, do you -- if you wish to be excused, you can

7  ask to be excused and I would do that, and I would seat

8  an alternate.  I just -- I'm not suggesting that, I'm

9  simply saying that we need to have jurors who can pay

10  complete attention to the case, and if you are being

11  distracted by health issues, then that's up to you to

12  tell me that and for me to act on it.

13  A.  I think I'm fine.

14  Q.  You think you are fine.  All right.  Thank you,

15  ma'am.  You may return to the jury room.

16          (Juror not present)

17          THE COURT:  All right.  Does anyone wish to put

18  anything on the record concerning my colloquy with the

19  juror?

20          MR. EICHELBERGER:  Nothing from the government,

21  Your Honor.  Thank you.

22          MR. LIOTTI:  Judge, the only thing I would

23  suggest is, you might want to also make an inquiry of

24  the marshal in that, you know, she said she was

25  listening to the testimony and that's fine, I don't

1 disbelieve the woman. But just to clarify the record,

2 if the marshal, for example, heard or saw the woman you

3 know truly nodding off or snoring or something of that

4 sort, I think we ought to just clarify that, that's all.

5 THE COURT: Well, do you mind if I do that at a

6 later time, or do you want it done now?

7 MR. LIOTTI: Well, if we are going to deal with

8 it, you know, a change in jurors here, I think we should

9 do it now, Judge. I'm sorry, but --

10 THE COURT: Could you ask him to come up?

11 MR. EICHELBERGER: While we wait, Your Honor,

12 we may have a couple of other matters we could use to

13 take up the time.

14 THE COURT: Okay.

15 MR. EICHELBERGER: In going over my preparation

16 for Mr. Branca, I'm struggling a little bit with how far

17 I can go on this section of the chat transcripts where

18 CIA INTEL or Pit Boss talked about having prank-called

19 Mr. Branca's parents.

20 I mean, clearly my plan would have been to show

21 him that section of the chat transcript and then

22 generally ask him whether it came to his attention that

23 a call of that nature was made.

24 And again, we are only -- we are not trying to

25 get into whether Mr. Giannone, in fact, made it but

1  rather just the fact -- albeit through his mother --

2  just the fact that a call of that nature was made.

3         Again, I submit that that is not a matter

4  subject to the hearsay rule, it's rather simply the fact

5  that a call like that took place.  And that's as far as

6  I would propose to go.

7         THE COURT:  You want to prove that, in fact, it

8  is true that someone called his mother, correct?

9         MR. EICHELBERGER:  That a call of that nature

10  took place, yes.

11         THE COURT:  Someone called his mother and

12  reported that his -- that he had been violating the

13  law?

14         MR. EICHELBERGER:  Yes.  And again, just so I'm

15  100 percent clear on this, we do not believe that is a

16  hearsay issue, rather it's merely the fact that the call

17  took place.

18         Obviously the person who called in this

19  circumstance, according to our theory, was not a Secret

20  Service agent, obviously it is not a fact that there was

21  an outstanding arrest warrant for that person, it is the

22  mere fact that confirms that section within the chats.

23         Because, again, we are dealing with a

24  circumstantial case here where if we have verifiable

25  details, we like to be able to show those verifiable

1  details to the jury.

2        THE COURT:  Normally I would agree with you

3  that you are not seeking to prove the truth of the

4  matter, but in this case the truth -- the matter that

5  you are trying to prove is, in fact, that someone called

6  the mother and relayed that information.  It's not an

7  issue of notice.  It's not being offered just for

8  notice, it's actually being offered for the truth of the

9  fact that someone did call his mother and relay that

10  information.

11        MR. EICHELBERGER:  I agree, and the point that

12  I make is that the mere fact that it's offered for the

13  truth that an event took place, our position is that

14  that does not fall within the hearsay rule.  It would be

15  analogous --

16        THE COURT:  No, they are not trying to offer

17  that the event took -- you are not offering it for the

18  truth of the matter --

19        MR. EICHELBERGER:  I'm offering it for the fact

20  that it took place.

21        To draw an analogy, if someone testified that I

22  was attending a theater and someone shouted out "fire,"

23  then the fact that someone heard it shouted "fire" and

24  then we had a chat transcript where somebody was saying,

25  "Hey, I was over at the theater today and I shouted

1  'fire,'" it would be confirming of that.  But it's not

2  really a hearsay issue, in our view.

3      THE COURT:  Because you are saying that the

4  truth is whether or not Branca was, in fact, engaged in

5  that type of activity?

6      MR. EICHELBERGER:  Oh, he clearly was

7  engaged --

8      THE COURT:  No, I know that.  But, I mean,

9  you're saying that in the context of a hearsay

10 evaluation --

11      MR. EICHELBERGER:  Correct.

12      THE COURT:  -- that would be -- that would be

13 the portion that would be objectionable.

14      MR. EICHELBERGER:  Well, I don't think it would

15 be objectionable on that basis.  We are trying to

16 establish a very narrow --

17      THE COURT:  Well, what my problem is, you know,

18 there are several ways to do that.  One would be

19 possibly call Mr. Branca's mother, if she's the one who

20 received the call --

21      MR. EICHELBERGER:  She's --

22      THE COURT:  -- but you don't want to do that,

23 you don't have her here.

24      MR. EICHELBERGER:  She's not --

25      THE COURT:  So you want to have Mr. Branca,

1  basically, testify to the substance of what his mother

2  told him.

3      MR. EICHELBERGER:  Not so much the substance,

4  but just whether -- it's a fine line -- whether his

5  mother reported an incident of that nature.  And

6  again -- and if we can't -- if we can't go there, I

7  understand the Court's -- I don't think I'm articulating

8  the legal basis for our theory that well.

9      But the basics of the theory is that all we are

10 trying to establish is that when Pit Boss or CIA INTEL

11 made that statement, "I prank-called CC Supplier's

12 parents," that, in fact, word came to CC Suppliers that

13 a call had been made.

14      THE COURT:  So you're trying to prove the truth

15 of the statement that Mr. Giannone is alleged to have

16 made.  You are trying to prove that that was true.

17      MR. EICHELBERGER:  Well, his statement --

18      THE COURT:  That's why I'm having a problem

19 saying it's not hearsay.

20      MR. EICHELBERGER:  His statement is an

21 admission, first off.

22      THE COURT:  Right.

23      MR. EICHELBERGER:  And then the second point of

24 it is, we are not -- we are not -- obviously, if it's

25 for the truth of the matter asserted -- our obvious

1  theory is that, in fact, that statement is a lie, so

2  it's not the truth of the statement.

3        We do not want to establish that Mr. Giannone

4  is with the United States Secret Service.  The only

5  thing that we want to establish is that a phone call was

6  made and words to that effect were spoken.

7        It is irrelevant what the words were, it is the

8  mere fact that a telephone call was made that is of the

9  substance reported by Pit Boss or CIA INTEL.  That's the

10  sole legal issue that I present to the Court.

11        THE COURT:  I don't think you can do it through

12  this witness.

13        MR. EICHELBERGER:  I understand.

14        THE COURT:  Okay.

15        MR. EICHELBERGER:  Thank you, Your Honor.

16        THE COURT:  All right.  We have the CSO.  Would

17  you come up, please, sir.  I need you to stand near a

18  microphone.  Maybe that one by the ELMO and just tell us

19  what you told me this morning, when we left the

20  courtroom, about the juror.

21        THE CSO:  Okay, this morning after our morning

22  break, I noticed one of the female jurors sitting on the

23  back row, all the way back, continually nodding off,

24  sleeping.  It was pretty obvious, her head was going

25  forward.  I'm 99 percent sure it's Juror No. 12, Rita

1  Smith.  And I only say that because this morning I

2  brought her, she was the last one -- one of the last

3  ones I brought up this morning.  But --

4          THE COURT:  Tell us exactly what you observed.

5          THE CSO:  Just her nodding.  I mean, she was

6  asleep at times.  Her head would fall back and it would

7  go forward and, you know, then I think she would catch

8  herself.  And then she would sit there for a minute and

9  then she would start nodding.

10         So, it was -- it was continually after the

11  morning break, until -- I don't know, even in the

12  re-examination by Mr. Eichelberger, she even nodded off

13  a couple of times during it.

14         THE COURT:  Well, you can't accuse Mr. Liotti

15  of being boring, then, Mr. Eichelberger.

16         MR. LIOTTI:  It's part of my job, Judge.

17  Nobody said I wanted them to stay awake.

18         THE COURT:  Okay.  Do you want me to follow up

19  now with the court security officer about what she has

20  said and ask him further questions?

21         MR. EICHELBERGER:  I would.  I think that if he

22  understood what her explanation was, perhaps he might be

23  able to offer his observations on whether it's

24  consistent.

25         MR. LIOTTI:  Judge, could I also say this?  I

1 think we all are unified in this point, we really do

2 thank the marshal for coming forward with that

3 information.  All of us appreciate that.  Thank you.

4          THE COURT:  We brought Ms. Smith in earlier,

5 before you came in, and I asked her about it and she --

6 her explanation to us was that she was not asleep, that

7 she has had a scratched lens, scratched eye problem from

8 a contact, and that she's now being required to wear

9 glasses instead of contacts and the glasses are making

10 her dizzy and that she has -- had her eyes closed

11 because of the discomfort of her eye and that she was

12 awake for the entire thing.

13          THE CSO:  Okay.

14          THE COURT:  So what we are wondering, I guess,

15 is, were your observations to the contrary?

16          THE CSO:  Well, you know, had she been still,

17 her head upright the whole time, I might -- would go 100

18 percent with that.

19          THE COURT:  Right.

20          THE CSO:  But when a head falls forward or it

21 even falls backwards a couple of times, to me that's a

22 pretty good indication that she might be asleep.

23          THE COURT:  So you think she was sleeping even

24 despite her explanation?

25          THE CSO:  I feel as though she was dozing, yes,

1  ma'am.

2          THE COURT:  All right.  Give us your name for

3  the record.

4          THE CSO:  Steven Smith.

5          THE COURT:  All right.  And does anyone want

6  Mr. Smith to be sworn and to state that what he has

7  testified, has just told us, is true to the best of his

8  information?

9          MR. EICHELBERGER:  No, Your Honor, I trust him.

10          MR. LIOTTI:  I trust him too, Judge.

11          THE COURT:  All right.  Thank you.

12          THE CSO:  Thank you.

13          THE COURT:  All right.  Now, where do you stand

14  on your position regarding the juror, Mr. Eichelberger?

15          MR. EICHELBERGER:  We will consent to

16  Mr. Liotti's motion to excuse the juror.

17          MR. LIOTTI:  Well, I hadn't made that motion,

18  but I do now.

19          THE COURT:  All right.  Would you ask her to

20  come back in, please?

21          MR. EICHELBERGER:  Your Honor, if I could,

22  would the Court indulge me and allow me to step out for

23  just a moment?

24          THE COURT:  Sure.

25          MR. EICHELBERGER:  I will be right back.

1          THE COURT:  Sorry to keep pulling you in and

2  out, but based on a number of things, we've decided to

3  excuse you as a juror in this case.

4          So, what I would like for you to do is to

5  gather up your personal belongings and leave your badge

6  in there, get any notes that you have taken and give

7  them to the court security officer on the way out, and

8  don't discuss the case with anyone or allow anyone to

9  discuss it with you.  And we thank you very much for

10  your attendance here.

11          (Juror not present)

12          MR. LIOTTI:  Judge, I don't want to speak

13  without Mr. Eichelberger being here, but --

14          THE COURT:  But you are going to anyway.  Go

15  ahead, Mr. Daley is here.  Go ahead.

16          MR. LIOTTI:  I don't think we finished the

17  argument on the hearsay ruling, Judge.

18          THE COURT:  Well, I ruled for you.

19          MR. LIOTTI:  Okay.  I didn't hear you say that.

20          THE COURT:  Okay.  You win.

21          MR. EICHELBERGER:  Thank you.  Your Honor, I

22  suggested Mr. Cutler, Mr. Hallman have the colloquy.

23          THE COURT:  Okay.  Let's do that while we're

24  waiting -- getting the juror dismissed.

25          Mr. Hallman, would you bring your client up

1    here for a moment to the rostrum?

2         MR. HALLMAN:  Yes, ma'am.

3         THE COURT:  Thank you.

4         MR. HALLMAN:  Good afternoon.

5         THE COURT:  Good afternoon, Mr. Hallman.  You

6    represent Mr. Cutler?

7         MR. HALLMAN:  I do.

8         THE COURT:  And Mr. Cutler is going to be

9    called as a government witness, is my understanding.

10        MR. HALLMAN:  Yes, ma'am.

11        THE COURT:  What we are trying to do in this

12   case is limit the testimony of these individuals to

13   matters that relate to the crime charged -- crimes

14   charged, and to the government's purpose in calling

15   them, which is one of identification, as well as going

16   to issues relating to what the defendant is charged with

17   here, and to avoid going into a lot of information about

18   other crimes which may have occurred between the

19   defendant and your client on other occasions.

20        So, just as an example, it's my understanding

21   that your client and Mr. Giannone may have been in

22   Orlando, Florida together on a certain date.  The fact

23   that they were there together on that date may have

24   independent relevance to show that they knew each other

25   at that point in time, but what they were doing in

1  Orlando, Florida may or may not be permitted.

2        We are going to operate with the presumption

3  that it's not going to be permitted.  For example, if

4  they were carding together in Orlando, we will operate

5  on the presumption that it's not going to be allowed.

6        And if the government wants to go into that,

7  then they are going to have to approach and ask for

8  permission, and I will have to make a ruling on 404(b),

9  and then -- only if I allowed it, and if I did allow it

10 under 404(b), I would give a cautionary or a limiting

11 instruction.

12       So, I just want your client to understand that

13 there's a presumption that he's not going to talk about

14 other crimes at other times.  He can say whatever is

15 relevant about the charges that -- because it's my

16 understanding he is directly mentioned in the charges

17 that are at issue here, so he would have, perhaps,

18 relevant testimony concerning that.

19       But when we get other times, other places,

20 other crimes, I want him to be very cautious and not

21 blurt out things like that without stopping and asking

22 and letting me make a ruling.

23       MR. HALLMAN:  All right.

24       THE COURT:  Mr. Cutler, do you understand

25 that?

1          MR. CUTLER:  Yes.

2          THE COURT:  We also -- and I don't know if you

3  were involved in ShadowCrew, but we are trying to avoid

4  reference to other arrests of Mr. Giannone, other -- if

5  he was involved in -- if you were involved in ShadowCrew

6  and he was involved in ShadowCrew, you may say we knew

7  each other back then and we dealt with this name or that

8  name, this -- but you don't have to go into what you

9  were doing when you were using those names to speak to

10  each other on the Internet.

11          MR. CUTLER:  Okay.

12          THE COURT:  Okay.  All right.  Thank you.

13          MR. HALLMAN:  Yes, ma'am.  Thank you.

14          THE COURT:  All right.  Now, I believe we have

15  everyone back and we are ready to go.  You are going to

16  call Mr. Branca next?

17          MR. EICHELBERGER:  Yes, Your Honor.

18          THE COURT:  All right.  You may bring the jury

19  in.

20          I'm simply going to tell the jurors that

21  Ms. Smith has been excused and they don't need to

22  concern themselves with why, and I may just say it's

23  very important for everyone to be alert and to pay

24  attention.

25          (Jury present)

1          THE COURT:  Good afternoon, everyone.  You

2   probably noticed that there are now only 13 of you

3   rather than 14.  One of your fellow jurors has been

4   excused from the case.  You don't need to concern

5   yourselves with why.  That means that one of you who was

6   an alternate will now become a regular juror, and it's

7   possible that another alternate would be seated before

8   we finish the trial.  But that's why we have alternates,

9   so that if we lose a juror we have a way to keep going.

10          I want to ask you to please pay attention and

11   try to be alert in the trial.  It's very important that

12   everyone pay attention during the course of a

13   significant case, and all cases that are brought in this

14   court are significant.  So I want to ask you to please

15   pay attention, and if you need a break, ask me for a

16   break.  Okay.  All right.  Thank you.

17          All right.  Mr. Eichelberger, you may call your

18   next witness.

19          MR. EICHELBERGER:  The government calls

20   Mr. Christopher Cutler.

21          MR. LIOTTI:  Judge, can we just approach for

22   one second?

23          MR. EICHELBERGER:  I'm sorry.  Christopher

24   Branca.  I misstated, Christopher Branca.

25          MR. LIOTTI:  Can we just approach for one

1    second?

2            THE COURT:  Sure.

3            MR. LIOTTI:  Thanks.

4            (Bench conference)

5            MR. LIOTTI:  Judge, I'm just wondering, because

6    the jurors seem to be somewhat displaced, the alternates

7    may be sitting somewhere in the middle, I wonder if you

8    could indicate that Churchill Sterling, who I believe is

9    the first alternate, is now a member of the petit jury,

10   you know.

11           MR. EICHELBERGER:  Nobody knows --

12           THE COURT:  Nobody knows who is an alternate,

13   so nobody knows which one is a regular juror or

14   alternate.  So --

15           MR. LIOTTI:  Okay.  But we know, right?

16           THE COURT:  We know, but they don't know.  And

17   I think it's better that they don't know because I want

18   all of them to pay attention.

19           MR. LIOTTI:  Right.

20           THE COURT:  I don't want the people, who if

21   they were told they were alternates, to pay less

22   attention.

23           MR. LIOTTI:  I defer to you.  Thank you,

24   Judge.

25           (In open court)

1          THE COURT:  All right.  You called Mr. Branca,

2    correct?

3          MR. EICHELBERGER:  Christopher Branca.

4          THE COURT:  All right.  Mr. Branca, you may

5    come forward to be sworn.  Mr. Branca, if you would,

6    step right over here to my right where this witness box

7    is, stand up in it, and raise your right hand.  All

8    right.  And tell us your full name.

9          MR. BRANCA:  Christopher J. Branca.

10         THE COURT:  All right.  Keep your hand up, you

11   are going to be sworn in.

12                CHRISTOPHER J. BRANCA, SWORN

13                    DIRECT EXAMINATION

14   BY MR. EICHELBERGER:

15   Q.  I'm sorry.  I called your name as Christopher

16   Branca.  Is it pronounced Branca -- it's pronounced

17   Branca, as I understand it?

18   A.  Yes.

19   Q.  Branca.  Okay.  I will try to get that straight.  I

20   may revert back to my bad habits.

21         THE COURT:  Mr. Branca, before you start, let

22   me get you to pull your chair up a little bit and adjust

23   that microphone to your height.  There you go.  There

24   you go.  Thank you.

25   BY MR. EICHELBERGER:

1  Q.  Mr. Branca, where do you live?

2  A.  Wallingford, Connecticut.

3  Q.  And how long have you lived in Wallingford,

4  Connecticut?

5  A.  About eight, nine years.

6  Q.  Eight to nine years.  What do you do for a living?

7  A.  I'm a computer technician.

8  Q.  Do you know a person by the name of Chris or

9  Christopher Cutler?

10  A.  I do.

11  Q.  How do you know Chris Cutler?

12  A.  Childhood friends.

13  Q.  And when you say childhood friends, approximately

14  what -- about how many years have you known him?

