IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No: 3:06-1011(CMC) |
| | ) | |
| V. | ) | |
| | ) | **RESPONSE IN OPPOSITION** |
| **JONATHAN GIANNONE** | ) | **TO MOTION FOR NEW TRIAL** |
| | ) | |

In its simplest recounting, the case against the Defendant stemmed from a series of online chats between a person going by the online names of "PitBoss 2600" and "CIA Intel" (later identified as the Defendant, Jonathan Giannone) and an undercover operative going by the name "Gollumfun." Gollumfun (Brett Shannon Johnson) had previously established a well recognized name for himself in the online credit card fraud community. He was working in an undercover capacity with the United States Secret Service following his arrest on state fraud charges in North Charleston, South Carolina.

During the investigation, the Defendant sold 21 Bank of America debit card numbers to Gollumfun for $600. The Defendant had previously given samples of his available credit cards without request for payment. On June 5, 2005, the Secret Service transferred $600 to a Bank of America account in the name of A&W Auto Clinic, as instructed by Giannone. They then notified Giannone through a chat service that the funds had been transferred. Within a very short time, Giannone arrived at a Bank of America ATM and withdrew a portion of the funds. At trial, Giannone stipulated that the account was his and that he withdrew the funds.

As a result of these actions, the defendant was charged with three counts of wire fraud and two counts of aggravated identity theft, in violation of Title 18, United States Code, Sections 1343 and 1028A, respectively. On March 8, 2007, he was convicted on all counts, and the Court ordered that he be immediately taken into custody based, in part, on evidence showing that he had engaged in new criminal conduct while on bond.

On August 22, 2007, the Court sentenced the defendant to 41 months imprisonment on the wire fraud counts to be followed by 24 months on the aggravated identity theft counts for a total sentence of 56 months imprisonment. The defendant has a pending appeal in this matter.

Even though he has a pending appeal, the Defendant has filed a *pro se* motion for new trial pursuant to Fed. R. Crim. P. 33. The only part of Rule 33 that applies at this point is subsection (b)(1) dealing with newly discovered evidence. No other grounds can be considered. A court may grant a motion for a new trial on the ground of newly discovered evidence only if the defendant shows that (1) the evidence relied on is, "in fact, newly discovered"; (2) there are facts "alleged from which the court may infer due diligence on the part of the movant"; (3) "the evidence relied upon [is] not merely cumulative or impeaching"; (4) "the evidence [is] material to the issues involved"; and (5) the evidence is of such a nature that it would "probably result in [an] acquittal at a new trial." United States v. Chavis, 880 F.2d 788, 793 (4th Cir. 1989). A new trial cannot be granted unless the answer to each inquiry is in the affirmative.

The Defendant has raised several issues which will be addressed in the order

presented in his Motion for New Trial. Those issues are as follows:

1.    Claimed <u>Brady</u> violation in which the Defendant alleges that the government failed to turn over a video demonstration showing how the Defendant could have created a false chat transcript;

2.    Claimed <u>Brady</u> violation in which the Defendant alleges that the government suppressed a March 1, 2007, letter which Brett Johnson wrote to the Court in connection with his sentencing;

3.    Claimed <u>Brady</u> violation in which the Defendant alleges that the government withheld a police report written by the Costa Mesa Police Department relating to the arrest of Chris Branca in California;

4.    Claimed <u>Brady</u> violation in which the Defendant alleges that the government withheld the grand jury transcript of the presentation of this case;

5.    Claim of newly discovered evidence in the form of a June 11, 2007, letter from Brett Johnson to the Defendant in which Johnson makes allegations about the federal agents who investigated this case; and

6.    Claims by the Defendant that the government presented false testimony to the jury during the trial of the case.

## RESPONSE TO DEFENDANT'S CLAIMS

### 1.    **Video Demonstration**

Since the Defendant stipulated that the account into which the $600 payment for the cards was transferred and that he withdrew funds from that account shortly thereafter, he had to come up with some way to explain away how he knew about the deposit.  His story was that he had sold a vehicle to Chris Cutler, and Cutler directed the transfer into the account as partial payment for the Ford F-150 pickup.  Cutler used the online name of "ElevenOneE", and in connection with the pretrial pleadings, Giannone submitted to the Court a chat transcript that purportedly proved that someone other than the Defendant was the person who sold the 21 stolen credit card numbers to the government.  This transcript was purported generated under the supervision of the Defendant's attorneys using a new laptop computer.  The transcript between ElevenOneE and the Defendant tends to support the claim of transfer into the Defendant's A&W Auto account as payment for a vehicle.  It also reflects that Giannone and Cutler had never met prior to the vehicle sale.