15  A.  I would have to say about six.

16  Q.  About six years.  All right.  Now, when you say a

17  childhood friend, I'm looking -- I'm trying to picture

18  just, from where you are sitting, about how old are

19  you?  Why don't you tell the jury how old you are now?

20  A.  I'm 20 years old.

21  Q.  20 years of age.  Perhaps the short haircut makes

22  you look a little bit older.

23  A.  Possibly.

24  Q.  Was there a time when you were living with Mr. Chris

25  Cutler?

1  A.  There was.

2  Q.  And how did that come about?

3  A.  I was living at my aunt's house, we didn't get

4  along, and I moved out and into Cutler's house.

5  Q.  You didn't get along with your aunt?

6  A.  Well, me and her had some differences.

7  Q.  All right.  So while you were living with Chris

8  Cutler did that go 100 percent well?

9  A.  No, it did not.

10  Q.  So, what steps did you take to try to be able to

11  get -- to get another place?

12  A.  We took steps to take a trip down to South Carolina.

13  Q.  All right.  We are going to talk about that trip

14  down to South Carolina in just a couple of minutes.

15  Before we get to that, I need to ask you sort of some

16  background questions about yourself.

17        Have you in the past been involved or engaged

18  in any online forums that had to deal with credit card

19  fraud?

20  A.  I have.

21  Q.  And what name did you go by?

22  A.  CC Suppliers.

23  Q.  All right.  Did you go by any other names?

24  A.  CBranca and also VendingMachine.

25  Q.  Is there any significance to the name CC Suppliers?

1  A.  CC would stand for credit card.

2  Q.  All right.  And when you say it stands for credit

3  cards, does that mean that you, for lack of a better

4  term, had a type of specialty within the area of credit

5  card fraud?

6  A.  You could say that.

7  Q.  I'm asking you whether you did?

8  A.  Yes.

9  Q.  And what was your particular area?

10  A.  Getting full information numbers.

11  Q.  Now, if you would tell the jury what you mean by a

12  full information?

13  A.  It would be name and address, city, ZIP code, state,

14  date of birth, social security number, their credit card

15  information, possibly their license number and that's

16  about it.

17  Q.  Now, you are 20 years of age now, can you give the

18  jury an idea when you started your involvement with this

19  activity?

20  A.  16 years of age.

21  Q.  Started as a minor?

22  A.  Yes.

23  Q.  Okay.  Now, in connection with your activity in this

24  area, is it your experience -- do you have experience

25  with whether people who are chatting online about these

1  subjects use their real names?

2  A.  Most do not.

3  Q.  Most do not.  Did you use your real name?

4  A.  At one point in time I did.

5  Q.  Now, you started talking about a trip down here to

6  South Carolina.  What was the purpose of that trip?

7  A.  To use credit cards.

8  Q.  Okay.  To use credit cards -- and you say the

9  purpose was to use credit cards.  I mean, there is no

10 easy way of saying this, you might as well look at them

11 and tell them exactly what was going on.

12 A.  There is a device used to encode the magnetic strip

13 on the back of the cards and in turn those would be used

14 at stores.

15 Q.  And who was involved in that activity?

16 A.  Myself, Danny Rogers, and Christopher Cutler.

17 Q.  Three people were involved?

18 A.  Three, including myself.

19 Q.  Now, when you came down to South Carolina were you

20 coming down here to meet someone that you had been

21 speaking with on the Internet?

22 A.  Not myself personally, but Chris Cutler had planned

23 to meet a gentleman --

24          MR. LIOTTI:  Objection.

25 BY MR. EICHELBERGER:

1  Q.  When you were --

2          THE COURT:  I'm assuming he's getting ready to

3  say what Chris Cutler told him, so I think the objection

4  is well founded if that's what he's about to say.

5  BY MR. EICHELBERGER:

6  Q.  In preparation for coming down to South Carolina,

7  had you at any time chatted online with someone that you

8  had found out later was in South Carolina?

9  A.  Yes.

10 Q.  And what was the identity of that person, the online

11 identity?

12 A.  He went by the name of gollumfun.

13 Q.  Now, did you know the true or in-the-real-world

14 identity for gollumfun at that time?

15 A.  His actual name?

16 Q.  Did you know that at that time?

17 A.  At that time I did not.

18 Q.  Okay.  Had you ever met this person gollumfun?

19 A.  I have not.

20 Q.  Now, how is it that you were familiar with the name

21 of gollumfun?

22 A.  Through these online forums that were used for

23 credit card fraud.

24 Q.  Now, with respect to your trip down here to South

25 Carolina, you have been appointed an attorney to

1  represent you in connection with that transaction; is

2  that correct?

3  A.  I have.

4  Q.  And in connection with your involvement in coming

5  down to South Carolina, have you entered into a plea

6  agreement with my office?

7  A.  I have.

8  Q.  And under that plea agreement you understand that

9  you will be pleading guilty to a federal felony for

10  conspiracy to commit credit card fraud, among other

11  things?

12  A.  I understand.

13  Q.  All right.  Now, in connection with that plea

14  agreement, what is your understanding about your

15  obligation as you sit here on the witness stand today

16  testifying to these jurors?

17  A.  My obligation --

18  Q.  What is your obligation in terms of testifying here

19  today in this court?  Does your plea agreement address

20  that issue?

21  A.  I'm sorry, you have to reword that.

22  Q.  I will see what I can do.  Do you have what's called

23  a cooperation clause within your plea agreement?

24          MR. LIOTTI:  Objection.

25  A.  Yes, I do.

1           THE COURT:  Overruled.

2  BY MR. EICHELBERGER:

3  Q.  And what is your understanding that that cooperation

4  clause requires you to do in connection with this case?

5  A.  For my testimony, I will receive a 5K1, which is a

6  downward departure on my sentence --

7  Q.  Have you been --

8           MR. LIOTTI:  Objection.  He interrupted the

9  witness, Judge.  May the witness be allowed to finish

10  his answer, please?

11          THE COURT:  Have you finished?

12          THE WITNESS:  Which my 5K1 will allow me to --

13  providing I'm helpful in this trial, will allow, you

14  know --

15  BY MR. EICHELBERGER:

16  Q.  You said provided your testimony is helpful.  Have

17  you been promised a 5K1 or a downward departure motion?

18  A.  No, I have not.

19  Q.  All right.  Now, what is your understanding that if,

20  at the appropriate time, a motion for a downward

21  departure or a 5K1 motion is made, is that binding upon

22  the judge who considers your case?

23  A.  Yes.

24  Q.  The judge -- your understanding is the judge has to

25  follow that, or does the judge --

1 A. No. The judge does not have to follow that

2 agreement.

3 Q. All right. So, do you have any guarantees as to

4 what is going to happen to you in connection with your

5 case?

6 A. I have no guarantees.

7 Q. Now, what's your understanding of what might happen

8 to your plea agreement, your situation, if you were to

9 come in here and testify falsely in connection with this

10 case?

11 A. Everything would become null and void and I would

12 lose my agreement completely.

13 Q. All right. Now, I need to ask you about some prior

14 activities that you have been involved in. Okay? In

15 order to do that though, I want to start out by -- we

16 are going to show you on the monitor right in front of

17 you a page of a chat transcript. It's Government's

18 Exhibit 1, page 2.

19       MR. EICHELBERGER: Mr. Daley, if we could bring

20 that up. And if we could -- let me see if I can spot --

21 it's about midway down. Go ahead scroll down,

22 Mr. Daley. I'll just tell you when to stop. And you

23 can stop right there.

24 BY MR. EICHELBERGER:

25 Q. Mr. Branca, you have testified previously that you

1  go by the name CC Suppliers; is that correct?

2  A.  Yes, it is.

3  Q.  Before I ask you the question, I want to ask you

4  whether or not, to your knowledge, does Mr. Giannone

5  know whether you go by that name?

6          MR. LIOTTI:  Objection, no foundation.

7          THE COURT:  Sustained.

8  BY MR. EICHELBERGER:

9  Q.  Have you previously had any personal dealings with

10  Mr. Giannone?

11  A.  Yes, I have.

12  Q.  On about how many occasions?

13          MR. LIOTTI:  Objection, no foundation.

14          THE COURT:  Overruled.

15  BY MR. EICHELBERGER:

16  Q.  About how many times have you had dealings with

17  Mr. Giannone?

18          MR. LIOTTI:  Judge, are we talking about a time

19  frame relating to Government Exhibit 1?

20          MR. EICHELBERGER:  I'm laying a foundation at

21  this point.

22          THE COURT:  He's responding to your objection.

23  A.  Elaborate on "times".

24  BY MR. EICHELBERGER:

25  Q.  The number of times that you have been in the

1 presence of Mr. Giannone.

2 A.  I couldn't give you an exact number.

3 Q.  Could you give us an approximate number?

4       MR. LIOTTI:  Objection, calls for speculation

5 on the part of the witness.

6       THE COURT:  When did you first meet

7 Mr. Giannone, in what year?

8       THE WITNESS:  I can't remember the exact year.

9 I would have to say before 2004.

10 BY MR. EICHELBERGER:

11 Q.  So if I told you that the chat transcript we are

12 looking at here took place in 2005, you would have

13 already known Mr. Giannone previously?

14 A.  Yes.

15 Q.  And prior to the chat transcript, prior to 2005, had

16 you engaged in any chat, that is online communications,

17 with Mr. Giannone?

18 A.  Yes, I have.

19 Q.  And what name did you use in connection with those

20 chats?

21 A.  Chris SBBK.

22 Q.  Did you ever use the online name that is reflected,

23 CC Suppliers?

24 A.  Yes, I have.

25 Q.  Referring, again, to -- you have the chat transcript

1  there in front of you?

2  A.  Yes, I do.

3  Q.  What I'm going to do is, I'm going to read to you --

4  first off before I read, do you recognize the name Pit

5  Boss 2600?

6  A.  Yes, I do.

7  Q.  How do you recognize it?

8  A.  I -- I used -- Giannone used that to conversate with

9  me over AOL Instant Messenger.

10 Q.  All right.  So you know Pit Boss 2600 to be an AOL

11 Instant messenger name used by --

12 A.  Jonathan Giannone.

13 Q.  And, again, if you can, about how many times have

14 you chatted with Mr. Giannone utilizing -- or

15 Mr. Giannone was utilizing the name Pit Boss 2600?

16 A.  A safe number would be to say at least 30.

17 Q.  At least 30 times.  All right.

18          Now, going on it says -- pit Boss 2600 says,

19 "CC Suppliers got busted in Orange County," and if

20 memory serves me this particular chat would have been on

21 May the 23rd of 2005?

22          MR. LIOTTI:  Objection, no foundation.

23          THE COURT:  Overruled.

24 BY MR. EICHELBERGER:

25 Q.  May the 23rd of 2005.  Around midyear of 2005 were

1  you arrested?

2  A.  Yes, I was.

3  Q.  Where were you when you were arrested?

4  A.  Costa Mesa, California.

5  Q.  Now, is that -- I'm not all that familiar with

6  California geography.  Here it says Orange County, is

7  that --

8  A.  That is in the county of Orange, yes.

9  Q.  Now, it also says that you got busted for carding

10 Apple and Sony stores?

11 A.  Yes.

12 Q.  Did that happen?

13 A.  Yes, it did.

14 Q.  Were you there in California by yourself?

15 A.  No, I was not.

16 Q.  Who was with you?

17 A.  Jonathan Giannone.

18 Q.  Now, when you say that you got busted for carding at

19 the Apple and the Sony store, what did you do?  Don't

20 tell us what anybody else did, I want to know what you

21 did.

22 A.  I walked into the Apple and Sony store with these

23 credit cards and used them to buy laptops.

24 Q.  What type laptops?

25 A.  Upscale ones, probably about $2900 apiece.

1  Q.  Thank you.

2         MR. EICHELBERGER:  Let's clear the screen,

3  please.

4  BY MR. EICHELBERGER:

5  Q.  And how did you get to California on that occasion,

6  the occasion when you got arrested carding?

7  A.  By plane.

8  Q.  Did you pay for the tickets?

9  A.  No.

10  Q.  Who did?

11  A.  Jonathan Giannone.

12  Q.  Have you ever known Mr. Giannone to use a name other

13  than Pit Boss 2600 during online communications?

14  A.  Yes.

15  Q.  What name have you known him to use?

16  A.  Mark Rich.

17  Q.  And, again, have you communicated with Mr. Giannone

18  when he used the name Mark Rich?

19  A.  Yes.

20  Q.  Thank you.

21         MR. EICHELBERGER:  I would like to bring up on

22  the screen, Mr. Daley, please, Government's 1, page 1.

23  BY MR. EICHELBERGER:

24  Q.  I'm going to direct your attention to about the

25  fourth and the sixth lines -- do you see them there?

1  A.  Yes.

2  Q.  -- where at one point it says "Hey, get me on AIM."

3  Based upon your experience in chats, what does the term

4  AIM mean?

5  A.  AOL Instant Messenger.

6  Q.  All right.  And when it says next, "Pit Boss 2600,"

7  what is that?

8  A.  That would be a screen name.

9  Q.  Whose screen name?

10  A.  Jonathan Giannone's.

11  Q.  And you see two lines down, "Who are you?"  And

12  what's the response?

13  A.  Mark Rich.

14  Q.  And, again, based upon your knowledge, your personal

15  familiarity, who is Mark Rich?

16  A.  The alias used on the carding forums.

17  Q.  For whom?

18  A.  Excuse me?

19  Q.  For whom?  Who used the alias Mark Rich?

20  A.  Jonathan Giannone.

21  Q.  Now, you said that you met Mr. Giannone --

22          MR. EICHELBERGER:  We can clear the screen,

23  Mr. Daley.

24  BY MR. EICHELBERGER:

25  Q.  You said that you met Mr. Giannone sometime prior to

1  2004.  Where did you first meet Mr. Giannone?

2  A.  On the ShadowCrew forum.

3  Q.  Let's not talk about the particular forum.

4         MR. LIOTTI:  Objection.

5  BY MR. EICHELBERGER:

6  Q.  I was asking where, as in the physical world that

7  you had met Mr. Giannone.

8         MR. LIOTTI:  Objection.

9         THE COURT:  Overruled.

10        MR. LIOTTI:  Move to strike the last answer,

11  please.

12        THE COURT:  All right.  Ladies and gentlemen,

13  the reference to ShadowCrew is stricken and you must not

14  consider that in deciding what the facts are.

15  BY MR. EICHELBERGER:

16  Q.  My question -- I'm sorry, if I asked it with perhaps

17  less precision than I might otherwise have done.  Did

18  there come a time after you had chatted online with

19  Mr. Giannone that you met him face to face?

20  A.  Yes.

21  Q.  And where did you first meet Mr. Giannone face to

22  face?

23  A.  Grand Central Station, New York.

24  Q.  And approximately how long ago?  You said you met

25  him in 2000 -- sometime in 2004.

1  A.  I don't recall the exact date.

2  Q.  Okay.  But it was what year?

3  A.  I would say 2004.

4  Q.  I would like to move forward to whether there came a

5  time that Mr. Giannone was upset with you over a

6  perceived -- well, did you steal something from him?

7  A.  Yes, I did.

8  Q.  What did you steal?

9  A.  Three laptops.

10  Q.  Did you steal anything other than laptops?

11  A.  Cash.

12  Q.  Do you recall about how much you took?

13  A.  About $800.

14  Q.  And where were you when you took three laptops and

15  about $800 from Mr. Giannone?

16  A.  In a hotel in New York.

17  Q.  And, again, who had paid for that hotel?

18  A.  Mr. Giannone.

19       MR. EICHELBERGER:  I would like to put on the

20  screen Government's Exhibit 11, page 1, please.

21  BY MR. EICHELBERGER:

22  Q.  Right at the very top you see that that's a chat

23  that took place 6-17-05; is that correct?  Again, you

24  recognize the name Pit Boss 2600?

25  A.  Yes, I do.

1  Q.  On the third line it says, "CC Suppliers stole $600

2  of my cash."  Is that a reference to you?

3  A.  Yes, it is.

4  Q.  "And three Powerbooks"?

5          MR. LIOTTI:  Objection.

6          THE COURT:  Overruled.

7  BY MR. EICHELBERGER:

8  Q.  Is that referring to you?

9  A.  That is referring to me.

10  Q.  Did you do what you are accused of here in this

11  chat?

12  A.  Yes, I did.

13  Q.  Okay.

14          MR. EICHELBERGER:  Moving on, please, to

15  Government's 12, page 2.

16  BY MR. EICHELBERGER:

17  Q.  Up at the very top, see there where it says -- and I

18  will just kind of -- see where I have drawn that little

19  line out to the side?

20  A.  Yes, I have -- yes, I do.

21  Q.  Take a moment and look over that information that is

22  in there and then I'm going to ask you some questions.

23          MR. LIOTTI:  Objection.

24          THE COURT:  What's the objection?

25          MR. LIOTTI:  Could we approach the sidebar,

1  please?

2          THE COURT:  Yes.

3          (Bench conference)

4          MR. LIOTTI:  I'm noticing on this exhibit that

5  there is a reference to ShadowCrew and also

6  carderplanet, and I think that was part of your advisory

7  instructions this morning to this witness so --

8          THE COURT:  This is his involvement not

9  Giannone's involvement.

10          MR. LIOTTI:  I just want to be careful about

11  that.

12          THE COURT:  Okay.

13          (In open court)

14  BY MR. EICHELBERGER:

15  Q.  Mr. Branca?

16  A.  Yes.

17  Q.  Have you had a chance to review over the material

18  that is contained in Government's Exhibit 12?

19  A.  Yes, I have.

20  Q.  I'm going to ask you a series of questions.  Is, in

21  fact, your user name CC Suppliers?

22  A.  Yes.

23  Q.  CBranca?

24  A.  Yes.

25  Q.  VendingMachine?

1  A.  Yes.

2  Q.  Do you, in fact, live in Wallingford, Connecticut?

3  A.  I do.

4  Q.  Is your full legal name Chris Branca?

5  A.  It is.

6  Q.  In 2005 did you live at 30 Hintz Drive in

7  Wallingford, Connecticut?

8  A.  Yes, I do.

9  Q.  Does this accurately state your date of birth as

10 07-17-1986?

11 A.  It does.

12 Q.  And 2005 did you have a cell phone number of

13 203-368-8740?

14 A.  Yes, I did.

15 Q.  And was your home phone number 203-284-5825?

16 A.  Yes, it is.

17 Q.  At that time were you on probation?

18 A.  Yes, I was.

19 Q.  Was your probation officer's name Patricia Warren?

20 A.  Yes, it was.

21 Q.  And was your probation officer's number

22 203-877-1253?