The transcript was a fraud upon the Court.  In fact, there was no vehicle sales transaction.  Further, Giannone and Cutler had known each other for some time prior to this purported sale.  In fact, they had traveled together to Florida earlier that year, and Giannone paid for the airline tickets.  All of these facts were established through testimony of Cutler, Ossama Awkul (the actual owner of A&W Auto Clinic), and travel records for the airline on which Cutler and Giannone traveled.

-4-

The computer used by the Defendant to generate the chat between himself and Cutler was provided to the government for inspection. In the course of this inspection, the government discovered anomalies tending to indicate that the identity of the persons participating in the chat had been fabricated. In order to prepare for cross examination should the chat be used by the Defendant during the trial, the agents prepared a video demonstration showing their theory of how the identities were faked. The demonstration was not given to the Defendant prior to trial. He now contends that this was a violation of the obligations of the government to turn over evidence favorable to the Defendant pursuant to Brady v. Maryland, 373 U.S. 83 (1963).

The video demonstration related only to the government's theory as to how the Defendant could have faked his chat transcript. It was an internal government document that was produced in connection with the investigation and prosecution of the case. As such, it was not subject to disclosure pursuant to Fed. R. Crim. P. 16(a)(2).

The Defendant claims that the government demonstration calls into question the validity and accuracy of the government's chat transcripts and should have been disclosed to the defense. This argument suffers from several flaws. The greatest flaw is that since the Defendant himself created the fake chat transcript, he could easily provide such information to his attorneys for use in questioning the accuracy of the government chats. We know that the Defendant faked his chat for several reasons. First, the substance of the chats was demonstrably false. As previously noted, it falsely implied that Giannone and Cutler had never met prior to the purported vehicle sales transaction. Second, the

actual owner of A&W Auto Clinic testified that Giannone was not the owner of A&W, and that he never sold any vehicle through that business. Most importantly, following his conviction, the Defendant submitted to a debriefing interview by the Secret Service agents who investigated this case. During this interview, Giannone admitted that he faked the chat transcript.

The Defendant's claims that he could have used the video demonstration to question the reliability of the government chat transcripts is a diversion. The theory of faking chat transcripts demonstrated by the video did not involve changing the words written during the chats. At page 7 of his memorandum, the Defendant actually quotes from the trial transcript where the government made this distinction to the Court. The government stated that the demonstration would show "how easy it is to set up a chat and to change the identity of the person on the other end." Changes to the text of the chats would be virtually impossible since the chats between Gollumfun and the Defendant were recorded both as contemporaneously generated transcripts and as video files of the computer screen. Thus, as testified by the case agents, the chats could not be changed by Brett Johnson or anyone else. The importance of this fact is that the government went to great lengths to link Giannone to the chats through the content of the chats rather than just the names generated automatically by the chat programs.

During the very first chat between Giannone and Gollumfun on May 23, 2005, the Defendant identified himself in chat text as "pitboss2600" and "markrich." The Defendant again identified himself as "pitboss2600" on May 29, 2005. Government

witnesses who knew Giannone testified that these were names that he used. More importantly, the Defendant gave numerous details about places he traveled, places he stayed, purchases he made, and the fact that he had obtained a Platinum American Express card. He even gave the last four digits of that card. Through a detailed review of his financial and travel records, the agents tied the Defendant to these disclosures, thereby proving to the jury that Giannone was the person engaging in the chats.

In summary, the demonstration of the government's theory of how the Defendant faked the chat between himself and ElevenOone was not subject to disclosure. Furthermore, the demonstration did not involve changes to the text of the chats, and it was the text of chats between the Defendant and Gollumfun that so powerfully linked the Defendant to the case. Because of this ability to link the Defendant to the chats, it is unlikely that even if the Defendant had been given the demonstration, the outcome of the trial would have been different. As such, this claimed basis for a new trial should be rejected.

**2.     March 1, 2007, Letter from Brett Johnson to the Court**

Brett Johnson was prosecuted for preparing and filing fraudulent tax returns. He ultimately pleaded guilty. In connection with his sentencing, Johnson wrote a 16 page letter to the Court. The Defendant claims that the government committed another Brady violation when it failed to turn the letter over to the Defendant for his use during the trial. This argument is invalid on its face.