23 A.  Yes, it was.

24 Q.  And did you have an AIM screen name of Chris SBBK?

25 A.  Yes.

1  Q.  To your knowledge did Jonathan Giannone know all of

2  that information?

3  A.  Yes.

4  Q.  Thank you.

5          MR. EICHELBERGER:  Clear the screen, please.

6          MR. LIOTTI:  Objection.

7          THE COURT:  Overruled.

8          MR. LIOTTI:  May I have a voir dire on that,

9  Judge, on that part of his testimony?

10         THE COURT:  Could you what?

11         MR. LIOTTI:  A voir dire, an evidentiary voir

12 dire on that part of his testimony that we just heard,

13 page -- I'm sorry.  Exhibit 12, page 2.

14         THE COURT:  All right.

15                    VOIR DIRE EXAMINATION

16 BY MR. LIOTTI:

17 Q.  Mr. Branca, good afternoon.  My name is Mr. Liotti.

18 I represent Jonathan Giannone.  I have a question about

19 the last document that was shown to you.  The

20 information that you testified about indicating that

21 Jonathan Giannone had access to this information, that

22 was commonly known, wasn't it?  It was on the Internet,

23 correct?

24 A.  Yes, it was.

25         MR. EICHELBERGER:  Your Honor, I have to object

1  to that.  That's cross-examination, not voir dire.

2          THE COURT:  Right.  But what -- I don't

3  understand the question.  What was commonly known?  The

4  information about Mr. Branca that is contained in that

5  document?

6          MR. EICHELBERGER:  Judge, can we take this up

7  at sidebar?

8          THE COURT:  All right.

9          (Bench conference)

10         MR. EICHELBERGER:  This isn't voir dire at all,

11  Your Honor, it's early cross-examination.  I haven't

12  completed my examination of this witness.

13         MR. LIOTTI:  It's evidentiary voir dire.

14         THE COURT:  For what purpose?  The document is

15  already in evidence.

16         MR. LIOTTI:  I understand that, Judge, but he

17  has -- Mr. Eichelberger has proffered through this

18  witness that somehow this was proprietary information

19  that Jonathan Giannone had and somehow this wasn't

20  available, just generally, on the Internet.

21         MR. EICHELBERGER:  I never said anything of the

22  sort nor did I intimate, I merely asked was he aware of

23  that.

24         THE COURT:  The last question was, did Jonathan

25  Giannone have -- to your knowledge did Jonathan Giannone

1 have access to this information, and the answer was yes.

2          MR. LIOTTI:  Yes, but so did the rest of the

3 world.

4          THE COURT:  Well, then, that would be cross-

5 examination.

6          MR. LIOTTI:  Well, I didn't want to leave that

7 with the jurors without them understanding that it is

8 available on the Internet.  It's not some special

9 information that Jonathan Giannone alone had.

10          MR. EICHELBERGER:  I will concede that it is

11 available to the world on the Internet because

12 Mr. Giannone posted it on the Internet.

13          THE COURT:  I'm not going to allow further voir

14 dire at this point because it does not appear to be

15 appropriate for voir dire but more appropriate for

16 cross-examination.

17          MR. EICHELBERGER:  Thank you, Your Honor.

18          (In open court)

19               DIRECT EXAMINATION - CONTINUED

20 BY MR. EICHELBERGER:

21 Q.  Mr. Branca --

22 A.  Yes.

23 Q.  -- did you give anyone permission to post your

24 personal identification information on the Internet?

25          MR. LIOTTI:  Objection.

1          THE COURT:  Overruled.

2   BY MR. EICHELBERGER:

3   Q.  I will restate the question.

4          Did you give anyone permission to post your

5   personal identification information on the Internet?

6          MR. LIOTTI:  Objection.  May we approach

7   again?  I'm sorry.

8          THE COURT:  Yes.

9          (Bench conference)

10          MR. LIOTTI:  I'm sorry to do that to you,

11   Judge.  I don't like having to come back like that.

12          No permission is required.  This is generally

13   available on the Internet through PACER.  It's there,

14   you don't need permission.

15          THE COURT:  To the extent you are objecting,

16   it's overruled.

17          (In open court)

18   BY MR. EICHELBERGER:

19   Q.  I must ask yet again, did you give anyone permission

20   to post your personal identification information on the

21   Internet?

22   A.  No, I did not.

23   Q.  I want to direct your attention to a purported

24   transaction involving the sale of a Ford F-150 pickup

25   truck to Chris Cutler.  Do you know anything about that?

1  A.  I do not recall.

2  Q.  Did you at any time that you can recall refer Chris

3  Cutler to anyone for the purpose of trying to purchase a

4  Ford F-150 pickup truck?

5  A.  I do not.

6  Q.  You did not?

7  A.  I do not.

8  Q.  To your knowledge did -- based upon your dealings

9  with Jonathan Giannone, do you know whether in about May

10  of 2005 Mr. Giannone had a pickup truck available for

11  sale?

12  A.  I do not.

13  Q.  Thank you.

14        MR. EICHELBERGER:  Thank you.  That's all I

15  have.

16        THE COURT:  You may cross-examine.

17        MR. LIOTTI:  Thank you.

18                    CROSS-EXAMINATION

19  BY MR. LIOTTI:

20  Q.  Mr. Branca, hello again.

21  A.  How are you?

22  Q.  Good, sir.  And you?  Probably be a little bit

23  better when this is over, right?

24        Mr. Branca, if I may -- first of all,

25  Mr. Eichelberger has asked you some questions about

1 whether you have been represented by counsel and you

2 indicated that you have been; is that right?

3 A.  Yes.

4 Q.  And it's fair to say, without telling me the

5 substance of any discussions you had with your attorney,

6 it's fair to say that for some period of time now in

7 connection with this case you have been conferring with

8 counsel?

9 A.  Yes, I have.

10 Q.  And do I have it right that your counsel is right

11 here in the courtroom sitting in the first row, right

12 behind the government, Mr. Small?

13 A.  Yes.

14 Q.  Okay.  Now, you remember Mr. Eichelberger asking you

15 some questions about the fact -- he phrased it this

16 way:  "What is your understanding of your obligations

17 under a plea agreement?"  Do you remember that

18 question?

19 A.  Yes.

20 Q.  And that you also remember saying that in return for

21 your testimony you hope to receive a 5K1.1 letter.  Do

22 you remember that?

23 A.  Hope to, yes.

24 Q.  And then Mr. Eichelberger later asked you are you

25 familiar with the cooperation clause of your agreement

1 and you indicated that you were, right?

2 A.  Yes.

3 Q.  And he asked you if you had any guarantees about

4 what would happen to you after your testimony?

5 A.  Yes.

6 Q.  Right?  And you answered no, you don't have any

7 guarantees, right?

8 A.  Yes.

9 Q.  And then Mr. Eichelberger asked you, "Well, what

10 happens if you testify falsely here?"  And you said, "My

11 agreement would go out the window," right?

12 A.  Yes.

13 Q.  Okay.  And that's all of your understanding, right?

14 A.  Yes.

15 Q.  Do you understand -- because you didn't tell us this

16 on direct -- that you must testify truthfully in this

17 case before Her Honor and the ladies and gentlemen of

18 the jury.  Do you understand that?

19 A.  I do.

20 Q.  Okay.  And you understand that you are testifying

21 under oath, right?

22 A.  I do.

23 Q.  Now, Mr. Eichelberger also asked you some questions

24 about a plea agreement.  Do you recall that?

25 A.  Yes.

1  Q.  And that plea agreement was negotiated with you and

2  Mr. Eichelberger, representatives of the United States

3  government, together with Mr. Small, correct?

4  A.  Yes, it was.

5  Q.  All right.  And this plea agreement was just signed

6  on March 2nd, last week; isn't that right?

7  A.  Yes.

8  Q.  Last Friday, to be exact?

9  A.  Yes.

10  Q.  One day before the start of this trial, right?  Is

11  that right?

12  A.  Well, technically Saturday and Sunday as well, but

13  if you're talking about a work week.

14  Q.  You're right.  You're right.  When you're right;

15  you're right.  So one business day before?

16  A.  Yes.

17  Q.  Right?  And how long have you known about this case?

18  A.  About the actual case?

19  Q.  Yes, sir, this case involving Mr. Giannone, how

20  long?

21  A.  I don't recall.  If I had to take a guess, I would

22  say about a month.

23  Q.  And how long have you known about any charges

24  involving you?

25  A.  Any charges that were involving me would -- I would

1  also have to say about a month, possibly three weeks.

2  Q.  So prior to that time you had no idea that you might

3  be called as a witness in this case or that you might be

4  implicated in some fashion in this case; is that right?

5  A.  Prior to me knowing about this case, yes.

6  Q.  So this all came to your realization roughly in the

7  last month, right?

8  A.  You could say that, yes.

9  Q.  So you had discussions with Mr. Eichelberger and the

10  agents in connection with this case about what you will

11  testify to, right?

12  A.  Yes.

13  Q.  And they also told you certain things about this

14  case, didn't they?

15  A.  You would have to elaborate.

16  Q.  No problem.  I will try to do that.  Thank you. I

17  was vague.  But they shared with you certain chats,

18  right?  Some of those Mr. Eichelberger just showed you

19  moments ago, right?  Isn't that correct?

20  A.  Shared with me the chats when?

21  Q.  Shared with you certain chats and I indicated to you

22  that he just showed you some moments ago.

23  A.  So you are saying that if he shared chats with me,

24  you are talking about just as recent as two minutes

25  ago?

1  Q.  Yes.  Well, thank you.  That's good.  Let me go

2  back.

3          Over the last month as you were learning about

4  this case, did Mr. Eichelberger show you or tell you

5  about these chats?

6  A.  He's told me about them.

7  Q.  Okay.  So, when did that happen for the first time?

8  A.  I saw a chat log on Friday.

9  Q.  Last Friday?

10  A.  Yes.

11  Q.  And in that chat that you told us about, which is

12  referred to, for example, in Government Exhibit 12 -- is

13  that the one that Mr. Eichelberger shared with you on

14  Friday?  12?

15  A.  I would have to see the chat again.

16  Q.  Okay.

17          MR. LIOTTI:  Can you help me, on 12?  It's

18  right next to you up there.

19          THE CLERK:  The exhibits in numerical order.

20          THE COURT:  If you will give him the exhibit

21  number he can look at it, Mr. Liotti.

22          MR. LIOTTI:  Does he have a copy, Judge?

23          THE COURT:  Yes.  Just give him the reference.

24          MR. LIOTTI:  Number 12.  You will see the

25  exhibit tabs in the upper right-hand portion of the

1  documents.

2          This would be page 73, Mr. Eichelberger.

3          MR. EICHELBERGER:  Mr. Liotti, if you would

4  like, we can offer to show them on the screen, if you

5  like.

6          MR. LIOTTI:  Thank you.  But I'm not making

7  that request at this time.  Thank you.

8          THE COURT:  He's not asking for it to be on.

9          MR. LIOTTI:  Again, I'm not shy, Judge.

10          THE COURT:  Did you find you Exhibit 12?  You

11  did?

12          THE WITNESS:  It's page 73.

13  BY MR. LIOTTI:

14  Q.  Thank you, sir.  Now, Mr. Eichelberger asked you

15  some questions about this as part of his direct

16  examination.  Is this the document that he told you

17  about on Friday?

18  A.  I don't recall.

19  Q.  Okay.  But you heard Mr. Eichelberger ask you some

20  questions moments ago about this information that was

21  out there, that he asked you -- I'm sorry.  Let me

22  rephrase that.

23          Mr. Eichelberger directed your attention to

24  page 2 of Exhibit 12.  Okay.  That would be page 74.

25  And he asked you questions about some pedigree

1  information pertaining to you: your address, your screen

2  names, and so on.  Do you remember that?

3  A.  Yes, I do.

4  Q.  Okay.  And also such information as, for example,

5  your probation officer's name and phone number, right?

6  A.  I'm sorry.  You have to say that again.

7  Q.  He asked you about your probation officer's name and

8  phone number.  He asked you if that information on

9  page 2 of Government Exhibit 12 is correct.

10  A.  Yes.

11  Q.  Okay.  And that was part -- and there were other

12  things that he asked you about, correct?

13  A.  Other personal information.

14  Q.  Right.  Do you know whether this information, aside

15  from being placed on the Internet, you say, by Jonathan

16  Giannone --

17          MR. EICHELBERGER:  Objection, assumes facts not

18  in evidence.

19  BY MR. LIOTTI:

20  Q.  Do you know how this information got on the

21  Internet?

22  A.  I do not.

23  Q.  Okay.  Have you checked to see whether the

24  department of probation or a court has placed this

25  information on the Internet?

1  A.  No, I have not.

2  Q.  Okay.  Did Mr. Eichelberger tell you of any --

3        MR. EICHELBERGER:  Objection as to what I said,

4  that's hearsay.

5  BY MR. LIOTTI:

6  Q.  Did the government inform you last Friday of how

7  this information might have gotten onto the Internet?

8  A.  I don't recall.

9  Q.  Okay.

10       THE COURT:  You say "gotten onto the Internet,"

11 you mean into this chat transcript?

12       MR. LIOTTI:  No.  I mean on the Internet so

13 that it would be publicly --

14       THE COURT:  In another location?

15       MR. LIOTTI:  It would be publicly available.

16       MR. EICHELBERGER:  That assumes facts not in

17 evidence, Your Honor.  I object.

18       MR. LIOTTI:  Well, I'm asking about it.

19       THE COURT:  Well, it was just confusing to me

20 as to whether you were asking about the portion that is

21 in this chat transcript, how that got on the Internet,

22 or if you're asking about whether it was otherwise on

23 the Internet.

24       MR. LIOTTI:  Yes, otherwise.

25       THE COURT:  Okay.  All right.

1  BY MR. LIOTTI:

2  Q.  Do you understand that?

3  A.  You will have to say it again.  I'm sorry.

4  Q.  Sure.  No problem.

5          MR. LIOTTI:  May I, Judge?

6          THE COURT:  Yes.

7          MR. LIOTTI:  Thank you.

8  BY MR. LIOTTI:

9  Q.  Taking Her Honor's question, I'm asking you whether

10  you were a -- whether you were aware that this

11  information was otherwise on the Internet.  Was it, to

12  the best of your knowledge?

13  A.  No.

14  Q.  Is it that the answer is no, or you just don't know?

15          THE COURT:  Do you have any knowledge whether

16  the information that is contained about you in that chat

17  is otherwise available on the Internet.

18          THE WITNESS:  No, I do not.

19          MR. LIOTTI:  Okay.  Thank you.

20  BY MR. LIOTTI:

21  Q.  Now, if I may, Mr. Eichelberger asked you a few

22  other questions, and in particular he asked you what you

23  have agreed to plead guilty to.  You understand that?

24  A.  Yes, I do.

25  Q.  Okay.  And Mr. Eichelberger referred to a section of

 1  the law known as 371 of Title 18.  Has that section been

 2  explained to you?

 3  A.  You will have to explain what that section is.

 4  Q.  Okay.  He used the word conspiracy when he asked you

 5  some questions on direct.  Do you remember that?

 6  A.  Yes.

 7  Q.  And do you have an understanding of a conspiracy?

 8  A.  Yes.

 9  Q.  Now, is it your understanding of a conspiracy that

10  you are alleged to have agreed with at least one other

11  person to violate United States laws and that one of you

12  then did something in furtherance of that conspiracy.

13  Is that your understanding?

14  A.  Yes.

15  Q.  So one of you had to do something called an overt

16  act, right?  That was explained to you too, wasn't it?

17  A.  No.

18  Q.  Have you taken a plea yet under this agreement?

19  A.  Yes.

20  Q.  You did?  You took an actual plea before a judge?

21  A.  Well -- no, I have not.

22  Q.  Is that scheduled at some point?

23  A.  Not at the moment.

24  Q.  Well, you are going to be asked -- at least this is

25  your understanding, I believe -- you are going to be

1 asked what your involvement was in a conspiracy,

2 correct?

3 A.  Yes, I believe so.

4 Q.  And are you going to be naming a coconspirator?

5 A.  Yes.

6 Q.  And who would that person be?

7 A.  It would be Chris Cutler and Danny Rogers.

8 Q.  So in the document that you have signed on Friday,

9 Mr. Giannone is not named as a coconspirator; isn't that

10 right?  Isn't that right?

11 A.  I -- I don't have the document in front of me.

12 Q.  Well, you are prepared to go forward and tell a

13 federal judge on the advice of counsel --

14         MR. EICHELBERGER:  Your Honor, I object on the

15 grounds of relevance.

16         THE COURT:  Sustained.  Mr. Liotti, you may

17 approach if you want a further clarification on that.

18         MR. LIOTTI:  Okay, thank you, Judge.  I will.

19         (Bench conference)

20         THE COURT:  It's my understanding that his plea

21 is to a conspiracy relating to the one trip to South

22 Carolina that he made with Mr. Cutler and Mr. Rogers for

23 the purpose of carding, and there is no allegation that

24 your client was involved in that.

25         MR. LIOTTI:  That's what I'm trying to bring

1  out.

2            MR. EICHELBERGER:  That's exactly the case.

3            MR. LIOTTI:  That's what I'm trying to bring

4  out.

5            MR. EICHELBERGER:  I will stipulate to that.

6            THE COURT:  You are trying to imply -- you're

7  trying to imply that he's pled guilty to conspiracy and

8  he hasn't named Mr. Giannone as a conspirator in that

9  particular conspiracy, which no one alleges that he is

10  involved in, it is misleading to the jury.

11            MR. EICHELBERGER:  Nor do we allege that

12  Mr. Branca is a conspirator with Mr. Giannone in what

13  Mr. Giannone was charged with.  We have two separate

14  cases that happen to stem from the same undercover

15  investigation.  It does not make them coconspirators in

16  any sense.

17            THE COURT:  I think it's an improper line of

18  questioning because it's misleading to the jury.

19            MR. LIOTTI:  Judge, I don't have any problem

20  with Your Honor clarifying it any way you wish, but I

21  think it's a fair line of inquiry because he's

22  testifying about various things that Mr. Giannone was

23  involved in.

24            THE COURT:  You are getting ready to open the

25  door, because there probably were a number of

1  conspiracies that they were involved in together that we

2  aren't talking about.  If you want to go there, you

3  better --

4          MR. LIOTTI:  Okay.  I get your point.  Thank

5  you.

6          (In open court)

7  BY MR. LIOTTI:

8  Q.  In any event, Mr. Branca, if I may, there is a

9  portion of your plea agreement wherein the various

10 penalties or possible penalties that you are facing --

11         MR. EICHELBERGER:  Objection as to the

12 penalties, Your Honor.  They are not relevant.

13         THE COURT:  Could you restate the question?

14         MR. LIOTTI:  I indicated, Judge, that there is

15 a portion of the plea agreement which indicates the

16 possible penalties that he's facing.

17         THE COURT:  The maximum penalty that what he

18 pled guilty to carries?