The Defendant observes that he only learned of the letter when family members

-7-

checked PACER for proceedings in Johnson's case.  Had he paid attention to the information available on PACER, he would have realized that the letter was sent to the Court, not to the government.  It only became available to the government after it was filed in court records.  According to these records, the letter was not filed until March 16, 2007, eight days AFTER Giannone was convicted.[1]

The best the Defendant can hope for is that the Johnson letter qualifies as newly discovered evidence.  Even if newly discovered, it fails at least three of the tests for a new trial.  The information in the letter is merely cumulative or impeaching, it is not material to the issues involved, and it would not likely result in an acquittal at a new trial.

The first problem with the letter is that its author is a manipulative, proven liar. The self-serving letter is designed to generate unwarranted sympathies from the Court. During the trial, the government repeatedly conceded that Johnson was unreliable.  The defendant repeatedly attacked Johnson's credibility, even though Johnson did not testify. From all sides, the jury was fully aware of the Johnson's background and his pattern of deceit and illegal conduct.  The letter would merely reinforce these known and acknowledged facts.

Johnson claims that the case agents verbally abused him and failed to adequately supervise him.  As to verbal abuse, one cannot prove a negative so the government will

---

[1] The government requests the Court to take judicial notice of the date of the filing as it is reflected in the court records as Entry Number 55-3 in the Johnson case.  Cr. No. 3:06-1129.

-8-

simply observe that even if true in some measure, verbal abuse is not material to the issues at trial. As to lack of supervision, both of the case agents acknowledged during the trial that there were brief periods of between five and ten minutes when they were not present in the room with Johnson. This allegation is therefore cumulative of testimony at trial. Further, it is merely impeaching of the agents. Finally, Johnson claims that the government computer was hacked by a third party during the investigation.

The hacking incident happened after the investigation into Giannone's crimes was complete. The last dealings with Giannone that resulted in criminal charges involved the transfer of funds into his A&W Auto Clinic account on June 5, 2005. The incident to which Johnson refers took place in September 2005. Furthermore, it was not the computer used to record chats that was compromised. Rather, it was an online payment account that the government used to transfer funds to persons offering illicit goods for sale that was compromised. As such, this incident had nothing to do with the investigation of the Defendant. Special Agent Bobby Kirby has prepared an affidavit recounting this incident that is attached to this memorandum.

At every mention of Brett Johnson during the trial, everyone conceded that he was a manipulative, untrustworthy person. The Defendant emphasized Johnson's involvement in the investigation in a failed attempt to taint the entire investigation with Johnson's illegal acts. He now wants to paint Johnson as a reliable source for negative information about the way in which the investigation was conducted. He cannot have it both ways. The final test for newly discovered evidence as it applies to this argument is whether the

letter from Johnson would likely result in a new trial. It would not.

The government did not use Johnson as a witness because of his acknowledged lack of credibility. Instead, the government relied upon the chat transcripts together with the extensive work of the agents to verify details within the chat transcripts – details that could not have been known by either Johnson or the agents. Further, the testimony of Chris Cutler and Chris Branca was not tainted by Johnson. Both of these men sat on the witness stand, admitted to their own illegal activities, and spoke of their personal involvement with the Defendant in his illegal activities. It is this independent corroboration that so powerfully convinced the jury of the guilt of the Defendant. It is highly unlikely that self-serving statements from Brett Johnson would have changed this result. Thus, the Defendant fails the ultimate test for winning a new trial based on the letter from Johnson.

### 3.     Police Report from Costa Mesa Police Department

On September 24, 2004, both the Defendant and Chris Branca were arrested by the Cosa Mesa, California, police and charged with Second Degree burglary and unauthorized use of personal identifying information. Branca pleaded guilty and the charges against Giannone were ultimately dismissed. In connection with their investigation of the case, Costa Mesa police prepared a report. The Defendant argues that this report was not turned over in discovery, and if he had it available, he could have used it to impeach Branca's testimony. The argument suffers from at least two fatal flaws. First, the information in the report was already known by the Defendant without any need

for the police report. He was arrested along with Branca, and he was interviewed by police. From the fact that the charges against Giannone were dismissed by Costa Mesa police, it is readily apparent that Branca did not identify Giannone as the source of the illicit credit cards used to make purchases. The second flaw is that Giannone claims he could have used the report to impeach Branca. Evidence to warrant a new trial, however, cannot be "merely impeaching." Thus, the premise of the Defendant's argument demonstrates why it cannot support a new trial. Finally, even if impeachment were sufficient, it would still be unavailing because the testimony that might have been impeached by the Costa Mesa police report was not allowed during the trial. At the insistence of the Defendant, the Court did not permit Branca to testify that Giannone had been arrested in Costa Mesa or that Giannone was the source of the illicit cards. Instead, Branca merely testified that Giannone was present in California. This is confirmed by the fact that the Costa Mesa police interviewed Giannone.