19         MR. LIOTTI:  Yes.

20         THE COURT:  All right.  Overruled.

21         MR. LIOTTI:  Thank you.

22 BY MR. LIOTTI:

23 Q.  You recall that portion of your agreement?

24 A.  Yes, I do.

25 Q.  Thank you.  And in that portion of your agreement,

1  which the government drafted, it says five years

2  imprisonment.  You understand that?

3  A.  Yes, I do.

4  Q.  Do you also understand that the possible punishment

5  could be as little as zero time in jail?

6         MR. EICHELBERGER:  Objection, calls for

7  speculation.

8  BY MR. LIOTTI:

9  Q.  You understand that?

10         THE COURT:  Overruled.  I mean, he can say what

11  the minimum and maximum was.

12         MR. LIOTTI:  Yes.  Thank you.

13  BY MR. LIOTTI:

14  Q.  In other words, it's your understanding, is it not,

15  that the minimum could be as little as zero, right?

16  Zero time in jail, zero to five years.  That's the

17  maximum that you are looking at, right?

18  A.  Yes.

19  Q.  And you understand also, do you not, that if the

20  government gives you the 5K1 letter that you testified

21  about, that there's a very good chance that you may

22  receive no jail?

23         MR. EICHELBERGER:  Objection, calls for

24  speculation.

25         THE COURT:  Sustained.

1  BY MR. LIOTTI:

2  Q.  Aren't you trying by virtue of your testimony,

3  coming into this courtroom, signing this plea agreement,

4  you are trying to get no time in jail, aren't you?

5  A.  Yes.

6  Q.  Thank you.  So that's what you get out of the

7  testimony here.  You get a possible no-jail sentence,

8  correct?

9  A.  Possible, yes.

10  Q.  Now, also as part of your testimony, your direct

11  examination, you told us that you took or stole -- I

12  think you said stole -- from Jonathan Giannone three

13  laptops and $800; am I correct?

14  A.  Yes.

15  Q.  Okay.  And I believe you said that that happened in

16  New York; is that right?

17  A.  Yes, it did.

18  Q.  And it happened in about 2004; isn't that so?

19  A.  I don't recall.

20  Q.  Okay.  I thought had you said 2004 in your direct

21  examination.  Do you remember now what year it was?  I'm

22  just trying to jog your memory.  I'm asking you a

23  question, and if you don't recall, you can tell us --

24  A.  I don't recall.

25  Q.  Okay.  So you don't remember exactly when that hotel

1  room that you told us about was rented by Mr. Giannone?

2  A.  Correct.

3  Q.  After you took the three laptops and the $800 from

4  Mr. Giannone, is it fair to say that you had no further

5  dealings with him?

6  A.  At all?

7  Q.  Well, did you have additional dealings with him

8  after that?

9  A.  Elaborate on "dealings."

10 Q.  Okay.  I think you have indicated that you were, in

11 a manner of speaking, in the credit card fraud business

12 from the time you were 16?

13 A.  Yes.

14 Q.  Okay.  And you indicated that you knew Mr. Cutler as

15 a childhood friend; am I right?

16 A.  Yes.

17 Q.  And is it Rogers?

18 A.  Yes.

19 Q.  As a childhood friend also?

20 A.  No.

21 Q.  You met him later?

22 A.  Yes.

23 Q.  Okay.  So in that particular business that you were

24 involved in, after you stole those three laptops and the

25 $800, did you have any further dealings with

1  Mr. Giannone?

2  A.  No.

3  Q.  Okay.  When was the last time, prior to today, that

4  you had any dealings with Mr. Giannone?

5  A.  I don't recall.

6  Q.  Could it have been prior to May of 2005?

7  A.  Again, I don't recall.

8  Q.  Mr. Branca, are you under a doctor's care?

9  A.  Doctor's?

10  Q.  Yes.

11  A.  No.

12  Q.  Are you having any problem with your memory?

13  A.  A little.

14  Q.  Okay.  Is that because you're taking any medication,

15  sir?

16  A.  I'm -- I'm not sure.

17  Q.  Are you taking medication?

18  A.  No, I am not.

19  Q.  But you are having a problem with your memory --

20  you're hesitating, that's why I'm asking, sir.  It's a

21  simple yes or no.  It may be embarrassing to you, but

22  it's a simple yes or no.

23  A.  No, I don't have a problem with my memory.

24  Q.  You have indicated that you believe that Jonathan

25  Giannone was known as Pit Boss 2600; is that correct?

1 A.  Yes.

2 Q.  When did you come by that information?

3 A.  Briefly after I -- I talked with him.

4 Q.  You spoke with him?

5 A.  Well, over the Internet.

6 Q.  When?

7 A.  When I met him.

8 Q.  Which was when?

9 A.  Again, I don't recall.

10 Q.  Do you know if anyone else ever utilized the name

11 Pit Boss?

12 A.  No, I don't.

13 Q.  Do you know if anyone ever had a password for

14 Jonathan Giannone, other than Jonathan, of course?

15 A.  No, I don't.

16 Q.  Do you know if anyone else -- well, withdrawn.

17        The name Mark Rich, Mr. Eichelberger asked you

18 some questions about that and you indicated that it's

19 your understanding that Jonathan Giannone used that as a

20 screen name; is that right?  Or a chat name?

21 A.  Yes.

22 Q.  When did you come by that information?

23 A.  That I knew him by that name?

24 Q.  Yes, sir.

25 A.  Again, when I started -- when I met him.

1  Q.  And, again, you don't remember when that was?

2  A.  I would have to say somewhere in the year 2004.

3  Q.  And so you are telling us here and now that no one

4  else, including the United States Government, provided

5  you with that information?

6  A.  Explain yourself, again.  I'm sorry.

7  Q.  Sure.  I'm asking you if anyone other than Jonathan

8  Giannone provided you with that information?

9  A.  The information that he went by the name --

10  Q.  Mark Rich, Pit Boss 2600.

11  A.  Not a direct link to his real name, no.

12  Q.  Okay.  Well, tell me again how you learned that

13  Jonathan Giannone went by those names?

14        THE COURT:  Let me ask you, when you are

15  answering, to be clear, whether you are talking about

16  when you met someone, whether you are talking about

17  meeting them online or meeting them in person.

18        THE WITNESS:  Yes, Your Honor.

19        THE COURT:  And please distinguish those

20  circumstances for us.

21        THE WITNESS:  Yes.

22        THE COURT:  Okay.  Thank you.

23  BY MR. LIOTTI:

24  Q.  Tell me again, if you would, how you learned that

25  Jonathan Giannone was utilizing those names, if you

1  recall?

2  A.  I -- I learned from us talking briefly on the Web

3  sites, then it moving to AOL Instant Messaging, and from

4  there moving to actually meeting in real life.

5  Q.  Well, let's take it one at a time.  As you sit here

6  now do you have anything in writing such as a chat or a

7  reprint of an e-mail or anything like that from Jonathan

8  Giannone indicating that he went by the name Mark Rich

9  or Pit Boss 2600?

10  A.  I do not.

11  Q.  But you're saying you recall seeing that in some

12  type of a writing, whether it be a chat or an e-mail,

13  you recall Jonathan Giannone communicating with you in

14  that forum and indicating that he utilized those names?

15  A.  Yes.

16  Q.  Did you tell anyone back in 2004 or thereafter that

17  you knew that Jonathan Giannone utilized those names?

18  A.  I don't recall.

19  Q.  What about the name CIA INTEL, do you know anything

20  about that?

21  A.  No, I do not.

22  Q.  And you went by several different names, didn't you?

23  A.  Yes.

24  Q.  You went by -- I think Mr. Eichelberger asked you --

25  CC Suppliers?

1  A.  Yes.

2  Q.  VendingMachine?

3  A.  Yes.

4  Q.  Any others?

5  A.  Are we talking about forums or are we talking about

6  instant messaging?

7  Q.  Either way.

8  A.  Yes, there were more.

9  Q.  Okay.  How many more?

10  A.  CBranca and Chris SBBK.

11  Q.  Any others?

12  A.  CC Suppliers on AOL Instant Messenger as well.

13  Q.  Any others?

14  A.  Not that I recall.

15  Q.  Now --

16          MR. LIOTTI:  Judge, could we approach for one

17  second, please?

18          THE COURT:  Yes.

19          (Bench conference)

20          MR. LIOTTI:  Judge, I don't think I have an

21  opening-the-door problem here but I just -- if I may ask

22  you for a bit of an advance ruling here, because I don't

23  want to get myself in trouble.  As far as the California

24  arrest is concerned, I believe there was a conviction

25  there and I believe the charges against Mr. Giannone

1  were dismissed for lack of proof.  So I would propose,

2  not even to bring up Mr. Giannone, by just simply asking

3  him was he convicted of anything in California.

4          THE COURT:  That's fine.

5          MR. LIOTTI:  That's all right?

6          THE COURT:  That's all right.

7          (In open court)

8  BY MR. LIOTTI:

9  Q.  Sir, I just want to focus for a second on what you

10 told us about your California case.

11 A.  Okay.

12 Q.  Were you charged in California?

13 A.  Yes, I was.

14 Q.  Were you convicted of anything in California?

15 A.  Yes, I was.

16 Q.  What were you convicted of?

17 A.  I believe it was second degree burglary --

18 commercial burglary.

19 Q.  And what was the sentence that you received?

20 A.  I received a 60-day sentence with -- I had to serve

21 a total of 40.

22 Q.  And you are out of jail now, right?

23 A.  Yes, I am.

24 Q.  Are you on probation?

25 A.  Yes, I am.

1  Q.  Do you know whether the plea that you are about to

2  enter in this case will cause your probation in the

3  State of California to be violated?

4  A.  I believe it will.

5  Q.  And did the government promise you that it would

6  also advise the department of probation in the State of

7  California that you have cooperated with it here?

8  A.  That I don't know.

9  Q.  But in your own mind you are hoping to receive some

10  benefit, even in California, for what you are doing

11  here; isn't that right?

12  A.  Again, hoping.  Yes.

13          MR. LIOTTI:  One second, Judge, please.

14          THE COURT:  All right.

15          MR. LIOTTI:  Judge, there's one further area

16  that we need to get into and we would ask for five

17  minutes, a recess right now, if Your Honor pleases.

18          THE COURT:  All right.

19          Ladies and gentlemen, we will take our

20  afternoon break.  You may take 10 minutes.  Leave your

21  pads here, turn them over.  Do not discuss the case

22  while you are on break.

23          Mr. Branca, you may not discuss this with

24  anyone, including your lawyer, while you are on break.

25          THE WITNESS:  Okay.

1              (Short recess)

2              MR. LIOTTI:  Judge, we are having a little bit

3     of a technical problem, besides the fact Mr. Smith just

4     ran to the bathroom, we are getting the DVD up on some

5     of the screens but not the big screens or on the jury

6     screens.

7              THE CLERK:  Well, that's because --

8              THE COURT:  She keeps it on override until I

9     admit it.

10             THE CLERK:  But you know we will need your disk

11    as an exhibit.

12             (Off record discussion)

13             MR. LIOTTI:  I think, Judge, just -- if we can

14    do this right, I think, probably, the best way to do it

15    would be to turn off the big screens and the screens in

16    front of the jurors, and I will ask him a statement

17    about what's contained on the DVD.  And if he doesn't

18    recall, we can show it to him, I think, privately, can't

19    we?

20             THE COURT:  We can.

21             MR. LIOTTI:  So we would do that first, and see

22    if that refreshes his recollection, if that's all right

23    with Your Honor.

24             THE COURT:  That's fine.

25             MR. LIOTTI:  Okay.  So that's what we'll try to

1    do.

2              THE COURT:  Okay.

3              THE CLERK:  Can you see it?

4              THE WITNESS:  Yes.

5              THE COURT:  Do we need to wait for Mr. Smith or

6    can we go ahead?

7              MR. LIOTTI:  Can I run down the hallway, Judge?

8              THE COURT:  Go ahead.

9              MR. LIOTTI:  Now we are ready, Judge.

10             THE COURT:  All right.  You may bring the jury

11   in.

12             (Jury present)

13             THE COURT:  All right.  Mr. Liotti, you may

14   continue.

15             MR. LIOTTI.  Yes.  Thank you, Judge.

16   BY MR. LIOTTI:

17   Q.  Mr. Branca, just a few more questions.  I believe

18   you told us a little while ago that you have another

19   screen name that you had utilized, namely Chris S, as in

20   Sam; B, as in boy; B, as boy; K, as in kite?

21   A.  Yes.

22   Q.  Do you recall having a conversation with Brett

23   Johnson, Brett Johnson also known as gollumfun?

24   A.  I have had contact with him, yes.

25   Q.  Do you recall indicating to Mr. Johnson in a chat

1  that you had stolen $200,000 and you went through it

2  because of a drug problem that you have?

3  A.  I don't recall.

4  Q.  Okay.  We are going to show you something now and

5  see if that refreshes your recollection.

6  A.  Okay.

7          MR. LIOTTI:  Judge, can we show him that

8  document now, please?

9          THE COURT:  Yes, just for the witness.

10         MR. LIOTTI:  Again, we don't want -- it's not

11 for the jurors.  Thank you.

12         MR. EICHELBERGER:  Your Honor, I believe the

13 text has been altered so I'm going to object to any

14 publication to the jury in its current form.

15         THE COURT:  You mean enlargement?

16         MR. EICHELBERGER:  Absolutely.

17         MR. SMITH:  Put it in regular type.

18 BY MR. LIOTTI:

19 Q.  Mr. Branca, do you see that on the screen in front

20 of you now?

21 A.  Yes.

22 Q.  Okay.

23         THE COURT:  Could we have a time frame?  Is

24 that possible?

25         MR. LIOTTI:  Okay.

1  BY MR. LIOTTI:

2  Q.  I'm directing your attention to the end of the

3  screen.  Do you see a date, July 8th of '05?

4  A.  Okay.  Yes.

5  Q.  Is that when this conversation or chat occurred?

6  A.  I don't recall.

7  Q.  That doesn't help you refresh your recollection?  We

8  are just going to scroll to the top of that and see if

9  that refreshes your recollection.

10         Okay.  Do you see the date that appears at the

11  top of that chat?

12  A.  7-7-05.

13  Q.  Yes.  Does that refresh your recollection?

14  A.  No.

15  Q.  Okay.  Now, let's go to the portion of the text that

16  I was asking you about.  Scroll down.

17         Okay.  Do you see that portion of the text, the

18  second line?

19  A.  On the top?

20  Q.  Yes, sir.

21  A.  Yes.

22  Q.  Does that refresh your recollection about a

23  conversation that you had with gollumfun?

24  A.  No, it doesn't.

25  Q.  Would you please read down?

1  A.  Okay.  I have read the entire thing down to the

2  date.

3  Q.  Does that refresh your recollection?

4  A.  No.

5  Q.  Well, let me ask you, did you -- did you steal money

6  under Bogart -- under Bogart?

7  A.  What do you mean by "Bogart"?

8  Q.  Will you take a look at the text again and see if

9  that refreshes your recollection?

10  A.  I don't understand how Bogart is being used in this

11  context.

12  Q.  And you don't recall that conversation with

13  gollumfun?

14  A.  I don't recall it, no.

15  Q.  But do you recall taking $200,000 illegally?

16  A.  In one sitting?

17  Q.  However it happened.

18  A.  I can't recall, no.

19  Q.  Do you recall telling gollumfun that you, quote,

20  Pissed it all away?

21  A.  I don't recall any of this.

22  Q.  Did you piss away --

23           THE COURT:  Are you saying that you don't

24  recall the circumstances that are being described here

25  or you don't recall having a conversation online about

1  it?

2        THE WITNESS:  I don't recall the words that

3  were being used in this conversation.

4        THE COURT:  That's still not clear.

5        THE WITNESS:  I don't recall saying this to

6  gollumfun.

7  BY MR. LIOTTI:

8  Q.  Did you piss away $200,000 on drugs, illegal drugs?

9  A.  I don't believe so.  I don't think so.

10 Q.  But you pissed away some amount of money on that; is

11 that right?

12 A.  I did use some drugs.

13 Q.  What kind of drugs did you use?

14 A.  Marijuana.

15 Q.  Any cocaine or heroin?

16 A.  Cocaine, never heroin.

17 Q.  Okay.  Crack?

18 A.  No, I haven't -- no --

19 Q.  You never smoked crack?

20 A.  No.

21 Q.  Over what period of time are we talking about did

22 you use drugs?

23 A.  Again, I don't recall.  Probably around 2004, 2005.

24 Q.  Okay.  In July of 2005?

25 A.  I don't recall.

1  Q.  Did you ever go into a rehab?

2  A.  No, I have not.

3  Q.  Are you still using drugs now?

4  A.  No, I am not.

5  Q.  When was the last time you stopped -- or when --

6  when did you stop, I should say?  Thank you.

7  A.  Definitely a year ago, maybe more.

8  Q.  As of 2006, sometime, you stopped?

9  A.  Yes.

10  Q.  And you haven't used drugs since?

11  A.  Never.

12  Q.  On this $200,000 that is referred to in there, is it

13  fair to say that you have taken more than $200,000

14  illegally in your activities?

15  A.  I don't believe so.

16  Q.  Since the time you were 16 until now you are telling

17  us that you didn't take more than $200,000?

18  A.  I don't recall an exact amount.

19  Q.  Ever keep track of it?

20  A.  No.

21  Q.  Any idea of how many dumps you have utilized over

22  the years?

23  A.  No.

24  Q.  Did Mr. Eichelberger or the government have any

25  discussions with you about restitution as part of your

1  plea?

2  A.  They have not, no.

3  Q.  So you are not quite sure what you may have to pay

4  back, if anything, in the way of restitution; is that

5  right?

6  A.  No, I am not.

7  Q.  Now, as far as your drug usage is concerned, in that

8  period prior to a year ago when you stopped using, you

9  tell us, how often were you using drugs?

10  A.  I don't recall.  Not -- not often, but -- I don't

11  recall an exact amount of time between times.

12  Q.  Okay.  Did you use cocaine once a week?

13  A.  You have to explain more -- once a week --

14  Q.  Once a week?

15  A.  Once a week for the entire time, between 16, you

16  know -- since I was 16 years of age all the way up to

17  2006?

18  Q.  Well, let's take right before you stopped.  Okay?

19  In about 2006 did you use cocaine once a week?

20  A.  No --

21  Q.  When was the last time you used cocaine?

22  A.  I can't remember.  It was -- I would have to say a

23  year and a half ago.

24  Q.  Okay.  When you used cocaine, how much did you use?

25  A.  I don't recall.

1  Q.  You know how much you paid for it?

2  A.  No, I do not -- well, yeah -- well, it varied.

3  Q.  And when you smoked marijuana, do you know how much

4  you paid for that?

5  A.  Yes.

6  Q.  And did smoke what is known as hydroponic marijuana?

7  A.  You have to elaborate a little bit more.

8  Q.  Do you know what hydroponic marijuana is?

9  A.  No.

10  Q.  Marijuana that is grown in water.

11        MR. EICHELBERGER:  Objection.  He said he

12  doesn't know.