As newly discovered evidence, the Costa Mesa police report cannot warrant a new trial. As pointed out above, its use would be for impeachment – and then only for impeachment of testimony that the defendant successfully prevented from being presented in the first place. The issues addressed in the police report are collateral to the issues at trial. Therefore they are material only to the credibility of Branca. He admitted to being arrested and convicted for the Costa Mesa incident. The report is therefore cumulative. Finally, because Branca was not permitted to testify about the Defendant's involvement in the Costa Mesa incident, the report would not likely result in an acquittal

at a new trial.

### 4.     __Grand Jury Transcript__

The Defendant argues that he could have impeached Special Agent Bobby Kirby with information from the grand jury transcript.  As repeatedly pointed out, however, newly discovered evidence cannot be "merely impeaching."  As such, the premise of the Defendant's argument demonstrates the reason it cannot support a new trial. Furthermore, the only specifically identified use of the grand jury transcript identified by the Defendant is to demonstrate perceived inconsistencies between Agent Kirby's testimony and that of his fellow agent, Bradley Smith.  During his grand jury testimony, Agent Kirby stated that "we ended up getting the information on that business account and it was revealed that that account was tied to a personal checking account through a common telephone number."  He also stated that "on July 1st – yeah, July 1st, 2005, a subpoena was issued to Bank of America for bank statements on both accounts, the fictitious account – well the fictitious business account we had placed the money into and the account that it was tied to through the common telephone number."  Agent Kirby testified during the trial that he contacted Bank of America "almost immediately" after the $600 was deposited into the A&W Auto Clinic account and determined the identify of the owner.  According to Giannone, "Kirby's statements at trial are completely inconsistent with his previous statements to the grand jury."  Defendants Motion for New Trial at 23.  They are not inconsistent.  Instead, they describe two separate investigative steps.

Documentation provided to the Defendant during discovery reflects that on June 9, 2005, just four days after the June 5, 2005, transfer of $600, agents contacted Bank of America to obtain information regarding the account into which they transferred the funds. They were advised only that the account had been opened on April 15, 2005, and it was associated with a personal account owned by Jonathan Giannone. Bank of America would not provide additional information without a subpoena. As testified during trial, that subpoena was later obtained and served on Bank of America for detailed records relating to the two accounts at issue. This is precisely the chronology that was testified to by Agents Kirby and Smith. The inconsistency is therefore illusory.

At trial, the Defendant stipulated that he was the true owner of the A&W Auto Clinic account. He further stipulated that he withdrew funds from the account shortly after the government transferred $600 into the account. The clear lack of any true inconsistency in the trial and grand jury testimony of the agents coupled with these stipulations demonstrates beyond question that the information in the grand jury transcript would not likely result in an acquittal. As such, this claimed basis for a new trial cannot prevail.

5.     **June 11, 2007, letter from Brett Johnson to the Defendant**

Following his own sentencing, Brett Johnson sent a letter dated June 11, 2007, to the Defendant. In this letter, Johnson brags that he was able to "break the law under their [the agents'] noses." In the Defendant's Motion for New Trial, he claims that this purportedly newly discovered evidence could have been used to contradict testimony of

-13-

Agent Smith that Johnson did not use Secret Service computers to prepare and submit false tax returns. In support of this argument, Giannone points to a single frame in video materials where a tax return is seen on the screen.

The purportedly newly discovered evidence is cumulative, merely impeaching, and would not result in a likely acquittal. It is cumulative in the sense that the Defendant argues that it shows that Johnson was not supervised at all times by the agents. At page 18 of his Motion, however, the Defendant quotes Agent Smith as testifying that there were periods where Johnson was alone – periods as long as 10 minutes in length. It is impeaching in the sense that the single frame showing a tax return, according to the Defendant, proves that agents incorrectly testified that Johnson did not engage in illegal activity on Secret Service computers.