13        THE COURT:  Sustained.

14  BY MR. LIOTTI:

15  Q.  Did you grow your own?

16  A.  No.

17  Q.  Okay.  Now, you said a moment ago that you thought

18  you might recall how much you were spending on cocaine.

19  Do you remember that?

20  A.  Yes, I recall one -- a couple of prices.

21  Q.  A couple of prices?

22  A.  Yes.

23  Q.  Okay.  What were they?

24  A.  Between $65 and $135.

25  Q.  And how much was that for?

1  A.  It varied between a gram and 3.5 grams.

2  Q.  Where did you buy that?

3  A.  From a local dealer.

4  Q.  Did the government ask you any questions about that

5  during its debriefing of you?

6  A.  No, they did not.

7  Q.  Okay.  So they didn't ask you to turn in the name of

8  your dealer?

9  A.  No, they did not.

10         MR. LIOTTI:  Excuse me one second, Judge.

11  BY MR. LIOTTI:

12  Q.  Just one final point, Mr. Branca.  Did you use those

13  dumps to purchase cocaine and pot?  Mr. Branca?

14  A.  I don't know how to answer the question.  Maybe when

15  I was -- sometimes.

16  Q.  Thank you.

17         MR. LIOTTI:  No further questions.

18         THE COURT:  Redirect?

19                REDIRECT EXAMINATION

20  BY MR. EICHELBERGER:

21  Q.  Mr. Branca, I'm going to hand you -- I'm going to

22  hand you what has been marked as Government's 28 for

23  identification.  If you would, take a look at the last

24  page of it.  Do you recognize your signature on the

25  document?

1  A.  Yes, I do.

2  Q.  Do you recognize Government's 28, your plea

3  agreement in connection with your criminal exposure?

4  A.  Yes.

5          MR. EICHELBERGER:  Offer 28 into evidence at

6  this time, Your Honor.

7          THE COURT:  May I see that?

8          THE WITNESS:  (Handing.)

9          MR. EICHELBERGER:  It probably does have the

10  clause Your Honor may be concerned about.

11          THE COURT:  I will admit this but it will have

12  to be redacted.

13          MR. EICHELBERGER:  I understand, Your Honor.

14  BY MR. EICHELBERGER:

15  Q.  Mr. Branca, I want to ask --

16          MR. EICHELBERGER:  If Your Honor could hand it

17  back to him?

18  BY MR. EICHELBERGER:

19  Q.  On the last page, immediately above your signature,

20  I would like to read and you just -- if you would, just

21  read along with me and you tell me if I have read it

22  correctly.

23          MR. LIOTTI:  Can we just have the exhibit

24  again?  Is this 28 we're talking about?

25          MR. EICHELBERGER:  Government's Exhibit 28.

1              MR. LIOTTI:  Thank you.

2   BY MR. EICHELBERGER:

3   Q.  You following along with me?

4   A.  Yes, I am.

5   Q.  "The parties hereby agree that this plea agreement

6   contains the entire agreement of the parties; that this

7   agreement supersedes all prior promises,

8   representations, and statements of the parties; that

9   this agreement shall not be binding upon any party until

10  the defendant tenders a plea of guilty to the court

11  having jurisdiction over this matter; that this

12  agreement may be modified only in writing, signed by all

13  parties; and that any and all other promises,

14  representations, and statements, whether made prior to,

15  contemporaneous with, or after this agreement are null

16  and void."

17             Did I read that correctly?

18  A.  Yes, you did.

19  Q.  Do you understand that clause to say, if it's not in

20  writing you don't have it?

21             MR. LIOTTI:  Objection.  The document speaks

22  for itself.

23             THE COURT:  Sustained.

24  BY MR. EICHELBERGER:

25  Q.  If you would, and this may take you a little bit of

1  time, but would you flip through Government's 28 and

2  would you tell us whether there is anything in

3  Government's 28 that addresses the fact of your

4  California charges and what might happen as a result of

5  this plea?  Is there anything in the agreement that

6  deals with that?

7           MR. LIOTTI:  Again, the document speaks for

8  itself, Judge.

9           THE COURT:  Overruled.

10  BY MR. EICHELBERGER:

11  Q.  And I will simply step back and let you take your

12  time.

13  A.  What page is 28?

14  Q.  I'm sorry?

15  A.  What page is this on?

16  Q.  I'm simply asking you whether it's in there.

17  Mr. Liotti asked the question --

18           MR. LIOTTI:  Objection.  Counsel is

19  testifying.

20           THE COURT:  Overruled.

21  BY MR. EICHELBERGER:

22  Q.  I simply want to find out --

23           MR. LIOTTI:  Objection.  There's a question on

24  the floor, Your Honor.

25           THE COURT:  Wait just a minute.

1          He's asking you to review the document and see

2    if there's anything in there about your California

3    charges.

4          MR. LIOTTI:  Judge, may the record reflect how

5    long it's taking the witness to review the document.  I

6    have it at 15 seconds so far.

7          THE COURT:  We will rely on you to keep us

8    updated.

9          Do you have some water?  Do you have water?

10         A JUROR:  Yes, ma'am.

11         THE COURT:  Okay.

12         MR. LIOTTI:  I have one minute so far, Judge.

13         That's two minutes, Your Honor.

14         Your Honor, that's three minutes.

15         MR. EICHELBERGER:  Your Honor, if we could, we

16   don't want to suggest to Mr. Branca there was some

17   promise made about California --

18         MR. LIOTTI:  Objection to counsel testifying.

19         MR. EICHELBERGER:  Want him to have all the

20   time in the world.

21         THE COURT:  Fine.

22         Are you finished?

23         THE WITNESS:  No.

24         THE COURT:  Okay.  What page are you on now?

25         THE WITNESS:  I was just rushing through it,

1  reading over it.

2          THE COURT:  Go ahead.

3          MR. LIOTTI:  That's four minutes, Your Honor.

4          That's five minutes, Your Honor.

5  BY MR. EICHELBERGER:

6  Q.  Have you finished?

7  A.  Yes.

8          MR. LIOTTI:  That's five minutes and 30

9  seconds, Your Honor.

10          THE COURT:  What's the grand total,

11  Mr. Liotti?

12          MR. LIOTTI:  Sorry?

13          THE COURT:  What was our grand total?

14          MR. LIOTTI:  Five minutes and 30 seconds, Your

15  Honor.  Thank you.

16  BY MR. EICHELBERGER:

17  Q.  Mr. Branca, in your five minutes and 30 seconds of

18  reviewing your plea agreement, is there anything in it

19  about what might happen with respect to your California

20  charges?

21  A.  "The provisions of this paragraph shall not be

22  applied to restrict any such information" --

23  Q.  I'm just asking, is there anything --

24          MR. LIOTTI:  Objection.  The witness's --

25          THE COURT:  Whoa, whoa, whoa --

1          MR. LIOTTI:  -- testimony was interrupted.

2          THE COURT:  Excuse me, Mr. Liotti.  When I'm

3  speaking, you don't speak.  Got that?

4          MR. LIOTTI:  Yes, sir -- yes, ma'am.  Sorry.

5          THE COURT:  Mr. Branca, you were referring to a

6  particular paragraph that you thought might have

7  something to do with the question.  Tell us what that

8  paragraph is.

9          THE WITNESS:  "The provisions of this paragraph

10  shall not be applied to restrict any such information,

11  A, which is irrelevant and, B, concerning the existence

12  of prior convictions and sentences."

13          THE COURT:  All right.

14  BY MR. EICHELBERGER:

15  Q.  You understand that to be a clause that permits Her

16  Honor to consider --

17          MR. LIOTTI:  Objection.  The document speaks

18  for itself.

19          THE COURT:  What is your understanding?  What

20  do you think that means?

21  BY MR. EICHELBERGER:

22  Q.  Which paragraph are you referring to, if I may?

23  A.  It's on page 6, number 9.

24  Q.  Thank you.

25  A.  Second paragraph down.

1  Q.  Why don't we read paragraph 9.  "The government

2  agrees --"

3          MR. LIOTTI:  Objection, Judge.  The witness was

4  in the process of answering the question.

5          MR. EICHELBERGER:  If we could, Your Honor, we

6  would like to --

7          THE COURT:  You may publish the paragraph and

8  then ask him what he understands it to mean.

9  BY MR. EICHELBERGER:

10 Q.  "The government agrees that any self-incriminating

11 information provided by the defendant as a result of the

12 cooperation required by the terms of this agreement,

13 although available to the Court, will not be used

14 against the defendant in determining the defendant's

15 applicable guideline range for sentencing, pursuant to

16 the U.S. Sentencing Commission guidelines.  The

17 provisions of this paragraph shall not be applied to

18 restrict any such information, A, known to the

19 government prior to the date of this agreement, B,

20 concerning the existence of prior convictions and

21 sentences, C, in a prosecution for perjury or giving

22 false statement or, D, in the event the defendant

23 breaches any of the terms of the plea agreement."

24          Have I read it correctly?

25          MR. LIOTTI:  Objection.

1          THE COURT:  Overruled.

2          MR. LIOTTI:  Your Honor, I believe you posed

3  the question of what his understanding of the agreement

4  was and now Mr. Eichelberger has placed before the jury

5  and this witness all of paragraph 9, verbatim.  That

6  wasn't responsive to the question.

7          THE COURT:  Your objection is overruled.

8          MR. LIOTTI:  Thank you.

9  BY MR. EICHELBERGER:

10  Q.  What is your understanding of what paragraph 9 has

11  to do with your charges out in California?  Is there

12  anything?

13          MR. LIOTTI:  Objection.

14          THE COURT:  Overruled.

15  A.  That the existence of my prior convictions or

16  sentencing won't be taken into consideration when

17  sentenced.

18  BY MR. EICHELBERGER:

19  Q.  On your current case; is that correct?

20  A.  I believe so.

21  Q.  Thank you.  Other than that, is there any reference

22  anywhere in the plea agreement to California, starting

23  back -- we can start the clock at five minutes and 30

24  seconds.

25          MR. LIOTTI:  Well, looking at it right now,

1  Judge.  So far we've got 10 seconds.

2           THE COURT:  This is ridiculous.  There is no

3  reference to California in your plea agreement; is

4  there?

5           THE WITNESS:  I didn't see one, no.

6           THE COURT:  All right.  We are done with this.

7           MR. EICHELBERGER:  Thank you, Your Honor.  I

8  simply wanted to make that point.

9           MR. LIOTTI:  Objection.  Move to strike

10 Mr. Eichelberger's last comment.

11          THE COURT:  Overruled.

12 BY MR. EICHELBERGER:

13 Q.  With respect to meeting with my office -- with me in

14 preparation, when was the first time you and I had a

15 chance to meet each other?

16 A.  Friday afternoon.

17 Q.  Last week?

18 A.  Yes.

19 Q.  Prior to Friday afternoon of last week had you ever

20 spoken either in person or by phone to me?

21 A.  No, I had not.

22 Q.  Had you spoken either in person or by phone to

23 anyone with my office?

24 A.  Yes, I have.

25 Q.  With my office, and by that I mean myself,

1  Mr. Daley, Mr. Smith, Mr. Kirby --

2  A.  No.

3  Q.  No.  And who was present on Friday of last week when

4  we met with you?

5  A.  Yourself, Agent Smith, and --

6  Q.  Mr. Daley?

7  A.  Mr. Daley.  I'm sorry, sir.

8  Q.  And your attorney?

9  A.  And my attorney, yes.

10  Q.  Mr. Small?

11  A.  Yes.

12  Q.  Now, with respect to that prep session, when

13  questions were raised about the information that we

14  previously put on the screen, information that has been

15  put into evidence previously from chat transcripts, were

16  you given access to any of that information before you

17  answered questions about that type information?

18  A.  No, I was not.

19  Q.  So the first time -- you were fully debriefed and

20  then asked to confirm information?

21  A.  Yes.

22  Q.  Thank you.  Let me make sure we clarify a point

23  here.  You testified that you first met Mr. Giannone in

24  2004; is that correct?

25  A.  On or about that time, yes.

1  Q.  Now, how long after you first met Mr. Giannone did

2  you steal the money and the three laptops?

3  A.  Quite a while.  After my conviction in California.

4  Q.  All right.  And your conviction in California would

5  have been when, approximately?

6  A.  I think it was September of 2005.

7  Q.  September 2005.  So you stole the laptops?

8  A.  Oh, no, no, the -- that was when I was convicted.

9  I'm sorry.

10  Q.  Okay.

11  A.  The laptops -- I don't recall.  I believe it was

12  summertime.

13  Q.  Of what year?

14  A.  I don't recall the year.

15  Q.  Now, who owned those three laptops?

16  A.  Mr. Giannone had, you know -- had them in his

17  possession.  They were under his ownership.

18  Q.  Mr. Giannone.  And if you know, about how much were

19  those laptops worth?

20  A.  Two of them were worth about $3,000 apiece.  The

21  other worth about 2,000.

22  Q.  Were they new or were they used?

23  A.  They were brand new in the box.

24  Q.  Brand new in the box?

25  A.  Brand new, sealed.

1  Q.  Never been opened?

2  A.  Never.

3  Q.  Bear with me for a second.

4  A.  Sure.

5          MR. EICHELBERGER:  Brief sidebar, Your Honor.

6          (Bench conference)

7          MR. EICHELBERGER:  First, I apologize for

8  taking the length of time, Your Honor, but I felt it was

9  a matter of honor where it's been suggested that I have

10 somehow made promises that I have not.

11          Two things.  I would ask the Court's take on

12 whether it would be proper for me to make the comment

13 that the plea agreement was provided to the defense

14 prior to Mr. Branca taking the stand and they knew what

15 was in that plea agreement.

16          THE COURT:  We don't need to go there.

17          MR. EICHELBERGER:  I understand.

18          Second point.  It strikes me, Your Honor, that

19 by going into some of the specifics of what went on out

20 in California with the charges, that Mr. Liotti may have

21 opened the door to further explore Mr. Giannone's

22 involvement in that episode.

23          THE COURT:  No.

24          MR. EICHELBERGER:  Thank you.

25          (In open court)

1          MR. EICHELBERGER:  Mr. Branca, if I could, I

2   will take the plea agreement back from you, and that's

3   all I have.

4          THE COURT:  All right.  Mr. Branca, you may be

5   excused.  You will not discuss your testimony here with

6   anyone while this trial is still going on.  Do you

7   understand that?

8          MR. LIOTTI:  Judge, I have a couple of

9   questions on recross, if Your Honor pleases.

10          THE COURT:  New material?  New material that

11   was just brought up for the first time on redirect?

12          MR. LIOTTI:  Yes, Your Honor.

13          THE COURT:  All right.  Go ahead.

14                    RECROSS-EXAMINATION

15   BY MR. LIOTTI:

16   Q.  Mr. Eichelberger had -- he asked you on redirect

17   examination about what happened last Friday when you

18   signed off on that plea agreements, correct?

19   A.  Yes.

20   Q.  Okay.  And you indicated that that was really the

21   first time that you had spoken with Mr. Eichelberger and

22   representatives from his office; is that right?

23   A.  Yes.

24   Q.  Okay.  Is it fair to say, though, that approximately

25   two weeks before that, on or about February 15th, 2007,

1  your counsel at the time, I believe Mr. Ed McMannus,

2  received a proffer agreement prepared by the United

3  States Government in connection with that plea

4  agreement?

5  A.  Yes, that's correct.

6  Q.  And you signed off on that, right?

7  A.  Yes, I did.

8  Q.  And as part of that agreement with the United States

9  Government, you agreed to be debriefed on everything,

10 right?

11 A.  I believe so.

12 Q.  To tell all about your life --

13 A.  Yes.

14 Q.  -- basically, correct?

15 A.  Yes.

16 Q.  And also you agreed to submit, if they chose to give

17 it to you --

18         MR. EICHELBERGER:  Objection, Your Honor.

19 BY MR. LIOTTI:

20 Q.  -- a --

21         THE COURT:  Don't go there.  Approach.

22         MR. LIOTTI:  Okay.

23         (Bench conference)

24         THE COURT:  You are getting ready to say

25 polygraph?

1          MR. LIOTTI:  Yes.

2          THE COURT:  We don't do that in this circuit,

3   ever.

4          MR. LIOTTI:  It's in the agreement.

5          THE COURT:  That's right.  We don't talk about

6   it in this circuit in front of a jury.  It's not

7   admissible.  That's why we redacted it out of the

8   agreement.  That's why when we moved the admission of

9   the agreement, that's why we said it had to be redacted,

10  the polygraph paragraph comes out.

11         MR. LIOTTI:  Is it all right with you later,

12  Judge, when we have a break at the end of the day that I

13  make reference to that and why I wanted to inquire into

14  it?

15         THE COURT:  Sure, not in front of the jury.

16         MR. LIOTTI:  Okay.

17         (In open court)

18         MR. LIOTTI:  I have no further questions.

19  Thank you, Judge.

20         THE COURT:  Mr. Branca, you may be excused.

21         You may call your next witness.

22         MR. EICHELBERGER:  We call Mr. Oussama Awkal.

23  Mr. Daley will be doing the examination.

24         THE COURT:  All right.  Mr. Awkal, if you will

25  come around here and step up into this witness box and

1  then raise your right hand, sir, and state your full

2  name and spell it for us please, and try not to hit the

3  microphone when you're standing there.  There you go.

4  All right.  State your full name.

5          THE WITNESS:  Oussama Akwal.

6          THE COURT:  Spell it, please.

7          THE WITNESS:  O-u-s-s-a-m-a, last name

8  A-w-k-a-l.

9          THE COURT:  All right.  Keep your hand up to be

10  sworn.

11                  OUSSAMA AWKAL, SWORN

12          THE COURT:  Mr. Awkal, I want you to pull up

13  closer and adjust that microphone down.  There you go.

14  Good.  Thank you.

15                  DIRECT EXAMINATION

16  BY MR. DALEY:

17  Q.  Mr. Awkal, where do you live?

18  A.  I live on 46 Ogden Street, Indian Orchard,

19  Massachusetts.

20  Q.  And how long have you lived there?

21  A.  Approximately four years.

22  Q.  And how long have you lived in the area?

23  A.  About 20 years.

24  Q.  What do you do?

25  A.  I own a dealership and a repair shop.

1  Q.  What's it called?

2  A.  Right now it's called AW&T, which is Auto Wholesaler

3  and Transport.

4  Q.  What was it called back in 2005?

5  A.  It was A&W Auto Clinic.

6  Q.  How long have you owned this auto clinic and

7  dealership?

8  A.  10 years.  Since October of '96.

9  Q.  Let's go ahead and fast forward to February 2005.

10  Did you at that time put your A&W Auto Clinic up for

11  sale on eBay?

12  A.  Yes, I did.

13  Q.  I want you to describe what you did to do that and

14  what happened as a result of that.