The presence of the tax return on the video provided to the Defendant is not a surprise. The undercover investigation was essentially an open door for criminals to enter and chat with Gollumfun. Numerous people took advantage of this "opportunity" and the topics ranged from trafficking in stolen identities, to selling illegally obtained codes to access pay computer services, to filing fraudulent tax returns. These various chats each generated their own transcripts that were automatically produced. They were also captured on video software that records all chats on the computer screen at any given time. These video captures could not be neatly segregated. Instead, if multiple chats were occurring at the same time, all of these chats would be reflected in the video capture files. This is the reason that the government resisted providing a forensic copy of the

computer to the Defendant.  As the government pointed out to the Court and the Defendant at the time, giving a copy of the hard drive would jeopardize any number of other ongoing investigations.  On the other hand, it was impossible to completely separate the evidence relating to various targets of the investigation.  This is because by copying and giving to the Defendant the portions of the video captures that pertained to him, any other chats that were simultaneously ongoing were also included in the videos of the computer screens.  For this reason, the government copied only those portions of the video files that related to the Defendant.

As reflected in a letter from Thomas Liotti to the Court dated February 26, 2007, the government gave 76 compact discs to the Defendant.  What is truly surprising is that only one frame within these materials showed a tax return.  The presence of this tax return does not prove that Johnson used government resources to file fraudulent returns.  It only reflects that fraudulent tax returns was discussed during chats.  That is why Agent Smith testified on cross examination that he was not surprised that a tax return would have been on the materials provided to the Defendant in discovery.  See, Defendant's Motion at 15 and Affidavit of Agent Kirby, attached.

### 6.    Claims that the government presented false testimony

The Defendant asserts that during the trial, the government knowingly presented false testimony to the jury.  The government does not agree that testimony during the trial was false, inconsistent with other testimony, or perjured.  In order to analyze the Defendant's claims, the proper legal standard must first be discussed.

-15-

Even if there were perjured testimony, that still would not automatically entitle the Defendant to a new trial.  See, <u>United States v. White</u>, 972 F.2d 16, 22 (2d Cir. 1992). Before a new trial can be granted, the Court must "strike a fair balance between the need for both integrity and finality in criminal prosecutions" by determining whether false testimony affected the outcome of the trial. <u>United States v. Stofsky</u>, 527 F.2d 237, 239 (2d Cir. 1975).  This process requires the Court to assess the materiality of the perjury to the verdict and to be guided by two standards which are based on the extent of the government's awareness of the false testimony prior to the conclusion of the trial. <u>United States v. Wallach</u>, 935 F.2d 445, 456 (2d Cir.1991).

If the government knew or should have known of the perjury prior to the conclusion of the trial, the conviction should be set aside if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." <u>Id</u>. (internal quotation marks omitted).  On the other hand, if the government was not aware of the perjury, the Court should grant a new trial only if the false testimony leads to "a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." <u>Id</u>. (internal quotation marks omitted).

Since the Defendant is claiming that the government secured his conviction based on false testimony, he bears the burden of proving that the testimony was, in fact, perjured.  <u>United States v. Griley</u>, 814 F.2d 967, 970 (4th Cir. 1987).  The Defendant has failed.  Instead, he merely recounts incidents where testimony from one witness purportedly differed from testimony of another witnesses.  He also identifies testimony

that is purportedly inconsistent with unsworn out of court statements made by Brett Johnson.  To conclude that these instances were, in fact, false testimony requires the suspension of critical inquiry and the blind acceptance of the Defendant's version of events.  Furthermore, mere inconsistency between witnesses does not establish that the government knowingly used false testimony.  United States v. Overton, 450 F.2d 919, 920 (5th Cir. 1971).  Rather, it only presents a question for the jury to weigh when evaluating various witnesses' testimony.  Griley, 814 F.2d at 970.