15  A.  Okay.  My brother and I -- I decided to put my

16  business up for sale on eBay and my brother, my older

17  brother, Mahar (phonetic), he helped me with -- with the

18  typing and the ideas and everything I should do to list

19  it.  Shortly after I listed it I received a phone call

20  from a Jonathan Giannone.

21  Q.  How long after you had listed it did you receive the

22  phone call?

23  A.  A few days.  I would say two to three days after I

24  had listed it I received a call from him.  It was on a

25  Sunday.

1  Q.  When you originally listed the business, how much

2  did you list it for sale?

3  A.  75,000 was my asking price.

4  Q.  And do you own the property as well, or was this

5  just going to --

6  A.  Yes, I do.

7  Q.  Okay.  And were you going to sell the property as

8  well, or was it just the business you were selling?

9  A.  No, just the business.

10  Q.  Describe the conversation, the initial conversation

11  you had with Mr. Giannone.

12  A.  Mr. Giannone had told me that he was very interested

13  in purchasing, in the prop -- in the business --

14          MR. LIOTTI:  Objection.

15          THE COURT:  Overruled.

16          MR. LIOTTI:  I would ask for a cautionary

17  instruction, Judge, because it hasn't been established

18  that it was Jonathan Giannone.  It was somebody who

19  identified themselves as Jonathan Giannone.

20          THE COURT:  You want to go back and do that

21  now, Mr. Daley?

22          MR. DALEY:  I would be happy to do that.

23          THE COURT:  Go ahead.

24  BY MR. DALEY:

25  Q.  How many times have you talked with Jonathan

1  Giannone?

2  A.  How many times have I talked --

3  Q.  Talked to him on the phone or talked to him in

4  person?

5  A.  I would say about 25, 30 times.

6  Q.  And did you become familiar with what his voice

7  sounded like?

8  A.  Yes.

9          MR. LIOTTI:  Objection.

10         THE COURT:  Overruled.

11         MR. LIOTTI:  Again, Judge, he's familiar with a

12 voice, not necessarily Jonathan Giannone's voice.

13         THE COURT:  Did you ever meet a person who

14 identified himself to you as Jonathan Giannone?

15         THE WITNESS:  Yes, he did identify himself.

16 The initial conversation he did identify himself as

17 John.

18         THE COURT:  I'm not talking about on the

19 telephone, I'm talking about in person.

20         THE WITNESS:  Yes, he did.

21         THE COURT:  Okay.

22 BY MR. DALEY:

23 Q.  And is this the same fellow who you talked to later

24 on as well?

25 A.  Yes.

1  Q.  The person you heard that first phone call from?

2  A.  Yes.

3  Q.  So during this conversation what did -- what did he

4  ask?  What did he say?

5  A.  He was asking me a question about the business, how

6  much I made, and things like that, and he was interested

7  in -- you know, he wanted to buy it.  And a few days

8  later he -- a day or two later he clicked the "Buy It

9  Now" price, which is -- he offered me my asking price --

10  Q.  Let's stop right there.  Some folks may not be

11  familiar with eBay.  When you put -- when you list

12  something on eBay, I guess sometimes it's an auction; is

13  that what you were doing?  Or what's the "Buy It Now"

14  feature mean?

15  A.  You can either bid on an item on eBay, you know, in

16  small increments, or you can just offer the full asking

17  price and not have to wait until the end of the

18  auction.  You can buy it now and not have to wait, you

19  know, the full term of the auction listing.

20  Q.  And so that's what happened?

21  A.  That's what he did, yes.

22  Q.  Okay.  And what happened after that?

23  A.  After that, a week, about a week after he came over

24  to see the property --

25  Q.  How did he make -- how did he make arrangements?

1  A.  He called me.  He called me.  I gave him the

2  address.  I gave him directions; he asked me for

3  directions.  He came over.  He saw the location; he

4  liked it.

5  Q.  Describe what he did during the time he was looking

6  at your business, that first time?

7  A.  He came in.  First he went in the office.  I met him

8  and I asked him -- I said, "Would you like me to show

9  you around, see what, you know -- what exactly you are

10  buying?"  And we went into the repair area -- into the

11  garage area and he looked kind of like he didn't know

12  what he was looking at.  He was looking at the tire

13  machine, he asked me what that was --

14           MR. LIOTTI:  Objection.

15           THE COURT:  Overruled.

16  BY MR. DALEY:

17  Q.  Go ahead.

18  A.  He asked me what the tire machine was.  He asked me

19  the strut compressor, he didn't know what that was.

20  And, you know, he just basically looked like he didn't

21  know what exactly he was getting into.

22  Q.  What -- okay.  So, he looks around, what happens

23  after that?

24  A.  He tells me, "Yeah, I like it.  Everything looks

25  good."  You know, he hang around for a few more, you

1  know -- a few more minutes and then he takes off to New

2  York, you know, back -- back home --

3  Q.  Did you sign any papers at that point?

4  A.  No.

5  Q.  So, what happened after he went back to --

6  A.  He went back to New York and about a week later -- a

7  few days to a week later he e-mailed me, renegotiated

8  the deal from the original deal that we had of $75,000.

9  Q.  Okay.  Approximately what date are we talking about

10  now?

11  A.  Towards the end of February.

12  Q.  Okay.

13  A.  Towards the end of February he e-mails me.  Instead

14  of $75,000, buying the entire business, he now only

15  wants the dealership part.  He doesn't want anything to

16  do with the repair site.  He doesn't want any of the

17  equipment.  He doesn't want any garage space and neither

18  does he want any parking in front of the garage.

19          So, he just wants the office space in the

20  garage area.  Offered me $25,000 for that and that was

21  his -- that was the renegotiated deal that we worked

22  out.  And I -- I agreed to it.

23  Q.  Okay.  And did you receive any money at that time?

24  A.  On -- around March 2nd he sent me the -- the

25  renegotiated deal via Fed Ex with a check for $2500

1 and -- in the letter inside the envelope he just said,

2 you know, told me that was a good-faith deposit, and by

3 cashing it I agreed to the terms that he highlighted.

4         And I went ahead and cashed the check and, you

5 know, we started the process of changing the dealer

6 license into his name.

7 Q.  Well, let's go through that process.  What did you

8 do next after this -- after you deposited the $2500?

9 A.  He came down -- he came down another time -- usually

10 it's either Friday or Saturday he would come down.

11 During the week, you know, he was kind of busy, he never

12 came down.  It was usually either Friday or Saturday he

13 came down, you know.  We set it up to go to city hall

14 to, you know -- to get the dealer license transferred to

15 his name and the last Thursday in March we had -- we had

16 a meeting at city hall --

17 Q.  How can you be sure it's the last Thursday of March?

18 A.  Because, the city hall in Holyoke only has

19 hearings -- they are called public hearings -- they only

20 have them the last Thursday of every month.

21 Q.  Okay.

22 A.  So, we went to the hearing -- and prior to going to

23 the hearing he sent me a deposit, another -- some more

24 money through PayPal.  It's a form of, you know, money

25 exchange.

1          MR. LIOTTI:  Objection.

2          THE COURT:  Overruled.

3   BY MR. DALEY:

4   Q.  Go ahead.

5   A.  He sent me some money through PayPal, around 16 or

6   $1700.  You know, that was, you know, some more money

7   for the business.

8   Q.  Was this before or after you had gone to city hall?

9   A.  That was right -- the week before we went to city

10  hall I received that money.

11  Q.  Okay.  And did you accept it, take the money --

12  A.  Yes, I did.

13  Q.  -- however you do that?

14  A.  Yes, I did.

15  Q.  Okay.  You go to city hall, what --

16  A.  We went to city hall.  You know, they asked us a few

17  questions.  We answer -- he answered.  They asked him

18  where he lived.  You know, when he told them he lived in

19  New York they -- they told him that they couldn't go

20  forward --

21          MR. LIOTTI:  Objection.

22          THE COURT:  Sustained.

23          You can't say what they told him.

24  BY MR. DALEY:

25  Q.  Did he receive any of the licenses or approvals he

1  wanted?

2  A.  No.  He didn't -- he didn't receive any of the

3  approvals because of where he lived.

4  Q.  What were the things he was seeking to get?

5  A.  An address, a residency in Massachusetts.

6  Q.  No.  No.  I'm sorry.  What was he seeking to get

7  from city hall in Holyoke?

8  A.  Oh, a license, a special permit to sell -- in order,

9  you know, to be able to sell cars in the City of

10  Holyoke.

11  Q.  Okay.  Anything else besides that, or was that the

12  main thing he was going to get?

13  A.  That was the main thing he was going after was the

14  special permit to be able to sell cars under his own

15  license.

16  Q.  What happened after that failed -- after that

17  attempt to get the license failed at the Holyoke City

18  Hall?

19          MR. LIOTTI:  Objection to the form of the

20  question.

21          THE COURT:  Overruled.

22  BY MR. DALEY:

23  Q.  Go ahead.

24          THE COURT:  Go ahead.

25  A.  Jonathan and I spoke and he told me that he was

1  going to work on getting an address, possibly move to

2  Massachusetts temporarily to get his business up and

3  running and going --

4  Q.  This was going to be the business at A&W Auto

5  Clinic?

6  A.  Yeah.

7  Q.  Okay.

8  A.  You know.  So he can have the address in

9  Massachusetts so he can get his license.  And he left

10 that night, he went back to New York, and I didn't hear

11 from him anymore.  So on -- that was in March.

12 Q.  Okay.

13 A.  That was, you know, in March, April.

14 Q.  End of March.  Okay.

15 A.  And then --

16 Q.  Well, let's go into April now.

17         MR. LIOTTI:  Your Honor, may the witness be

18 allowed to finish his answer, please?

19         THE COURT:  Mr. Awkal, are you saying that at

20 the end of March, that was the last time you saw him, or

21 were you saying that you saw him in April?

22         THE WITNESS:  In April?  I did see him --

23         THE COURT:  Speak up into the microphone.

24         THE WITNESS:  Okay.  I saw him in March --

25 March was the last -- March was the last I seen of him.

1  BY MR. DALEY:

2  Q.  Is there any time --

3          MR. LIOTTI:  Can we get a year on that, Judge,

4  please?

5          THE COURT:  Do you know what year?

6          THE WITNESS:  2005.

7  BY MR. DALEY:

8  Q.  How about some computers, were there ever some

9  computers installed at your business by Mr. Giannone?

10  A.  Yes.  Yes.

11  Q.  When was that?

12  A.  In -- that was in April.

13  Q.  So it's after the city hall visit?

14  A.  Yeah.  Yeah.

15  Q.  Okay.

16          MR. LIOTTI:  Again, is this 2005, Judge?

17          THE WITNESS:  Yes, it is.

18  BY MR. DALEY:

19  Q.  Are all the dates we are talking about in 2005?

20  A.  Yes.

21  Q.  Thank you.  Go ahead.  What happened?

22  A.  April -- in April he came down, right before he came

23  over to install the computers, that's when he sent me

24  the $1700, 16 or 1700.  I'm not exactly positive on.

25  That -- and the same week he came down with a friend of

1 | his, installed two computers in my office and a server.

2 | Q.  Why did you let him do that?

3 | A.  He wanted to use them to train --

4 |         MR. LIOTTI:  Objection to the form of the

5 | question.

6 |         THE COURT:  Overruled.

7 | A.  He wanted to use the computer to train one of my

8 | workers.  He was going to have him work for him after he

9 | took over the business, and that's why he installed

10 | them, so he can train him to use the computers.

11 | BY MR. DALEY:

12 | Q.  Okay.  And were they installed?

13 | A.  Yes, they were.

14 | Q.  Okay.  When did you next see Mr. Giannone in person?

15 | A.  After he installed the computers, that's when I

16 | didn't see him anymore.

17 | Q.  You never saw him in person --

18 | A.  I never saw him in person after he installed the

19 | computers.  It wasn't -- I want to go back a little bit.

20 | Q.  Go ahead.

21 |         MR. LIOTTI:  Objection.

22 |         THE COURT:  Overruled.

23 | A.  I -- I said earlier in my statement that I didn't

24 | see him in March, I actually did see him after March.  I

25 | saw him in April when he came down and installed the

1  computers.

2  BY MR. DALEY:

3  Q.  Okay.  That's fine.

4  A.  I just wanted to --

5  Q.  That's all right.  So what happened after he's

6  installed the computer?

7  A.  He installed the computers and then they leave that

8  day, him and his friend.  I never heard from him, and

9  then, in the beginning of May, May 1st or 2nd, I receive

10  a FedEx package from Mr. Giannone.  That's when he was

11  requesting a bunch of personal information about me.

12  My -- he wanted me to sign some auction access forms in

13  my name, he wanted the banking information in my name,

14  just a lot of stuff that -- that's personal to me that

15  he has no business --

16          MR. LIOTTI:  Objection.

17          THE COURT:  Would you like to state some

18  possible basis for the objection?

19          MR. LIOTTI:  Sorry, Judge?

20          THE COURT:  Would you like to state some

21  possible basis for the objection?

22          MR. LIOTTI:  Yes, Judge.  There are certain

23  facts which the witness can testify about but he can't

24  testify as to his opinion or he can't testify concerning

25  conjecture or speculation.  That's the basis of my

1  objection.

2          THE COURT:  He's testifying as to why he was

3  concerned.  Overruled.

4  BY MR. DALEY:

5  Q.  So you got all of these requests for information.

6  Did you -- did you fill out these?

7  A.  No, I didn't.

8  Q.  Why not?

9  A.  Well, because that information, getting auction

10 access in my name would be useless to him because he's

11 the one that is going to be conducting --

12         MR. LIOTTI:  Objection.

13         THE COURT:  Overruled.

14 BY MR. DALEY:

15 Q.  Go ahead.

16 A.  He's the one that's going to be conducting business

17 at these auctions after we -- after he obtains a dealer

18 license.  He has no business going to any auction --

19         MR. LIOTTI:  Objection.

20         THE COURT:  Overruled.

21 BY MR. DALEY:

22 Q.  Go ahead.

23 A.  He has no business going to any auctions at this

24 point.  He did not obtain a dealer's license yet.  So he

25 was trying to go to the auctions using my personal

1  information, which in Massachusetts, it's against the

2  law.

3          MR. LIOTTI:  Objection.  Move to strike the

4  testimony.

5          THE COURT:  Denied.

6  BY MR. DALEY:

7  Q.  Okay.  So you didn't respond.  You weren't going to

8  give him that information?

9  A.  I didn't respond and that was in May.  He gave -- he

10  gave me a deadline.  I don't recall exactly how much

11  time he gave me to respond, but I want to -- I want to

12  say around 10 days.  He gave me about 10 days to respond

13  to his -- to his request.

14          When I didn't respond to it, he -- towards the

15  end of May --

16  Q.  Did you try to get in touch with him?

17  A.  Yes, I did.

18          MR. LIOTTI:  Objection.  The witness's answer

19  was interrupted again, Judge.

20          THE COURT:  Overruled.

21  BY MR. DALEY:

22  Q.  Go ahead.  Did you try to --

23  A.  I tried --

24  Q.  Did you try to --

25  A.  I tried to contact him after I received his request

1  to ask him exactly what he's looking for, you know.  For

2  what kind of information exactly is he looking for.  He

3  wouldn't return my calls.  He wouldn't return my

4  e-mails.  He just, basically, ignored me.  He didn't

5  want to get in touch with me.  I called him.  I left him

6  a couple of messages on his voice mail and still didn't

7  get back to me.

8         Towards the end of May, beginning of June I

9  checked my -- my PayPal account and there's a dispute --

10  a dispute case opened up against my account for the

11  money that I received from Mr. Giannone.

12  Q.  The -- what?  It was the PayPal amount?

13  A.  The PayPal amount.

14  Q.  The 2500 you still had?

15  A.  The 2500 that I -- yeah, I still have that.

16  Q.  Was there ever a time he was trying to get back the

17  2500?

18  A.  Yeah.  In the envelope -- in the FedEx envelope that

19  I got he asked me to --

20  Q.  Give us a date.  What FedEx envelope are we talking

21  about?

22  A.  The one he sent me on May -- in May -- in the

23  beginning of May, requesting -- the same -- the same

24  envelope that he was requesting my personal information,

25  he was asking me to give him back the $2500 because he

1  wanted to give me $5,000 instead via PayPal.  But I knew

2  it was a trick.  He was tricking me into giving him back

3  the 2500.

4           MR. LIOTTI:  Objection.

5           THE COURT:  Overruled.

6  BY MR. DALEY:

7  Q.  Go ahead.

8  A.  He was tricking me so I can give him back his $2500

9  because at this point I knew he was -- he wanted out of

10  the deal.  He didn't want to go through the deal of

11  purchasing the business any longer.

12  Q.  In May of 2005, how many F-150 Ford pickup trucks

13  did you have at A&W Auto Clinic?

14  A.  None.

15  Q.  When did you last have one on consignment or that

16  you had to sell at A&W?

17  A.  About three years ago I had a white one with a plow

18  on it.

19  Q.  And that would have been -- why do you say three

20  years ago?

21  A.  Because I -- that's the one -- that's the only one I

22  can think of.  That's the only one I had and it had a

23  plow on it so it kind of stuck out in my mind.

24  Q.  When did Mr. Giannone ever get authorized to sell

25  any vehicles through A&W?

1  A.  He was never authorized to conduct business.

2  Q.  When did he actually finalize the deal and become

3  the rightful owner of the A&W?

4  A.  He never did.

5  Q.  When did you authorize him to open up a bank account

6  in the name of A&W?

7          MR. LIOTTI:  Objection.

8          THE COURT:  Overruled.

9  A.  I never did.

10  BY MR. DALEY:

11  Q.  So you never authorized him to?

12  A.  No.

13  Q.  How many automobiles did Mr. Giannone sell at A&W

14  Auto Clinic or through A&W Auto Clinic?

15  A.  None.

16          MR. DALEY:  Nothing further, Your Honor.

17          THE COURT:  You may cross-examine.

18                    CROSS-EXAMINATION

19  BY MR. LIOTTI:

20  Q.  I may mispronounce your name.  It's not deliberate

21  on my part.

22  A.  That's okay.

23  Q.  Is it pronounced Awkal?

24  A.  That's fine.

25  Q.  Thank you, sir.  Mr. Awkal, I represent Jonathan

1 Giannone.  My name is Thomas Liotti.  I have a couple of

2 questions for you.

3          MR. DALEY:  Your Honor --

4          THE COURT:  I'm sorry?

5          MR. DALEY:  I wanted to do a sidebar about

6 something that we might get into.

7          THE COURT:  All right.

8          (Bench conference)

9          MR. DALEY:  In the letter motion Mr. Liotti

10 mentions that Mr. Awkal might be inclined to lie because

11 he was supposedly under continuous observation by the

12 State of Massachusetts for criminal and environmental

13 crimes.

14          If he has basis for it, I would like for him to

15 state it, so I know he has a good-faith basis to ask

16 that question to Mr. Awkal.  If he doesn't, I would ask

17 him not to.