Many of the claimed instances of false testimony are merely repackaged versions of other arguments previously addressed in this response.  These include the claims that the case agents falsely testified that they monitored Brett Johnson at all times and that Brett Johnson was unable to alter chat transcripts.  As to the first, the Defendant himself quotes trial testimony acknowledging that there were brief periods where no agent was directly supervising Johnson.  As to the second, the agents testified at length about the steps that were taken to protect the integrity of the chat transcripts that were generated during the undercover investigation.  These steps included the redundant means of documenting chats both through the automatically generated chat transcripts and the use of the Camtasia video program.  The Camtasia program in particular assured the accuracy of the materials generated during the investigation because it captured in real time everything that occurred on the video screen.  The Defendant was provided both the chat transcripts and the Camtasia files of all chats between himself and Gollumfun.  These materials document that the Defendant initiated the contact with the undercover

investigation, he provided information in the text of his chats that was sufficient to link himself to the online identities that he used during these chats, and when he first approached Gollumfun, he identified himself as "Mark Rich", an online identity that Gollumfun had known from Shadowcrew days.[2]

The agents testified that Brett Johnson could not alter the chat transcripts. The Defendant argues that the agents and the government knew this to be false because they had prepared a demonstration to attack the Defendant's own fraudulently produced transcript. In his arguments that the government committed a <u>Brady</u> violation, the Defendant quotes the government's description of what the demonstration would depict. "They have actually put together a demonstration on video, a Camtasia file, to document how easy it is to set up a chat and to change the identity of the person on the other end." This is a reference to the automatically generated identity of the person who enters a particular line of chat. Later in the same section, the government told the Court that the demonstration showed how "Jonathan Giannone and some confederate of his unknown to us to set up a chat and to make it appear that it is a chat between imakemovies4free and ElevenOnee." Nothing in these proffers of the government suggests that the text entered during the chats could be changed. Thus, the claim of false testimony is illusory.

The Defendant claims that testimony about how he was identified was perjured.

_____

[2] The Court will recall that Shadowcrew was a prior international fraud conspiracy that resulted in the prosecution of numerous persons throughout the United States. Gollumfun had originally established his online persona during the Shadowcrew days.

He recites trial testimony of Agents Kirby and Smith that Bank of America was contacted almost immediately after the $600 was transferred to Giannone on June 5, 2005, and that a grand jury subpoena was issued to Bank of America for account information in July of 2005. As previously pointed out, these are not inconsistent. Rather, they describe two distinct steps in the investigation. Furthermore, discovery materials provided to the Defendant documented both steps. The first was an informal contact with Bank of America security officials where only very basic information was obtained. Bank of America would not provide detailed account information with first being served with a grand jury subpoena. That is exactly what happened, and that is what the agents testified to during the trial.

Finally, the Defendant claims that the government falsely submitted testimony that Giannone was the source of illicit credit cards that Chris Branca used when he was arrested in Costa Mesa, California. No such testimony was put before the jury. During an evidentiary hearing at the beginning of the second day of trail, the government made a proffer to the Court about anticipated testimony from Chris Branca. This proffer included a representation that if permitted, Branca would testify that Giannone was the source of the cards. The Court did not permit the government to pursue this line of inquiry, and Branca did not so testify. As to the incidents in Costa Mesa, Branca testified that he was arrested and pled guilty, that Jonathan Giannone was in California at the same time, and that Giannone paid for the airline ticket to travel to California. Giannone claims that this is false testimony because the police report prepared by the Costa Mesa

police department states that Branca flew to California on a separate flight from Giannone. This, or course, does not mean that Giannone did not pay for the ticket as Branca testified. Additionally, the police report which the Defendant attached to his Motion as Exhibit H shows that the statement about the separate flight came from Giannone, not from Branca. See, first full paragraph on Page 8 of Exhibit H. Thus, there was no prior inconsistent statement that could have been used to impeach Branca.

These perceived inconsistencies in the testimony presented during the trial do not amount to perjury or false testimony. Furthermore, none of the purported inconsistencies would warrant the lack of confidence in the jury verdict sufficient to set aside the conviction. Therefore, the motion for new trial should be denied.

## CONCLUSION

For the reasons set forth in this memorandum and its attachments as well as the entire record of this case, the government urges the Court to deny the motion of the defendant for a new trial.

Respectfully submitted,

W. WALTER WILKINS
UNITED STATES ATTORNEY


By: ___s/ Dean A. Eichelberger_____
        Assistant U. S. Attorney

-20-

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I am an employee in the Office of the United States Attorney for the District of South Carolina, and on July 28, 2008, I caused to be served one true and correct copy of the government's RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR NEW TRIAL in the above-captioned case via the court's e-noticing system, but if that means failed, then by regular mail, on the following person(s)**:**

Thomas F. Liotti
600 Old Country Road, Suite 530
Garden City, New York 11530

Jonathan Giannone
LSCI Allenwood
Post Office Box 1000
White Deer, PA 17887-1000


s/Dean A. Eichelberger
Assistant United States Attorney