18          THE COURT:  Do you intend to go into that?

19          MR. LIOTTI:  I don't think so, Judge.

20          THE COURT:  Okay.

21          (In open court)

22 BY MR. LIOTTI:

23 Q.  Mr. Awkal, you mentioned this business that you had

24 for some years, I think you said 10 years, in the State

25 of Massachusetts; is that right?

1   A.   Yes.

2   Q.   And you had some dealings with Mr. Giannone about

3   the purchase of that business?

4   A.   Yes, I did.

5   Q.   Right?  And you basically talked about a business

6   called the A&W Auto Clinic in Massachusetts, correct?

7   A.   Yes.

8   Q.   Is that a business that was incorporated in the

9   State of Massachusetts?

10  A.   No.

11  Q.   Was it ever incorporated?

12  A.   No.

13  Q.   Okay.  Was there any kind of a certificate of

14  business filed, if you know, in the State of

15  Massachusetts concerning the use of that name?

16  A.   Yes, there was.

17  Q.   Where was that filed?

18  A.   It was filed at city hall in Holyoke.

19  Q.   Is that the permit that you alluded to earlier?

20  A.   I'm sorry?

21  Q.   Is that the permit that you alluded to earlier?

22  A.   No.

23  Q.   Okay.  There is a certificate of business on file as

24  far as you know in the City of Holyoke, Massachusetts

25  which authorizes you to conduct business under the name

1  of A&W Auto Clinic; is that correct?

2  A.  Yes.

3  Q.  Okay.  Now, is that certificate that you filed, does

4  that apply to Holyoke, Massachusetts, or the entire

5  State of Massachusetts?

6  A.  Holyoke, Massachusetts.

7  Q.  All of Massachusetts?

8  A.  No, just Holyoke.

9  Q.  Just Holyoke?

10  A.  Yes.

11  Q.  So if somebody wanted to open up a business with the

12  same business with the same name in Boston, for example,

13  as far as you know -- and I realize this may call for

14  somewhat of a legal conclusion on your part -- but as

15  far as you know, they could do that, right?

16  A.  I believe so, yeah.

17  Q.  All right.  And if Jonathan Giannone or somebody

18  else wanted to use that name out of state, they could do

19  that too, right?

20  A.  Sure they can.

21  Q.  Right.  And if Jonathan Giannone wanted to open up a

22  bank account under the name of A&W Auto Clinic, Inc., or

23  just A&W Auto Clinic in the State of New York or

24  anywhere else, they could do that, right?

25  A.  I'm sure they can.

1  Q.  Right?  Now, you mentioned that Mr. Giannone had

2  asked you for some information; is that correct?

3  A.  Yes, he did.

4  Q.  Okay.  And there was an actual agreement that was

5  signed between you and Mr. Giannone, was there not,

6  concerning the acquisition of your business?

7  A.  Yeah.

8          MR. LIOTTI:  Could I have this marked for

9  identification, please?

10 BY MR. LIOTTI:

11 Q.  I'm placing before you, sir, a document that has

12 been marked as Defendant's Exhibit 6 for Identification

13 and I'm going to ask you if you can identify it, sir?

14 Is that correct, can you identify that?

15 A.  Yes.

16 Q.  Is that the agreement that you and Mr. Giannone

17 signed?

18 A.  Not sure if I signed it.

19 Q.  Okay.  Did you keep a copy of it in your records?

20 A.  No, I don't have a copy of this.

21 Q.  I'm sorry?

22 A.  No, I don't have a copy of this.

23 Q.  Okay.  But that is the agreement, as far as you can

24 recall?

25 A.  No, the agreement was $25,000, not $10,000.

1  Q.  So that's not the agreement?

2  A.  No, he did -- I did see this from him.  That was a

3  suggestion by Mr. Giannone --

4  Q.  But you didn't sign that agreement?

5  A.  I don't believe I did, no.

6  Q.  Did you sign another agreement?

7  A.  No, we haven't signed any agreements.  We never

8  signed any agreements.

9  Q.  All right.

10          MR. LIOTTI:  Judge, I would offer that at this

11  time as a proposed agreement that was offered to this

12  witness for his signature but which he did not sign.

13          THE COURT:  Any objection?  Any objection?

14  He's offering it -- the witness has testified that this

15  was an offer that was made to him that he did not

16  accept, and he's offering the document as evidence of

17  such an offer.  Any objection?

18          MR. DALEY:  No objection, Your Honor.

19          THE COURT:  Admitted.

20          MR. LIOTTI:  Should that be marked by your

21  clerk, Judge?

22          THE COURT:  We will fix it in just a moment.

23          MR. LIOTTI:  Should I take it back from the

24  witness, Judge?

25          THE COURT:  If you are finished asking him

1  about it.

2  BY MR. LIOTTI:

3  Q.  Do you remember when that agreement was presented to

4  you?

5  A.  No, I don't.

6  Q.  And that's an agreement that included the purchase

7  of your business; isn't that so?

8  A.  Yes.

9  Q.  And I think you told us earlier that when you first

10  advertised on eBay you advertised the business for

11  $75,000, right?

12  A.  Yes.

13  Q.  Not including the property on which the business was

14  located.

15  A.  Right.

16  Q.  Okay.  And then some time after you got the

17  Exhibit 6 before you, you got a check from Mr. Giannone;

18  isn't that right?

19  A.  Yes, I did.

20  Q.  For $2500, isn't that so?

21  A.  Yeah.

22  Q.  And you've made mention on your direct testimony

23  that as part of that check, in the memo box or

24  somewhere, there was indicated that this was a

25  good-faith down payment for deposit for the purchase of

1  that business; isn't that right?

2  A.  Yes.

3  Q.  And you accepted that deposit, did you not, for the

4  purchase of the business?

5  A.  Yes, I did.

6  Q.  Even though you didn't have a written agreement?

7  A.  The agreement was the eBay contract.  When you --

8  when you click a "Buy It Now" price on eBay, you buy

9  something on eBay, that's considered a legal, binding

10  contract between two people.

11  Q.  All right.  So you were --

12  A.  And that's the contract we had.

13  Q.  Okay, that's -- you are telling us that that was

14  your written contract?

15  A.  Yes.

16  Q.  Okay.  And you considered that to be a written

17  contract for the purchase of your business for $25,000,

18  $50,000 less than what you were asking for in eBay;

19  isn't that right?

20  A.  Yes.

21  Q.  Okay.  Did you keep a copy of any paperwork from

22  eBay?

23  A.  I have a copy of the renegotiated offer.  I printed

24  it off my -- my e-mails.

25  Q.  Do you have that with you today?

1  A.  The -- I think he has -- I don't have a copy of it,

2  no.

3  Q.  Are you telling us -- you just pointed at one of the

4  attorneys here, did you --

5  A.  I gave him -- gave him the copy.

6  Q.  You gave him a copy?

7  A.  Yes.

8          MR. LIOTTI:  Your Honor, if that is so, I would

9  like to call for the production of that document.

10          MR. DALEY:  Your Honor, I think Mr. Awkal is

11  confused.  It's the documents that we turned over to the

12  defense --

13          THE COURT:  It's documents that they already

14  have?

15          MR. DALEY:  Correct.  With the cover sheet that

16  they came from Secret Service Agent Durand up in

17  Massachusetts.

18          THE COURT:  All right.

19          MR. LIOTTI:  We will certainly make -- look for

20  those.

21  BY MR. LIOTTI:

22  Q.  Now, you made mention of some other documents that

23  Mr. Giannone sent to you.  Do you recall that?

24  A.  Yes.

25  Q.  Okay.  And, in fact, they came with a cover letter,

1  I think you said, from Mr. Giannone asking for tax

2  returns, income statements, balance sheets, and what

3  have you; isn't that right?

4  A.  Yes.

5  Q.  Now, do you remember when -- approximately when you

6  got that communication from Mr. Giannone asking for that

7  additional financial information?

8  A.  Beginning of May.

9  Q.  Okay.  Now, when he did that -- withdrawn.

10          You had indicated that you went to city hall in

11  the City of Holyoke, Massachusetts, right?

12  A.  Yes.

13  Q.  To assign or have Jonathan Giannone get a permit to

14  conduct the business which you were then operating,

15  right?

16  A.  Yes.

17  Q.  Now, you had a permit, right?

18  A.  Yes, I did.

19  Q.  Did you have to file financial statements or records

20  with the City of Holyoke when you secured that permit?

21  A.  No.

22  Q.  How many years ago was that?

23  A.  Four years ago -- approximately four years ago.

24  Q.  And have the requirements changed as far as you know

25  since then?  Did they change as of early May of '05?

1  A.  I'm not -- I'm not familiar with the changes, I --

2  Q.  Okay.  But it's fair to say if you are conducting

3  that kind of business, the City of Holyoke apparently

4  wants to know something about the people who are

5  conducting the business, right?

6  A.  They only require -- they only do a query check,

7  which is a criminal background check.  And if you come

8  up clean, they go forward with you -- with your

9  application that you submit for the used car permit.

10 Q.  Okay.  And that's what this was, a used car

11 business, right?

12 A.  Right.

13 Q.  And you would be a used car salesman; is that

14 correct?

15 A.  Yep.

16 Q.  Okay.  And your brother -- I think you mentioned

17 your brother is also involved in the business, right?

18 A.  No, he's not.

19 Q.  He's not?

20 A.  (Witness shakes head in the negative.)

21 Q.  Okay.  Now, in any event, did you ask Mr. Giannone

22 what he wanted this financial information for?

23 A.  I tried to contact him by phone, he wouldn't answer

24 my calls.  I left him two voice messages on his cellular

25 phone and never returned my calls, and that was the end

1  of us speaking.  He never talked to me after that.

2  Q.  Have you ever secured a business loan for A&W?

3  A.  No.

4  Q.  Okay.  Have you ever secured a business loan?

5  A.  No.

6  Q.  Do you know whether if you are trying to secure

7  financing or a business loan you have to provide

8  financials to the lending institution about the nature

9  of the business?

10  A.  Yes.

11  Q.  And do you have any knowledge as to whether

12  Mr. Giannone was attempting to secure financing in order

13  to purchase your business?

14  A.  No, he wasn't.

15  Q.  Do you have any knowledge I said, sir?

16  A.  No, I don't.

17  Q.  Thank you.

18  A.  He was -- he was --

19  Q.  You answered my question.  Thank you.

20          Now, as far as you were concerned, when you

21  accepted the $2500, you had a deal with Mr. Giannone,

22  right?

23  A.  Yes.

24  Q.  And it's fair to say that separate and apart from

25  the permit issue itself, you could sell a portion or

1  even all of your business to Mr. Giannone, couldn't you?

2  A.  Yes, I could.

3  Q.  And he might have some problems in operating the

4  business but he could make you, for example, a manager

5  of the business; isn't that right?

6  A.  He could.

7  Q.  Right.  And he could be sort of a minority

8  shareholder in that business, or what have you, right?

9  A.  Sure.

10  Q.  Or even a majority shareholder?

11  A.  Yep.

12  Q.  Without there being any change in the permit status

13  at all; isn't that right?

14  A.  I'm not sure of the legal aspect of how city hall

15  and IRS would have us go about it.

16  Q.  But he could make you, for example, the president of

17  the business.  And you are the manager of the business

18  and you are continuing to work the business, right?

19  A.  I believe he would have to incorporate the business

20  before --

21  Q.  But you didn't have to?

22  A.  No.

23  Q.  Okay.  And he could incorporate it in some other

24  state, right?

25  A.  I'm not sure how he could have done it.

1  Q.  Well, he could incorporate in South Carolina.  He

2  could incorporate in North Carolina.  Delaware.

3  Anywhere.

4          MR. DALEY:  Objection, calls for speculation.

5          THE COURT:  Sustained.

6  BY MR. LIOTTI:

7  Q.  In order to conduct business in a particular state,

8  you don't have to be incorporated in that state; isn't

9  that right?

10  A.  Not sure.

11  Q.  Like Ford Motor Company --

12          MR. DALEY:  Objection, Your Honor.

13          THE COURT:  Mr. Liotti, you are asking him

14  legal questions.  He indicated he's not sure.

15          MR. LIOTTI:  You're right.  You're right.  I'm

16  sorry.

17  BY MR. LIOTTI:

18  Q.  Now, you accepted a second check for $1700; isn't

19  that right?

20  A.  No.

21  Q.  What happened with the $1700?

22  A.  The 1700 was a payment through PayPal, which is a

23  form of wire -- of money transfer from one party to

24  another.  It wasn't a check, it was a wire transfer.

25  Q.  Okay.  I stand corrected, but there was a second

1  payment made?

2  A.  Yes.

3  Q.  Okay.  So in all -- when did you get the second

4  payment?

5  A.  The second payment, I got it sometime in April,

6  right before -- right before we went to city hall.

7  Q.  Okay.  So, that would be April of 2005?

8  A.  Yes.

9  Q.  So at that point Mr. Giannone had given you roughly

10 $4200?

11 A.  Yes, that's correct.

12 Q.  Against 25,000?

13 A.  Yes.

14 Q.  Okay.  And is that business of yours, A&W Auto

15 Clinic, or Auto, is that still in business?

16 A.  No.

17 Q.  Did you dissolve it or --

18 A.  Yes, I did.

19 Q.  When did that happen?

20 A.  Beginning of this -- the beginning of 2007.

21 Q.  So you continued to operate that all that time?

22 A.  Yes, I did.

23 Q.  Did you ever return -- I think -- withdrawn.

24         It's fair to say that Mr. Giannone didn't pay

25 you any more money?

1  A.  No.

2  Q.  You didn't follow through on the agreement, correct?

3  A.  No.

4  Q.  Did you ever return any portion of the $4200 to

5  Mr. Giannone?

6  A.  Yes, I did.

7  Q.  How much did you give him back?

8  A.  The PayPal payments.

9  Q.  The 1700?

10  A.  Yes.

11  Q.  When did you do that?

12  A.  Well, he started --

13  Q.  When did you do it, sir?

14  A.  End of July.

15  Q.  Of what year?

16  A.  2005.

17  Q.  Thank you.

18          MR. LIOTTI:  Just one second, Your Honor,

19  please.  Thank you.

20          I apologize for going right up until the time

21  Your Honor breaks, but I just have to ask a few more

22  questions.

23  BY MR. LIOTTI:

24  Q.  Mr. Awkal, did you at or about the time that we are

25  discussing here, April, May 2005, did you have any

1   environmental problems with --

2            MR. DALEY:  Objection, Your Honor.

3            THE COURT:  Sustained.

4            MR. DALEY:  Thank you.

5   BY MR. LIOTTI:

6   Q.  Did you have any licensing problems at that time due

7   to environmental issues at that location?

8            MR. DALEY:  Objection, Your Honor.

9            THE COURT:  Are you talking about -- at what

10  time?

11           MR. LIOTTI:  I'm talking about April and May of

12  2005, did he have any environmental --

13           MR. DALEY:  Sidebar, Your Honor.

14           THE COURT:  All right.

15           (Bench conference)

16           MR. DALEY:  I mean, I would have appreciated --

17  if you have a good-faith basis I'm happy to let you ask

18  the question.

19           MR. LIOTTI:  My client was told by local

20  authorities that this witness had substantial

21  environmental problems, toxic waste problems, in the

22  garage area which prevent -- other people knew about it

23  and he couldn't sell the business for that reason, and

24  he was also having licensing problems for that reason.

25  That's what my client was told.

1            THE COURT:  By whom?

2            MR. LIOTTI:  I believe by somebody in the City

3   of Holyoke, but I can find that out.

4            THE COURT:  And that resulted in what?

5            MR. LIOTTI:  That resulted in some discussions

6   between them about this permit issue, because they were

7   having difficulties getting a permit.  And then

8   Mr. Awkal said they could continue to do business under

9   his name and operate in that fashion.

10           THE COURT:  So are you telling --

11           MR. LIOTTI:  That was the apparent problem for

12  the denial of the permit and some of the other issues

13  that they were facing, is why he was having

14  difficulties, because of the environmental problems that

15  he had.

16           THE COURT:  You can go there.

17           MR. DALEY:  Okay.

18           (In open court)

19  BY MR. LIOTTI:

20  Q.  Mr. Awkal, again, I'm sorry for the lateness of the

21  hour.  Did you at or about that time -- we are talking

22  April, May 2005 -- did the business have some toxic

23  waste or environmental problems that were affecting your

24  permit and licensing?

25  A.  No.

1  Q.  Okay.  Was it interfering in some way with your

2  ability to sell the business?

3  A.  No, sir.

4  Q.  Well, you dropped the purchase price from $75,000 to

5  $25,000, did it have a bearing on that?

6  A.  I'm sorry.  What did it have?

7  Q.  When you dropped the purchase price from $75,000 to

8  $25,000, did it have a bearing on that?

9  A.  What did have a bearing on --

10  Q.  Any environmental issues.

11  A.  No.

12  Q.  Did anyone else offer to buy your business?

13  A.  No.

14  Q.  Did you indicate to Mr. Giannone that if he was

15  denied a license that you could operate the business

16  under your name?

17  A.  No, I didn't.

18  Q.  Did you attend an auction, an auto auction, with

19  Mr. Giannone in Framingham, Massachusetts, during this

20  process where he was endeavoring to get a permit?

21  A.  No, we didn't.

22  Q.  Did you ever attend an auction with him in

23  Framingham, Massachusetts?

24  A.  Never.

25  Q.  Okay.  Did you permit Jonathan to buy cars under

1  your firm's name while the licensing process was still

2  pending?

3  A.  No, I didn't.

4  Q.  Now, you told Mr. Eichelberger that -- withdrawn.

5          MR. LIOTTI:  Could I have this marked for

6  identification, please?

7          THE COURT:  Please show it to counsel.

8          MR. LIOTTI:  Yes, of course.

9  BY MR. LIOTTI:

10  Q.  If I may, Mr. Awkal, were you interviewed by the

11  Department of Treasury, United States Secret Service in

12  or about January 9th of '07?

13  A.  Yes, I was.

14  Q.  And were you advised of your rights at that time by

15  Special Agent Brian Durand?

16  A.  Yes.

17  Q.  Was that in connection with this case?

18  A.  Yes, it was.

19  Q.  Okay.  Is that the first time you were interviewed

20  in connection with this case?

21  A.  Yes.  In person the first time.

22  Q.  What was that?

23          THE COURT:  He said that was the first time he

24  was interviewed in person.

25  BY MR. LIOTTI:

1  Q.  There was a time when you were interviewed over the

2  phone?

3  A.  Yes.

4  Q.  When did that happen?

5  A.  That was about a week before -- around the 2nd --

6  around January 2nd.

7  Q.  The week before that?

8  A.  Yes.

9        MR. LIOTTI:  Okay.  Just bear with me one

10  second, please.

11  BY MR. LIOTTI:

12  Q.  I have just one final question.

13        Mr. Eichelberger had asked you some questions

14  about the S-150 automobile?

15  A.  Yeah.

16  Q.  Okay.  And you indicated that the last one you

17  owned, to the best of your recollection, was back in --

18  well, three years ago, I think, you said, right?

19  A.  Yeah.

20  Q.  Okay.  So that would be, what?  2004?

21  A.  Yeah.  About 2004, 2003 -- yeah.  It was about three

22  years ago, yeah.

23  Q.  Did you keep an inventory, by the way, of vehicles

24  that you were buying and selling through the business at

25  that time?

1  A.  Did I keep a record?

2  Q.  Yes.

3  A.  Yes, I did.

4  Q.  And did you look at those records before your

5  testimony here?

6  A.  Yes, I did.

7  Q.  Okay.  And is that how you came up with that date of

8  three years ago?

9  A.  Yes.

10  Q.  Okay.  But it's fair to say that there's a turnover

11  of automobiles in your business; isn't that so?

12  A.  Yes, there is.

13  Q.  Okay.  And back when your business was operating,

14  let's say in April or May of 2005, a certain number of

15  autos were sold, let's say, on a monthly basis or a

16  weekly basis, correct?

17  A.  Yes.

18  Q.  So the inventory changed periodically; is that

19  right?

20  A.  Yes.

21  Q.  Thank you.

22          MR. LIOTTI:  No further questions.

23          THE COURT:  Anything further, Mr. Daley?

24          MR. DALEY:  Very short.

25                    REDIRECT EXAMINATION

1  BY MR. DALEY:

2  Q.  I want to rewind as far as the bank account,

3  authorizing any bank account in the name of A&W.  What

4  was -- what's the address of A&W?

5  A.  395 Maple Street in Holyoke, Massachusetts.

6  Q.  And the area code?

7  A.  01040.

8  Q.  Did you authorize Mr. Giannone to open up a bank

9  account in A&W's name at that address?

10  A.  No, I didn't.

11  Q.  And was -- when was he named CEO of A&W?

12  A.  He was never named CEO.

13  Q.  President?

14  A.  Never.

15  Q.  COO?

16  A.  Never.

17  Q.  Parts manager?

18  A.  Never.

19  Q.  Salesman?

20  A.  He was never there to sell any cars.

21  Q.  After he came in and installed those computers, when

22  did he next darken the doors of A&W?

23  A.  He never came back.

24  Q.  How can you be certain he didn't come onto the

25  property at some point and pose to somebody trying to

 1  sell a car there?

 2          MR. LIOTTI:  Objection to the form of the

 3  question.

 4          THE COURT:  Sustained.

 5  BY MR. DALEY:

 6  Q.  Give me the layout of A&W.

 7          MR. LIOTTI:  Objection, beyond the scope of

 8  cross-examination.

 9          THE COURT:  Overruled.

10  BY MR. DALEY:

11  Q.  You can answer.

12  A.  Okay.  It's a two-bay garage for repair, two

13  offices, parking area for about 25 cars, and it's all

14  fenced in with a six-foot-high fence and barbed wire,

15  and one gate that -- that's locked at night.

16          MR. DALEY:  Beg the court's indulgence.

17  BY MR. DALEY:

18  Q.  Mr. Awkal, we are going to pull up Government's

19  Exhibit 6.  I believe it's page 2.  Do you see it there?

20  A.  Yes.

21  Q.  Do you see the address of A&W Auto Clinic?

22  A.  Yes, I do.

23  Q.  Okay.  And is that the address of your A&W Auto

24  Clinic?

25  A.  Yes, it is.

1  Q.  And that's the Holyoke -- and the right ZIP code?

2  A.  Yes.

3  Q.  And the number at the top, that 9505552565 -- I

4  don't know how good you are with numbers -- is that a

5  bank account that you ever had?

6  A.  No.

7  Q.  The number?

8          MR. DALEY:  Nothing further, Your Honor.

9          MR. LIOTTI:  Judge, I -- I have some.

10         THE COURT:  All right.  Go ahead.

11                    RECROSS-EXAMINATION

12  BY MR. LIOTTI:

13  Q.  Mr. Daley just asked you some questions about the

14  layout of your premises, right?

15  A.  Yes.

16  Q.  And I think you said it was a 25-car lot?

17  A.  No, I said you can park about 25 cars on the lot --

18  yeah.  You can park about 25 cars on the lot.

19  Q.  When you advertised on eBay, did you advertise it as

20  a 40-car lot?

21  A.  Yes, I did.

22  Q.  That was a misstatement?

23  A.  No.  At the time the City of Holyoke has granted me

24  a dealer -- a license to have 40 cars on the lot, but

25  now they went in and they did the measurements and I'm

1  only allowed 25 cars.

2  Q.  So in April and May of 2005 was it a 25-car lot or a

3  40-car lot?

4  A.  It was a 40-car lot, it was a 40-car license.

5  Q.  So that was a true statement at that time?

6  A.  Yes.

7  Q.  Even though you can only fit 25 cars on it?

8  A.  Yes.

9  Q.  Thank you.

10         THE COURT:  All right.  Thank you, Mr. Awkal.

11 You may be excused.

12         Ladies and gentlemen, we will break now until

13 tomorrow morning at 9:30.  Please take your pads and

14 leave them in the jury room.  Do not discuss the case

15 while you are on break.

16         I anticipate that you will at some point during

17 the day tomorrow have the case for the beginning of your

18 deliberations but I don't know if you will be able to

19 finish your deliberations tomorrow, and I would

20 anticipate that you will probably be needed here on

21 Thursday.  I can't say that for sure but at this point

22 it looks like it would be Thursday before we would

23 finish everything.

24         Thank you.  Have a good evening.

25         (Jury not present)

1          THE COURT:  All right.  Anything before we

2    break for the evening?

3          MR. EICHELBERGER:  No, Your Honor.  Thank you.

4          THE COURT:  You have Mr. Cutler left.  Do you

5    have any other witnesses?

6          MR. EICHELBERGER:  Mr. Cutler will be our last

7    witness, Your Honor.

8          THE COURT:  Okay.  All right.

9          And, Mr. Liotti, do you know at this time

10   whether you plan to put up any defense?

11         MR. LIOTTI:  It looks like negative, Judge.

12         THE COURT:  Okay.  All right.  So we need to

13   be -- all right.  Let me ask you about the jury

14   instructions.  Did you have a chance to look at those?

15         MR. EICHELBERGER:  Your Honor, I looked over

16   them last night.

17         THE COURT:  Do you have any request to change

18   or add or delete anything?

19         MR. EICHELBERGER:  Your Honor, the only

20   questions I had, at page 18 -- let me see.  Yes, Your

21   Honor, beginning at page 18.

22         THE COURT:  Right.

23         MR. EICHELBERGER:  At line 14, it defines the

24   phrase "transmit by the means of wire" to include "a

25   transfer of funds by wire from one state to another."

1  We do not have an issue of wire transfers of funds.  The

2  money in this case was actually deposited in person at

3  the local bank, so I think that could come out, lines 14

4  through 16.

5          THE COURT:  All right.

6          MR. EICHELBERGER:  On line 18, I think I know

7  what the Court was intending, but it's where it states

8  "The use of a wire, radio, or television communication

9  facility in interstate commerce over the Internet,"

10  perhaps what we mean to say here is "or a communication

11  over the Internet" for purposes of clarity.

12          THE COURT:  All right.  I will look at that.

13          MR. EICHELBERGER:  Similarly, Your Honor, at

14  the top of page 19, where it says "The fact that a

15  document had been transmitted," in this case we are not

16  talking about documents having been transmitted, such as

17  facsimile transmission, but rather Internet chats.  So

18  that notation would be on line 1 and on line 3 of page

19  19.

20          THE COURT:  Would it be communication?

21          MR. EICHELBERGER:  Yes.  The way I had changed

22  it is that "The fact that a communication has been

23  transmitted by means of wire or Internet may be

24  established -- "

25          And then in line 3, "That he or she actually

1  communicated over the Internet by computer."

2  THE COURT: All right.

3  MR. EICHELBERGER: And finally, Your Honor, I

4  know that there is a -- like one line in the charges

5  that deals with the fact that we do not have to show

6  that the alleged scheme actually succeeded. There I'm

7  referring to page 17, lines 13 and 14.

8  But in view of the fact that in the opening

9  statement counsel made an issue of the fact that there

10 was no loss in this case, I would request that the Court

11 consider making a stronger charge about that, something

12 to the effect that the fact that no -- nobody actually

13 lost any money is not a requirement, that it is enough

14 if the defendant acted with an intent to defraud and

15 exposed people to loss, or attempted to commit a loss.

16 THE COURT: I'll consider that.

17 MR. EICHELBERGER: Thank you, Your Honor.

18 Other than that, I did not have any specific

19 objections.

20 I will confess, however, that I was a little

21 bit brain mushed at the time that I was reading through

22 these, so if the Court will permit I will look at them

23 tonight. I don't think that I will have any additional

24 requests tomorrow morning, but I would ask that liberty

25 should there be anything else.

1       THE COURT:  All right.

2       Mr. Smith?

3       MR. SMITH:  Good afternoon, Your Honor.

4       THE COURT:  Afternoon.

5       MR. SMITH:  I'm looking at page 9, line 17

6  through 19, not a very major change at all, only that

7  line 17 reads, "This case is important to the government

8  for the enforcement of criminal laws as a matter of

9  prime concern to the community."  And it goes on to say,

10  "Equally it is important to the defendant who are

11  charged with serious crimes."

12       I would suggest changing that to "who is

13  charged," and also adding something, because it doesn't

14  seem to give the same force and effect as the

15  government's part of that little paragraph there.

16       So what I had suggested to add is, "And whose

17  constitutional right to a fair trial must be protected,"

18  if Your Honor were so inclined.

19       MR. EICHELBERGER:  I concede the point that

20  counsel raises.  Perhaps the shorter way would be simply

21  to say, "It is equally important," the same words, just

22  change it so it more closely modifies "important," and

23  has a clear reference back to it being of a prime

24  concern.

25       THE COURT:  All right.  I'll work on that.

1    MR. EICHELBERGER:  Thank you, Your Honor.

2    MR. SMITH:  Also, Your Honor -- and I will

3 provide you, hopefully tomorrow morning, with an

4 additional charge, if Your Honor would still accept an

5 additional charge at this point.

6    In light of Mr. Branca's testimony today, we

7 would be requesting an additional jury charge regarding

8 an addicted confidential informant.

9    THE COURT:  I have a standard charge on witness

10 using or addicted to drugs that I can put in.  I had

11 already noted that when I heard the testimony.

12    The only other one that I noted that I hadn't

13 put in today was the question of whether or not the

14 government wants a failure to investigate techniques

15 charge.

16    MR. EICHELBERGER:  We do, Your Honor.

17 Absolutely.

18    THE COURT:  All right.

19    All right.  Anything else, Mr. Smith?

20    MR. SMITH:  If I think of anything tonight,

21 Your Honor, is it all right if I put it on paper and

22 submit it to you?

23    THE COURT:  Sure.  Sure.  I won't finalize this

24 until tomorrow morning, so you can look at it again

25 tonight.

1           MR. SMITH:  Thank you.

2           MR. EICHELBERGER:  One other thing.  We had

3   previously submitted as a third proposed charge a

4   case -- citing the Hadaway case out of the Fourth

5   Circuit about subsequent conduct being probative of

6   prior acts.  But, actually, I think some of that case

7   law goes a little bit farther than that as well.

8           It essentially says -- would stand for the

9   proposition that where someone was acting in a

10  particular way over a period of time that that can be

11  indicative of intent, and I don't think it's -- it

12  certainly -- the Hadaway case stands for the proposition

13  that "a subsequent conduct," but it's also true, Your

14  Honor, we submit, that prior conduct may be probative of

15  intent as well.

16          THE COURT:  And that prior conduct that is in

17  evidence is what?

18          MR. EICHELBERGER:  In this case we have clear

19  evidence that the three laptops that Mr. Branca took

20  were all three brand new, valued at approximately

21  $8,000.  They were in Mr. Giannone's possession.

22          I think the jury can make a reasonable

23  inference of that and we would be entitled to make a

24  reasonable inference that that's exactly what it was, he

25  had these laptops, they came from fraudulent means, and

1 that established one aspect of the intent of this

2 defendant.

3          MR. SMITH:  Your Honor, I don't believe

4 fraudulent means was ever established on those laptops

5 that were taken from that hotel room.

6          THE COURT:  Not sufficient for me to give this

7 charge.

8          MR. EICHELBERGER:  Can --

9          THE COURT:  He can argue the inference, but I

10 don't know -- I wouldn't charge on it.  Okay.

11          MR. EICHELBERGER:  And the other angle of that,

12 Your Honor, is during the course of the chats there is

13 ample communication about Pit Boss 2600 and/or CIA INTEL

14 interchangeably talking about extensive fraud that they

15 have engaged in.

16          If the jury concludes, as we believe that they

17 will, that CIA INTEL and Pit Boss are, in fact, Jonathan

18 Giannone, then that goes to establish the intent angle,

19 one of the elements that we have to determine in

20 connection with this case.  So, again, we think that

21 would provide an independent basis for such a charge.

22          THE COURT:  I'm not inclined to give that

23 charge.

24          MR. EICHELBERGER:  All right.

25          THE COURT:  All right.  Anything else?

1    MR. LIOTTI:  Judge, just in terms of scheduling

2  for tomorrow, I'm hoping that my remarks or my inquiry

3  now will save all of us a little time tonight and maybe

4  give the Court some time to sleep as well as counsel,

5  and the agents and the defendant, but I'm thinking,

6  Judge, that tomorrow we're going to have Mr. Cutler.  I

7  imagine he's going to take about the same amount of time

8  as Mr. Branca on direct and cross, and the government

9  will then rest its case.

10    We would ask for just a few minutes, Judge, not

11  many but a few minutes, perhaps 15 minutes, to make a

12  Rule 29 motion and then thereafter we would be,

13  probably, resting our case, Judge, and we would be ready

14  for summations at that point.  I would imagine that

15  could take place late morning.

16    THE COURT:  It's possible.  What I'll do, at

17  the time you make your Rule 29 motion, after I rule on

18  those, I will directly address Mr. Giannone concerning

19  his right of silence, his right to waive his right of

20  silence and testify, and ask him questions about has he

21  discussed this with his lawyers, but it's his decision,

22  has he reached a decision, and I will get all of that on

23  the record.

24    MR. LIOTTI:  Yes, Your Honor.

25    THE COURT:  And he can change his mind, you

1   know, and tell me that he wants to testify.

2        MR. LIOTTI:  But it would be your plan, Judge,

3   to charge tomorrow sometime?

4        THE COURT:  Oh, yes.

5        MR. LIOTTI:  Good.

6        THE COURT:  It's my plan that if we can, we get

7   closing arguments in before lunch.

8        MR. LIOTTI:  Great.

9        THE COURT:  And then charge after lunch.

10        MR. LIOTTI:  I just wanted to be clear on that.

11        THE COURT:  That may be a little optimistic

12   given how long it took us with Mr. Branca, and

13   Mr. Cutler, it's hard to project how long he'll --

14        MR. EICHELBERGER:  His direct will be shorter

15   than that of Mr. Branca.

16        THE COURT:  Well, I suppose it's possible that

17   we could do something on time in this case but it's not

18   likely.

19        Did you look at the verdict form?  Did

20   anyone suggest --

21        MR. EICHELBERGER:  I did --

22        THE COURT:  Look at that overnight.  The only

23   thing unusual about this verdict form is that, of

24   course, if they don't convict on count 1, they don't go

25   to count 2, they skip it.  And if they don't convict on

1  count 4, then they never get to count 5. So that's the
2  way I have set it up in the verdict form.
3        MR. EICHELBERGER: I understand.
4        THE COURT: And I just wanted to make sure
5  everyone agrees with that. Okay?
6        MR. EICHELBERGER: Thank you, Your Honor.
7        MR. LIOTTI: Thank you, Judge. Have a good
8  night.
9        THE COURT: You too. 9:30.
10       I need to go back on the record for one second.
11       One of the jurors -- you may have noticed the
12  African American woman on the second -- on the first
13  row, second chair, appears to be somewhat ill. She's
14  been coughing and sneezing and has Kleenex to her nose a
15  lot, and she told Ms. Willis that she's not feeling well
16  at all.
17       And so Ms. Willis gave her her number and asked
18  her to call her directly if she felt like she was too
19  ill to come in the morning. And so we don't have her
20  name right now but if she calls in the morning it's
21  possible that we would have to seat the second
22  alternate.
23       MR. EICHELBERGER: That's fine, Your Honor.
24       MR. LIOTTI: I assume, Judge, we are going to
25  encourage her to be here, though, if she can be?

1    THE COURT:  Oh, absolutely.  But she was,

2  actually -- she did appear to be fairly miserable.

3  Hopefully she'll be better, but it's my observation --

4  however, at one point I asked her if she had some water.

5    MR. LIOTTI:  Judge, I have an application just

6  very quickly.  If Mr. Eichelberger doesn't get these for

7  himself, I'm going to buy them tonight and bring them in

8  tomorrow and put it on the record that I'm giving him

9  Cold-eeze tablets for tomorrow so that he can relieve

10  that congestion in his throat and stop coughing.

11    MR. EICHELBERGER:  I have tried Cold-eeze --

12    THE COURT:  He's had this since December.

13    MR. EICHELBERGER:  I got this December the 25th

14  and it will not go away.  I have tried Cold-eeze, I've

15  tried everything under the sun.

16    THE COURT:  Yes.  We've tried a number of cases

17  where's he's coughed more than this.

18    MR. EICHELBERGER:  I'm much better now.

19    (Thereupon, the proceedings were recessed.)

20  * * * * * * * * * * * * * * * * * * * * * * * * *

21    EXAMINATION INDEX

22

BOBBY JOE KIRBY, JR.
23       DIRECT BY MR. EICHELBERGER          2-23
         CROSS BY MR. LIOTTI                 2-24
24       REDIRECT BY MR. EICHELBERGER        2-114
         VOIR DIRE BY THE COURT              2-127
25       VOIR DIRE BY THE COURT              2-139

CHRISTOPHER J. BRANCA
     DIRECT BY MR. EICHELBERGER          2-157
     VOIR DIRE BY MR. LIOTTI            2-177
     DIRECT BY MR. EICHELBERGER          2-179
     CROSS BY MR. LIOTTI                2-181
     REDIRECT BY MR. EICHELBERGER       2-214
     RECROSS BY MR. LIOTTI              2-227

OUSSAMA AKWAL
     DIRECT BY MR. DALEY                2-230
     CROSS BY MR. LIOTTI                2-248
     REDIRECT BY MR. DALEY              2-269
     RECROSS BY MR. LIOTTI             2-272

* * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER


      I certify that the foregoing is a correct

transcript from my stenographic notes in the

above-entitled matter.


s/ Gary N. Smith                      May 2, 2008
_____       _____

Gary N. Smith, CM
Official Court Reporter
United States District Court
District of South Carolina